# 23-1344

**IN UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

---

EDDIE GRANT, JR.; JENNIFER HAMILTON; MICHAEL STIEFEL; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; SECOND AMENDMENT FOUNDATION, INC.

*Plaintiffs-Appellants*,

v.

JAMES ROVELLA; JOHN P. DOYLE, JR.; SHARMESE L. WALCOTT; PAUL J. NARDUCCI

*Defendants-Appellees*,

and

Edward Lamont, Jr.; Patrick Griffin; Margaret E. Kelly; David R. Applegate; Joseph T. Corradino; David R. Shannon; Michael A. Gailor; Christian Watson; Paul J. Ferencek; Matthew C. Gedansky; Maureen Platt; Anne F. Mahoney

*Defendants.*

---

On Appeal from the United States District Court for the Connecticut, No. 3:22-cv-01223-JAM

---

**JOINT APPENDIX VOL. II OF VI (JA-209 – JA-485)**

---


Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd.
P.O. Box 340
Harwinton, CT 06791
Tel: (203) 677-0782
catkinson@atkinsonlawfirm.com

Craig Fishbein, Esq.
FISHBEIN LAW FIRM, LLC
100 South Main St.
P.O. Box 363
Wallingford, CT 06492
Tel: (203) 265-2895
ccf@fishbeinlaw.com

Doug Dubitsky, Esq.
LAW OFFICES OF DOUG DUBITSKY
P.O Box 70
North Windham, CT 06256
Tel: (860) 933-9495
doug@lawyer.com

*Attorneys for Plaintiffs-Appellants*


February 1, 2024

# JOINT APPENDIX TABLE OF CONTENTS

## Volume 1

District Court Docket Sheet……………………………………………………JA-1

Second Amended Complaint (Dkt. 48)……………………………………...JA-17

Plaintiffs' Amended Motion For Preliminary Injunction (Dkt. 51)……………JA-54

Exhibit A To Amended Motion For Preliminary Injunction – Governor Lamont's 2023 Legislative Proposal 1/26/2023 (Dkt. 51-2)……..……………………JA-57

Exhibit B To Amended Motion For Preliminary Injunction – Affidavit of Ray Bevis, Jr. and Accompanying Exhibits (Dkt. 51-3)……………………................JA-60

Exhibit C To Amended Motion For Preliminary Injunction – Affidavit of Holly Sullivan (Dkt. 51-4)…………………………………………..……...JA-86

Exhibit D To Amended Motion For Preliminary Injunction – Affidavit of Eddie Grant, Jr. (Dkt. 51-5)………………………………………………….JA-90

Exhibit E To Amended Motion For Preliminary Injunction – Affidavit of Jenny Hamilton (Dkt. 51-6)………………………………………………….JA-94

Exhibit F To Amended Motion For Preliminary Injunction – Affidavit of Michael Stiefel (Dkt. 51-7)…………………………………………………….JA-98

Exhibit G To Amended Motion For Preliminary Injunction – Declaration of Salam Fatohi and Accompanying Exhibits (Dkt. 51-8)…………………………..JA-102

Exhibit H To Amended Motion For Preliminary Injunction – ATF Pistol Brace Final Rule 1/31/2023 (Dkt. 51-9)………………………………………….JA-110

## Volume 2

Exhibit I To Amended Motion For Preliminary Injunction – Conn. Public Act No. 23-53 (Dkt. 51-10)…………………………………………………..JA-209

Exhibit J To Amended Motion For Preliminary Injunction – Supplemental Declaration of Eddie Grant, Jr. (Dkt. 51-11)…………………………..….JA-312

Exhibit K To Amended Motion For Preliminary Injunction – Supplemental Declaration of Jennifer Hamilton (Dkt. 51-12)……………………………JA-316

Exhibit L To Amended Motion For Preliminary Injunction – Supplemental Declaration of Michael Stiefel (Dkt. 51-13)………………………………JA-320

Exhibit A To Defendants' Memorandum Of Law Opposing Amended Motion For Preliminary Injunction – Declaration of Detective Brindiana Warenda (Dkt. 59-1)…………………………………………………………………....JA-324

Exhibit B To MOL Opposing Amended Motion For Preliminary Injunction – Declaration of Professor John J. Donohue and Accompanying Exhibits (Dkt. 59-2)……………………………………………………………………JA-367

Pages 1-55 of Exhibit C To MOL Opposing Amended Motion For Preliminary Injunction – Declaration and Expert Report of Professor Louis Klarevas (Dkt. 59-3)…………………………………………………………………JA-431

**Volume 3**

Pages 56 - 350 of Exhibit C To MOL Opposing Amended Motion For Preliminary Injunction – Declaration and Expert Report of Professor Louis Klarevas (Dkt. 59-3)…………………………………………………………………JA-486

**Volume 4**

Pages 351 - 516 of Exhibit C To MOL Opposing Amended Motion For Preliminary Injunction – Declaration and Expert Report of Professor Louis Klarevas (Dkt. 59-3)…………………………………………………………………JA-781

Exhibit D To MOL Opposing Amended Motion For Preliminary Injunction – Declaration of Lucy Allen and Accompanying Exhibits (Dkt. 59-4)…….JA-947

**Volume 5**

Exhibit E To MOL Opposing Amended Motion For Preliminary Injunction – Declaration of Dr. Martin Schrieber and Accompanying Exhibits (Dkt. 59-5)…………………………………………………………………...JA-1025

Exhibit F To MOL Opposing Amended Motion For Preliminary Injunction – Declaration of Professor Randolph Roth and Accompanying Exhibits (Dkt. 59-6)…………………………………………………………………...JA-1131

Exhibit G To MOL Opposing Amended Motion For Preliminary Injunction – Declaration of Professor Saul Cornell (Dkt. 59-7)……………..................JA-1209

**Volume 6**

Exhibit H To MOL Opposing Amended Motion For Preliminary Injunction – Text of Historical Laws and Regulations (Dkt. 59-8)…………………………JA-1240

Order Denying Amended Motion For Preliminary Injunction 8/28/2023 (Dkt. 65)…………………………………………………………………….JA-1334

Notice of Appeal 9/27/2023……………………………………………...JA-1348

*Exhibit I To MOL Opposing Amended Motion For Preliminary Injunction – Unredacted Deposition Transcript of Eddie Grant (Dkt. 77-1)…………..JA-1351

*Exhibit J To MOL Opposing Amended Motion For Preliminary Injunction – Unredacted Deposition Transcript of Michael Stiefel (Dkt. 77-2)………JA-1379

*Exhibit K To MOL Opposing Amended Motion For Preliminary Injunction – Unredacted Deposition Transcript of Jennifer Hamilton (Dkt. 77-3)…………………………………………………………………...JA-1401

* The Plaintiffs-Appellants each asserted several claims of confidentiality over certain parts of their depositions. Since discovery on their amended motion for a preliminary injunction proceeded on an expedited schedule, the district court did not resolve these claims until after it denied the amended motion for a preliminary injunction. The parties include the refiled transcripts containing less redactions than the originally filed transcripts and do not duplicate the record by submitting multiple versions of the same transcript.

# Exhibit I

***Substitute House Bill No. 6667***

## ***Public Act No. 23-53***

***AN ACT ADDRESSING GUN VIOLENCE.***

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. Section 29-35 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) (1) No person shall carry any pistol or revolver upon **[**his or her**]** such person's person, except when such person is within **[**the dwelling house or place of business of such person**]** such person's dwelling house, on land leased or owned by such person or within the place of business of such person, without a permit to carry the same issued as provided in section 29-28, as amended by this act.

(2) No person shall knowingly carry any firearm with intent to display such firearm, except when such person is within such person's dwelling house, on land leased or owned by such person or within the place of business of such person, or such person is engaged in firearm training or bona fide hunting activity. For the purposes of this subdivision, a person shall not be deemed to be carrying a firearm with intent to display such firearm if such person has taken reasonable measures to conceal the fact that such person is carrying a firearm. Neither a fleeting glimpse of a firearm nor an imprint of a firearm through such person's clothing shall constitute a violation of this

subdivision. If a person displays a firearm temporarily while engaged in self-defense or other conduct that is otherwise lawful, such display shall not constitute a violation of this subdivision.

(3) The provisions of this subsection shall not apply to the carrying of any **[**pistol or revolver**]** firearm by any: **[**parole**]**

(A) (i) Parole officer or peace officer of this state, or **[**any**]** (ii) parole officer or peace officer of any other state while engaged in the pursuit of official duties;

(B) Department of Motor Vehicles inspector appointed under section 14-8 and certified pursuant to section 7-294d; **[**, or parole officer or peace officer of any other state while engaged in the pursuit of official duties, or federal**]**

(C) Federal marshal or federal law enforcement agent; **[**, or to any member**]**

(D) Member of the armed forces of the United States, as defined in section 27-103, or of the state, as defined in section 27-2, when on duty or going to or from duty; **[**, or to any member**]**

(E) Member of any military organization when on parade or when going to or from any place of assembly; **[**, or to the transportation of pistols or revolvers**]**

(F) Person transporting or inspecting a firearm as merchandise; **[**, or to any person transporting any pistol or revolver while**]**

(G) Person transporting a firearm contained in the package in which **[**it**]** such firearm was originally wrapped at the time of sale and while transporting the same from the place of sale to the purchaser's residence or place of business; **[**, or to any person**]**

(H) Person transporting a firearm as part of the process of removing

such person's household goods or effects from one place to another; [, or to any person while]

(I) Person transporting [any such pistol or revolver] a firearm from such person's place of residence or business to a place or [individual] person where or by whom such [pistol or revolver] firearm is to be repaired or while returning to such person's place of residence or business after the same has been repaired; [, or to any person]

(J) Person transporting a [pistol or revolver] firearm in or through the state for the purpose of taking part in competitions, taking part in [formal pistol or revolver] firearm training, repairing such [pistol or revolver] firearm or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States and is permitted to possess and carry a [pistol or revolver] firearm in the state or subdivision of the United States in which such person resides; [, or to any person]

(K) Person transporting a [pistol or revolver] firearm to and from a testing range at the request of the issuing authority; [, or to any person] or

(L) Person transporting an antique pistol or revolver, as defined in section 29-33, as amended by this act.

(4) For the purposes of this subsection, ["formal pistol or revolver training"] "firearm training" means [pistol or revolver] firearm training at a [locally approved or permitted] firing range, [or] training facility or fish and game club or sporting club, and ["transporting a pistol or revolver"] "transporting a firearm" means transporting a [pistol or revolver] firearm that is unloaded and, if such [pistol or revolver] firearm is being transported in a motor vehicle, is not readily accessible or directly accessible from the passenger compartment of the vehicle or, if such [pistol or revolver] firearm is being transported in a motor

vehicle that does not have a compartment separate from the passenger compartment, such [pistol or revolver] firearm shall be contained in a locked container other than the glove compartment or console. Nothing in this section shall be construed to prohibit the carrying of a [pistol or revolver] firearm during [formal pistol or revolver] firearm training or repair.

(b) The holder of a permit issued pursuant to section 29-28, as amended by this act, shall carry such permit upon one's person while carrying such pistol or revolver. Such holder shall present his or her permit upon the request of a law enforcement officer who has reasonable suspicion of a crime for purposes of verification of the validity of the permit or identification of the holder, provided such holder is carrying a pistol or revolver that is observed by such law enforcement officer.

(c) Not later than February 1, 2025, and annually thereafter, each law enforcement unit, as defined in section 7-294a, shall prepare and submit a report to the Institute for Municipal and Regional Policy at The University of Connecticut concerning any stops conducted on suspicion of a violation of subdivision (2) of subsection (a) of this section during the preceding calendar year, except that the initial report shall be based on the fifteen months preceding January 1, 2025. Such report shall be submitted electronically using a standardized method and form disseminated jointly by the Institute for Municipal and Regional Policy and the Police Officer Standards and Training Council. The standardized method and form shall allow compilation of statistics on each incident, including, but not limited to, the race and gender of the person stopped, provided the identification of such characteristics shall be based on the observation and perception of the police officer. The Institute for Municipal and Regional Policy and the Police Officer Standards and Training Council may revise the standardized method and form and disseminate such revisions to law enforcement units. Each

law enforcement unit shall, prior to submission of any such report pursuant to this subsection, redact any information from such report that may identify a minor, witness or victim.

(d) The Institute for Municipal and Regional Policy at The University of Connecticut shall, within available appropriations, review the incidents reported pursuant to subsection (c) of this section. Not later than December 1, 2025, and annually thereafter, the institute shall report, in accordance with the provisions of section 11-4a, the results of any such review, including any recommendations, to the Governor and the joint standing committees of the General Assembly having cognizance of matters relating to the judiciary, public safety and municipalities.

Sec. 2. Section 29-37 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) Any person violating any provision of section 29-28, as amended by this act, or 29-31, as amended by this act, shall be guilty of a class E felony, and any pistol or revolver found in the possession of any person in violation of any of said provisions shall be forfeited.

(b) Any person violating any provision of subdivision (1) of subsection (a) of section 29-35, as amended by this act, shall be guilty of a class D felony, and, in the absence of any mitigating circumstances as determined by the court, one year of the sentence imposed may not be suspended or reduced by the court. The court shall specifically state the mitigating circumstances, or the absence thereof, in writing for the record. Any pistol or revolver found in the possession of any person in violation of any provision of subsection (a) of section 29-35, as amended by this act, shall be forfeited.

(c) Any person violating any provision of subdivision (2) of subsection (a) of section 29-35, as amended by this act, shall be guilty of

a class B misdemeanor for a first offense and a class A misdemeanor for any subsequent offense. The court may order suspension of prosecution in addition to any other diversionary programs available to the defendant, if the court finds that a violation of said subdivision is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection. The court shall not order suspension of prosecution unless the accused person has acknowledged that he or she understands the consequences of the suspension of prosecution. Any person for whom prosecution is suspended shall agree to the tolling of any statute of limitations with respect to such violation and to a waiver of his or her right to a speedy trial. Such person shall appear in court and shall be released to the supervision of the Court Support Services Division for such period, not exceeding two years, and under such conditions as the court shall order. If the person refuses to accept, or, having accepted, violates such conditions, the court shall terminate the suspension of prosecution and the case shall be brought to trial. If such person satisfactorily completes such person's period of probation, he or she may apply for dismissal of the charges against such person and the court, on finding such satisfactory completion, shall dismiss such charges. If the person does not apply for dismissal of the charges against such person after satisfactorily completing such person's period of probation, the court, upon receipt of a report submitted by the Court Support Services Division that the person satisfactorily completed such person's period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section 54-142a. An order of the court denying a motion to dismiss the charges against a person who has completed such person's period of probation or terminating the participation of a defendant in such program shall be a final judgment for purposes of appeal.

**[**(c)**]** (d) Any person violating any provision of subsection (b) of section 29-35, as amended by this act, shall have committed an infraction and shall be fined thirty-five dollars.

Sec. 3. Section 29-36a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) No person shall complete the manufacture of a firearm without subsequently (1) obtaining a unique serial number or other mark of identification from the Department of Emergency Services and Public Protection pursuant to subsection (b) of this section, and (2) engraving upon or permanently affixing to the firearm such serial number or other mark in a manner that conforms with the requirements imposed on licensed importers and licensed manufacturers of firearms pursuant to 18 USC 923(i), as amended from time to time, and any regulation adopted thereunder.

(b) Not later than thirty days after a person completes the manufacture of a firearm, **[**or ninety days after the Department of Emergency Services and Public Protection provides notice in accordance with section 29-36b that the system to distribute a unique serial number or other mark of identification pursuant to this section is operational, whichever date is later,**]** such person shall notify the department of such manufacture and provide any identifying information to the department concerning the firearm and the owner of such firearm, in a manner prescribed by the Commissioner of Emergency Services and Public Protection. Upon receiving a properly submitted request for a unique serial number or other mark of identification from a person who completes manufacture of a firearm, the department shall determine if such person is prohibited from purchasing a firearm and if not, shall issue to such person a unique serial number or other mark of identification immediately and in no instance more than three business days after the department receives such request. Issuance of a unique serial number or other mark of

identification pursuant to this subsection shall not be evidence that the firearm is otherwise lawfully possessed.

(c) (1) On and after January 1, 2024, no person shall possess a firearm without a serial number or other mark of identification unless such person has (A) declared possession of such firearm pursuant to subdivision (2) or (3) of this subsection, or (B) applied to obtain a unique serial number or other mark of identification from the Department of Emergency Services and Public Protection pursuant to subsections (a) and (b) of this section and such person has not yet received such serial number or other mark of identification.

(2) Any person who, prior to January 1, 2024, lawfully possesses a firearm without a serial number or other mark of identification manufactured prior to October 1, 2019, shall apply by January 1, 2024, or, if such person is a member of the military or naval forces of this state or of the United States and is unable to apply by January 1, 2024, because such member is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the department to declare possession of such firearm. Such application shall be made on such form and in such manner as the Commissioner of Emergency Services and Public Protection prescribes.

(3) Any person who moves into the state in lawful possession of a firearm without a serial number or other mark of identification shall, within ninety days, either (A) obtain a unique serial number or other mark of identification from the department and engrave upon or permanently affix to the firearm such serial number or other mark pursuant to subsection (a) of this section, (B) render such firearm permanently inoperable, (C) sell such firearm to a federally licensed firearm dealer, or (D) remove such firearm from the state, except that any person who is a member of the military or naval forces of this state or of the United States, is in lawful possession of a firearm without a serial number or other mark of identification and has been transferred

into the state after January 1, 2024, may, within ninety days of arriving in the state, apply to the department to declare possession of such firearm.

(4) For purposes of this subsection, "lawfully possesses", with respect to a firearm without a serial number or other mark of identification, means that a person has (A) actual and lawful possession of such firearm, (B) constructive possession of such firearm pursuant to a lawful purchase that was transacted prior to or on the date preceding the effective date of this section, regardless of whether the firearm was delivered to the purchaser prior to or on the date preceding the effective date of this section, which lawful purchase is evidenced by a writing sufficient to indicate that (i) a contract for sale was made between the parties prior to or on the date preceding the effective date of this section, for the purchase of the firearm, or (ii) full or partial payment for the firearm was made by the purchaser to the seller of the firearm prior to or on the date preceding the effective date of this section, or (C) actual possession under subparagraph (A) of this subdivision, or constructive possession under subparagraph (B) of this subdivision, as evidenced by a written statement made under penalty of false statement on such form as the commissioner prescribes.

(5) The department may adopt regulations, in accordance with the provisions of chapter 54, to establish procedures with respect to applications under this subsection. Notwithstanding the provisions of sections 1-210 and 1-211, the name and address of a person who has declared possession of a firearm without a serial number or other mark of identification shall be confidential and shall not be disclosed, except such records may be disclosed to (A) law enforcement agencies and employees of the United States Probation Office acting in the performance of their duties and parole officers within the Department of Correction acting in the performance of their duties, and (B) the Commissioner of Mental Health and Addiction Services to carry out the

provisions of subsection (c) of section 17a-500.

(6) (A) Except as provided in this subsection, no person within this state shall distribute, import into this state, keep for sale, offer or expose for sale or purchase a firearm without a serial number or other mark of identification.

(B) The provisions of subparagraph (A) of this subdivision shall not apply to the transfer of a firearm without a serial number or other mark of identification (i) the possession of which has been declared to the department pursuant to this section, by bequest or intestate succession, or, upon the death of a testator or settlor: (I) To a trust, or (II) from a trust to a beneficiary; or (ii) to a police department or the Department of Emergency Services and Public Protection.

**[**(c)**]** (d) The provisions of subsections (a), **[**and**]** (b) and (c) of this section shall not apply to the manufacture of a firearm manufactured using an unfinished frame or lower receiver on which a serial number or other mark has been engraved or permanently affixed pursuant to subsection (c) of section 53-206j.

**[**(d)**]** (e) No person shall transfer to another person any firearm manufactured in violation of this section.

**[**(e)**]** (f) The provisions of this section shall not apply to (1) the manufacture of firearms by a federally licensed firearm manufacturer, (2) (A) any antique firearm, as defined in 18 USC 921, as amended from time to time, or (B) any firearm manufactured prior to **[**the effective date of this section**]** December 16, 1968, provided such firearm is otherwise lawfully possessed, or (3) delivery or transfer of a firearm to a law enforcement agency.

**[**(f)**]** (g) No person shall knowingly, recklessly or with criminal negligence facilitate, aid or abet the manufacture of a firearm (1) by a person or for a person who is otherwise prohibited by law from

purchasing or possessing a firearm, or (2) that a person is otherwise prohibited by law from purchasing or possessing.

**[**(g)**]** (h) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, the court may order suspension of prosecution. The court shall not order suspension of prosecution unless the accused person has acknowledged that he or she understands the consequences of the suspension of prosecution. Any person for whom prosecution is suspended shall agree to the tolling of any statute of limitations with respect to such violation and to a waiver of his or her right to a speedy trial. Such person shall appear in court and shall be released to the supervision of the Court Support Services Division for such period, not exceeding two years, and under such conditions as the court shall order. If the person refuses to accept, or, having accepted, violates such conditions, the court shall terminate the suspension of prosecution and the case shall be brought to trial. If such person satisfactorily completes such person's period of probation, **[**he or she**]** such person may apply for dismissal of the charges against such person and the court, on finding such satisfactory completion, shall dismiss such charges. If the person does not apply for dismissal of the charges against such person after satisfactorily completing such person's period of probation, the court, upon receipt of a report submitted by the Court Support Services Division that the person satisfactorily completed such person's period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section 54-142a. An order of the court denying a motion to dismiss the charges against a person who has completed such person's period of probation or terminating the participation of a defendant in such program shall be a final judgment for purposes of

appeal.

**[**(h)**]** (i) (1) Any person who is ineligible to possess a firearm under state or federal law and violates any provision of this section shall be guilty of a class C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, and any firearm found in the possession of any person in violation of any provision of this section shall be forfeited.

(2) Any person who is not ineligible to possess a firearm under state or federal law and violates any provision of this section shall be guilty of a class C misdemeanor.

**[**(i)**]** (j) For purposes of this section, "manufacture" means to fabricate or construct a firearm including the initial assembly, "firearm" means firearm, as defined in section 53a-3, as amended by this act, and "law enforcement agency" means law enforcement agency, as defined in section 29-1i.

Sec. 4. Subsection (a) of section 29-28 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) (1) No person who sells ten or more **[**pistols or revolvers**]** firearms in a calendar year or is a federally licensed firearm dealer shall advertise, sell, deliver, or offer or expose for sale or delivery, or have in such person's possession with intent to sell or deliver, any pistol or revolver at retail without having a permit therefor issued as provided in this subsection.

(2) The chief of police or, where there is no chief of police, the chief executive officer of the municipality, as defined in section 7-148, or, if designated by such chief executive officer, the resident state trooper

serving such municipality or a state police officer of the state police troop having jurisdiction over such municipality, may, upon the application of any person, issue a permit in such form as may be prescribed by the Commissioner of Emergency Services and Public Protection for the sale at retail of **[**pistols and revolvers**]** firearms within the jurisdiction of the authority issuing such permit. No permit for the sale at retail of **[**any pistol or revolver**]** firearms shall be issued unless the applicant holds a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f, as amended by this act, or a valid state permit to carry a pistol or revolver issued pursuant to subsection (b) of this section; and the applicant submits documentation sufficient to establish that local zoning requirements have been met for the location where the sale is to take place, except that any person selling or exchanging a pistol or revolver for the enhancement of a personal collection or for a hobby or who sells all or part of such person's personal collection of pistols or revolvers shall not be required to submit such documentation for the location where the sale or exchange is to take place.

(3) Any person holding a valid permit for the sale at retail of pistols or revolvers issued on or before September 30, 2023, shall be deemed to be a holder of a valid permit for the sale at retail of firearms until such permit for the sale at retail of pistols or revolvers expires or is revoked, suspended, confiscated or surrendered. The holder of such permit may renew such permit as a permit for the sale at retail of firearms pursuant to section 29-30, as amended by this act.

Sec. 5. Subsection (d) of section 29-28 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(d) Notwithstanding the provisions of sections 1-210 and 1-211, the name and address of a person issued a permit to sell firearms at retail **[**pistols and revolvers**]** pursuant to subsection (a) of this section or a state

or a temporary state permit to carry a pistol or revolver pursuant to subsection (b) of this section, or a local permit to carry pistols and revolvers issued by local authorities prior to October 1, 2001, shall be confidential and shall not be disclosed, except (1) such information may be disclosed to law enforcement officials acting in the performance of their duties, including, but not limited to, employees of the United States Probation Office acting in the performance of their duties and parole officers within the Department of Correction acting in the performance of their duties, (2) the issuing authority may disclose such information to the extent necessary to comply with a request made pursuant to section 29-33, as amended by this act, 29-37a, as amended by this act, or 29-38m, as amended by this act, for verification that such state or temporary state permit is still valid and has not been suspended or revoked, and the local authority may disclose such information to the extent necessary to comply with a request made pursuant to section 29-33, as amended by this act, 29-37a, as amended by this act, or 29-38m, as amended by this act, for verification that a local permit is still valid and has not been suspended or revoked, and (3) such information may be disclosed to the Commissioner of Mental Health and Addiction Services to carry out the provisions of subsection (c) of section 17a-500.

Sec. 6. Subsection (a) of section 29-30 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) The fee for each permit originally issued under the provisions of subsection (a) of section 29-28, as amended by this act, for the sale at retail of **[**pistols and revolvers**]** firearms shall be two hundred dollars and for each renewal of such permit two hundred dollars. The fee for each state permit originally issued under the provisions of subsection (b) of section 29-28, as amended by this act, for the carrying of pistols and revolvers shall be one hundred forty dollars plus sufficient funds as required to be transmitted to the Federal Bureau of Investigation to

cover the cost of a national criminal history records check. The local authority shall forward sufficient funds for the national criminal history records check to the commissioner no later than five business days after receipt by the local authority of the application for the temporary state permit. Seventy dollars shall be retained by the local authority. Upon approval by the local authority of the application for a temporary state permit, seventy dollars shall be sent to the commissioner. The fee to renew each state permit originally issued under the provisions of subsection (b) of section 29-28, as amended by this act, shall be seventy dollars. Upon deposit of such fees in the General Fund, ten dollars of each fee shall be credited within thirty days to the appropriation for the Department of Emergency Services and Public Protection to a separate nonlapsing account for the purposes of the issuance of permits under subsections (a) and (b) of section 29-28, as amended by this act.

Sec. 7. Section 29-31 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

No sale of any **[**pistol or revolver**]** firearm shall be made except in the room, store or place described in the permit for the sale of **[**pistols and revolvers**]** firearms, and such permit or a copy **[**thereof**]** of such permit certified by the authority issuing the same shall be exposed to view within the room, store or place where **[**pistols or revolvers**]** firearms are sold or offered or exposed for sale. No sale or delivery of any **[**pistol or revolver**]** firearm shall be made unless the purchaser or person to whom the same is to be delivered is personally known to the vendor of such **[**pistol or revolver**]** firearm or the person making delivery thereof or unless the person making such purchase or to whom delivery thereof is to be made provides evidence of his or her identity. The vendor of any **[**pistol or revolver**]** firearm shall keep a record of each **[**pistol or revolver**]** firearm sold in a book kept for that purpose, which record shall be in such form as is prescribed by 27 CFR 478.125. The vendor of any **[**pistol or revolver**]** firearm shall make such record available for

inspection upon the request of any sworn member of an organized local police department or the Division of State Police within the Department of Emergency Services and Public Protection or any investigator assigned to the state-wide firearms trafficking task force established under section 29-38e or any investigator employed by a federal law enforcement agency for official purposes related to such member's, investigator's employment.

Sec. 8. (NEW) (*Effective October 1, 2023*) (a) In addition to any other duty required by chapter 529 of the general statutes, a person who possesses a permit to sell firearms at retail issued pursuant to subsection (a) of section 29-28 of the general statutes, as amended by this act, shall not:

(1) Furnish false or fraudulent information in any application to the Department of Emergency Services and Public Protection or fail to comply with representations made in any application;

(2) Fail to maintain a permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28 of the general statutes, as amended by this act, or a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f of the general statutes, as amended by this act;

(3) Fail to maintain a permit to sell firearms at retail issued pursuant to subsection (a) of section 29-28 of the general statutes, as amended by this act;

(4) Fail to maintain effective controls against theft of firearms, including, but not limited to, installation or maintenance of the burglar alarm system required under section 29-37d of the general statutes;

(5) Fail to acquire an authorization number for a firearm transfer pursuant to sections 29-36*l* and 29-37a of the general statutes, as amended by this act;

(6) Transfer a firearm to a person ineligible to receive such firearm, unless the permittee relied in good faith on information provided to such permittee by the department in verifying the eligibility of such ineligible person;

(7) Sell, deliver or otherwise transfer an assault weapon in violation of sections 53-202a to 53-202k, inclusive, of the general statutes, as amended by this act, or fail to maintain accurate records of any such sale, delivery or transfer;

(8) Sell, deliver or otherwise transfer a large capacity magazine in violation of sections 53-202w of the general statutes, as amended by this act, and 53-202x of the general statutes or fail to maintain accurate records of any such sale, delivery or transfer;

(9) Fail to maintain current and proper acquisition and disposition records required by the Bureau of Alcohol, Tobacco, Firearms and Explosives;

(10) Fail to post placards or furnish written warnings pursuant to section 29-37b of the general statutes, as amended by this act;

(11) Fail to provide a trigger lock, gun lock or gun locking device with each purchase pursuant to section 29-37b of the general statutes, as amended by this act;

(12) Fail to verify the age and criminal background of employees pursuant to section 29-37f of the general statutes;

(13) Fail to report any firearm stolen in compliance with section 53-202g, as amended by this act, and 18 USC 923(g)(6), as amended from time to time; or

(14) Fail to conduct an annual physical inventory reconciliation as required by subsection (b) of this section.

(b) Any person who possesses a permit to sell firearms at retail shall, not later than the fifth business day of October of each year, cause a physical inventory reconciliation to be performed that includes comparing the physical inventory of firearms with acquisition and disposition records required to be maintained pursuant to this chapter and 27 CFR 478.125 (e), as amended from time to time. A permittee shall, within five business days of performing this inventory reconciliation, attest to the commissioner, in a form and manner specified by the commissioner, that the required inventory reconciliation was performed and any firearms determined to be missing from the inventory were reported to the Attorney General and appropriate local authorities as required by section 53-202g of the general statutes, as amended by this act, and 18 USC 923 (g)(6), as amended from time to time.

(c) (1) If there is probable cause to believe that a person has failed to comply with the duties specified in subsection (a) of this section, the commissioner or the chief of police or, where there is no chief of police, the chief executive officer of the municipality or if designated by such chief executive officer, the resident state trooper serving such municipality or a state police officer of the state police troop having jurisdiction over such municipality in which such person resides may issue notice of a violation. Such notice shall detail the reasons for issuing such notice and provide a date, not earlier than thirty days following the date of service of the notice, by which such person must cure the violation.

(2) If the period for cure described in subdivision (1) of this subsection has expired and the commissioner or chief determines that the violation is not cured, the commissioner or chief or, where there is no chief of police, the chief executive officer of the municipality or if designated by such chief executive officer, the resident state trooper may temporarily prohibit further sale of firearms at the permitted premises by issuing a stop sales order. Such order shall be effective when served upon the

person in violation or posted by the commissioner or chief or, where there is no chief of police, the chief executive officer of the municipality or if designated by such chief executive officer, the resident state trooper at the permitted premises. The commissioner or chief or, where there is no chief of police, the chief executive officer of the municipality or if designated by such chief executive officer, the resident state trooper may assess a civil penalty against of not more than one hundred dollars per day during which the violation continues. Any person who sells, delivers or otherwise transfers a firearm in violation of a stop sales order shall be guilty of a class C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

(3) Any person against which a stop sales order is issued pursuant to subdivision (2) of this subsection may request a hearing before the commissioner to challenge the grounds for issuance of such stop sales order and any associated civil penalties. Such hearing shall be conducted not later than seven days after receipt of such request in accordance with the provisions of chapter 54 of the general statutes.

(4) Stop sales orders shall be effective against any successor entity that has one or more of the same principals or officers as the corporation, partnership or sole proprietorship against which the stop sales order was issued and are engaged in the same or equivalent trade or activity.

(5) The commissioner shall adopt regulations, in accordance with the provisions of chapter 54 of the general statutes, to specify any hearing provisions necessary to carry out the provisions of this subsection.

Sec. 9. Section 29-33 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) No person, firm or corporation shall sell, deliver or otherwise transfer any pistol or revolver to any person who is prohibited from possessing a pistol or revolver as provided in section 53a-217c, as amended by this act.

(b) [On and after October 1, 1995, no] No person may purchase or receive any pistol or revolver unless such person holds a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28, as amended by this act, a valid permit to sell firearms at retail [a pistol or revolver] issued pursuant to subsection (a) of section 29-28, as amended by this act, or a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f, as amended by this act, or is a federal marshal, parole officer or peace officer.

(c) No person, firm or corporation shall sell, deliver or otherwise transfer any pistol or revolver except upon written application on a form prescribed and furnished by the Commissioner of Emergency Services and Public Protection. Such person, firm or corporation shall ensure that all questions on the application are answered properly prior to releasing the pistol or revolver and shall retain the application, which shall be attached to the federal sale or transfer document, for at least twenty years or until such vendor goes out of business. Such application shall be available for inspection during normal business hours by law enforcement officials. No sale, delivery or other transfer of any pistol or revolver shall be made unless the person making the purchase or to whom the same is delivered or transferred is personally known to the person selling such pistol or revolver or making delivery or transfer thereof or provides evidence of his identity in the form of a motor vehicle operator's license, identity card issued pursuant to section 1-1h or valid passport. No sale, delivery or other transfer of any pistol or revolver shall be made until the person, firm or corporation making such transfer obtains an authorization number from the Commissioner of Emergency Services and Public Protection. Said commissioner shall

perform the national instant criminal background check and make a reasonable effort to determine whether there is any reason that would prohibit such applicant from possessing a pistol or revolver as provided in section 53a-217c, as amended by this act. If the commissioner determines the existence of such a reason, the commissioner shall (1) deny the sale and no pistol or revolver shall be sold, delivered or otherwise transferred by such person, firm or corporation to such applicant, and (2) inform the chief of police of the town in which the applicant resides, or, where there is no chief of police, the warden of the borough or the first selectman of the town, as the case may be, that there exists a reason that would prohibit such applicant from possessing a pistol or revolver.

(d) No person, firm or corporation shall sell, deliver or otherwise transfer any pistol or revolver, other than at wholesale, unless such pistol or revolver is equipped with a reusable trigger lock, gun lock or gun locking device appropriate for such pistol or revolver, which lock or device shall be constructed of material sufficiently strong to prevent it from being easily disabled and have a locking mechanism accessible by key or by electronic or other mechanical accessory specific to such lock or device to prevent unauthorized removal. No pistol or revolver shall be loaded or contain therein any gunpowder or other explosive or any bullet, ball or shell when such pistol or revolver is sold, delivered or otherwise transferred.

(e) Upon the sale, delivery or other transfer of any pistol or revolver, the person making the purchase or to whom the same is delivered or transferred shall sign a receipt for such pistol or revolver, which shall contain the name and address of such person, the date of sale, the caliber, make, model and manufacturer's number and a general description of such pistol or revolver, the identification number of such person's permit to carry pistols or revolvers, issued pursuant to subsection (b) of section 29-28, as amended by this act, permit to sell

firearms at retail, **[**pistols or revolvers,**]** issued pursuant to subsection (a) of said section, or eligibility certificate for a pistol or revolver, issued pursuant to section 29-36f, as amended by this act, if any, and the authorization number designated for the transfer by the Department of Emergency Services and Public Protection. The person, firm or corporation selling such pistol or revolver or making delivery or transfer thereof shall (1) give one copy of the receipt to the person making the purchase of such pistol or revolver or to whom the same is delivered or transferred, (2) retain one copy of the receipt for at least five years, and (3) send, by first class mail, or electronically transmit, within forty-eight hours of such sale, delivery or other transfer, (A) one copy of the receipt to the Commissioner of Emergency Services and Public Protection, and (B) one copy of the receipt to the chief of police of the municipality in which the transferee resides or, where there is no chief of police, the chief executive officer of the municipality, as defined in section 7-148, in which the transferee resides or, if designated by such chief executive officer, the resident state trooper serving such municipality or a state police officer of the state police troop having jurisdiction over such municipality.

(f) (1) The Commissioner of Emergency Services and Public Protection shall not issue more than three authorization numbers for sale at retail of a pistol or revolver to any transferee within a thirty-day period, except that if such transferee is certified as a firearms instructor by the state pursuant to section 29-28, as amended by this act, or the National Rifle Association, said commissioner shall not issue more than six authorization numbers within a thirty-day period.

(2) No authorization number issued for any of the following purposes shall count toward the limits in subdivision (1) of this subsection: (A) Any firearm transferred to a federal, state or municipal law enforcement agency, or any firearm legally transferred under the provisions of section 29-36k, (B) the exchange of a pistol or revolver purchased by an

individual from a federally licensed firearm dealer for another pistol or revolver from the same federally licensed firearm dealer not later than thirty days after the original transaction, provided the federally licensed firearm dealer reports the transaction to the Commissioner of Emergency Services and Public Protection, (C) as otherwise provided in subsection (h) or (i) of this section, or (D) a transfer to a museum at a fixed location that is open to the public and displays firearms as part of an educational mission.

**[**(f)**]** (g) The provisions of this section shall not apply to antique pistols or revolvers. An antique pistol or revolver, for the purposes of this section, means any pistol or revolver which was manufactured in or before 1898 and any replica of such pistol or revolver provided such replica is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition except rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and not readily available in the ordinary channel of commercial trade.

**[**(g)**]** (h) The provisions of this section shall not apply to the sale, delivery or transfer of pistols or revolvers between (1) a federally-licensed firearm manufacturer and a federally-licensed firearm dealer, (2) a federally-licensed firearm importer and a federally-licensed firearm dealer, **[**or**]** (3) federally-licensed firearm dealers, or (4) federally-licensed firearm manufacturers.

**[**(h)**]** (i) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, the court may order suspension of prosecution. The court shall not order suspension of prosecution unless the accused person has acknowledged that he understands the consequences of the suspension of prosecution. Any person for whom prosecution is suspended shall agree to the

tolling of any statute of limitations with respect to such violation and to a waiver of his right to a speedy trial. Such person shall appear in court and shall be released to the supervision of the Court Support Services Division for such period, not exceeding two years, and under such conditions as the court shall order. If the person refuses to accept, or, having accepted, violates such conditions, the court shall terminate the suspension of prosecution and the case shall be brought to trial. If such person satisfactorily completes his period of probation, he may apply for dismissal of the charges against him and the court, on finding such satisfactory completion, shall dismiss such charges. If the person does not apply for dismissal of the charges against him after satisfactorily completing his period of probation, the court, upon receipt of a report submitted by the Court Support Services Division that the person satisfactorily completed his period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section 54-142a. An order of the court denying a motion to dismiss the charges against a person who has completed his period of probation or terminating the participation of a defendant in such program shall be a final judgment for purposes of appeal.

**[**(i)**]** (j) Any person who violates any provision of this section shall be guilty of a class C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, except that any person who sells, delivers or otherwise transfers a pistol or revolver in violation of the provisions of this section knowing that such pistol or revolver is stolen or that the manufacturer's number or other mark of identification on such pistol or revolver has been altered, removed or obliterated, shall be guilty of a class B felony for which three years of the sentence imposed may not be suspended or reduced by the court, and ten thousand dollars of the fine imposed may

not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, and any pistol or revolver found in the possession of any person in violation of any provision of this section shall be forfeited.

Sec. 10. Section 29-36*l* of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) The Commissioner of Emergency Services and Public Protection shall establish a state database that any person, firm or corporation who sells or otherwise transfers firearms may access, by telephone or other electronic means in addition to the telephone, for information to be supplied immediately, on whether a permit to carry a pistol or revolver, issued pursuant to subsection (b) of section 29-28, as amended by this act, a permit to sell firearms at retail, **[**a pistol or revolver,**]** issued pursuant to subsection (a) of section 29-28, as amended by this act, an eligibility certificate for a pistol or revolver, issued pursuant to section 29-36f, as amended by this act, or a long gun eligibility certificate, issued pursuant to section 29-37p, as amended by this act, is valid and has not been revoked or suspended.

(b) Upon establishment of the database, the commissioner shall notify each person, firm or corporation holding a permit to sell firearms at retail **[**pistols or revolvers**]** issued pursuant to subsection (a) of section 29-28, as amended by this act, of the existence and purpose of the system and the means to be used to access the database.

(c) The Department of Emergency Services and Public Protection shall establish days and hours during which the telephone number or other electronic means shall be operational for purposes of responding to inquiries, taking into consideration the normal business hours of retail firearm businesses.

(d) (1) The Department of Emergency Services and Public Protection

shall be the point of contact for initiating a background check through the National Instant Criminal Background Check System (NICS), established under section 103 of the Brady Handgun Violence Prevention Act, on individuals purchasing firearms.

(2) The Department of Emergency Services and Public Protection, Department of Mental Health and Addiction Services and Judicial Department shall, in accordance with state and federal law regarding confidentiality, enter into a memorandum of understanding with the Federal Bureau of Investigation for the purpose of implementing the National Instant Criminal Background Check System in the state. The Department of Emergency Services and Public Protection shall report the name, date of birth and physical description of any person prohibited from possessing a firearm pursuant to 18 USC 922(g) or (n) to the National Instant Criminal Background Check System Index, Denied Persons Files.

(e) Any person, firm or corporation that contacts the Department of Emergency Services and Public Protection to access the database established under this section and determine if a person is eligible to receive or possess a firearm shall not be held civilly liable for the sale or transfer of a firearm to a person whose receipt or possession of such firearm is unlawful or for refusing to sell or transfer a firearm to a person who may lawfully receive or possess such firearm if such person, firm or corporation relied, in good faith, on the information provided to such person, firm or corporation by said department, unless the conduct of such person, firm or corporation was unreasonable or reckless.

(f) Any person, firm or corporation that sells, delivers or otherwise transfers any firearm pursuant to section 29-33<u>, as amended by this act,</u> or 29-37a<u>, as amended by this act</u>, shall contact the Department of Emergency Services and Public Protection to access the database established under this section and receive an authorization number for such sale, delivery or transfer. The provisions of this subsection shall not

apply to: (1) Any sale, delivery or transfer of an antique firearm manufactured in or before 1898, including any firearm with a matchlock, flintlock, percussion cap or similar type of ignition system manufactured in or before 1898; (2) any sale, delivery or transfer of any replica of any firearm described in subdivision (1) of this subsection if such replica uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; (3) transactions between persons who are licensed as firearms importers or collectors, manufacturers or dealers pursuant to 18 USC 921 et seq.; (4) the transfer of firearms to and from gunsmiths for purposes of repair only; and (5) any sale, delivery or transfer of any firearm to any agency of the United States, the state of Connecticut or any local government.

Sec. 11. Section 29-37a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) For the purposes of this section, "long gun" means a firearm, as defined in section 53a-3, as amended by this act, other than a pistol or revolver.

(b) (1) Except as provided in subdivision (2) of this subsection, no person, firm or corporation may sell, deliver or otherwise transfer, at retail, any long gun to any person under eighteen years of age.

(2) No person, firm or corporation may sell, deliver or otherwise transfer **[**, at retail,**]** any semi-automatic centerfire rifle that has or accepts a magazine with a capacity exceeding five rounds to any person under twenty-one years of age. The provisions of this subdivision shall not apply to the sale, delivery or transfer of such a rifle to any person who is a member or employee of an organized local police department, the Department of Emergency Services and Public Protection or the Department of Correction or a member of the military or naval forces of this state or of the United States for use in the discharge of their duties.

(c) **[**On and after April 1, 2014, no**]** No person may purchase or receive any long gun unless such person holds a valid long gun eligibility certificate issued pursuant to section 29-37p, as amended by this act, a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28, as amended by this act, a valid permit to sell firearms at retail **[**a pistol or revolver**]** issued pursuant to subsection (a) of section 29-28, as amended by this act, or a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f, as amended by this act.

(d) No person, firm or corporation may sell, deliver or otherwise transfer, at retail, any long gun to any person unless such person makes application on a form prescribed and furnished by the Commissioner of Emergency Services and Public Protection, which shall be attached by the transferor to the federal sale or transfer document and filed and retained by the transferor for at least twenty years or until such transferor goes out of business. Such application shall be available for inspection during normal business hours by law enforcement officials. No such sale, delivery or other transfer of any long gun shall be made until the person, firm or corporation making such sale, delivery or transfer has ensured that such application has been completed properly and has obtained an authorization number from the Commissioner of Emergency Services and Public Protection for such sale, delivery or transfer. The Department of Emergency Services and Public Protection shall make every effort, including performing the national instant criminal background check, to determine if the applicant is eligible to receive such long gun. If it is determined that the applicant is ineligible to receive such long gun, the Commissioner of Emergency Services and Public Protection shall immediately notify the (1) person, firm or corporation to whom such application was made and no such long gun shall be sold, delivered or otherwise transferred to such applicant by such person, firm or corporation, and (2) chief of police of the town in which the applicant resides, or, where there is no chief of police, the

warden of the borough or the first selectman of the town, as the case may be, that the applicant is not eligible to receive a long gun. When any long gun is delivered in connection with any sale or purchase, such long gun shall be enclosed in a package, the paper or wrapping of which shall be securely fastened, and no such long gun when delivered on any sale or purchase shall be loaded or contain any gunpowder or other explosive or any bullet, ball or shell. Upon the sale, delivery or other transfer of the long gun, the transferee shall sign in triplicate a receipt for such long gun, which shall contain the name, address and date and place of birth of such transferee, the date of such sale, delivery or transfer and the caliber, make, model and manufacturer's number and a general description thereof. Not later than twenty-four hours after such sale, delivery or transfer, the transferor shall send by first class mail or electronically transfer one receipt to the Commissioner of Emergency Services and Public Protection and one receipt to the chief of police of the municipality in which the transferee resides or, where there is no chief of police, the chief executive officer of the municipality, as defined in section 7-148, in which the transferee resides or, if designated by such chief executive officer, the resident state trooper serving such municipality or a state police officer of the state police troop having jurisdiction over such municipality, and shall retain one receipt, together with the original application, for at least five years.

(e) No sale, delivery or other transfer of any long gun shall be made by a person who is not a federally licensed firearm manufacturer, importer or dealer to a person who is not a federally licensed firearm manufacturer, importer or dealer unless:

(1) The prospective transferor and prospective transferee comply with the provisions of subsection (d) of this section and the prospective transferor has obtained an authorization number from the Commissioner of Emergency Services and Public Protection for such sale, delivery or transfer; or

(2) The prospective transferor or prospective transferee requests a federally licensed firearm dealer to contact the Department of Emergency Services and Public Protection on behalf of such prospective transferor or prospective transferee and the federally licensed firearm dealer has obtained an authorization number from the Commissioner of Emergency Services and Public Protection for such sale, delivery or transfer.

(f) (1) **[**On and after January 1, 2014, for**]** For purposes of a transfer pursuant to subdivision (2) of subsection (e) of this section, a prospective transferor or prospective transferee may request a federally licensed firearm dealer to contact the Department of Emergency Services and Public Protection to obtain an authorization number for such sale, delivery or transfer. If a federally licensed firearm dealer consents to contact the department on behalf of the prospective transferor or prospective transferee, the prospective transferor or prospective transferee shall provide to such dealer the name, sex, race, date of birth and state of residence of the prospective transferee and, if necessary to verify the identity of the prospective transferee, may provide a unique numeric identifier including, but not limited to, a Social Security number, and additional identifiers including, but not limited to, height, weight, eye and hair color, and place of birth. The prospective transferee shall present to the dealer such prospective transferee's valid long gun eligibility certificate issued pursuant to section 29-37p, as amended by this act, valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28, as amended by this act, valid permit to sell firearms at retail **[**a pistol or revolver**]** issued pursuant to subsection (a) of section 29-28, as amended by this act, or valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f, as amended by this act. The dealer may charge a fee for contacting the department on behalf of the prospective transferor or prospective transferee.

(2) The Department of Emergency Services and Public Protection shall make every effort, including performing the national instant criminal background check, to determine if the prospective transferee is eligible to receive such long gun. The Commissioner of Emergency Services and Public Protection shall immediately notify the dealer of the department's determination and the dealer shall immediately notify the prospective transferor or prospective transferee of such determination. If the department determines the prospective transferee is ineligible to receive such long gun, no long gun shall be sold, delivered or otherwise transferred by the prospective transferor to the prospective transferee. If the department determines the prospective transferee is eligible to receive such long gun and provides an authorization number for such sale, delivery or transfer, the prospective transferor may proceed to sell, deliver or otherwise transfer the long gun to the prospective transferee.

(3) Upon the sale, delivery or other transfer of the long gun, the transferor or transferee shall complete a form, prescribed by the Commissioner of Emergency Services and Public Protection, that contains the name and address of the transferor, the name and address of the transferee, the date and place of birth of such transferee, the firearm permit or certificate number of the transferee, the firearm permit or certificate number of the transferor, if any, the date of such sale, delivery or transfer, the caliber, make, model and manufacturer's number and a general description of such long gun and the authorization number provided by the department. Not later than twenty-four hours after such sale, delivery or transfer, the transferor shall send by first class mail or electronically transfer one copy of such form to the Commissioner of Emergency Services and Public Protection and one copy to the chief of police of the municipality in which the transferee resides or, where there is no chief of police, the chief executive officer of the municipality, as defined in section 7-148, in which the transferee resides or, if designated by such chief executive officer, the resident state trooper serving such municipality or a state police officer

of the state police troop having jurisdiction over such municipality, and shall retain one copy, for at least five years.

(g) **[**Prior to April 1, 2014, no**]** No sale, delivery or other transfer of any long gun shall be made until the expiration of two weeks from the date of the application, except that such waiting period shall not apply to any federal marshal, parole officer or peace officer, or to the sale, delivery or other transfer of (1) any long gun to a holder of a valid state permit to carry a pistol or revolver issued under the provisions of section 29-28, as amended by this act, a valid eligibility certificate issued under the provisions of section 29-36f, as amended by this act, or a valid long gun eligibility certificate issued under the provisions of section 29-37p, as amended by this act, (2) any long gun to an active member of the armed forces of the United States or of any reserve component thereof, (3) any long gun to a holder of a valid hunting license issued pursuant to chapter 490, or (4) antique firearms. For the purposes of this subsection, "antique firearm" means any firearm which was manufactured in or before 1898 and any replica of such firearm, provided such replica is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition except rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and not readily available in the ordinary channel of commercial trade.

(h) The provisions of subsections (c) to (g), inclusive, of this section shall not apply to the sale, delivery or transfer of (1) long guns to (A) the Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States, (B) a sworn and duly certified member of an organized police department, the Division of State Police within the Department of Emergency Services and Public Protection or the

Department of Correction, a chief inspector or inspector in the Division of Criminal Justice, a salaried inspector of motor vehicles designated by the Commissioner of Motor Vehicles, a conservation officer or special conservation officer appointed by the Commissioner of Energy and Environmental Protection pursuant to section 26-5, or a constable who is certified by the Police Officer Standards and Training Council and appointed by the chief executive authority of a town, city or borough to perform criminal law enforcement duties, pursuant to a letter on the letterhead of such department, division, commissioner or authority authorizing the purchase and stating that the sworn member, inspector, officer or constable will use the long gun in the discharge of official duties, and that a records check indicates that the sworn member, inspector, officer or constable has not been convicted of a crime of family violence, for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty, (C) a member of the military or naval forces of this state or of the United States, or (D) a nuclear facility licensed by the United States Nuclear Regulatory Commission for the purpose of providing security services at such facility, or any contractor or subcontractor of such facility for the purpose of providing security services at such facility; (2) long guns to or between federally licensed firearm manufacturers, importers or dealers; (3) curios or relics, as defined in 27 CFR 478.11, to or between federally licensed firearm collectors; or (4) antique firearms, as defined in subsection (g) of this section.

(i) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution. The court shall not order suspension of prosecution unless the accused person has acknowledged that he

understands the consequences of the suspension of prosecution. Any person for whom prosecution is suspended shall agree to the tolling of any statute of limitations with respect to such violation and to a waiver of his right to a speedy trial. Such person shall appear in court and shall be released to the supervision of the Court Support Services Division for such period, not exceeding two years, and under such conditions as the court shall order. If the person refuses to accept, or, having accepted, violates such conditions, the court shall terminate the suspension of prosecution and the case shall be brought to trial. If such person satisfactorily completes his period of probation, he may apply for dismissal of the charges against him and the court, on finding such satisfactory completion, shall dismiss such charges. If the person does not apply for dismissal of the charges against him after satisfactorily completing his period of probation, the court, upon receipt of a report submitted by the Court Support Services Division that the person satisfactorily completed his period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section 54-142a. An order of the court denying a motion to dismiss the charges against a person who has completed his period of probation or terminating the participation of a defendant in such program shall be a final judgment for purposes of appeal.

(j) Any person who violates any provision of this section shall be guilty of a class D felony, except that any person who sells, delivers or otherwise transfers a long gun in violation of the provisions of this section, knowing that such long gun is stolen or that the manufacturer's number or other mark of identification on such long gun has been altered, removed or obliterated, shall be guilty of a class B felony, and any long gun found in the possession of any person in violation of any provision of this section shall be forfeited.

Sec. 12. Section 29-37i of the general statutes is repealed and the

following is substituted in lieu thereof (*Effective October 1, 2023*):

No person shall store or keep any firearm, as defined in section 53a-3, as amended by this act, on any premises under such person's control [if such person knows or reasonably should know that (1) a minor is likely to gain access to the firearm without the permission of the parent or guardian of the minor, (2) a resident of the premises is ineligible to possess a firearm under state or federal law, (3) a resident of the premises is subject to a risk protection order issued pursuant to section 29-38c, or (4) a resident of the premises poses a risk of imminent personal injury to himself or herself or to another person,] unless such person [(A)] (1) keeps the firearm in a securely locked box or other container or in a manner which a reasonable person would believe to be secure, or [(B)] (2) carries the firearm on his or her person or within such close proximity thereto that such person can readily retrieve and use the firearm as if such person carried the firearm on his or her person. [For the purposes of this section, "minor" means any person under the age of eighteen years.]

Sec. 13. Section 29-38b of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) The Commissioner of Emergency Services and Public Protection, in fulfilling [his] the commissioner's obligations under sections 29-28 to 29-38, inclusive, as amended by this act, and section 53-202d, as amended by this act, shall verify that any person who [, on or after October 1, 1998,] applies for or seeks renewal of a permit to sell firearms at retail, [a pistol or revolver,] a permit to carry a pistol or revolver, an eligibility certificate for a pistol or revolver or a certificate of possession for an assault weapon, or who [, on or after July 1, 2013,] applies for or seeks renewal of a long gun eligibility certificate, has not been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court or has not been voluntarily admitted to a hospital for persons with

psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680, by making an inquiry to the Department of Mental Health and Addiction Services in such a manner so as to only receive a report on the commitment or admission status of the person with respect to whom the inquiry is made including identifying information in accordance with the provisions of subsection (b) of section 17a-500.

(b) If the Commissioner of Emergency Services and Public Protection determines pursuant to subsection (a) of this section that a person has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court or has been voluntarily admitted to a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680, said commissioner shall report the status of such person's application for or renewal of a permit to sell firearms at retail, **[**a pistol or revolver,**]** a permit to carry a pistol or revolver, an eligibility certificate for a pistol or revolver, a certificate of possession for an assault weapon or a long gun eligibility certificate to the Commissioner of Mental Health and Addiction Services for the purpose of fulfilling his responsibilities under subsection (c) of section 17a-500.

Sec. 14. Section 29-38m of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) For the purposes of this section and sections 29-38n to 29-38p, inclusive, "ammunition" means a loaded cartridge, consisting of a primed case, propellant or projectile, designed for use in any firearm, "firearm" has the meaning provided in section 53a-3, as amended by this

act, and "magazine" means any firearm magazine, belt, drum, feed strip or similar device that accepts ammunition.

(b) No person, firm or corporation shall sell ammunition or an ammunition magazine to any person under eighteen years of age.

(c) [On and after October 1, 2013, no] No person, firm or corporation shall sell ammunition or an ammunition magazine to any person unless such person holds a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28, as amended by this act, a valid permit to sell firearms at retail [a pistol or revolver] issued pursuant to subsection (a) of section 29-28, as amended by this act, a valid eligibility certificate for a pistol or revolver issued pursuant to section 29-36f, as amended by this act, or a valid long gun eligibility certificate issued pursuant to section 29-37p, as amended by this act, and presents to the transferor such permit or certificate, or unless such person holds a valid ammunition certificate issued pursuant to section 29-38n and presents to the transferor such certificate and such person's motor vehicle operator's license, passport or other valid form of identification issued by the federal government or a state or municipal government that contains such person's date of birth and photograph.

(d) The provisions of [subsection] subsections (b) and (c) of this section shall not apply to the sale of ammunition to (1) the Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States; (2) a sworn and duly certified member of an organized police department, the Division of State Police within the Department of Emergency Services and Public Protection or the Department of Correction, a chief inspector or inspector in the Division of Criminal Justice, a salaried inspector of motor vehicles designated by the Commissioner of Motor Vehicles, a conservation officer or special

conservation officer appointed by the Commissioner of Energy and Environmental Protection pursuant to section 26-5, or a constable who is certified by the Police Officer Standards and Training Council and appointed by the chief executive authority of a town, city or borough to perform criminal law enforcement duties, for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty; (3) a member of the military or naval forces of this state or of the United States; (4) a nuclear facility licensed by the United States Nuclear Regulatory Commission for the purpose of providing security services at such facility, or any contractor or subcontractor of such facility for the purpose of providing security services at such facility; or (5) a federally licensed firearm manufacturer, importer, dealer or collector.

(e) Any person who violates any provision of this section shall be guilty of a class D felony.

Sec. 15. Subsections (d) to (f), inclusive, of section 53-202f of the general statutes are repealed and the following is substituted in lieu thereof (*Effective from passage*):

(d) (1) Not later than December 31, 2013, any person who lawfully possessed an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, on April 4, 2013, which was lawful under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, in effect on January 1, 2013, may transfer possession of the assault weapon to a licensed gun dealer within or outside of this state for sale outside of this state, and may transport the assault weapon to such dealer for the purpose of making such transfer, without obtaining a certificate of possession under section 53-202d, as amended by this act.

(2) Not later than April 30, 2024, any person who lawfully possessed a 2023 assault weapon on the date immediately preceding the effective

date of this section, which was lawful under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, in effect on January 1, 2023, may transfer possession of the 2023 assault weapon to a licensed gun dealer within or outside of this state for sale outside of this state, and may transport the 2023 assault weapon to such dealer for the purpose of making such transfer, without obtaining a certificate of possession under section 53-202d, as amended by this act.

(e) (1) Not later than October 1, 2013, any licensed gun dealer, pawnbroker licensed under section 21-40, or consignment shop operator, as defined in section 21-39a, may transfer possession of an assault weapon to any person who **[**(1)**]** (A) legally possessed the assault weapon prior to or on April 4, 2013, **[**(2)**]** (B) placed the assault weapon in the possession of such dealer, pawnbroker or operator prior to or on April 4, 2013, pursuant to an agreement between such person and such dealer, pawnbroker or operator for the sale of the assault weapon to a third person, and **[**(3)**]** (C) is eligible to possess a firearm on the date of such transfer.

(2) Any licensed gun dealer, pawnbroker licensed under section 21-40, or consignment shop operator, as defined in section 21-39a, may transfer possession of a 2023 assault weapon to any person who (A) legally possessed the 2023 assault weapon prior to the effective date of this section, (B) placed the 2023 assault weapon in the possession of such dealer, pawnbroker or operator pursuant to an agreement between such person and such dealer, pawnbroker or operator for the sale of the assault weapon to a third person, and (C) is eligible to possess a firearm on the date of such transfer.

(f) The term "licensed gun dealer", as used in sections 53-202a to 53-202k, inclusive, as amended by this act, means a person who has a federal firearms license and a permit to sell firearms pursuant to section 29-28, as amended by this act.

Sec. 16. Subsection (b) of section 54-36e of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(b) Firearms and ammunition turned over to the state police pursuant to subsection (a) of this section which are not destroyed or retained for appropriate use shall be sold at public auctions, conducted by the Commissioner of Administrative Services or said commissioner's designee. Pistols and revolvers, as defined in section 53a-3<u>, as amended by this act</u>, which are antiques, as defined in section 29-33<u>, as amended by this act</u>, or curios or relics, as defined in the Code of Federal Regulations, Title 27, Chapter 1, Part 178, or modern pistols and revolvers which have a current retail value of one hundred dollars or more may be sold at such public auctions, provided such pistols and revolvers shall be sold only to persons who have a valid permit to sell **[**a pistol or revolver**]** <u>firearms at retail</u>, or a valid permit to carry a pistol or revolver, issued pursuant to section 29-28<u>, as amended by this act</u>. Rifles and shotguns, as defined in section 53a-3<u>, as amended by this act</u>, shall be sold only to persons qualified under federal law to purchase such rifles and shotguns and who have a valid long gun eligibility certificate issued pursuant to section 29-37p<u>, as amended by this act</u>. The proceeds of any such sale shall be paid to the State Treasurer and deposited by the State Treasurer in the forfeit firearms account within the General Fund.

Sec. 17. Subsection (e) of section 53-202*l* of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(e) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order

suspension of prosecution in accordance with the provisions of subsection **[**(h)**]** (i) of section 29-33, as amended by this act.

Sec. 18. Subsection (g) of section 53-202w of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(g) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution in accordance with the provisions of subsection **[**(h)**]** (i) of section 29-33, as amended by this act.

Sec. 19. Subsection (f) of section 53-206g of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(f) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution in accordance with the provisions of subsection **[**(h)**]** (i) of section 29-33, as amended by this act.

Sec. 20. Section 53a-217a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) **[**A**]** Except as provided in subsection (b) of this section, a person is guilty of criminally negligent storage of a firearm when such person violates the provisions of section 29-37i, as amended by this act, and **[**a minor or, a resident of the premises who is ineligible to possess a firearm under state or federal law or who poses a risk of imminent personal

injury to himself or herself or to other individuals,**]** another person obtains the firearm and causes the injury or death of such **[**minor, resident**]** person or any other person. **[**For the purposes of this section, "minor" means any person under the age of eighteen years.**]**

(b) The provisions of this section shall not apply if the **[**minor**]** person obtains the firearm as a result of an unlawful entry to any premises by any person and, if such firearm is stolen, such firearm is reported stolen pursuant to the provisions of section 53-202g, as amended by this act.

(c) Criminally negligent storage of a firearm is a class D felony.

Sec. 21. Section 54-66a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

Any bail bond posted in any criminal proceeding in this state shall be automatically terminated and released whenever the defendant: (1) Is granted accelerated rehabilitation pursuant to section 54-56e; (2) is granted admission to the pretrial alcohol education program pursuant to section 54-56g; (3) is granted admission to the pretrial family violence education program pursuant to section 46b-38c; (4) is granted admission to the pretrial drug education and community service program pursuant to section 54-56i; (5) has the complaint or information filed against such defendant dismissed; (6) has the prosecution of the complaint or information filed against such defendant terminated by entry of a nolle prosequi; (7) is acquitted; (8) is sentenced by the court and a stay of such sentence, if any, is lifted; (9) is granted admission to the pretrial school violence prevention program pursuant to section 54-56j; (10) is charged with a violation of section 29-33, as amended by this act, 53-202*l*, as amended by this act, or 53-202w, as amended by this act, and prosecution has been suspended pursuant to subsection **[**(h)**]** (i) of section 29-33, as amended by this act; (11) is charged with a violation of section 29-37a, as amended by this act, and prosecution has been suspended pursuant to subsection (i) of section 29-37a, as amended by

this act; (12) is granted admission to the supervised diversionary program for persons with psychiatric disabilities, or persons who are veterans, pursuant to section 54-56*l*; (13) is granted admission to a diversionary program for young persons charged with a motor vehicle violation or an alcohol-related offense pursuant to section 54-56p; (14) is granted admission to the pretrial drug intervention and community service program pursuant to section 54-56q; or (15) is granted admission to the pretrial impaired driving intervention program pursuant to section 54-56r.

Sec. 22. Subdivision (8) of section 54-280 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(8) "Offense committed with a deadly weapon" or "offense" means: (A) A violation of subsection (c) of section 2-1e, subsection (e) of section 29-28, subsections (a) to (e), inclusive, or **[**(i)**]** (j) of section 29-33, as amended by this act, section 29-34, subsection (a) of section 29-35, as amended by this act, section 29-36, 29-36k, 29-37a, as amended by this act, or 29-37e, subsection (c) of section 29-37g, section 29-37j, subsection (b), (c) or (g) of section 53-202, section 53-202b, 53-202c, as amended by this act, 53-202j, 53-202k, 53-202*l*, as amended by this act, 53-202aa or 53-206b, subsection (b) of section 53a-8, section 53a-55a, 53a-56a, 53a-60a, 53a-60c, 53a-72b, 53a-92a, 53a-94a, 53a-102a, 53a-103a, 53a-211, 53a-212, 53a-216, 53a-217, 53a-217a, as amended by this act, 53a-217b or 53a-217c, as amended by this act, or a second or subsequent violation of section 53-202g, as amended by this act; or (B) a violation of any section of the general statutes which constitutes a felony, as defined in section 53a-25, provided the court makes a finding that, at the time of the offense, the offender used a deadly weapon, or was armed with and threatened the use of or displayed or represented by words or conduct that the offender possessed a deadly weapon;

Sec. 23. Section 53-202a of the general statutes is repealed and the

following is substituted in lieu thereof (*Effective from passage*):

As used in this section and sections 53-202b to 53-202k, inclusive:

(1) "Assault weapon" means:

(A) (i) Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user or any of the following specified semiautomatic firearms: Algimec Agmi; Armalite AR-180; Australian Automatic Arms SAP Pistol; Auto-Ordnance Thompson type; Avtomat Kalashnikov AK-47 type; Barrett Light-Fifty model 82A1; Beretta AR-70; Bushmaster Auto Rifle and Auto Pistol; Calico models M-900, M-950 and 100-P; Chartered Industries of Singapore SR-88; Colt AR-15 and Sporter; Daewoo K-1, K-2, Max-1 and Max-2; Encom MK-IV, MP-9 and MP-45; Fabrique Nationale FN/FAL, FN/LAR, or FN/FNC; FAMAS MAS 223; Feather AT-9 and Mini-AT; Federal XC-900 and XC-450; Franchi SPAS-12 and LAW-12; Galil AR and ARM; Goncz High-Tech Carbine and High-Tech Long Pistol; Heckler & Koch HK-91, HK-93, HK-94 and SP-89; Holmes MP-83; MAC-10, MAC-11 and MAC-11 Carbine type; Intratec TEC-9 and Scorpion; Iver Johnson Enforcer model 3000; Ruger Mini-14/5F folding stock model only; Scarab Skorpion; SIG 57 AMT and 500 series; Spectre Auto Carbine and Auto Pistol; Springfield Armory BM59, SAR-48 and G-3; Sterling MK-6 and MK-7; Steyr AUG; Street Sweeper and Striker 12 revolving cylinder shotguns; USAS-12; UZI Carbine, Mini-Carbine and Pistol; Weaver Arms Nighthawk; Wilkinson "Linda" Pistol;

(ii) A part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in subparagraph (A)(i) of this subdivision, or any combination of parts from which an assault weapon, as defined in subparagraph (A)(i) of this subdivision, may be rapidly assembled if those parts are in the possession or under the control of the same person;

(B) Any of the following specified semiautomatic centerfire rifles, or copies or duplicates thereof with the capability of any such rifles, that were in production prior to or on April 4, 2013: (i) AK-47; (ii) AK-74; (iii) AKM; (iv) AKS-74U; (v) ARM; (vi) MAADI AK47; (vii) MAK90; (viii) MISR; (ix) NHM90 and NHM91; (x) Norinco 56, 56S, 84S and 86S; (xi) Poly Technologies AKS and AK47; (xii) SA 85; (xiii) SA 93; (xiv) VEPR; (xv) WASR-10; (xvi) WUM; (xvii) Rock River Arms LAR-47; (xviii) Vector Arms AK-47; (xix) AR-10; (xx) AR-15; (xxi) Bushmaster Carbon 15, Bushmaster XM15, Bushmaster ACR Rifles, Bushmaster MOE Rifles; (xxii) Colt Match Target Rifles; (xxiii) Armalite M15; (xxiv) Olympic Arms AR-15, A1, CAR, PCR, K3B, K30R, K16, K48, K8 and K9 Rifles; (xxv) DPMS Tactical Rifles; (xxvi) Smith and Wesson M&P15 Rifles; (xxvii) Rock River Arms LAR-15; (xxviii) Doublestar AR Rifles; (xxix) Barrett REC7; (xxx) Beretta Storm; (xxxi) Calico Liberty 50, 50 Tactical, 100, 100 Tactical, I, I Tactical, II and II Tactical Rifles; (xxxii) Hi-Point Carbine Rifles; (xxxiii) HK-PSG-1; (xxxiv) Kel-Tec Sub-2000, SU Rifles, and RFB; (xxxv) Remington Tactical Rifle Model 7615; (xxxvi) SAR-8, SAR-4800 and SR9; (xxxvii) SLG 95; (xxxviii) SLR 95 or 96; (xxxix) TNW M230 and M2HB; (xl) Vector Arms UZI; (xli) Galil and Galil Sporter; (xlii) Daewoo AR 100 and AR 110C; (xliii) Fabrique Nationale/FN 308 Match and L1A1 Sporter; (xliv) HK USC; (xlv) IZHMASH Saiga AK; (xlvi) SIG Sauer 551-A1, 556, 516, 716 and M400 Rifles; (xlvii) Valmet M62S, M71S and M78S; (xlviii) Wilkinson Arms Linda Carbine; and (xlix) Barrett M107A1;

(C) Any of the following specified semiautomatic pistols, or copies or duplicates thereof with the capability of any such pistols, that were in production prior to or on April 4, 2013: (i) Centurion 39 AK; (ii) Draco AK-47; (iii) HCR AK-47; (iv) IO Inc. Hellpup AK-47; (v) Mini-Draco AK-47; (vi) Yugo Krebs Krink; (vii) American Spirit AR-15; (viii) Bushmaster Carbon 15; (ix) Doublestar Corporation AR; (x) DPMS AR-15; (xi) Olympic Arms AR-15; (xii) Rock River Arms LAR 15; (xiii) Calico Liberty III and III Tactical Pistols; (xiv) Masterpiece Arms MPA Pistols

and Velocity Arms VMA Pistols; (xv) Intratec TEC-DC9 and AB-10; (xvi) Colefire Magnum; (xvii) German Sport 522 PK and Chiappa Firearms Mfour-22; (xviii) DSA SA58 PKP FAL; (xix) I.O. Inc. PPS-43C; (xx) Kel-Tec PLR-16 Pistol; (xxi) Sig Sauer P516 and P556 Pistols; and (xxii) Thompson TA5 Pistols;

(D) Any of the following semiautomatic shotguns, or copies or duplicates thereof with the capability of any such shotguns, that were in production prior to or on April 4, 2013: All IZHMASH Saiga 12 Shotguns;

(E) Any semiautomatic firearm regardless of whether such firearm is listed in subparagraphs (A) to (D), inclusive, of this subdivision, and regardless of the date such firearm was produced, that meets the following criteria:

(i) A semiautomatic, centerfire rifle that has an ability to accept a detachable magazine and has at least one of the following:

(I) A folding or telescoping stock;

(II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;

(III) A forward pistol grip;

(IV) A flash suppressor; or

(V) A grenade launcher or flare launcher; or

(ii) A semiautomatic, centerfire rifle that has a fixed magazine with the ability to accept more than ten rounds; or

(iii) A semiautomatic, centerfire rifle that has an overall length of less than thirty inches; or

(iv) A semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the following:

(I) An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip;

(II) A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer;

(III) A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel; or

(IV) A second hand grip; or

(v) A semiautomatic pistol with a fixed magazine that has the ability to accept more than ten rounds; or

(vi) A semiautomatic shotgun that has both of the following:

(I) A folding or telescoping stock; and

(II) Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; or

(vii) A semiautomatic shotgun that has the ability to accept a detachable magazine; or

(viii) A shotgun with a revolving cylinder; or

(ix) Any semiautomatic firearm that meets the criteria set forth in

subdivision (3) or (4) of subsection (a) of section 53-202a of the general statutes, revision of 1958, revised to January 1, 2013; or

(F) A part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in any provision of subparagraphs (B) to (E), inclusive, of this subdivision, or any combination of parts from which an assault weapon, as defined in any provision of subparagraphs (B) to (E), inclusive, of this subdivision, may be assembled if those parts are in the possession or under the control of the same person;

(G) Any semiautomatic firearm other than a pistol, revolver, rifle or shotgun, regardless of whether such firearm is listed in subparagraphs (A) to (D), inclusive, of this subdivision, and regardless of the date such firearm was produced, that has at least one of the following:

(i) Any grip of the weapon, including a pistol grip, a thumbhole stock or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;

(ii) An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip;

(iii) A fixed magazine with the ability to accept more than ten rounds;

(iv) A flash suppressor or silencer, or a threaded barrel capable of accepting a flash suppressor or silencer;

(v) A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel;

(vi) A second hand grip; or

(vii) An arm brace or other stabilizing brace that could allow such firearm to be fired from the shoulder, with or without a strap designed to attach to an individual's arm;

(H) Any semiautomatic firearm that meets the criteria set forth in subdivision (3) or (4) of subsection (a) of section 53-202a of the general statutes, revision of 1958, revised to January 1, 2013, that was legally manufactured prior to September 13, 1994; or

(I) A combination of parts designed or intended to convert a firearm into an assault weapon, as defined in any provision of subparagraph (G) or (H) of this subdivision, or any combination of parts from which an assault weapon, as defined in any provision of subparagraph (G) or (H) of this subdivision, may be assembled if those parts are in the possession or under the control of the same person;

(2) "Assault weapon" does not include (A) any firearm modified to render it permanently inoperable, or (B) a part or any combination of parts of an assault weapon, that are not assembled as an assault weapon, when in the possession of a licensed gun dealer, as defined in subsection (f) of section 53-202f, as amended by this act, or a gunsmith who is in the licensed gun dealer's employ, for the purposes of servicing or repairing lawfully possessed assault weapons under sections 53-202a to 53-202k, inclusive, as amended by this act;

(3) "Action of the weapon" means the part of the firearm that loads, fires and ejects a cartridge, which part includes, but is not limited to, the upper and lower receiver, charging handle, forward assist, magazine release and shell deflector;

(4) "Detachable magazine" means an ammunition feeding device that can be removed without disassembling the firearm action;

(5) "Firearm" means a firearm, as defined in section 53a-3, as amended by this act;

(6) "Forward pistol grip" means any feature capable of functioning as a grip that can be held by the nontrigger hand;

(7) "Lawfully possesses" means: **[**, with**]**

(A) With respect to an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of **[**this**]** subdivision (1) of this section, **[**(A)**]** (i) actual possession that is lawful under sections 53-202b to 53-202k, **[**(B)**]** (ii) constructive possession pursuant to a lawful purchase transacted prior to or on April 4, 2013, regardless of whether the assault weapon was delivered to the purchaser prior to or on April 4, 2013, which lawful purchase is evidenced by a writing sufficient to indicate that **[**(i)**]** (I) a contract for sale was made between the parties prior to or on April 4, 2013, for the purchase of the assault weapon, or **[**(ii)**]** (II) full or partial payment for the assault weapon was made by the purchaser to the seller of the assault weapon prior to or on April 4, 2013, or **[**(C)**]** (iii) actual possession under subparagraph **[**(A)**]** (A)(i) of this subdivision, or constructive possession under subparagraph **[**(B)**]** (A)(ii) of this subdivision, as evidenced by a written statement made under penalty of false statement on such form as the Commissioner of Emergency Services and Public Protection prescribes; or

(B) With respect to a 2023 assault weapon, (i) actual possession that is lawful under sections 53-202b to 53-202k, inclusive, (ii) constructive possession pursuant to a lawful purchase transacted prior to the effective date of this section, regardless of whether such assault weapon was delivered to the purchaser prior to the effective date of this section, which lawful purchase is evidenced by a writing sufficient to indicate that (I) a contract for sale was made between the parties prior to the effective date of this section, for the purchase of such assault weapon, or (II) full or partial payment for such assault weapon was made by the purchaser to the seller of such assault weapon prior to the effective date of this section, or (iii) actual possession under subparagraph (B)(i) of this subdivision, or constructive possession under subparagraph (B)(ii) of

this subdivision, as evidenced by a written statement made under penalty of false statement on such form as the Commissioner of Emergency Services and Public Protection prescribes;

(8) "Pistol grip" means a grip or similar feature that can function as a grip for the trigger hand; **[**and**]**

(9) "Second hand grip" means a grip or similar feature that can function as a grip that is additional to the trigger hand grip; and

(10) "2023 assault weapon" means an assault weapon described in any provision of subparagraphs (G) to (I), inclusive, of subdivision (1) of this section.

Sec. 24. Section 53-202c of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) Except as provided in section 53-202e, any person who, within this state, possesses an assault weapon, except as provided in sections 53-202a to 53-202k, inclusive, as amended by this act, and 53-202o, shall be guilty of a class D felony and shall be sentenced to a term of imprisonment of which one year may not be suspended or reduced by the court, except that a first-time violation of this subsection shall be a class A misdemeanor if (1) the person presents proof that such person lawfully possessed the assault weapon (A) prior to October 1, 1993, with respect to an assault weapon described in subparagraph (A) of subdivision (1) of section 53-202a, as amended by this act, **[**or**]** (B) on April 4, 2013, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, in effect on January 1, 2013, with respect to an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, or (C) on the date immediately preceding the effective date of this section, under the provisions of sections 53-202a to 53-202k, inclusive, revision of 1958, revised to January 1, 2023, with

respect to an assault weapon defined as a 2023 assault weapon in section 53-202a, as amended by this act, and (2) the person has otherwise possessed the assault weapon in compliance with subsection (f) of section 53-202d.

(b) The provisions of subsection (a) of this section shall not apply to the possession of assault weapons by: (1) The Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States, (2) a sworn and duly certified member of an organized police department, the Division of State Police within the Department of Emergency Services and Public Protection or the Department of Correction, a chief inspector or inspector in the Division of Criminal Justice, a salaried inspector of motor vehicles designated by the Commissioner of Motor Vehicles, a conservation officer or special conservation officer appointed by the Commissioner of Energy and Environmental Protection pursuant to section 26-5, or a constable who is certified by the Police Officer Standards and Training Council and appointed by the chief executive authority of a town, city or borough to perform criminal law enforcement duties, for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty, (3) a member of the military or naval forces of this state or of the United States, or (4) a nuclear facility licensed by the United States Nuclear Regulatory Commission for the purpose of providing security services at such facility, or any contractor or subcontractor of such facility for the purpose of providing security services at such facility.

(c) The provisions of subsection (a) of this section shall not apply to the possession of an assault weapon described in subparagraph (A) of subdivision (1) of section 53-202a, as amended by this act, by any person

prior to July 1, 1994, if all of the following are applicable:

(1) The person is eligible under sections 53-202a to 53-202k, inclusive, as amended by this act, to apply for a certificate of possession for the assault weapon by July 1, 1994;

(2) The person lawfully possessed the assault weapon prior to October 1, 1993; and

(3) The person is otherwise in compliance with sections 53-202a to 53-202k, inclusive, as amended by this act.

(d) The provisions of subsection (a) of this section shall not apply to the possession of an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, by any person prior to April 5, 2013, if all of the following are applicable:

(1) The person is eligible under sections 53-202a to 53-202k, inclusive, as amended by this act, to apply for a certificate of possession for the assault weapon by January 1, 2014;

(2) The person lawfully possessed the assault weapon on April 4, 2013, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, in effect on January 1, 2013; and

(3) The person is otherwise in compliance with sections 53-202a to 53-202k, inclusive, as amended by this act.

(e) The provisions of subsection (a) of this section shall not apply to the possession of a 2023 assault weapon by any person prior to May 1, 2024, if all of the following are applicable:

(1) The person is eligible under sections 53-202a to 53-202k, inclusive, as amended by this act, to apply for a certificate of possession for such assault weapon by May 1, 2024;

(2) The person lawfully possessed such assault weapon on the date immediately preceding the effective date of this section, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, and section 53-202m of the general statutes, revision of 1958, revised to January 1, 2023; and

(3) The person is otherwise in compliance with sections 53-202a to 53-202k, inclusive, as amended by this act.

(f) The provisions of subsection (a) of this section shall not apply to the possession of a 2023 assault weapon by any person if all of the following are applicable:

(1) Such assault weapon was reclassified for federal purposes as a rifle pursuant to the amendments to 27 CFR Parts 478 and 479 published at 88 Federal Register 6478 (January 31, 2023).

(2) The person applied to register such assault weapon under the National Firearms Act, P. L. 73-474, as amended from time to time, using the form known as Form 1 published by the Bureau of Alcohol, Tobacco, Firearms and Explosives, and submitted a copy of such form to the Department of Emergency Services and Public Protection not later than August 1, 2023, and the Bureau of Alcohol, Tobacco, Firearms and Explosives has approved such application, has denied such application within the past thirty days, or has not yet processed such application.

(3) The person lawfully possessed such assault weapon on the date immediately preceding the effective date of this section, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, and section 53-202m of the general statutes, revision of 1958, revised to January 1, 2023; and

(4) The person is otherwise in compliance with sections 53-202a to 53-202k, inclusive, as amended by this act.

**[**(e)**]** <u>(g)</u> The provisions of subsection (a) of this section shall not apply to a person who is the executor or administrator of an estate that includes an assault weapon, or the trustee of a trust that includes an assault weapon, for which a certificate of possession has been issued under section 53-202d<u>, as amended by this act,</u> if the assault weapon is possessed at a place set forth in subdivision (1) of subsection (f) of section 53-202d or as authorized by the Probate Court.

**[**(f)**]** <u>(h)</u> The provisions of subsection (a) of this section shall not apply to the possession of a semiautomatic pistol that is defined as an assault weapon in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a<u>, as amended by this act,</u> that the Commissioner of Emergency Services and Public Protection designates as being designed expressly for use in target shooting events at the Olympic games sponsored by the International Olympic Committee pursuant to regulations adopted under subdivision (4) of subsection (b) of section 53-202b that is (1) possessed and transported in accordance with subsection (f) of section 53-202d, or (2) possessed at or transported to or from a collegiate, Olympic or target pistol shooting competition in this state which is sponsored by, conducted under the auspices of, or approved by a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms, provided such pistol is transported in the manner prescribed in subsection (a) of section 53-202f.

Sec. 25. Subsections (a) and (b) of section 53-202d of the general statutes are repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) (1) (A) Except as provided in subparagraph (B) of this subdivision, any person who lawfully possesses an assault weapon, as defined in subparagraph (A) of subdivision (1) of section 53-202a<u>, as amended by this act</u>, prior to October 1, 1993, shall apply by October 1, 1994, or, if such person is a member of the military or naval forces of this state or of

the United States and is unable to apply by October 1, 1994, because such member is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the Department of Emergency Services and Public Protection, for a certificate of possession with respect to such assault weapon.

(B) No person who lawfully possesses an assault weapon pursuant to subdivision (1), (2) or (4) of subsection (b) of section 53-202c, as amended by this act, shall be required to obtain a certificate of possession pursuant to this subdivision with respect to an assault weapon used for official duties, except that any person described in subdivision (2) of subsection (b) of section 53-202c, as amended by this act, who purchases an assault weapon, as defined in subparagraph (A) of subdivision (1) of section 53-202a, as amended by this act, for use in the discharge of official duties who retires or is otherwise separated from service shall apply within ninety days of such retirement or separation from service to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon.

(2) (A) Except as provided in subparagraph (B) of this subdivision, any person who lawfully possesses an assault weapon, as defined in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, on April 4, 2013, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, in effect on January 1, 2013, or any person who regains possession of an assault weapon as defined in any provision of said subparagraphs pursuant to subsection (e) of section 53-202f, or any person who lawfully purchases a firearm on or after April 4, 2013, but prior to June 18, 2013, that meets the criteria set forth in subdivision (3) or (4) of subsection (a) of section 53-202a of the general statutes, revision of 1958, revised to January 1, 2013, shall apply by January 1, 2014, or, if such person is a member of the military or naval forces of this state or of the United States and is unable to apply by January 1, 2014, because such member

is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon. Any person who lawfully purchases a semiautomatic pistol that is defined as an assault weapon in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, that the Commissioner of Emergency Services and Public Protection designates as being designed expressly for use in target shooting events at the Olympic games sponsored by the International Olympic Committee pursuant to regulations adopted under subdivision (4) of subsection (b) of section 53-202b shall apply within ninety days of such purchase to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon.

(B) No person who lawfully possesses an assault weapon pursuant to subdivision (1), (2) or (4) of subsection (b) of section 53-202c, as amended by this act, shall be required to obtain a certificate of possession pursuant to this subdivision with respect to an assault weapon used for official duties, except that any person described in subdivision (2) of subsection (b) of section 53-202c, as amended by this act, who purchases an assault weapon, as defined in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, for use in the discharge of official duties who retires or is otherwise separated from service shall apply within ninety days of such retirement or separation from service to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon.

(3) Any person who obtained a certificate of possession for an assault weapon, as defined in subparagraph (A) of subdivision (1) of section 53-202a, as amended by this act, prior to April 5, 2013, that is defined as an assault weapon pursuant to any provision of subparagraphs (B) to (F),

inclusive, of subdivision (1) of section 53-202a, as amended by this act, shall be deemed to have obtained a certificate of possession for such assault weapon for the purposes of sections 53-202a to 53-202k, inclusive, as amended by this act, and shall not be required to obtain a subsequent certificate of possession for such assault weapon.

(4) (A) Except as provided in subparagraphs (B) and (C) of this subdivision, any person who lawfully possesses a 2023 assault weapon on the date immediately preceding the effective date of this section, under the provisions of sections 53-202a to 53-202k, inclusive, as amended by this act, in effect on January 1, 2023, or any person who regains possession of a 2023 assault weapon pursuant to subdivision (2) of subsection (e) of section 53-202f, as amended by this act, shall apply by May 1, 2024, or, if such person is a member of the military or naval forces of this state or of the United States and is unable to apply by May 1, 2024, because such member is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon. The Department of Emergency Services and Public Protection shall accept applications both in paper and electronic form, to the extent practicable, and shall not require such applications be notarized.

(B) No person who lawfully possesses an assault weapon pursuant to subdivision (1), (2) or (4) of subsection (b) of section 53-202c, as amended by this act, shall be required to obtain a certificate of possession pursuant to this subdivision with respect to an assault weapon used for official duties, except that any person described in subdivision (2) of subsection (b) of section 53-202c, as amended by this act, who purchases a 2023 assault weapon for use in the discharge of official duties who retires or is otherwise separated from service shall apply within ninety days of such retirement or separation from service to the Department of Emergency Services and Public Protection for a certificate of possession

with respect to such assault weapon.

(C) Any person who lawfully possesses a 2023 assault weapon pursuant to the provisions of subsection (f) of section 53-202c, as amended by this act, and whose Form 1 application to the Bureau of Alcohol, Tobacco, Firearms and Explosives has not yet been processed may, instead of following the procedure specified in subparagraph (A) of this subdivision, apply by May 1, 2024, to the Department of Emergency Services and Public Protection for a temporary certificate of possession with respect to such assault weapon. Such temporary certificate of possession shall expire on the earlier of January 1, 2027, and the date seven days succeeding a denial of the Form 1 application. When the Form 1 application is approved with respect to such assault weapon, such person may apply to the Department of Emergency Services and Public Protection to convert such temporary certificate of possession into a certificate of possession with respect to such assault weapon. If a complete application to convert is received, the Commissioner of Emergency Services and Public Protection shall approve the application. For the purposes of this subparagraph, a full and complete Form 1 application submitted to the Department of Emergency Services and Public Protection in a form and manner determined by the department shall be sufficient to constitute a complete application for a temporary certificate of possession, and a copy of the notice that a Form 1 application has been approved shall constitute a complete application to convert a temporary certificate of possession into a certificate of possession. The Department of Emergency Services and Public Protection shall accept applications under this subparagraph both in paper and electronic form, to the extent practicable, and shall not require such applications to be notarized.

(5) Any person who obtained a certificate of possession for an assault weapon, as defined in any provision of subparagraphs (A) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act,

prior to the effective date of this section, that is also a 2023 assault weapon shall be deemed to have obtained a certificate of possession for such assault weapon for the purposes of sections 53-202a to 53-202k, inclusive, as amended by this act, and shall not be required to obtain a subsequent certificate of possession for such assault weapon.

**[**(4)**]** (6) The certificate of possession shall contain a description of the firearm that identifies it uniquely, including all identification marks, the full name, address, date of birth and thumbprint of the owner, and any other information as the department may deem appropriate.

**[**(5)**]** (7) The department shall adopt regulations, in accordance with the provisions of chapter 54, to establish procedures with respect to the application for and issuance of certificates of possession pursuant to this section. Notwithstanding the provisions of sections 1-210 and 1-211, the name and address of a person issued a certificate of possession shall be confidential and shall not be disclosed, except such records may be disclosed to (A) law enforcement agencies and employees of the United States Probation Office acting in the performance of their duties and parole officers within the Department of Correction acting in the performance of their duties, and (B) the Commissioner of Mental Health and Addiction Services to carry out the provisions of subsection (c) of section 17a-500.

(b) (1) No assault weapon, as defined in subparagraph (A) of subdivision (1) of section 53-202a, as amended by this act, possessed pursuant to a certificate of possession issued under this section may be sold or transferred on or after January 1, 1994, to any person within this state other than to a licensed gun dealer, as defined in subsection (f) of section 53-202f, as amended by this act, or as provided in section 53-202e, or by bequest or intestate succession, or, upon the death of a testator or settlor: (A) To a trust, or (B) from a trust to a beneficiary who is eligible to possess the assault weapon.

(2) No assault weapon, as defined in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53-202a, as amended by this act, possessed pursuant to a certificate of possession issued under this section may be sold or transferred on or after April 5, 2013, to any person within this state other than to a licensed gun dealer, as defined in subsection (f) of section 53-202f, as amended by this act, or as provided in section 53-202e, or by bequest or intestate succession, or, upon the death of a testator or settlor: (A) To a trust, or (B) from a trust to a beneficiary who is eligible to possess the assault weapon.

(3) No 2023 assault weapon possessed pursuant to a certificate of possession issued under this section may be sold or transferred on or after the effective date of this section, to any person within this state other than to a licensed gun dealer, or as provided in section 53-202e, or by bequest or intestate succession, or, upon the death of a testator or settlor: (A) To a trust, or (B) from a trust to a beneficiary who is eligible to possess the assault weapon.

Sec. 26. Subsection (b) of section 29-36n of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(b) The Commissioner of Emergency Services and Public Protection, in conjunction with the Chief State's Attorney and the Connecticut Police Chiefs Association, shall update the protocol developed pursuant to subsection (a) of this section to reflect the provisions of sections 29-7h, 29-28, as amended by this act, 29-28a, as amended by this act, 29-29, 29-30, as amended by this act, 29-32 and 29-35, as amended by this act, subsections (b) and (h) of section 46b-15, subsections (c) and (d) of section 46b-38c and sections 53-202a, as amended by this act, 53-202*l* **[**, 53-202m**]** and 53a-217, as amended by this act, and shall include in such protocol specific instructions for the transfer, delivery or surrender of pistols and revolvers and other firearms and ammunition when the assistance of more than one law enforcement agency is necessary to

effect the requirements of section 29-36k.

Sec. 27. Section 53-202w of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) As used in this section and section 53-202x:

(1) "Large capacity magazine" means any firearm magazine, belt, drum, feed strip or similar device that has the capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition, but does not include: (A) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds of ammunition, (B) a .22 caliber tube ammunition feeding device, (C) a tubular magazine that is contained in a lever-action firearm, or (D) a magazine that is permanently inoperable;

(2) "Lawfully possesses", with respect to a large capacity magazine, means that a person has (A) actual and lawful possession of the large capacity magazine, (B) constructive possession of the large capacity magazine pursuant to a lawful purchase of a firearm that contains a large capacity magazine that was transacted prior to or on April 4, 2013, regardless of whether the firearm was delivered to the purchaser prior to or on April 4, 2013, which lawful purchase is evidenced by a writing sufficient to indicate that (i) a contract for sale was made between the parties prior to or on April 4, 2013, for the purchase of the firearm, or (ii) full or partial payment for the firearm was made by the purchaser to the seller of the firearm prior to or on April 4, 2013, or (C) actual possession under subparagraph (A) of this subdivision, or constructive possession under subparagraph (B) of this subdivision, as evidenced by a written statement made under penalty of false statement on such form as the Commissioner of Emergency Services and Public Protection prescribes; and

(3) "Licensed gun dealer" means a person who has a federal firearms

license and a permit to sell firearms pursuant to section 29-28.

(b) Except as provided in this section, on and after April 5, 2013, any person who, within this state, distributes, imports into this state, keeps for sale, offers or exposes for sale, or purchases a large capacity magazine shall be guilty of a class D felony. On and after April 5, 2013, any person who, within this state, transfers a large capacity magazine, except as provided in subsection (f) of this section, shall be guilty of a class D felony.

(c) Except as provided in this section and section 53-202x, **[**: (1) Any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained prior to April 5, 2013, shall commit an infraction and be fined not more than ninety dollars for a first offense and shall be guilty of a class D felony for any subsequent offense, and (2) any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained on or after April 5, 2013, shall be guilty of a class D felony**]** any person who possesses a large capacity magazine shall be guilty of a (1) class D felony if such person is ineligible to possess a firearm under state or federal law, or (2) class A misdemeanor if such person is not ineligible to possess a firearm under state or federal law.

(d) A large capacity magazine may be possessed, purchased or imported by:

(1) The Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States;

(2) A sworn and duly certified member of an organized police department, the Division of State Police within the Department of Emergency Services and Public Protection or the Department of

Correction, a chief inspector or inspector in the Division of Criminal Justice, a salaried inspector of motor vehicles designated by the Commissioner of Motor Vehicles, a conservation officer or special conservation officer appointed by the Commissioner of Energy and Environmental Protection pursuant to section 26-5, or a constable who is certified by the Police Officer Standards and Training Council and appointed by the chief executive authority of a town, city or borough to perform criminal law enforcement duties, for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty;

(3) A member of the military or naval forces of this state or of the United States;

(4) A nuclear facility licensed by the United States Nuclear Regulatory Commission for the purpose of providing security services at such facility, or any contractor or subcontractor of such facility for the purpose of providing security services at such facility;

(5) Any person who is sworn and acts as a policeman on behalf of an armored car service pursuant to section 29-20 in the discharge of such person's official duties; or

(6) Any person, firm or corporation engaged in the business of manufacturing large capacity magazines in this state that manufactures, purchases, tests or transports large capacity magazines in this state for sale within this state to persons specified in subdivisions (1) to (5), inclusive, of this subsection or for sale outside this state, or a federally-licensed firearm manufacturer engaged in the business of manufacturing firearms or large capacity magazines in this state that manufactures, purchases, tests or transports firearms or large capacity magazines in this state for sale within this state to persons specified in subdivisions (1) to (5), inclusive, of this subsection or for sale outside

this state.

(e) A large capacity magazine may be possessed by:

(1) A licensed gun dealer;

(2) A gunsmith who is in a licensed gun dealer's employ, who possesses such large capacity magazine for the purpose of servicing or repairing a lawfully possessed large capacity magazine;

(3) A person, firm, corporation or federally-licensed firearm manufacturer described in subdivision (6) of subsection (d) of this section that possesses a large capacity magazine that is lawfully possessed by another person for the purpose of servicing or repairing the large capacity magazine;

(4) Any person who has declared possession of the magazine pursuant to section 53-202x; or

(5) Any person who is the executor or administrator of an estate that includes a large capacity magazine, or the trustee of a trust that includes a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 53-202x, which is disposed of as authorized by the Probate Court, if the disposition is otherwise permitted by this section and section 53-202x.

(f) Subsection (b) of this section shall not prohibit:

(1) The transfer of a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 53-202x, by bequest or intestate succession, or, upon the death of a testator or settlor: (A) To a trust, or (B) from a trust to a beneficiary;

(2) The transfer of a large capacity magazine to a police department

or the Department of Emergency Services and Public Protection;

(3) The transfer of a large capacity magazine to a licensed gun dealer in accordance with section 53-202x; or

(4) The transfer of a large capacity magazine prior to October 1, 2013, from a licensed gun dealer, pawnbroker licensed under section 21-40, or consignment shop operator, as defined in section 21-39a, to any person who (A) possessed the large capacity magazine prior to or on April 4, 2013, (B) placed a firearm that such person legally possessed, with the large capacity magazine included or attached, in the possession of such dealer, pawnbroker or operator prior to or on April 4, 2013, pursuant to an agreement between such person and such dealer, pawnbroker or operator for the sale of the firearm to a third person, and (C) is eligible to possess the firearm on the date of such transfer.

(g) **[**If**]** The court may order suspension of prosecution in addition to any other diversionary programs available to the defendant, if the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution in accordance with the provisions of subsection **[**(h)**]** (i) of section 29-33, as amended by this act.

Sec. 28. Subsections (a) and (b) of section 29-37p of the general statutes are repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) Any person who is eighteen years of age or older may apply to the Commissioner of Emergency Services and Public Protection for a long gun eligibility certificate.

(b) The Commissioner of Emergency Services and Public Protection

shall issue a long gun eligibility certificate unless said commissioner finds that the applicant: (1) **[**Has**]** (A) For any application filed prior to July 1, 2024, has failed to successfully complete a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of firearms including, but not limited to, a safety or training course in the use of firearms available to the public offered by a law enforcement agency, a private or public educational institution or a firearms training school, utilizing instructors certified by the National Rifle Association or the Department of Energy and Environmental Protection and a safety or training course in the use of firearms conducted by an instructor certified by the state or the National Rifle Association, or (B) for any application filed on or after July 1, 2024, has failed to successfully complete, not earlier than two years prior to the submission of such application, a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of firearms, which courses may include those certified by the National Rifle Association or other organizations, conducted by an instructor certified by the National Rifle Association or by the state, provided any such course includes instruction in state law requirements pertaining to safe storage in the home and in vehicles, lawful use of firearms and lawful carrying of firearms in public; (2) has been convicted of (A) a felony, (B) a misdemeanor violation of section 21a-279 on or after October 1, 2015, **[**or**]** (C) a misdemeanor violation of section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d during the preceding twenty years, or (D) a misdemeanor violation of any law of this state that has been designated as a family violence crime pursuant to section 46b-38h; (3) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120; (4) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13; (5) has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court; (6) has

been voluntarily admitted to a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680; (7) is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person, including an ex parte order issued pursuant to section 46b-15 or 46b-16a; (8) is subject to a firearms seizure order issued prior to June 1, 2022, pursuant to section 29-38c after notice and hearing, or a risk protection order or risk protection investigation order issued on or after June 1, 2022, pursuant to section 29-38c; (9) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to **[**18 USC 922(g)(4)**]** 18 USC 922(g)(2), (g)(4) or (g)(9); or (10) is an alien illegally or unlawfully in the United States.

Sec. 29. Subsection (b) of section 29-28 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(b) Upon the application of any person having a bona fide permanent residence within the jurisdiction of any such authority, such chief of police or, where there is no chief of police, such chief executive officer or designated resident state trooper or state police officer, as applicable, may issue a temporary state permit to such person to carry a pistol or revolver within the state, provided such authority shall find that such applicant intends to make no use of any pistol or revolver which such applicant may be permitted to carry under such permit other than a lawful use and that such person is a suitable person to receive such permit. If the applicant has a bona fide permanent residence within the jurisdiction of any federally recognized Native American tribe within the borders of the state, and such tribe has a law enforcement unit, as defined in section 7-294a, the chief of police of such law enforcement

unit may issue a temporary state permit to such person pursuant to the provisions of this subsection, and any chief of police of any other law enforcement unit having jurisdiction over an area containing such person's bona fide permanent residence shall not issue such temporary state permit if such tribal law enforcement unit accepts applications for temporary state permits. No state or temporary state permit to carry a pistol or revolver shall be issued under this subsection if the applicant: (1) (A) For any application filed prior to July 1, 2024, has failed to successfully complete a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of pistols and revolvers including, but not limited to, a safety or training course in the use of pistols and revolvers available to the public offered by a law enforcement agency, a private or public educational institution or a firearms training school, utilizing instructors certified by the National Rifle Association or the Department of Energy and Environmental Protection and a safety or training course in the use of pistols or revolvers conducted by an instructor certified by the state or the National Rifle Association, and (B) for any application filed on or after July 1, 2024, has failed to successfully complete, not earlier than two years prior to the submission of such application, a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of firearms, which courses may include those certified by the National Rifle Association or other organizations, conducted by an instructor certified by the National Rifle Association or by the state, provided any such course includes instruction in state law requirements pertaining to safe storage in the home and in vehicles, lawful use of firearms and lawful carrying of firearms in public. Any person wishing to provide such course, may apply in the form and manner prescribed by the commissioner. The commissioner shall approve or deny any application for provision of such a course not later than July 1, 2024, in the case of an application submitted before October 1, 2023; (2) has been convicted of (A) a felony, **[**or**]** (B) a misdemeanor violation of section 21a-279 on or after October 1, 2015, **[**or**]** (C) a misdemeanor violation of

section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d during the preceding twenty years, a misdemeanor violation of any law of this state that has been designated as a family violence crime pursuant to section 46b-38h; (3) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120; [,] (4) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13; [,] (5) (A) has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court, or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person, as those terms are defined in section 17a-680; [,] (6) is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person, including an ex parte order issued pursuant to section 46b-15 or 46b-16a; [,] (7) is subject to a firearms seizure order issued prior to June 1, 2022, pursuant to section 29-38c after notice and hearing, or a risk protection order or risk protection investigation order issued on or after June 1, 2022, pursuant to section 29-38c; [,] (8) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to [18 USC 922(g)(4),] 18 USC 922(g)(2), (g)(4) or (g)(9); (9) is an alien illegally or unlawfully in the United States; [,] or (10) is less than twenty-one years of age. Nothing in this section shall require any person who holds a valid permit to carry a pistol or revolver on [October 1, 1994] July 1, 2024, to participate in any additional training in the safety and use of pistols and revolvers. No person may apply for a temporary state permit to carry a pistol or revolver more than once within any twelve-month period, and no temporary state permit to carry a pistol or revolver shall be issued to any person who has applied for such permit more than once within the

preceding twelve months. Any person who applies for a temporary state permit to carry a pistol or revolver shall indicate in writing on the application, under penalty of false statement in such manner as the issuing authority prescribes, that such person has not applied for a temporary state permit to carry a pistol or revolver within the past twelve months. Upon issuance of a temporary state permit to carry a pistol or revolver to the applicant, the local authority shall forward the original application to the commissioner. Not later than sixty days after receiving a temporary state permit, an applicant shall appear at a location designated by the commissioner to receive the state permit. The commissioner may then issue, to any holder of any temporary state permit, a state permit to carry a pistol or revolver within the state. Upon issuance of the state permit, the commissioner shall make available to the permit holder a copy of the law regarding the permit holder's responsibility to report the loss or theft of a firearm and the penalties associated with the failure to comply with such law. Upon issuance of the state permit, the commissioner shall forward a record of such permit to the local authority issuing the temporary state permit. The commissioner shall retain records of all applications, whether approved or denied. The copy of the state permit delivered to the permittee shall be laminated and shall contain a full-face photograph of such permittee. A person holding a state permit issued pursuant to this subsection shall notify the issuing authority within two business days of any change of such person's address. The notification shall include the old address and the new address of such person.

Sec. 30. Subsection (b) of section 29-36f of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(b) The Commissioner of Emergency Services and Public Protection shall issue an eligibility certificate unless said commissioner finds that the applicant: (1) **[**Has**]** <u>(A) For any application filed prior to July 1, 2024,</u>

has failed to successfully complete a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of pistols and revolvers including, but not limited to, a safety or training course in the use of pistols and revolvers available to the public offered by a law enforcement agency, a private or public educational institution or a firearms training school, utilizing instructors certified by the National Rifle Association or the Department of Energy and Environmental Protection and a safety or training course in the use of pistols or revolvers conducted by an instructor certified by the state or the National Rifle Association, or (B) for any application filed on or after July 1, 2024, has failed to successfully complete, not earlier than two years prior to the submission of such application, a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of firearms, which courses may include those certified by the National Rifle Association or other organizations, conducted by an instructor certified by the National Rifle Association or by the state, provided any such course includes instruction in state law requirements pertaining to safe storage in the home and in vehicles, lawful use of firearms and lawful carrying of firearms in public; (2) has been convicted of (A) a felony, (B) a misdemeanor violation of section 21a-279 on or after October 1, 2015, **[**or**]** (C) a misdemeanor violation of section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d during the preceding twenty years, or (D) a misdemeanor violation of any law of this state that has been designated as a family violence crime pursuant to section 46b-38h; (3) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120; (4) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13; (5) (A) has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court; or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as

defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680; (6) is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person, including an ex parte order issued pursuant to section 46b-15 or section 46b-16a; (7) is subject to a firearms seizure order issued prior to June 1, 2022, pursuant to section 29-38c after notice and hearing, or a risk protection order or risk protection investigation order issued on or after June 1, 2022, pursuant to section 29-38c; (8) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to **[**18 USC 922(g)(4)**]** 18 USC 922(g)(2), (g)(4) or (g)(9); or (9) is an alien illegally or unlawfully in the United States.

Sec. 31. Section 53a-217 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) A person is guilty of criminal possession of a firearm, ammunition or an electronic defense weapon when such person possesses a firearm, ammunition or an electronic defense weapon and (1) has been convicted of (A) a felony committed prior to, on or after October 1, 2013, (B) a misdemeanor violation of section 21a-279 on or after October 1, 2015, **[**or**]** (C) a misdemeanor violation of section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d committed on or after October 1, 2013, and during the preceding twenty years, or (D) a misdemeanor violation of any law of this state that has been designated as a family violence crime pursuant to section 46b-38h and was committed on or after October 1, 2023, (2) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120, (3) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13, (4) knows

that such person is subject to (A) a restraining or protective order of a court of this state that has been issued against such person, after notice has been provided to such person, in a case involving the use, attempted use or threatened use of physical force against another person, or (B) a foreign order of protection, as defined in section 46b-15a, that has been issued against such person in a case involving the use, attempted use or threatened use of physical force against another person, (5) (A) has been confined on or after October 1, 2013, in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court, or with respect to any person who holds a valid permit or certificate that was issued or renewed under the provisions of section 29-28, as amended by this act, or 29-36f, as amended by this act, in effect prior to October 1, 2013, such person has been confined in such hospital within the preceding twelve months, or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability, unless the person (i) was voluntarily admitted solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680, or (ii) is a police officer who was voluntarily admitted and had his or her firearm, ammunition or electronic defense weapon used in the performance of the police officer's official duties returned in accordance with section 7-291d, (6) knows that such person is subject to a firearms seizure order issued prior to June 1, 2022, pursuant to section 29-38c after notice and an opportunity to be heard has been provided to such person, or a risk protection order or risk protection investigation order issued on or after June 1, 2022, pursuant to section 29-38c, or (7) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to **[**18 USC 922(g)(4)**]** 18 USC 922(g)(2), (g)(4) or (g)(9). For the purposes of this section, "convicted" means having a judgment of conviction entered by a court of competent jurisdiction, "ammunition" means a loaded cartridge, consisting of a primed case, propellant or projectile, designed

for use in any firearm, and a motor vehicle violation for which a sentence to a term of imprisonment of more than one year may be imposed shall be deemed an unclassified felony.

(b) Criminal possession of a firearm, ammunition or an electronic defense weapon is a class C felony, for which two years and one day of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

Sec. 32. Section 53a-217c of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of (A) a felony committed prior to, on or after October 1, 2013, (B) a misdemeanor violation of section 21a-279 committed on or after October 1, 2015, **[**or**]** (C) a misdemeanor violation of section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d committed during the preceding twenty years, or (D) a misdemeanor violation of any law of this state that has been designated as a family violence crime pursuant to section 46b-38h and was committed on or after October 1, 2023, (2) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120, (3) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a-13, (4) (A) has been confined prior to October 1, 2013, in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding twelve months by order of a probate court, or has been confined on or after October 1, 2013, in a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding sixty months by order of a probate court, or, with respect to

any person who holds a valid permit or certificate that was issued or renewed under the provisions of section 29-28, as amended by this act, or 29-36f, as amended by this act, in effect prior to October 1, 2013, such person has been confined in such hospital within the preceding twelve months, or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as defined in section 17a-495, within the preceding six months for care and treatment of a psychiatric disability, unless the person (i) was voluntarily admitted solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a-680, or (ii) is a police officer who was voluntarily admitted and had his or her firearm, ammunition or electronic defense weapon used in the performance of the police officer's official duties returned in accordance with section 7-291d, (5) knows that such person is subject to (A) a restraining or protective order of a court of this state that has been issued against such person, after notice has been provided to such person, in a case involving the use, attempted use or threatened use of physical force against another person, or (B) a foreign order of protection, as defined in section 46b-15a, that has been issued against such person in a case involving the use, attempted use or threatened use of physical force against another person, (6) knows that such person is subject to a firearms seizure order issued prior to June 1, 2022, pursuant to section 29-38c after notice and an opportunity to be heard has been provided to such person, or a risk protection order or risk protection investigation order issued on or after June 1, 2022, pursuant to section 29-38c, (7) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to **[**18 USC 922(g)(4)**]** 18 USC 922(g)(2), (g)(4) or (g)(9), or (8) is an alien illegally or unlawfully in the United States. For the purposes of this section, "convicted" means having a judgment of conviction entered by a court of competent jurisdiction.

(b) Criminal possession of a pistol or revolver is a class C felony, for which two years of the sentence imposed may not be suspended or

reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

Sec. 33. Subsection (a) of section 29-37b of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) Each person, firm or corporation which engages in the retail sale of any **[**pistol or revolver**]** firearm, at the time of sale of any such **[**pistol or revolver**]** firearm, shall (1) equip such **[**pistol or revolver**]** firearm with a reusable trigger lock, gun lock or gun locking device appropriate for such firearm, which lock or device shall be constructed of material sufficiently strong to prevent it from being easily disabled and have a locking mechanism accessible by key or by electronic or other mechanical accessory specific to such lock or device to prevent unauthorized removal, and (2) provide to the purchaser thereof a written warning which shall state in block letters not less than one inch in height: "UNLAWFUL STORAGE OF A LOADED FIREARM MAY RESULT IN IMPRISONMENT OR FINE."

Sec. 34. Subsection (a) of section 53-205 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2023*):

(a) No person shall carry or possess in any vehicle or snowmobile any **[**shotgun, rifle or muzzleloader of any gauge or caliber**]** firearm, other than a pistol or revolver, while such **[**shotgun, rifle or muzzleloader**]** firearm contains in the barrel, chamber or magazine any loaded shell or cartridge capable of being discharged or, if such firearm is a muzzleloader, when such muzzleloader has a percussion cap in place or when the powder pan of a flintlock contains powder. As used in this subsection, "muzzleloader" means a rifle or shotgun that is incapable of firing a self-contained cartridge and must be loaded at the muzzle end.

Sec. 35. Section 53-341b of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) No person, firm or corporation shall sell or deliver body armor to another person unless the transferee (1) meets in person with the transferor to accomplish the sale or delivery, and (2) possesses a permit or certificate issued under the provisions of section 29-28, as amended by this act, 29-36f, as amended by this act, 29-37p, as amended by this act, or 29-38n.

(b) The provisions of subsection (a) of this section shall not apply to the sale or delivery of body armor to (1) a sworn member or authorized official of an organized local police department, the Division of State Police within the Department of Emergency Services and Public Protection, the Division of Criminal Justice, the Department of Correction, the Board of Pardons and Paroles or the Department of Motor Vehicles, (2) an authorized official of a municipality or the Department of Administrative Services that purchases body armor on behalf of an organized local police department, the Division of State Police within the Department of Emergency Services and Public Protection, the Division of Criminal Justice, the Department of Correction, the Board of Pardons and Paroles or the Department of Motor Vehicles, (3) a judicial marshal or probation officer or an authorized official of the Judicial Branch who purchases body armor on behalf of a probation officer or a judicial marshal, **[**or**]** (4) a member of the National Guard or the armed forces reserve, (5) a federal firearms licensee, or (6) an employee of an emergency medical service organization, as defined in section 53a-3, as amended by this act.

(c) As used in this section, "body armor" means any **[**material**]** item designed to provide bullet penetration resistance and to be worn on or under clothing on the body, **[**and to provide bullet penetration resistance**]** like a vest or other article of clothing.

(d) Any person, firm or corporation that violates the provisions of this section shall be guilty of a class B misdemeanor.

Sec. 36. Section 53a-3 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

Except where different meanings are expressly specified, the following terms have the following meanings when used in this title:

(1) "Person" means a human being, and, where appropriate, a public or private corporation, a limited liability company, an unincorporated association, a partnership, a government or a governmental instrumentality;

(2) "Possess" means to have physical possession or otherwise to exercise dominion or control over tangible property;

(3) "Physical injury" means impairment of physical condition or pain;

(4) "Serious physical injury" means physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ;

(5) "Deadly physical force" means physical force which can be reasonably expected to cause death or serious physical injury;

(6) "Deadly weapon" means any weapon, whether loaded or unloaded, from which a shot may be discharged, or a switchblade knife, gravity knife, billy, blackjack, bludgeon, or metal knuckles. The definition of "deadly weapon" in this subdivision shall be deemed not to apply to section 29-38 or 53-206;

(7) "Dangerous instrument" means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or

serious physical injury, and includes a "vehicle" as that term is defined in this section and includes a dog that has been commanded to attack, except a dog owned by a law enforcement agency of the state or any political subdivision thereof or of the federal government when such dog is in the performance of its duties under the direct supervision, care and control of an assigned law enforcement officer;

(8) "Vehicle" means a "motor vehicle" as defined in section 14-1, a snowmobile, any aircraft, or any vessel equipped for propulsion by mechanical means or sail;

(9) "Peace officer" means a member of the Division of State Police within the Department of Emergency Services and Public Protection or an organized local police department, a chief inspector or inspector in the Division of Criminal Justice, a state marshal while exercising authority granted under any provision of the general statutes, a judicial marshal in the performance of the duties of a judicial marshal, a conservation officer or special conservation officer, as defined in section 26-5, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, 29-18a, 29-18b or 29-19, an adult probation officer, an official of the Department of Correction authorized by the Commissioner of Correction to make arrests in a correctional institution or facility, any investigator in the investigations unit of the office of the State Treasurer, an inspector of motor vehicles in the Department of Motor Vehicles, who is certified under the provisions of sections 7-294a to 7-294e, inclusive, a United States marshal or deputy marshal, any special agent of the federal government authorized to enforce the provisions of Title 21 of the United States Code, or a member of a law enforcement unit of the Mashantucket Pequot Tribe or the Mohegan Tribe of Indians of Connecticut created and governed by a memorandum of agreement under section 47-65c who is certified as a police officer by the Police Officer Standards and Training Council pursuant to sections 7-294a to 7-294e, inclusive;

(10) "Firefighter" means any agent of a municipality whose duty it is to protect life and property therein as a member of a duly constituted fire department whether professional or volunteer;

(11) A person acts "intentionally" with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct;

(12) A person acts "knowingly" with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists;

(13) A person acts "recklessly" with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation;

(14) A person acts with "criminal negligence" with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation;

(15) "Machine gun" means a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a submachine gun;

(16) "Rifle" means a weapon designed or redesigned, made or

remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger;

(17) "Shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger;

(18) "Pistol" or "revolver" means any firearm having a barrel less than twelve inches;

(19) "Firearm" means any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged;

(20) "Electronic defense weapon" means a weapon which by electronic impulse or current is capable of immobilizing a person temporarily, including a stun gun or other conductive energy device;

(21) "Martial arts weapon" means a nunchaku, kama, kasari-fundo, octagon sai, tonfa or chinese star;

(22) "Employee of an emergency medical service organization" means an ambulance driver, emergency medical technician or paramedic as defined in section 19a-175;

(23) "Railroad property" means all tangible property owned, leased or operated by a railroad carrier including, but not limited to, a right-of-way, track, roadbed, bridge, yard, shop, station, tunnel, viaduct, trestle, depot, warehouse, terminal or any other structure or appurtenance or equipment owned, leased or used in the operation of a railroad carrier including a train, locomotive, engine, railroad car, signals or safety

device or work equipment or rolling stock;

(24) "Serious firearm offense" means a violation of section 29-36, 29-36a, as amended by this act, or 53-202w, as amended by this act, possession of a stolen firearm or a firearm that is altered in a manner that renders the firearm unlawful, or any crime of which an essential element is that the person discharged, used or was armed with and threatened the use of a firearm; and

(25) "Serious firearm offender" means a person who has (A) two convictions for a serious firearm offense, (B) a conviction for a serious firearm offense and was previously convicted of a violation of section 29-36, 29-36a, as amended by this act, subdivision (1) of subsection (a) of section 53a-217, as amended by this act, or subdivision (1) of subsection (a) of section 53a-217c, as amended by this act, or (C) a conviction for a serious firearm offense and was previously convicted of two or more additional felony offenses.

Sec. 37. Section 53a-32 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) At any time during the period of probation or conditional discharge, the court or any judge thereof may issue a warrant for the arrest of a defendant for violation of any of the conditions of probation or conditional discharge, or may issue a notice to appear to answer to a charge of such violation, which notice shall be personally served upon the defendant. Whenever a probation officer has probable cause to believe that a person on probation who is a serious firearm offender has violated a condition of probation, or knows that a person on probation for a felony conviction has been arrested for the commission of a serious firearm offense, such probation officer shall apply to the court or any judge thereof for a warrant for the arrest of such person for violation of a condition or conditions of probation or conditional discharge. Any such warrant shall authorize all officers named therein to return the

defendant to the custody of the court or to any suitable detention facility designated by the court. Whenever a probation officer has probable cause to believe that a person has violated a condition of such person's probation, such probation officer (1) may notify any police officer that such person has, in such officer's judgment, violated the conditions of such person's probation, and **[**such**]** (2) shall notify such police officer if such person is a serious firearm offender or is on probation for a felony conviction and has been arrested for the commission of a serious firearm offense. Such notice shall be sufficient warrant for the police officer to arrest such person and return such person to the custody of the court or to any suitable detention facility designated by the court. Whenever a probation officer so notifies a police officer, the probation officer shall notify the victim of the offense for which such person is on probation, and any victim advocate assigned to assist the victim, provided the probation officer has been provided with the name and contact information for such victim or victim advocate. Any probation officer may arrest any defendant on probation without a warrant or may deputize any other officer with power to arrest to do so by giving such other officer a written statement setting forth that the defendant has, in the judgment of the probation officer, violated the conditions of the defendant's probation. Such written statement, delivered with the defendant by the arresting officer to the official in charge of any correctional center or other place of detention, shall be sufficient warrant for the detention of the defendant. After making such an arrest, such probation officer shall present to the detaining authorities a similar statement of the circumstances of violation. **[**Provisions**]** Except as provided in subsection (e) of this section, provisions regarding release on bail of persons charged with a crime shall be applicable to any defendant arrested under the provisions of this section. Upon such arrest and detention, the probation officer shall immediately so notify the court or any judge thereof.

(b) When the defendant is presented for arraignment on the charge

of violation of any of the conditions of probation or conditional discharge, the court shall review any conditions previously imposed on the defendant and may order, as a condition of the pretrial release of the defendant, that the defendant comply with any or all of such conditions in addition to any conditions imposed pursuant to section 54-64a, as amended by this act. Unless the court, pursuant to subsection (c) of section 54-64a, as amended by this act, orders that the defendant remain under the supervision of a probation officer or other designated person or organization, the defendant shall be supervised by the Court Support Services Division of the Judicial Branch in accordance with subsection (a) of section 54-63b.

(c) Upon notification by the probation officer of the arrest of the defendant or upon an arrest by warrant as herein provided, the court shall cause the defendant to be brought before it without unnecessary delay for a hearing on the violation charges. At such hearing the defendant shall be informed of the manner in which such defendant is alleged to have violated the conditions of such defendant's probation or conditional discharge, shall be advised by the court that such defendant has the right to retain counsel and, if indigent, shall be entitled to the services of the public defender, and shall have the right to cross-examine witnesses and to present evidence in such defendant's own behalf. Unless good cause is shown, a charge of violation of any of the conditions of probation or conditional discharge shall be disposed of or scheduled for a hearing not later than one hundred twenty days after the defendant is arraigned on such charge, except, if the defendant is a serious firearm offender, or is on probation for a felony conviction and has been arrested for the commission of a serious firearm offense, such charge shall be disposed of or scheduled for a hearing not later than sixty days after the defendant is arraigned on such charge.

(d) If such violation is established and the violation consisted of the commission of a serious firearm offense or the defendant is a serious

firearm offender, the court shall revoke the sentence of probation or conditional discharge, otherwise, the court may: (1) Continue the sentence of probation or conditional discharge; (2) modify or enlarge the conditions of probation or conditional discharge; (3) extend the period of probation or conditional discharge, provided the original period with any extensions shall not exceed the periods authorized by section 53a-29; or (4) revoke the sentence of probation or conditional discharge. If such sentence is revoked, the court shall require the defendant to serve the sentence imposed or impose any lesser sentence. Any such lesser sentence may include a term of imprisonment, all or a portion of which may be suspended entirely or after a period set by the court, followed by a period of probation with such conditions as the court may establish. No such revocation shall be ordered, except upon consideration of the whole record and unless such violation is established by the introduction of reliable and probative evidence and by a preponderance of the evidence.

(e) Provisions regarding release on bail of any serious firearm offender arrested pursuant to this section who is charged with a crime, or any felony offender arrested pursuant to this section for a serious firearm offense, shall be applicable to such serious firearm offender provided that, for the purpose of applying such provisions, there shall be a rebuttable presumption that such serious firearm offender poses a danger to the safety of other persons.

Sec. 38. Section 54-64a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) (1) Except as provided in subdivision (2) of this subsection and subsection (b) or (c) of this section, when any arrested person is presented before the Superior Court, said court shall, in bailable offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient to reasonably ensure the appearance of the arrested person in court: (A) Upon execution of a

written promise to appear without special conditions, (B) upon execution of a written promise to appear with nonfinancial conditions, (C) upon execution of a bond without surety in no greater amount than necessary, or (D) upon execution of a bond with surety in no greater amount than necessary, but in no event shall a judge prohibit a bond from being posted by surety. In addition to or in conjunction with any of the conditions enumerated in subparagraphs (A) to (D), inclusive, of this subdivision the court may, when it has reason to believe that the person is drug-dependent and where necessary, reasonable and appropriate, order the person to submit to a urinalysis drug test and to participate in a program of periodic drug testing and treatment. The results of any such drug test shall not be admissible in any criminal proceeding concerning such person.

(2) If the arrested person is charged with no offense other than a misdemeanor, the court shall not impose financial conditions of release on the person unless (A) the person is charged with a family violence crime, as defined in section 46b-38a, or (B) the person requests such financial conditions, or (C) the court makes a finding on the record that there is a likely risk that (i) the arrested person will fail to appear in court, as required, or (ii) the arrested person will obstruct or attempt to obstruct justice, or threaten, injure or intimidate or attempt to threaten, injure or intimidate a prospective witness or juror, or (iii) the arrested person will engage in conduct that threatens the safety of himself or herself or another person. In making a finding described in this subsection, the court may consider past criminal history, including any prior record of failing to appear as required in court that resulted in any conviction for a violation of section 53a-172 or any conviction during the previous ten years for a violation of section 53a-173 and any other pending criminal cases of the person charged with a misdemeanor.

(3) The court may, in determining what conditions of release will reasonably ensure the appearance of the arrested person in court,

consider the following factors: (A) The nature and circumstances of the offense, (B) such person's record of previous convictions, (C) such person's past record of appearance in court, (D) such person's family ties, (E) such person's employment record, (F) such person's financial resources, character and mental condition, (G) such person's community ties, and (H) in the case of a violation of section 53a-222a, as amended by this act, when the condition of release was issued for a family violence crime, as defined in section 46b-38a, the heightened risk posed to victims of family violence by violations of conditions of release.

(b) (1) **[**When**]** Except as provided in subsection (c) of this section, any arrested person charged with the commission of a class A felony, a class B felony, except a violation of section 53a-86 or 53a-122, a class C felony, except a violation of section 53a-87, 53a-152 or 53a-153, or a class D felony under sections 53a-60 to 53a-60c, inclusive, section 53a-72a, 53a-95, 53a-103, 53a-103a, 53a-114, 53a-136 or 53a-216, or a family violence crime, as defined in section 46b-38a, is presented before the Superior Court, said court shall, in bailable offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient to reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered: (A) Upon such person's execution of a written promise to appear without special conditions, (B) upon such person's execution of a written promise to appear with nonfinancial conditions, (C) upon such person's execution of a bond without surety in no greater amount than necessary, or (D) upon such person's execution of a bond with surety in no greater amount than necessary, but in no event shall a judge prohibit a bond from being posted by surety. In addition to or in conjunction with any of the conditions enumerated in subparagraphs (A) to (D), inclusive, of this subdivision, the court may, when it has reason to believe that the person is drug-dependent and where necessary, reasonable and appropriate, order the person to submit to a urinalysis drug test and to participate in a program of periodic drug testing and treatment. The

results of any such drug test shall not be admissible in any criminal proceeding concerning such person.

(2) The court may, in determining what conditions of release will reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered, consider the following factors: (A) The nature and circumstances of the offense, (B) such person's record of previous convictions, (C) such person's past record of appearance in court after being admitted to bail, (D) such person's family ties, (E) such person's employment record, (F) such person's financial resources, character and mental condition, (G) such person's community ties, (H) the number and seriousness of charges pending against the arrested person, (I) the weight of the evidence against the arrested person, (J) the arrested person's history of violence, (K) whether the arrested person has previously been convicted of similar offenses while released on bond, (L) the likelihood based upon the expressed intention of the arrested person that such person will commit another crime while released, and (M) the heightened risk posed to victims of family violence by violations of conditions of release and court orders of protection.

(3) When imposing conditions of release under this subsection, the court shall state for the record any factors under subdivision (2) of this subsection that it considered and the findings that it made as to the danger, if any, that the arrested person might pose to the safety of any other person upon the arrested person's release that caused the court to impose the specific conditions of release that it imposed.

(c) (1) When any arrested person charged with the commission of a serious firearm offense, as defined in section 53a-3, as amended by this act, is (A) a serious firearm offender, (B) has two previous convictions for a violation of section 29-36, 29-36a, as amended by this act, 53-202, 53-202a, as amended by this act, 53-202b, 53-202c, as amended by this act, 53-202w, as amended by this act, 53-202aa, 53-206i, 53a-54a, 53a-54b,

53a-54c, 53a-54d, 53a-55, 53a-55a, 53a-56, 53a-56a, 53a-59, 53a-60, 53a-60a, 53a-134, 53a-212, 53a-216, 53a-217, as amended by this act, 53a-217b or 53a-217c, as amended by this act, (C) a previous conviction for a violation of section 29-35, as amended by this act, in addition to a prior conviction for a violation of section 29-36, 29-36a, as amended by this act, 53-202, 53-202a, as amended by this act, 53-202b, 53-202c, as amended by this act, 53-202w, as amended by this act, 53-202aa, 53-206i, 53a-54a, 53a-54b, 53a-54c, 53a-54d, 53a-55, 53a-55a, 53a-56, 53a-56a, 53a-59, 53a-60, 53a-60a, 53a-134, 53a-212, 53a-216, 53a-217, as amended by this act, 53a-217b or 53a-217c, as amended by this act, or (D) two or more convictions during the five-year period immediately prior to the current arrest for a violation of section 21a-277, 21a-278, 53a-122 or 53a-123, is presented before the Superior Court, the court shall, in bailable offenses, promptly order the release of such person after establishing a bond amount found sufficient to reasonably ensure the appearance of the arrested person in court, and that the safety of any other person will not be endangered and upon such person's execution of a bond with or without surety in no greater amount than necessary. The prosecutorial official shall petition for the arrested person to deposit at least thirty per cent of the bond amount directly with the court, and there shall be a rebuttable presumption that the safety of other persons will be endangered without the granting of such petition. Additionally, the court may, when it has reason to believe that the person is drug-dependent and where necessary, reasonable and appropriate, order the person to submit to a urinalysis drug test and to participate in a program of periodic drug testing and treatment. The results of any such drug test shall not be admissible in any criminal proceeding concerning such person.

(2) When any arrested person charged with the commission of a serious firearm offense, as defined in section 53a-3, as amended by this act, other than a person described in subdivision (1) of this subsection, is presented before the Superior Court, the court shall, in bailable

offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient to reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered: (A) Upon such person's execution of a written promise to appear without special conditions, (B) upon such person's execution of a written promise to appear with nonfinancial conditions, (C) upon such person's execution of a bond without surety in no greater amount than necessary, or (D) upon such person's execution of a bond with surety in no greater amount than necessary, but in no event shall a judge prohibit a bond from being posted by surety. The prosecutorial official may petition the court to deem such person a serious risk to the safety of another person or persons. The prosecutorial official may present any information developed by federal, state and local law enforcement agencies in the course of a criminal investigation or enforcement action, including, but not limited to, social media posts, pictures or videos threatening violence, claiming responsibility for violence or suggesting possession of a firearm. If the court finds that the arrested person poses a serious risk to the safety of another person or persons, the arrested person may only be released pursuant to subparagraph (C) or (D) of this subdivision and the arrested person shall be required to deposit at least thirty per cent of any bond amount directly with the court. Additionally, the court may, when it has reason to believe that the person is drug-dependent and where necessary, reasonable and appropriate, order the person to submit to a urinalysis drug test and to participate in a program of periodic drug testing and treatment. The results of any such drug test shall not be admissible in any criminal proceeding concerning such person.

(3) The court may, in determining what conditions of release will reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered, consider the following factors: (A) The nature and circumstances of the offense, (B) such person's record of previous convictions, (C) such person's past

record of appearances in court after being admitted to bail, (D) such person's family ties, (E) such person's employment record, (F) such person's financial resources, character and mental condition, (G) such person's community ties, (H) the number and seriousness of charges pending against the arrested person, (I) the weight of the evidence against the arrested person, (J) the arrested person's history of violence, (K) whether the arrested person has previously been convicted of similar offenses while released on bond, and (L) the likelihood based upon the expressed intention of the arrested person that such person will commit another crime while released.

(4) When imposing conditions of release under this subsection, the court shall state for the record any factors under subdivision (3) of this subsection that it considered and the findings that it made as to the danger, if any, that the arrested person might pose to the safety of any other person upon the arrested person's release that caused the court to impose the specific conditions of release that the court imposed.

**[**(c)**]** (d) If the court determines that a nonfinancial condition of release should be imposed pursuant to subparagraph (B) of subdivision (1) of subsection (a) or (b) of this section, the court shall order the pretrial release of the person subject to the least restrictive condition or combination of conditions that the court determines will reasonably ensure the appearance of the arrested person in court and, with respect to the release of the person pursuant to subsection (b) or (c) of this section, that the safety of any other person will not be endangered, which conditions may include an order that the arrested person do one or more of the following: (1) Remain under the supervision of a designated person or organization; (2) comply with specified restrictions on such person's travel, association or place of abode; (3) not engage in specified activities, including the use or possession of a dangerous weapon, an intoxicant or a controlled substance; (4) provide sureties of the peace pursuant to section 54-56f under supervision of a

designated bail commissioner or intake, assessment and referral specialist employed by the Judicial Branch; (5) avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense; (6) maintain employment or, if unemployed, actively seek employment; (7) maintain or commence an educational program; (8) be subject to electronic monitoring; or (9) satisfy any other condition that is reasonably necessary to ensure the appearance of the person in court and that the safety of any other person will not be endangered. The court shall state on the record its reasons for imposing any such nonfinancial condition.

**[**(d)**]** (e) If the arrested person is not released, the court shall order him committed to the custody of the Commissioner of Correction until he is released or discharged in due course of law.

**[**(e)**]** (f) The court may require that the person subject to electronic monitoring pursuant to subsection **[**(c)**]** (d) of this section pay directly to the electronic monitoring service provider a fee for the cost of such electronic monitoring services. If the court finds that the person subject to electronic monitoring is indigent and unable to pay the costs of electronic monitoring services, the court shall waive such costs. Any contract entered into by the Judicial Branch and the electronic monitoring service provider shall include a provision stating that the total cost for electronic monitoring services shall not exceed five dollars per day. Such amount shall be indexed annually to reflect the rate of inflation.

Sec. 39. Section 54-64f of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) Upon application by the prosecuting authority alleging that a defendant has violated the conditions of the defendant's release, the court may, if probable cause is found, order that the defendant appear in court for an evidentiary hearing upon such allegations. An order to

appear shall be served upon the defendant by any law enforcement officer delivering a copy to the defendant personally, or by leaving it at the defendant's usual place of abode with a person of suitable age and discretion then residing therein, or mailing it by registered or certified mail to the last-known address of the defendant.

(b) **[**If**]** Except as provided in subsection (d) of this section, if the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by clear and convincing evidence that the defendant has violated reasonable conditions imposed on the defendant's release it may impose different or additional conditions upon the defendant's release. If the defendant is on release with respect to an offense for which a term of imprisonment of ten or more years may be imposed and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by clear and convincing evidence that the defendant has violated reasonable conditions of the defendant's release and that the safety of any other person is endangered while the defendant is on release, it may revoke such release. The revocation of a defendant's release pursuant to this subsection shall cause any bond posted in the criminal proceeding to be automatically terminated and the surety to be released.

(c) **[**If**]** Except as provided in subsection (d) of this section, if the defendant is a serious firearm offender or is on release with respect to a serious firearm offense as defined in section 53a-3, as amended by this act, or the defendant is on release with respect to an offense for which a term of imprisonment of ten or more years may be imposed and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by clear and convincing evidence that the safety of any other person is endangered while the defendant is on release and that there is probable cause to believe that the defendant has committed a federal, state or local crime while on release, there shall be a rebuttable presumption that the defendant's release should be

revoked.

(d) If the defendant is a serious firearm offender as defined in section 53a-3, as amended by this act, and is on release with respect to any offense and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by the preponderance of the evidence that there is probable cause to believe that the defendant has committed a serious firearm offense, as defined in section 53a-3, as amended by this act, while on release, or if the defendant is on release with respect to any offense referenced in subsection (c) of section 54-64a, as amended by this act, and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by the preponderance of evidence that there is probable cause to believe that the defendant has committed a serious firearm offense, the defendant's release shall be revoked.

**[**(d)**]** (e) The revocation of a defendant's release pursuant to this section shall cause any bond posted in the criminal proceeding to be automatically terminated and the surety to be released.

(f) If the defendant commits a serious firearm offense while on pretrial release and is subsequently convicted of any offense for which the defendant was on pretrial release and a serious firearm offense committed while on pretrial release, any bond posted in the criminal proceeding for the offense for which the defendant was on pretrial release shall be forfeited.

Sec. 40. Section 54-127 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

The request of the Commissioner of Correction or any officer of the Department of Correction so designated by the commissioner, or of the Board of Pardons and Paroles or its chairman shall be sufficient warrant to authorize any officer of the Department of Correction or any officer

authorized by law to serve criminal process within this state, to return any **[**convict or inmate**]** parolee on parole into actual custody; and any such officer, police officer, constable or state marshal shall arrest and hold any parolee **[**or inmate**]** when so requested, without any written warrant, and the commissioner shall make such request if the parolee is a serious firearm offender, as defined in section 53a-3, as amended by this act, and is arrested while on parole for a felony offense, or if the parolee is arrested for a serious firearm offense as defined in section 53a-3, as amended by this act.

Sec. 41. (NEW) (*Effective from passage*) (a) For the purposes of this section, "firearm-related crime docket" means a docket in a geographical area separate and apart from other criminal matters for the hearing of firearm-related matters.

(b) Not later than December 31, 2023, the Chief Court Administrator shall establish a firearm-related crime docket to serve the geographical area courts in Fairfield, Hartford, New Haven and Waterbury. The Chief Court Administrator shall establish policies and procedures to implement such firearm-related crime docket.

Sec. 42. (NEW) (*Effective October 1, 2023*) Notwithstanding any provision of the general statutes, any peace officer who is a sworn member of a law enforcement agency or any prosecutorial official who is aware of any person released on parole or serving probation who poses a serious threat to public safety, may file an emergency petition with the supervisory staff of the probation or parole office, as applicable, and a copy of such petition with the office of the Chief State's Attorney. Such petition shall cite risk factors pointing to the person released on parole or serving probation as a serious threat to public safety and may present any information developed by federal, state and local law enforcement agencies in the course of a criminal investigation or enforcement action, including, but not limited to, social media posts, pictures or videos threatening violence, claiming responsibility for

violence or suggesting possession of a firearm. Not later than forty-eight hours after receiving such petition, the supervisory staff of the probation or parole office, as applicable, shall (1) seek a warrant for such person serving probation for a violation of such probation, as applicable, or (2) provide the rationale for not taking an action described in subdivision (1) of this section.

Sec. 43. Subsection (a) of section 53a-222 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) A person is guilty of violation of conditions of release in the first degree when, while charged with the commission of a felony, such person is released pursuant to subsection (b) of section 54-63c, subsection (c) of section 54-63d or subsection **[**(c)**]** <u>(d)</u> of section 54-64a<u>, as amended by this act</u>, and intentionally violates one or more of the imposed conditions of release.

Sec. 44. Subsection (a) of section 53a-222a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) A person is guilty of violation of conditions of release in the second degree when, while charged with the commission of a misdemeanor or motor vehicle violation for which a sentence to a term of imprisonment may be imposed, such person is released pursuant to subsection (b) of section 54-63c, subsection (c) of section 54-63d or subsection **[**(c)**]** <u>(d)</u> of section 54-64a<u>, as amended by this act,</u> and intentionally violates one or more of the imposed conditions of release.

Sec. 45. Section 53-202g of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(a) Any person who lawfully possesses an assault weapon under sections 53-202a to 53-202k, inclusive<u>, as amended by this act</u>, or a

firearm, as defined in section 53a-3, as amended by this act, that is lost or stolen from such person shall report the loss or theft to the organized local police department for the town in which the loss or theft occurred or, if such town does not have an organized local police department, to the state police troop having jurisdiction for such town within seventy-two hours of when such person discovered or should have discovered the loss or theft. Such department or troop shall forthwith forward a copy of such report to the Commissioner of Emergency Services and Public Protection. The provisions of this subsection shall not apply to the loss or theft of an antique firearm as defined in section 29-37a, as amended by this act.

(b) Any person who fails to make a report required by subsection (a) of this section, within the prescribed time period shall **[**commit an infraction and be fined not more than ninety dollars**]** be guilty of a class A misdemeanor for a first offense and be guilty of a class C felony for any subsequent offense, except that, if such person intentionally fails to make such report within the prescribed time period, such person shall be guilty of a class B felony. Any person who violates subsection (a) of this section for the first offense shall not lose such person's right to hold or obtain any firearm permit under the general statutes.

Sec. 46. Subsection (b) of section 29-28a of the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2023*):

(b) (1) The local authority shall, not later than eight weeks after a sufficient application for a temporary state permit has been made, inform the applicant that such applicant's request for a temporary state permit has been approved or denied, and if denied, supply to the applicant a detailed written reason for such denial. The local authority shall forward a copy of the application indicating approval or denial of the temporary state permit to the Commissioner of Emergency Services and Public Protection. If the local authority has denied the application

for a temporary state permit, no state permit may be issued. If the local authority has failed to expressly deny the application or issue a temporary state permit during the eight-week period following the submission of such application, upon presentation by the applicant of an affidavit attesting to such failure to expressly deny the application at least (A) thirty-two weeks, in the case of an application filed on or before March 30, 2024, and (B) sixteen weeks, in the case of an application filed on or after April 1, 2024, after submission of such application, the commissioner shall accept such affidavit in lieu of a temporary state permit and notify the local authority immediately of the receipt of such affidavit. The commissioner shall, not later than eight weeks after receiving an application indicating approval from the local authority, or an affidavit attesting to a failure to expressly deny the application, inform the applicant in detailed writing that the applicant's application for a state permit has been approved or denied, or that the results of the national criminal history records check have not been received. If grounds for denial become known after a temporary state permit has been obtained, the temporary state permit shall be immediately revoked pursuant to section 29-32. The failure of the issuing authority to complete the review of an application for a temporary state permit shall not be grounds for the commissioner to deny issuance of a state permit.

(2) Notwithstanding subparagraph (B) of subdivision (1) of this subsection, during a major disaster or an emergency declaration by the President of the United States, or an emergency declaration issued by the Governor due to any disease epidemic, public health emergency or natural disaster impacting a local authority, the Commissioner of Emergency Services and Public Protection shall not accept any affidavit filed under subdivision (1) of this subsection until thirty-two weeks have passed since submission of the application for a temporary state permit.

Sec. 47. (NEW) (*Effective from passage*) (a) Any comprehensive plan

and program developed by the Commissioner of Emergency Services and Public Protection pursuant to subsection (b) of section 28-5 of the general statutes shall include a response plan for a mass shooting event. A mass shooting event is deemed to occur when, within a period of twenty-four hours, four or more individuals are shot within a three-mile radius.

(b) In any response plan for a mass shooting event, the commissioner shall include provisions directing the coordination of a meeting with the Department of Emergency Services and Public Protection, the local police department, community leaders, including religious leaders and representatives of the Project Longevity Initiative, established under section 4-68bb of the general statutes, for the purpose of determining (1) why the shooting event occurred, (2) what circumstances led to the shooting event, (3) whether there were warning signs that such shooting event would occur, (4) preventative measures the community can enact to prevent further shooting events, and (5) if there are resources available to assist the community in its response to the shooting event. At the conclusion of such meeting, the meeting participants shall report their findings to the Commissioner of Emergency Services and Public Protection. The commissioner shall review and report the findings and any other information the commissioner deems pertinent, in accordance with the provisions of section 11-4a of the general statutes, to the Governor, majority and minority leaders of the House of Representatives and the Senate and the joint standing committee of the General Assembly having cognizance of matters relating to public safety and security. Such report shall include recommendations, if any, for legislative action to reduce mass shooting events.

(c) The Commissioner of Emergency Services and Public Protection shall coordinate with the Commissioner of Public Health for the deployment of grief counselors and mental health professionals to provide mental health services to the family members or other

individuals with a close association with any victim of a mass shooting. Such deployments shall be made to local community outreach groups in and around the impacted geographical location and to any school or institution of higher education where any victim or perpetrator of a mass shooting event was enrolled.

(d) The Commissioner of Emergency Services and Public Protection shall coordinate an investigation into each mass shooting event with the office of the Chief State's Attorney. Each such investigation shall consider: (1) How the perpetrator acquired any firearm used in the event, (2) whether the firearm that was used was legally acquired, (3) if the magazine used in the shooting was a large capacity magazine, as defined in section 53-202w of the general statutes, as amended by this act, and (4) the backgrounds of the perpetrator and the victims. The commissioner and Chief State's Attorney shall report, in accordance with the provisions of section 11-4a of the general statutes, a summary of each such investigation, all findings of such investigation, including any determination of cause of the mass shooting event and any recommendations to prevent future mass shooting events to the Governor, majority and minority leaders of the House of Representatives and the Senate and the joint standing committee of the General Assembly having cognizance of matters relating to public safety and security and to the chief elected officer and legislative body, each as described in section 7-193 of the general statutes, of the municipality where the mass shooting event occurred.

Sec. 48. (NEW) (*Effective October 1, 2023*) The administrative head of each law enforcement unit, as defined in section 7-291e of the general statutes, shall ensure that each police station, headquarters or barracks under such administrative head's jurisdiction posts in a conspicuous place that is readily available for viewing by the public a statement informing individuals of (1) their right to request and obtain an application to apply for a permit to carry a pistol or revolver, their right

to submit an application for a permit to carry a pistol or revolver no more than one week after their request to do so, their right to be informed in writing of the result of their application within eight weeks from its submittal, their right to file an appeal in the event of a denial of a permit for the carrying of a pistol or revolver and an individual's state and federal constitutional right to own, possess and carry a firearm for the protection of the individual's home or family as the individual so lawfully chooses, and (2) the application process for a risk protection order pursuant to section 29-38c of the general statutes, including the process by which a family member or medical professional can apply.

Sec. 49. Section 53-202m of the general statutes is repealed. (*Effective from passage*)

Approved June 6, 2023

# Exhibit J

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

EDDIE GRANT, JR., JENNIFER HAMILTON; MICHAEL STIEFEL; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; AND SECOND AMENDMENT FOUNDATION, INC.,

Plaintiffs,

v.

EDWARD M. LAMONT, JR., in his official capacity; JAMES ROVELLA, in his official capacity; PATRICK GRIFFIN, in his official capacity; MARGARET E. KELLY, in her official capacity; DAVID R. APPLEGATE, in his official capacity; JOSEPH T. CORRADINO, in his official capacity; SHARMESE L. WALCOTT, in her official capacity; DAVID R. SHANNON, in his official capacity; MICHAEL A. GAILOR, in his official capacity; CHRISTIAN WATSON, in his official capacity; JOHN P. DOYLE, JR., in his official capacity, PAUL J. NARDUCCI, in his official capacity; PAUL J. FERENCEK, in his official capacity; MATTHEW C. GEDANSKY, in his official capacity, MAUREEN PLATT, in her official capacity; ANNE F. MAHONEY, in her official capacity,

Defendants.

CIV. NO. 3:22-cv-01223-JBA

**SUPPLEMENTAL DECLARATION OF EDDIE GRANT, JR. PURSUANT TO 28 U.S.C. § 1746**

I, Eddie Grant, Jr., being duly sworn, deposes and says:

1. I am over 18 years of age and understand the obligations of an oath.

2. I am making this supplemental declaration pursuant to 28 U.S.C. § 1746, and I understand that the same obligations that apply to statements made under oath apply to the statements that I make herein.

3. I am one of the individual Plaintiffs in *Grant et al v. Lamont et al.*, 3:22-cv-01223-JBA. I submit this supplemental declaration in further support of the Plaintiffs' Amended Motion for Preliminary Injunction in *Grant v. Lamont.*

4. I currently own firearms that are legally considered to be "others" – firearms that are not rifles, pistols, or shotguns.

5. It has been my intention to acquire a .300 Blackout in a Connecticut "other" configuration for quite some time. Specifically, it has pistol grips and fore grips.

6. On June 30, 2023, I contacted Lock N' Load Firearms, LLC in Plantsville, Connecticut to inquire about purchasing this firearms.

7. I was informed that Lock N' Load Firearms, LLC could not sell me a .300 Blackout in a Connecticut "other" configuration because it is now considered to be illegal "assault weapons" under Connecticut law.

8. I still intend to acquire a .300 Blackout in a Connecticut "other" configuration and I want the ability to do so lawfully and without fear of criminal prosecution.

9. Further affiant sayeth not.

I, Eddie Grant, Jr., declare under penalty of perjury that the foregoing is true and correct.

Executed on July 5, 2023

Eddie Grant, Jr.

# Exhibit K

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| EDDIE GRANT, JR., JENNIFER HAMILTON; MICHAEL STIEFEL; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; AND SECOND AMENDMENT FOUNDATION, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>EDWARD M. LAMONT, JR., in his official capacity; JAMES ROVELLA, in his official capacity; PATRICK GRIFFIN, in his official capacity; MARGARET E. KELLY, in her official capacity; DAVID R. APPLEGATE, in his official capacity; JOSEPH T. CORRADINO, in his official capacity; SHARMESE L. WALCOTT, in her official capacity; DAVID R. SHANNON, in his official capacity; MICHAEL A. GAILOR, in his official capacity; CHRISTIAN WATSON, in his official capacity; JOHN P. DOYLE, JR., in his official capacity, PAUL J. NARDUCCI, in his official capacity; PAUL J. FERENCEK, in his official capacity; MATTHEW C. GEDANSKY, in his official capacity, MAUREEN PLATT, in her official capacity; ANNE F. MAHONEY, in her official capacity,<br><br>Defendants. | CIV. NO. 3:22-cv-01223-JBA<br><br>**SUPPLEMENTAL DECLARATION OF JENNIFER HAMILTON PURSUANT TO 28 U.S.C. § 1746** |

I, Jennifer Hamilton, being duly sworn, deposes and says:

1. I am over 18 years of age and understand the obligations of an oath.

2. I am making this supplemental declaration pursuant to 28 U.S.C. § 1746, and I understand that the same obligations that apply to statements made under oath apply to the statements that I make herein.

3. I am one of the individual Plaintiffs in *Grant et al v. Lamont et al.*, 3:22-cv-01223-JBA. I submit this supplemental declaration in further support of the Plaintiffs' Amended Motion for Preliminary Injunction in *Grant v. Lamont.*

4. I currently own firearms that are legally considered to be "others" – firearms that are not rifles, pistols, or shotguns.

5. It has been my intention to acquire a JP Firearms Corp. ".300 Blackout" in a Connecticut "other" configuration for quite some time. Specifically, this firearm would have had a 12.5 inch barrel, a pistol grip, and a fore grip.

6. On July 5, 2023, I contacted Tobacco Valley Gun in East Windsor, Connecticut to inquire whether I could purchase this firearm.

7. I was informed that Tobacco Valley Gun could not build or sell me this firearm in a Connecticut "other" configuration because it is now considered to be an illegal "assault weapon" under Connecticut law.

8. I still intend to acquire a JP Firearms Corp. ".300 Blackout" in a Connecticut "other" configuration, and I want the ability to do so lawfully and without fear of criminal prosecution.

9. Further affiant sayeth not.

I, Jennifer Hamilton declare under penalty of perjury that the foregoing is true and correct.

Executed on July 5, 2023

Jennifer Hamilton

# Exhibit L

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| EDDIE GRANT, JR., JENNIFER HAMILTON; MICHAEL STIEFEL; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; AND SECOND AMENDMENT FOUNDATION, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>EDWARD M. LAMONT, JR., in his official capacity; JAMES ROVELLA, in his official capacity; PATRICK GRIFFIN, in his official capacity; MARGARET E. KELLY, in her official capacity; DAVID R. APPLEGATE, in his official capacity; JOSEPH T. CORRADINO, in his official capacity; SHARMESE L. WALCOTT, in her official capacity; DAVID R. SHANNON, in his official capacity; MICHAEL A. GAILOR, in his official capacity; CHRISTIAN WATSON, in his official capacity; JOHN P. DOYLE, JR., in his official capacity, PAUL J. NARDUCCI, in his official capacity; PAUL J. FERENCEK, in his official capacity; MATTHEW C. GEDANSKY, in his official capacity, MAUREEN PLATT, in her official capacity; ANNE F. MAHONEY, in her official capacity,<br><br>Defendants. | CIV. NO. 3:22-cv-01223-JBA<br><br>**SUPPLEMENTAL DECLARATION OF MICHAEL STIEFEL PURSUANT TO 28 U.S.C. § 1746** |

I, Michael Stiefel, being duly sworn, deposes and says:

1. I am over 18 years of age and understand the obligations of an oath.

2. I am making this supplemental declaration pursuant to 28 U.S.C. § 1746, and I understand that the same obligations that apply to statements made under oath apply to the statements that I make herein.

3. I am one of the individual Plaintiffs in *Grant et al v. Lamont et al.*, 3:22-cv-01223-JBA. I submit this supplemental declaration in further support of the Plaintiffs' Amended Motion for Preliminary Injunction in *Grant v. Lamont*.

4. I currently own firearms that are legally considered to be "others" – firearms that are not rifles, pistols, or shotguns.

5. It has been my intention to acquire a custom built ".300 Blackout" in a Connecticut "other" configuration for quite some time.

6. On July 3, 2023, I contacted Swamp Yankee Arms, LLC to discuss them building a custom .300 Blackout in a Connecticut "other" configuration for me. Specifically, this custom .300 Blackout would have had a pistol grip and a fore grip.

7. I was informed that Swamp Yankee Arms, LLC could not build or sell me a .300 Blackout in a Connecticut "other" configuration because it is now considered to be an illegal "assault weapon" under Connecticut law.

8. I still intend to acquire a custom .300 Blackout in a Connecticut "other" configuration with the features I described above, and I want the ability to do so lawfully and without fear of criminal prosecution.

9. Further affiant sayeth not.

I, Michael Stiefel, declare under penalty of perjury that the foregoing is true and correct.

Executed on July 5, 2023

Michael Stiefel

# EXHIBIT A

## Declaration of Detective Brindiana Warenda

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ET. AL. | : | CIVIL NO. 3:22-CV-01118(JBA) |
| *Plaintiff*, | : | |
| v. | : | |
| NED LAMONT, ET AL., | : | JULY 25, 2023 |
| *Defendant.* | | |

AFFIDAVIT OF BRINDIANA WARENDA

I, Brindiana Warenda, having been duly sworn, testifies and affirms as follows:

1. I am over eighteen years of age and understand the obligations of an oath.

2. I have been employed as a Trooper with the Connecticut State Police (CSP) since 2012. The CSP is a division within the Connecticut Department of Emergency Services and Public Protection (DESPP).

3. I am presently assigned to the Special Licensing & Firearms Unit (SLFU) as a Detective and have been since September 2018. There are several different detective sections within SLFU including but not limited to Revocations, the Firearms Vault, Boxing/MMA, and Special Licensing (e.g. Bail Bondsmen, Security Guards, Armed Security Guards, etc.). From September 2018 to October 2019, I was assigned to Revocations. In October 2019, I was reassigned to the Firearms Vault and I am currently the primary detective at the Firearms Vault.

4. In my capacity as a Detective at the Firearms Vault, I specialize in firearm destruction and firearm legality. The Firearms Vault is the clearinghouse for firearm destruction in the State of Connecticut and processes over 3,000 firearms per year for destruction. However, we maintain a collection of firearms to primarily aid the judicial system with examples of firearms that are enumerated in statute. I also assist local, State and Federal law enforcement, as well as Federal Firearm Licensed (FFL) dealers and public, with Connecticut State Statutes regarding firearm legality within the State of Connecticut.

5. While I am directly assigned to the Firearms Vault, I assist on a regular basis with Revocations. Revocation duties include, but are not limited to revoking pistol permits for statutory prohibitors, making the determination if a person is suitable for a pistol permit, interacting with law enforcement agencies in the State of Connecticut and Federal, State and local law enforcement agencies throughout the United States, preparing Board of Firearms Permit Examiners (BFPE) hearing packets for DESPP's Legal Affairs Unit, and explaining firearms laws/regulations to various agencies, organizations and citizens.

6. I am certified by the Police Officer Standards and Training Council (P.O.S.T.) to instruct in "Weapons and Permits." The purpose of "Weapons and Permits" is to familiarize recruits and sworn law enforcement with the Connecticut State Statutes and federal laws relative to various firearms and firearms permits. One of the performance objectives is to identify the Connecticut Statutes relative to the illegal sale, carrying of, and safe securing of various firearms such as rifles, shotguns, and handguns. I am re-certified every three years by P.O.S.T.

7. I have received extensive training with respect to the use and safe handling of firearms. In addition, I have been trained and certified as an "armorer" on specific firearm platforms. An armorer is someone who is authorized by the manufacturer to repair and replace parts of firearms.

8. In 2020, I attended an armorer school established by Glock, Inc., a firearm manufacturer, and became a certified armorer on all Glock model pistols, excluding the G18 select fire models. I was trained to take apart a Glock pistol and replace/repair any defective part to make the firearm functional. In 2022, I attended a similar armorer school established by Smith & Wesson, another firearm manufacturer, where I became certified in repairing Smith & Wesson M&P 2.0 pistols.

9. I am also certified by the International Firearm Specialist Academy (IFSA) as a Certified Firearm Specialist. The training included, but was not limited to rules of safe handling, clearing procedures, safety precautions, classification of firearms pursuant to the Gun Control Act (GCA), firearm markings, nomenclature (identification of parts necessary to safety and/or marking locations), ammunition components, mechanical types of operations (e.g. semiautomatic versus fully automatic), and National Firearms Act (NFA) items.

10. Since I have been assigned to the Firearms Vault, I have had an opportunity to work with thousands of different types of firearms beyond what is issued to me by CSP. This handling of non-CSP issued firearms is invaluable because, not only do I need to know how to make firearms safe, but I also need to be able to identify features that could make a firearm illegal in the State of Connecticut.

11. In 1993, the Connecticut State Legislature passed Public Act 93-306 which prohibited possessing, selling, or transporting assault weapons with limited exceptions. The act defined an assault weapon as: 1. Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user, including but not limited to AK-47 type, MAC-type, Auto-Ordnance Thompson-Type, and Colt AR-15; 2. any of a list of named firearms; 3. A part or combination of parts designed or intended to convert a firearm into an assault weapon or from which an assault weapon may be rapidly assembled if they are in the possession or under the control of the same person.

12. In 2001, the Connecticut State Legislature passed Public Act 01-130 which expanded the definition of assault weapon to include semiautomatic firearms with certain features. The features that were added consisted of the following: 1. semiautomatic rifle that can accept a detachable magazine if the rifle has any two of the following features: (a) a folding or telescoping stock, (b) a pistol grip that protrudes conspicuously beneath the action of the

weapon, (c) a bayonet mount, (d) a flash suppressor or threaded barrel designed to accommodate a flash suppressor, or (e) a grenade launcher; 2. semiautomatic pistol that can accept a detachable magazine if the pistol has any two of the following features: (a) an ammunition magazine that attaches to the pistol outside of the pistol grip; (b) a threaded barrel that can accept a barrel extender, flash suppressor, forward handgrip, or silencer; (c) a shroud attached to, or partially or completely encircling, the barrel that permits the shooter to hold the firearm with the non-trigger hand without being burned; (d) a manufactured weight of 50 ounces or more when unloaded; and (e) a semiautomatic version of an automatic firearm; 3. semiautomatic shotgun with any two of the following features: (a) a folding or telescoping stock, (b) a pistol grip protruding conspicuously beneath the action of the weapon, (c) a fixed magazine capacity over five rounds, and (d) the ability to accept a detachable magazine; and 4. part or parts in one person's possession either designed or intended to convert any firearm into one of the newly covered assault weapons or from which one may be assembled rapidly.

13. In 2013, the Connecticut State Legislature passed Public Act 13-3 which made extensive changes to the firearm laws. Three of the major changes were significantly expanding the assault weapon ban, banning the sale, purchase, or transfer of large capacity magazines (LCMs) and requiring a state issued permit or eligibility certificate to purchase long guns.

14. Public Act 13-3 (Conn. Gen. Stat. § 53-202a) retained the list of firearms banned by name in Public Act 93-306 but added additional semiautomatic firearms by name and created a new features test for firearms not banned by name. The new features were: 1. semiautomatic centerfire rifles that can accept a detachable magazine and at least one of five specified features (folding/telescoping stock, any grip of the weapon that would result in any finger on the trigger hand being directly below that action of the weapon when firing, a forward pistol grip, a flash suppressor, or grenade/flare launcher); 2. semiautomatic centerfire rifles that have a fixed magazine that can accept more than 10 rounds of ammunition; 3. Semiautomatic centerfire rifles that are less than 30 inches long; 4. Semiautomatic pistols with a fixed magazine that can accept more than 10 rounds of ammunition; 5. Semiautomatic pistols that can accept a detachable magazine and have at least one of four specified features (ability to accept a detachable magazine outside of pistol grip, a threaded barrel, a shroud permitting the shooter to fire the firearm without being burned, or a second hand grip); 5. semiautomatic shotguns that have both of the following features: a folding or telescoping stock and any grip of the weapon that would result in any finger on the trigger hand being directly below that action of the weapon when firing; 6. semiautomatic shotgun that can accept a detachable magazine; and 7. a shotgun with a revolving cylinder.

15. A telescoping stock or collapsible stock is a stock that can retract into and shorten itself to make a firearm more compact.

16. A flash suppressor is a device attached to the muzzle of a firearm that reduces its visible signature while firing.

17. A forward pistol grip or second pistol grip is a grip on the front of the firearm or simply a second grip on a firearm.

18. On June 6, 2023, Governor Lamont signed Public Act 23-53 (Connecticut Substitute House Bill No. 6667 As Amended by House Amendment Schedules "A" and "B") into law which made extensive changes to the firearms laws. While most of the changes do not go into effect until on or after October 1, 2023, the "2023 Assault Weapon" ban went into effect upon passage.

19. Public Act 23-53 retained the list of firearms banned by name and the features tests in Public Acts 93-306 and 13-3. However, Public Act 23-53 also bans any semiautomatic firearm that meets the features tests of Public Acts 93-306 and 13-3 that was manufactured prior to September 13, 1994. These firearms are commonly referred to as pre-ban firearms. Additionally, Public Act 23-53 added an additional features test for any semiautomatic firearm other than a pistol, revolver, rifle, or shotgun. These firearms are known colloquially as "CT Others."

20. Under the new features test, a "CT Other" is considered an assault weapon if it has at least one of the following: 1. any grip of the weapon that would result in any finger on the trigger hand being directly below that action of the weapon when firing; 2. the ability to accept a detachable magazine outside of the pistol grip; 3. A fixed magazine with the ability to accept more than 10 rounds of ammunition; 4. A flash suppressor or silencer, or threaded barrel capable of accepting a flash suppressor or silencer; 5. a shroud permitting the shooter to fire the firearm without being burned; 6. a second hand grip; or 7. an arm brace or other stabilizing brace that could allow the firearm to be fired from the shoulder, with or without a strapped designed to attach to an arm.

21. The "2023 Assault Weapon" ban was designed to close a loophole in the CT assault weapons ban and is similar to a rule change enacted by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in January of 2023 in C.F.R. 479.11. Before Public Act 23-53, a "CT Other" did not meet the Connecticut statutory definition of either a pistol, a rifle, or a shotgun, and therefore did not meet the statutory definition of an "assault weapon" pursuant to Conn. Gen. Stat. § 53-202a-c. Under the new features test, such firearms may be assault weapons.

22. Conn. Gen. Stat. § 53a-3(16) defines a rifle, in part, as a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder. Firearms equipped with an arm or stabilizing brace instead of a traditional stock were deemed not to be a rifle since manufacturers claimed these devices were not intended to be shouldered. As such, firearms that had an arm or stabilizing brace were potentially excluded from the 1993 and 2013 Assault Weapon bans despite being functionally similar to firearms captured until the original ban. Public Act 23-53 now captures such firearms with arm or stabilizing braces.

23. Public Act 93-306 and Public Act 13-3 allowed individuals who possessed assault weapons as defined by Connecticut law to obtain a Certificate of Possession by specific dates to retain the firearms lawfully.

24. Similarly to Public Acts 93-306 and 13-3, Public Act 23-53 allows individuals who possess "2023 Assault Weapons" to obtain a Certificate of Possession by May 1, 2024 to retain the firearms lawfully.

25. Since the passage of Public Acts 93-306 and 13-3 and as of June 7, 2023, prior to the effective date of Public Act 23-53, the total number of Certificate of Possessions that had been issued was 82,351.

26. The number of Certificate of Possessions increased by 369 since January 30, 2023. The increase is due to exemptions in the Conn. Gen. Stat. § 53-202b, which allows members of the military and law enforcement to purchase assault weapons.

27. The assault weapons banned in Connecticut are a sub-category of the larger group of all semiautomatic weapons. A semiautomatic weapon fires one round for each squeeze of the trigger. After each shot, the firearm automatically loads the next round in the chamber and arms the firing mechanism for the next shot, thereby permitting a faster rate of fire as compared to manually operated guns.

28. In contrast to semiautomatic weapons, fully automatic weapons (e.g. machine guns) fire continuously for as long as the trigger is pressed. A federal tax stamp is required to legally possess a machine gun in Connecticut. Further, Connecticut State law requires that anyone that owns a machine gun to register it with DESPP within 24 hours of acquiring it and annually thereafter.

29. Assault weapons listed in § 53-202a are essentially civilian versions of military weapons used by armed forces across the world. The most prolific military firearms in the world are the M-16/AR-15 and the AK-47. The primary difference between these military weapons and those assault weapons listed in the Public Acts is that the civilian commercial version does not have the fully automatic selective-fire option. Selective-fire allows the operator to choose between semiautomatic and fully automatic.

30. The assault rifle provision of Conn. Gen. Stat. § 53-202a(1)(B) only covers semiautomatic, centerfire rifles, except for the Remington Tactical 7615, which is a pump action rifle. Centerfire rifles are designed for centerfire cartridges which are more powerful projectiles because they have a larger bullet, higher velocity, greater range, and more "foot pounds of energy" or stopping power, than other cartridges such as rimfire or pistol ammunition. An example of a centerfire cartridge would be a .223 round that is often used in an AR-15 type assault rifle.

31. Conn. Gen. Stat. § 53-202a(1)(B) lists 49 assault rifles by name. Based upon my experience and expertise, the majority of the firearms specifically named in the statutes are semiautomatic versions of the original selective-fire AR-15/M-16, the AK-47, or variants of these weapon platforms in an assortment of calibers.

32. Of these 49 assault rifles, nineteen (19) are variants of the AK-47; thirteen (13) are variants of the AR-15/M-16; and three (3) are variants of the HK 91 or FN type.

33. The remaining twelve (12) rifles listed are types of rifles that are unique and different from the AK-47, M-16/AR-15 and HK91. It would be fair to say that although 49 rifles are listed in the Act, only fifteen (15) distinct types of rifles are covered by the Act: semiautomatic versions of AK-47s, M-16/AR-15s, HK91, and the twelve (12) distinct rifles that are unique and not of "a type."

34. The Avtomat Kalashnikov AK-47 type, simply known as AK-47, is a 7.62 x 39mm rifle that originates from Russia. The firearm was developed by Mikhail Kalashnikov in 1947 as a select-fire rifle and was initially intended to replace rifles and submachines guns carried by Soviet forces at the end of World War II. The AK-47 became the Soviet military standard issue infantry weapon from 1949 until 1959. By the end of the 1950s, the technology to manufacture firearms in the Soviet Union had expanded greatly. As a result, a modernized AK-47, the 7.62 Modernizirovannia Avtomat Kalashnikova (AKM), was designed in 1959 and fully developed by 1960. The AKM was regularly encountered by American Forces in Vietnam. Modern versions of the AK-47 are still in use throughout the world due to is simplicity, reliability and affordability. It is also one of the most recognizable rifles in the world.

35. In 1989 (pre-Federal Assault Weapons Ban of 1994), ATF banned the importation of several semi-automatic versions of military firearms due to the firearms failing to meet the sporting purposes test of the Gun Control Act of 1968. One of the 43 firearms banned in 1989 was the AK-47 type.

36. Four examples that the Firearms Vault has in its collection of the nineteen (19) variants of the AK-47 listed in Conn. Gen. Stat. § 53-202a(1)(B) are the Norinco Type 56S, Poly Technologies AKS, WASR-10 and VEPR.

37. The Norinco Type 56 is a 7.62 x 29mm select-fire rifle that originates from China. Mechanically, this firearm is similar to an AK-47 and entered operation service in 1956. The Norinco Type 56S is the semi-automatic only civilian version of the Type 56.



Overall View: Left Side of Norinco Type 56S


Overall View: Right Side of Norinco Type 56S


Close-up View: Left side of Norinco Type 56S

38. The Poly Technologies AKS-762, typically referred to as AKS, is a 7.62 x 39mm rifle that originates from China. The AKS is a Chinese-made version of the AK-47.



Overall: Left Side of Firearm



Overall: Right Side of Firearm with Stock Collapsed




Close-up: Left Side of Firearm

39. The Cugir WASR-10 is a 7.62 x 39mm semi-automatic rifle that originates from Romania. The WASR-10 is the Romania's civilian version of their military AKM-type rifle (Pistol Mitraliera 1963/1965). The WASR-10 was imported by Century Arms and modified to conform with the Public Safety and Recreational Firearms Use Protection Act, also known as the Federal Assault Weapons Ban of 1994.



Overall View: Right side of WASR-10



Overall View: Left side of WASR-10




Close-up View: Left side of WASR-10




Close-up View: Right Side of WASR-10

40. The Molot-Oruzhie VEPR is a semi-automatic rifle that originates from Russia and is modeled after the AK. The VEPR is offered in various calibers including, but not limited to 7.62 x 39mm, 7.62 x 54R and .308.



Overall View: Left Side of VEPR



Overall View: Right Side of VEPR



Close-up View: Left Side of VEPR

41. The AR-15 originally was manufactured as a selective-fire machine gun and was adopted by the United States military as the M-16 machine gun during the Vietnam War. The M16 rifle was designed by Eugene Stoner of ArmaLite Corporation in response to a request from

the U.S. military for an improved infantry weapon in the 1950s. The ArmaLite AR-15, the predecessor firearm to the M16, first went into mass production in June 1959.

42. Colt Manufacturing Company retained the AR-15 trademark for its semiautomatic version of the AR-15, which it began selling to the civilian market in the early 1960s. The AR-15 is now the civilian commercial term for the M-16, without the fully automatic fire option. Two examples of the thirteen (13) are variants of the AR-15/M-16 are the Bushmaster XM-15 and Smith & Wesson M&P-15.

43. Two examples that the Firearms Vault has in its collection of the thirteen (13) AR-15/M-16 variants are the Smith & Wesson M&P-15 and the Bushmaster XM-15.

44. The Smith & Wesson M&P-15 is a 5.56 x 45mm AR-15 style semi-automatic rifle that originates from the United States. Smith & Wesson first introduced the M&P-15 at SHOT Show in 2006. Smith & Wesson designed the firearm for police and consumer markets.



Overall View: Left Side of the M&P-15



Overall View: Right Side of the M&P-15




Close-Up View: Left Side of M&P-15



Close-Up View: Right Side of M&P-15

45. The Bushmaster XM-15 is a 5.56 x 45mm AR-15 style semi-automatic rifle that originates from the United States. The Bushmaster XM-15 was notably used in the December 2012 Sandy Hook Elementary School shooting.


Overall View: Left Side of XM-15



Overall View: Right Side of XM-15



Close-up View: Left Side of XM-15

46. Other examples of assault rifles that the Firearms Vault has in its collection that are banned, but not of a "type" are the Keltec Sub-2000 and Beretta Storm.

47. The Keltec Sub-2000 is a 9 mm or .40 Smith & Wesson semi-automatic rifle that originates from the United States. This Sub-2000 is unique since it folds in half and has a slimmer profile compared with other rifles. When the Sub-2000 is in the folded position, it can be locked with a key for added safety. It cannot be fired when in the folded position.


Overall View: Right Side of Keltec Sub2000


Overall View: Left Side of Keltec Sub2000



Close-up View: Right Side of Keltec Sub2000



Close-up View: Left Side of Keltec Sub2000

48. The Beretta Storm is a pistol-caliber semi-automatic rifle that originates from Italy. The rifle is available in 9 mm, .40 Smith & Wesson, .45 ACP and 9 x 21mm calibers. The Beretta Storm was first introduced in 2003 and designed as a sporting or personal defense firearm.



Overall View: Left Side of Beretta Storm



Overall View: Right Side of Beretta Storm



Close-Up View: Left Side of Beretta Storm



Close-Up View: Right Side of Beretta Storm

49. Conn. Gen. Stat. § 53-202a also banned certain semi-automatic pistols listed. A pistol is defined under Connecticut law as any firearm that has a barrel under twelve inches in length (Connecticut General Statute § 29-27). Of the 22 assault pistols listed in the Act, six (6) are variants of the AK-47 and seven (7) are variants of the M-16/AR-15. The remaining nine (9) pistols are unique and not of "a type."

50. Two examples that the Firearms Vault maintains in its collection of semi-automatic pistols are the Intratec TEC-DC9 and Mini-Draco AK-47.

51. The Intratec TEC-DC9 is a 9mm semi-automatic pistol that originates from the United States. However, the design of the firearm was based upon Swedish firearms manufacturer Interdynamic AB's MP-9 submachine gun. Due to a poor market in Sweden, a subsidiary company was established in Miami, Florida to manufacture Interdynamic firearms for the civilian market in the United States. Intratec began produced the TEC-9, the predecessor of the TEC-DC9, in 1984 then rebranded the firearm in 1990 to TEC-DC9. In 1994, the TEC-9 and TEC-DC9 were banned nationally under the Federal Assault Weapons Ban.



Overall View: Left side of Intratec TEC=DC9



Overall View: Right side of Intratec TEC=DC9




Close-up View: Left Side of Intratec TEC-DC9

52. The Cugir Mini Draco is a 7.62 x 39mm semi-automatic AK-type pistol that originates from Romania. Despite the small size (overall length of approximately 17.5 inches), the receiver is the same size as a standard AK.



Overall View: Left Side of Mini-Draco



Overall View: Right Side of Mini-Draco




Close-Up View: Left Side of Mini-Draco




Close-Up View: Right Side of Mini-Draco

53. There is only one shotgun specifically listed in Public Act 13-3: the IZHMASH SAIGA 12 shotgun. Although it is a shotgun, the IZHMASH is based on an AK-47 platform.

54. The Izhmash Saiga 12 is a 12-gauge semi-automatic shotgun that originates from Russia. The Saiga 12 designed is based on the basic design of the AK, but with changes to accommodate shot shells.



Overall View: Left Side of Saiga 12



Overall View: Right Side of Saiga 12



Close-Up View: Right Side of Saiga 12



Close-Up View: Left Side of Saiga 12

55. The Remington Tactical 7615 is a pump action rifle, not a semiautomatic. It uses detachable magazines that can accept more than ten rounds of ammunition. However, in 2015, the United States Court of Appeals for the Second Circuit decided in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) that the ban on the Remington Tactical 7615 pump action rifle was unconstitutional.

56. The Firearms Vault also maintains several firearms in its collection that were banned under Public Act 93-306 and listed in Conn. Gen. Stat. § 53-202a(1)(A). The firearms in the collection include but are not limited to the Auto-Ordnance Thompson-Type, HK-91, HK-94, UZI Carbine, UZI Pistol, Feather AT-9, and Franchi SPAS-12.

57. The Auto-Ordnance Thompson type, colloquially known as a "Tommy gun," is a .45 caliber submachine gun that originates from the United States. There are several models of the Thompson-type including, but not limited to Model of 1921 and Model of 1927. Model 1921 was the first quantitative production model of the Thompson submachine guns with approximately 15,000 produced and was manufactured as select-fire. Model 1927 was based on the Model 1921, but was manufactured as semi-automatic only. There are several variations for the Model 1927 including but not limited to the 1927A1. Model 1927A1 was the semi-automatic version produced for the civilian market and production is still ongoing today.



Overall View: Left side of Thompson M1927A1



Overall View: Right side of Thompson M1927A1




Close-up View: Right Side of Thompson M1927A1




Close-up View: Left Side of Thompson M1927A1

58. The Heckler & Kock HK-91 is a 7.62 x 51mm (i.e., .308 Winchester) semi-automatic rifle that originates from Germany. The HK-91 is the civilian version of the German Army's service rifle, the Heckler & Koch G3, which is select-fire rifle. The HK-91 was part of 1989 ban and less than 50,000 were imported into the United States.



Overall View: Left Side of HK-91



Overall View: Right Side of HK-91




Close-up View: Left Side of HK-91




Close-up View: Right Side of HK-91

59. The Heckler & Koch HK-94 is a 9mm semi-automatic rifle that originates from Germany. The HK-94 is the civilian version of the Heckler & Koch MP5, a submachine gun developed in the mid-1960s for the German Federal Police and German special forces. Similar to the HK-91, the HK-94 was banned from importation into the United States in 1989.



Overall View: Left Side of HK-94



Overall View: Right Side of HK-94



Close-up View: Left Side of HK-94



Close-up View: Right Side of HK-94


Overall View: Top of HK-94




Close-up View: Top of HK-94

60. The UZI is a series of submachine guns and machine pistols that originate from Israel and have been exported to over 90 countries. The UZI was adopted by the Israel Defense Forces in 1954 and retired by the Israel Defense Force in 2003. UZI made several civilian variants that are semi-automatic only including but not limited to the UZI Model A carbine and UZI Pistol.

61. The UZI Carbine is a 9mm semi-automatic rifle that was imported into the United States by Action Arms from Israel. There are two variants of the UZI Carbine: Model A and Model B. The Model A was imported from 1980 to 1983 and the Model B was imported from 1983 until 1989. Importation of the UZI Carbine ceased in 1989 when ATF deemed that the UZI Carbine failed the sporting purposes test and permanently banned it from being imported into the United States.



Overall View: Left Side of UZI Carbine Model A



Overall View: Right Side of UZI Carbine Model A



Close-up View: Left Side of UZI Carbine Model A



Close-up View: Right Side of UZI Carbine Model A

62. The UZI pistol is a 9mm semi-automatic pistol that was first manufactured in 1984 and produced until 1993.



Overall View: Left Side of UZI Pistol



Overall View: Right Side of UZI Pistol



Close-up View: Left Side of UZI Pistol



Close-up View: Right Side of UZI Pistol

63. The Feather AT-9 is a 9mm semi-automatic rifle that originates from the United States. The firearm was designed in the early 1990's and was produced until Feather Industries went out of business in 1995. Feather Industries developed the AT-9 to be more compact and cheaper version of an Armalite AR-7, which had the ability to be taken apart to make it easier to transport and conceal (i.e., a takedown rifle).


Overall View: Left Side of AT-9


Overall View: Right Side of AT-9




Close-up View: Right Side of AT-9

64. The Franchi SPAS (Special Purpose Automatic Shotgun) 12 is a 12-gauge shotgun that originates from Italy. The SPAS 12 is a dual-function firearm meaning that it is capable of operating with pump action or as semi-automatic. The firearm has an eight (8) round tubular magazine.



Overall View: Left Side of Franchi SPAS 12



Overall View: Right Side of Franchi SPAS 12




Close-up View: Right Side of Franchi SPAS 12



Close-up View: Left Side of Franchi SPAS 12

65. There are many different manufacturers and types of arm braces and stabilizing braces available in the United States including, but not limited to SB Tactical SBPDW arm brace and Shockwave Technologies Blade Pistol Stabilizer. The SB Tactical SBPDW is a three-position adjustable stabilizing arm brace that is compatible with AR-type buffers. The Shockwave Technologies Blade Pistol Stabilizer incorporates a vertical fin and fits a standard AR-type buffer tube.

66. The Firearms Vault also maintains several firearms in its collection that were banned under the "2023 Assault Weapon" ban in Public Act 23-53. The firearms in the collection include but are not limited to an Aero Precision X15, New Frontier CM-9 and Kalashnikov Komrad.

67. Aero Precision, LLC manufactures quality and reliable lower receivers and complete upper receivers for civilians to build a firearm. One type of lower receiver that Aero Precision manufactures is an AR-15 type. Although a civilian is not required to utilize an Aero Precision upper receiver on an Aero Precision lower receiver, Aero Precision manufactures upper receivers for their AR-15 type lower receivers chambered in 5.56 x 45mm, .300 Blackout, 6.5 Grendel, .350 Legend, .223 Wylde, and .224 Valkyrie. Since AR-type lower receivers can accept multiple calibers, Aero Precision stamps their firearms as "multi" to meet Federal marking regulations.

68. While 6.5 Grendel and .224 Valkyrie calibers require specific bolt carrier groups, 5.56 x 45mm, .300 Blackout, .350 Legend and .223 Wylde utilize the standard 5.56 bolt carrier group. In other words, the only difference between a 5.56 x 45mm AR-15 type build and .300 Blackout AR-15 type build would be the barrel is chambered in a different caliber. The remaining parts including, but not limited to the bolt carrier group, buffer and buffer tube are the same.

69. The Aero Precision semi-automatic "CT Other" that the Firearms Vault maintains in its collection is an Aero Precision X15 with an AT3 Tactical barrel chambered in 5.56 x 45mm. The X15 is equipped with an SB Tactical SBPDW arm brace and vertical forward grip (i.e. second hand grip). The arm brace is equipped at the rear of the firearm.



Overall View: Left Side of Aero Precision X15



Overall View: Right Side of Aero Precision X15




Close-Up View: Left Side of Aero Precision X15



Close-Up View: Left Side of SB Tactical Arm Brace on Aero Precision X15




Close-Up View: Right Side of AT3 Tactical 5.56 x 45mm Barrel on Aero Precision X15

70. New Frontier Armory was founded in 2009 and is a full-service firearms dealer, distributor and manufacturer located in Las Vegas, Nevada. Like Aero Precision, New Frontier manufactures various lower and upper receivers. One of the lower receivers that New Frontier manufactures is a C9, which is a pistol caliber carbine build. The lower receiver

can accept double stack Glock magazines in various pistol calibers including, but not limited to 9mm, .40 Smith & Wesson, and .357 SIG. As such, the lower receiver is stamped with "multi" to meet Federal marking regulations.

71. The New Frontier semi-automatic "CT Other" that the Firearms Vault maintain in its collection is a New Frontier C-9 chambered in 9mm. The C-9 is equipped with a Shockwave Technologies Blade Stabilizer and vertical forward grip (i.e. second hand grip).



Overall View: Left Side of New Frontier C-9



Overall View: Left Side of New Frontier C-9




Close-Up View: Left Side of New Frontier C-9




Close-Up View: Right Side of New Frontier C-9



Close-Up View: Left Side of Shockwave Technologies Blade Stabilizer on New Frontier C-9



Close-Up View: Right Side of Shockwave Technologies Blade Stabilizer on New Frontier C-9

72. The Kalashnikov Komrad is a 12-gauge semi-automatic firearm that originates from the United States. The Komrad is based on the Russian Saiga series. The Komrad is equipped with an SB Tactical adjustable arm brace, vertical forward grip and a threaded barrel.



Overall View: Left Side of Kalashnikov Komrad



Overall View: Right Side of Kalashnikov Komrad



Overall View: Bottom of Kalashnikov Komrad




Close-up View: Bottom of Kalashnikov Komrad

73. Notwithstanding the assault weapons prohibited by Connecticut General Statute § 53-202a and Public Act 23-53, there remain more than one thousand firearms that Connecticut residents can purchase for responsible and lawful uses like self-defense, home defense, and other lawful purposes such as hunting and sport shooting.

74. There are many resources such as “Guns and Ammo” and “Gun Digest” that identify numerous firearms (including rifles, pistols, revolvers and shotguns) that remain legal in Connecticut. Many of these firearms are suitable for home and self-defense.

75. Conservatively speaking, I would expect that a gun purchaser could identify over a thousand firearms he/she could purchase as an alternative to those banned in Connecticut.

76. Conn. Gen. Stat. § 53-202w defined an LCM as any firearm magazine, belt, drum, feed strip, or similar devices that can be readily restored or converted to accept more than 10 rounds of ammunition with limited exceptions.

77. A magazine, sometimes incorrectly referred to as a “clip,” is a container that holds ammunition for a firearm. Typically, they hold bullets and feed the ammunition into the firearm. There are both fixed and detachable magazines. Detachable magazines may be removed from the firearm and replaced quickly with another fully loaded magazine. Fixed magazines are typically reloaded by reloading bullets into a magazine that is attached to the firearm.

78. A magazine contains no firing mechanism.

79. Ordinary ammunition magazines extend perpendicularly from the frame of the firearm and are fed with one round on top of the other. Tubular magazines, by contrast, generally are fixed magazines that run horizontally along the length of the barrel and are fed with cartridges end to end. Tubular magazines are only typically designed for lever action rifles, rimfire rifles and shotguns.

80. Magazines are manufactured for all types of firearms, including handguns, rifles, and shotguns. Large capacity magazines, as defined by the statute, are those which can hold more than 10 rounds of ammunition at a time. Large capacity magazines have been manufactured for a variety of firearms, including handguns, rifles, and shotguns.

81. Most firearms that accept large capacity magazines can also function using a magazine that has a capacity of under ten rounds.

82. Beginning April 1, 2014, Conn. Gen. Stat. § 29-37a required anyone purchasing or receiving a long gun to hold a valid state-issued permit to carry a pistol or revolver, handgun eligibility certificate or long gun eligibility certificate with limited exceptions (e.g. peace officer). Under prior law, no credential was required to buy long guns.

83. As of January 30, 2023, there are 328,502 active permits to carry a pistol or revolver, 187 active handgun eligibility certificates and 1,886 long gun eligibility certificates.

84. There is no statutory requirement to "register" the majority of privately owned firearms with DESPP in CT. The amount of firearms in the CT firearms registry does not capture all privately owned firearms in CT.

DECLARATION UNDER PENALTY OF PERJURY
PURSUANT TO 28 U.S.C. § 1746

I declare that the foregoing is true and correct under penalty of perjury under the laws of the United States.

Executed on July 25, 2023

Det. B. M. L. #5087
Brindiana Warenda

# EXHIBIT B

## Declaration of Professor John J. Donohue

**EXPERT REPORT AND AFFIDAVIT OF JOHN J. DONOHUE**

I, John J. Donohue, being duly sworn, hereby depose and state as follows, based on my personal knowledge:

1. I am a citizen of the United States and a Resident of California.

2. I am over 21 years of age.

**BACKGROUND AND QUALIFICATIONS**

3. I am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School. (A copy of my complete cv is attached as Exhibit A.) After earning a law degree from Harvard and a Ph.D. in economics from Yale, I have been a member of the legal academy since 1986. I have previously held tenured positions as a chaired professor at both Yale Law School and Northwestern Law School. I have also been a visiting professor at a number of prominent law schools, including Harvard, Yale, the University of Chicago, Cornell, the University of Virginia, Oxford, Toin University (Tokyo), St. Gallens (Switzerland), Tel Aviv University, and Renmin University (Beijing).

4. For a number of years, I have been teaching at Stanford a course on empirical law and economics issues involving crime and criminal justice, and I have previously taught similar courses at Yale Law School, Tel Aviv University Law School, the Gerzensee Study Center in Switzerland, and St. Gallen University School of Law in Switzerland. Since gun crime is such an important aspect of American criminal justice, my courses evaluate both the nature of gun regulation in the United States and the impact of gun regulation (or the lack thereof) on crime, which is an important part of my research, about which I have published extensively (as reflected in my c.v.). I have also consistently taught courses on law and statistics for two decades.

5. I am a Research Associate of the National Bureau of Economic Research, and an elected member of the American Academy of Arts and Sciences. I was a Fellow at the Center for Advanced Studies in Behavioral Sciences in 2000-01 and served as the co-editor (handling empirical articles) of the *American Law and Economics Review* for six years. I have also served as the President of the American Law and Economics Association and as Co-President of the Society of Empirical Legal Studies.

6. From October 2011 – December 2018, I served on the Committee on Law and Justice of the National Research Council ("NRC"), which "reviews, synthesizes, and proposes research related to crime, law enforcement, and the administration of justice, and provides an

intellectual resource for federal agencies and private groups." (See http://www7.national-academies.org/claj/ online for more information about the NRC.)

7. I filed an expert declaration in each of two cases involving a National Rifle Association ("NRA") challenge to city restrictions on the possession of large-capacity magazines: *Fyock v. City of Sunnyvale*, United States District Court (N.D. Cal.), January 2014; *Herrera v. San Francisco*, United States District Court (N.D. Cal.), January 2014.

8. I also filed an expert declaration in a case involving an NRA challenge to Maryland's restrictions on assault weapons and large-capacity magazines: *Tardy v. O'Malley*, United States District Court (District of Maryland), February 2014.

9. In all these cases, the relevant gun regulations have (ultimately) been sustained in the relevant federal appellate courts.

10. I also filed (June 1, 2017) an expert declaration in a case involving a challenge to California's restrictions on carrying of weapons in public in *Flanagan v. Becerra*, United States District Court (C.D. Cal.), Case No. 2:16-cv-06164-JAK-AS and expert declarations on June 4, 2017 and June 16, 2017 in two separate cases challenging California's ban on the possession of large-capacity magazines: *Duncan v. Becerra*, United States District Court (S.D. Cal.), Case No. 17-cv-1017-BEN-JLB and *Weise v. Becerra*, United States District Court (E.D. Cal.), Case No. 2:17-cv-00903-WBS-KJN. I filed a supplemental declaration in *Duncan* (now *Duncan v. Bonta*) on November 8, 2022.

11. I filed an expert declaration, and provided expert testimony, in a case involving a challenge to New Jersey's restrictions on large-capacity magazines in *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:18–cv–10507–PGS–LHG (D.N.J.), August 2018.

12. I filed an expert declaration in *Chambers v. City of Boulder*, Case No. 2018CV30581, in the District Court of Boulder County in September 2020, involving a challenge to the City of Boulder's restrictions on assault weapons.

13. At the request of the United States Department of Justice, I filed an expert declaration in July 2020 and testified at trial in April 2021 in a case arising out of the Sutherland Springs mass shooting that killed 26 in November 2017: *Holcombe, et al. v. United States*, Case No. 5:18-CV-555-XR (W.D. Tex.). On December 9, 2020, I submitted an expert report on behalf of the City of San Francisco in a wrongful conviction lawsuit, *Caldwell v. City of San*

*Francisco*, Case No. 12-cv-1892 DMR, United States District Court, Northern District of California, Oakland Division.

14. I was the main author of the Brief of Amici Curiae Social Scientists and Public Health Researchers in Support of Respondents, which was submitted to the United States Supreme Court on September 21, 2021 in *New York State Rifle & Pistol Association v. Bruen*, Case No. 20-843.

15. On January 24, 2022, I submitted an expert declaration in *Worth v. Harrington*, a lawsuit in the District of Minnesota (Case No. 21-cv-1348) challenging how Minnesota regulates the concealed carry of firearms by individuals aged 18 to 20. I was deposed in this case on March 28, 2022.

16. On May 31, 2022, I submitted an expert declaration in *Meyer v. Raoul*, a lawsuit in the Southern District of Illinois (Case No. 21-cv-518-SMY) challenging how Illinois regulates the concealed carry of firearms by individuals aged 18 to 20.

17. On September 14, 2022, I submitted an expert declaration in *Viramontes v. The County of Cook*, a lawsuit in the Northern District of Illinois (Case No. 1:21-cv-04595) challenging the Blair Holt Assault Weapons Ban enacted by Cook County, Illinois in 2006.

18. On October 13, 2022, I submitted an expert declaration in *Miller v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:19-cv-01537-BEN-JLB) challenging how California regulates assault weapons. This report supplemented my earlier wok in that case which involved submission of an expert declaration on January 23, 2020, followed by testimony on October 23, 2020 during an evidentiary hearing on the Plaintiffs' motion for a preliminary injunction.

19. On January 6, 2023, I submitted an expert declaration in *Rupp v. Bonta*, a lawsuit in the Central District of California (Case No. 8:17-cv-00746-JLS-JDE) challenging how California regulates assault weapons.

20. On January 6, 2023, I submitted an expert declaration in *State of Vermont v. Misch*, Criminal Division, Docket No. 173-2-19 Bncr in a case challenging magazine-size restrictions for handguns and long-guns.

21. On January 26, 2023, I submitted two expert declarations: 1) in *NAGR v. Lamont,* a case challenging Connecticut's restrictions on assault weapons and limits on magazine size,

and 2) in *NAGR v. Campbell*, Civil Action No. 1:22-cv-11431-FDS, U.S. District Court for the District of Massachusetts, a similar case involving the comparable restrictions in Massachusetts.

22. Finally, on February 27, 2023, I submitted an expert report in *Herrera v. Kwame Raoul, et al*., 23 CV 0532, in the U.S. District Court for the Northern District of Illinois, Eastern Division. This case also involved a challenge to the restrictions in Illinois on assault weapons and magazine size.

## SUMMARY OF CONCLUSIONS

21. It is a sound, evidenced-based, and longstanding harm-reducing strategy virtually uniformly embraced throughout the developed world for governments to place constraints on the harm that weapons can inflict. Restrictions on assault weapons and the size of large-capacity magazines (LCMs) sit comfortably in this appropriate regulatory approach and can be expected to reduce deaths and injury from gun violence.

22. A ban on assault weapons and LCMs would be expected to have little or no effect on the ability of individuals to possess weapons for self-defense in the home but should have a restraining impact on the effectiveness of those who have the criminal intent to kill as many individuals as possible. The restrictions imposed by the state of Connecticut that are challenged in this litigation are well-tailored to limit the behavior of criminals engaging in the most dangerous forms of violent criminal behavior, and at the same time are likely to have little or no impact on the defensive capabilities of law-abiding citizens.

23. The problem of public mass shootings in the United States is a serious and worsening national problem that imposes substantial burdens on the American public far beyond the growing numbers of dead and injured victims that are besieged every year. Since so many of these shootings are committed (or made possible) by previously "law-abiding" citizens with no basis under current law to prevent them from possessing firearms and since such a large proportion of the mass shooters die in the course of their deadly massacres, improved background checks and increased criminal penalties alone cannot adequately address this growing problem. Moreover, the empirical evidence indicates that another possible policy response – allowing increased gun carrying by the untrained public – rarely generates any benefit

by stopping public mass shootings and is indeed self-defeating since it generates substantial increases in violent crime.[1]

24. Indeed, gun massacres fell substantially during the ten years of the federal assault weapons ban, which curtailed the proliferation of both assault weapons and high-capacity magazines, and then rose sharply when the ban was lifted in 2004. FBI data show that the problem of active shooters inflicting mayhem on the public has been rising substantially since the end of the federal ban. State laws restricting assault weapons and high-capacity magazines have also been shown to reduce mass shooting deaths and overall casualties.

25. The important point to note in considering the constitutionality of restrictions on assault weapons and high-capacity magazines is that when the problem of mass shooting began to emerge in the United States, state and federal governments began responding to this growing menace with lawful, appropriate, and effective restrictions on the type of weaponry that both facilitated mass shootings and was attractive to mass shooters. As we learned from the repeal of the federal assault weapons ban, any backsliding on these wise restraints that promote the health, safety, and freedom of Americans would be costly in lives and in devastating firearm injuries.

**DISCUSSION**

26. The Plaintiffs' Amended Motion for Preliminary Injunction states on page 14 that "the challenged statutory scheme banning 'assault weapons'…deprives the Plaintiffs of their Second Amendment right to obtain, keep, and bear arms in common usage for lawful purposes, including self-defense." While the comment is either intentionally or unintentionally ambiguous, it is important to clarify that the typical law-abiding citizen does not posess any firearm --

[1] See Donohue, John, Abhay Aneja, and Kyle Weber, 2019, "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis," *Journal of Empirical Legal Studies*, https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219. The amicus brief submitted to the United States Supreme Court on behalf of "Social Scientists and Public Health Researchers in Support of Respondents" in *New York State Rifle & Pistol Association v. Bruen*, September 21, 2021, further discusses the evidence that right-to-carry laws increase violent crime, citing 14 studies that have so found in the last five years. Since that brief was submitted, three additional empirical studies have confirmed the conclusion that increased gun carrying leads to higher violent crime: Van Der Wal, W. M. (2022). Marginal Structural Models to Estimate Causal Effects of Right-to-Carry Laws on Crime. *Statistics and Public Policy*, 9(1):163–174.; Doucette, M. L., Ward, J. A., McCourt, A. D., Webster, D., and Crifasi, C. K. (2022). Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020. *Journal of Urban Health*, pages 1–12.; Donohue, J. J., Cai, S. V., Bondy, M. V., and Cook, P. J. (2022). More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities. Working paper no. 30190, National Bureau of Economic Research.

whether an assault weapon or not, and whether it has a high-capacity magazine or not. The clear majority of Americans do not own any firearm.

27. By a wide margin, most Americans do not own guns, and most Americans who do own guns do not own assault weapons. Both statements are particularly true for Connecticut residents.

28. 70 percent of all American adults do not own any firearm according to recent survey data.[2] Moreover, many of the 30 percent of Americans who do own firearms, only possess shotguns, hunting rifles, and revolvers and do not possess assault weapons or firearms equipped with high-capacity magazines of the type covered by the federal assault weapons ban from 1994-2004.

29. Since assault weapons are only a small fraction of the overall gun supply in the United States, it is clear that only a relatively small minority of Americans owns assault weapons, and most Americans recognize that assault weapons are not important to their self-defense.

30. The majority of Americans have consistently supported bans on assault weapons for years. A poll conducted for the *New York Times* from June 17-20, 2016 among a national sample of 1975 registered voters found that 67 percent of Americans favored such a ban.

31. Less than a year later, a Pew Research Center survey among 3,930 adults (conducted from March 13-27 and April 4-18, 2017) again showed broad opposition to assault weapons.[3]

32. The Pew survey results released on October 18, 2018 again showed that 67 percent of Americans favored bans on assault weapons and on high-capacity magazines.[4] The same Pew survey based on interviews from September 3 – 15, 2019 showed that 69 percent of Americans

---

[2] This is the finding of a June 2021 survey of 10,606 adults by the Pew Research Center. https://www.pewresearch.org/fact-tank/2021/08/04/wide-differences-on-most-gun-policies-between-gun-owners-and-non-owners-but-also-some-agreement/.

[3] Ruth Igielnik and Anna Brown, "Key takeaways on Americans' views of guns and gun ownership," Pew Research Center, June 22, 2017, http://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership/. The authors noted that this poll was conducted *prior* to two of the five deadliest mass shootings in modern US history, which occurred in October and November of 2017: "a staggering [59] people were killed and more than 500 were hurt when [Steven Paddock] opened fire on a Las Vegas concert and at least 26 people were killed in a Texas church" only five weeks later.

[4] Pew Research Center, "Gun Policy Remains Divisive, But Several Proposals Still Draw Bipartisan Support," October 18, 2018, http://www.people-press.org/2018/10/18/gun-policy-remains-divisive-but-several-proposals-still-draw-bipartisan-support/. This survey had 5307 respondents and was conducted from September 24 through October 7, 2018.

supported a ban on assault weapons.[5] A national survey by Pew Research Center, conducted from April 5-11, 2021 among 5,109 adults found that 63 percent of Americans supported a ban on assault weapons.[6]

33. Importantly, the *New York Times* also polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy" to ask them what measures would be most effective in dealing with America's mass shooting problem, and an assault weapons ban was deemed overall by this panel to have the highest level of effectiveness among the 20 evaluated measures.[7]

34. Similarly, American adults consistently support bans on such high-capacity magazines, because it is widely recognized that such accoutrements threaten public security and have little utility for personal defense. A national survey by Pew Research Center, conducted from April 5-11, 2021 among 5,109 adults found that almost two-thirds of Americans -- 64 percent -- supported a ban on magazines with greater than 10 rounds.[8] This is a consistent and persistent finding: The Pew survey results released on October 18, 2018 similarly found that 67 percent of Americans favored bans on high-capacity magazines.[9]

**The Growing Problem of Public Mass Shootings**

35. Although the long-term (pre-pandemic) secular trend in overall crime over the last 25 years has been benign, the opposite is true for the trend in public mass shootings since the end of the Federal Assault Weapons Ban in 2004. As the Third Circuit stated in upholding New Jersey's restrictions on high-capacity magazines, "plaintiffs attempt to discount the need for [governmental weaponry restrictions] by describing mass shootings as rare incidents" gives

[5] Katherine Schaeffer, "Share of Americans who favor stricter gun laws has increased since 2017," https://www.pewresearch.org/fact-tank/2019/10/16/share-of-americans-who-favor-stricter-gun-laws-has-increased-since-2017/ (October 16, 2019).
[6] https://www.pewresearch.org/politics/2021/04/20/amid-a-series-of-mass-shootings-in-the-u-s--gun-policy-remains-deeply-divisive/.
[7] The list of 32 academics included not only me, but also many strong gun-rights supporters, including John Lott, Gary Kleck, David Kopel, Carlisle E. Moody, and Eugene Volokh. See, Margot Sanger-Katz And Quoctrung Bui, "How to Reduce Mass Shooting Deaths? Experts Rank Gun Laws," *New York Times*, October 5, 2017, https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html.
[8] https://www.pewresearch.org/politics/2021/04/20/amid-a-series-of-mass-shootings-in-the-u-s--gun-policy-remains-deeply-divisive/.
[9] Pew Research Center, "Gun Policy Remains Divisive, But Several Proposals Still Draw Bipartisan Support," October 18, 2018, http://www.people-press.org/2018/10/18/gun-policy-remains-divisive-but-several-proposals-still-draw-bipartisan-support/. This survey had 5307 respondents and was conducted from September 24 through October 7, 2018.

insufficient weight "to the significant increase in the frequency and lethality of these incidents." Association Of New Jersey Rifle and Pistol Clubs v. Attorney General of New Jersey (3d Cir., December 5, 2018).

36. According to a report of the Congressional Research Service, there were an average of 2.7 public mass shootings per year in the 1980s rising to an average of 4.5 events per year from 2010 to 2013.[10] Since then things have only gotten worse.

37. Writing in May 2018, Louis Klarevas, an Associate Lecturer of Global Affairs at the University of Massachusetts–Boston, noted:

> "Last week's school shooting in Texas marks a new milestone in American history. It's the first time we have ever experienced four gun massacres resulting in double-digit fatalities within a 12-month period. In October 2017, [60] were killed at a concert in Las Vegas. A month later, 26 were killed at a church in Sutherland Springs, Texas. Earlier this year, 17 people lost their lives at a high school in Parkland, Fl. And to this list we can now add the 10 people who lost their lives at a high school in Santa Fe, Texas."[11]

Sadly, the mayhem did not let up in 2019. In May of that year, 12 were killed in Virginia Beach by a shooter equipped with high-capacity magazines. In August 2019, a gunman again took advantage of the enhanced lethality of high-capacity magazines to kill 23 were killed in El Paso, Texas. Just 13 hours later, rapid action by police stopped a similarly equipped mass shooter in Dayton, Ohio, limiting the body count to nine killed and 27 wounded. That same month, 7 were killed and 25 were wounded – again facilitated by high-capacity magazines – in Odessa, Texas.

38. In response to the growing list of gun tragedies, President Obama signed into law in 2013 the Investigative Assistance for Violent Crimes Act of 2012, which granted authority to the U.S. Attorney General to assist in the investigation of "violent acts and shootings occurring in a place of public use" and in the investigation of "mass killings and attempted mass killings."[12]

---

[10] William J. Krouse & Daniel J. Richardson, Cong. Research Serv., R44126, Mass Murder with Firearms: Incidents and Victims, 1999-2013, at 14-15 (2015), http://fas.org/sgp/crs/misc/R44126.pdf [http://perma.cc/RC4C-SP48]; Mark Follman, "Yes, Mass Shootings Are Occurring More Often," *Mother Jones* (Oct. 21, 2014, 5:05 am), http://www.motherjones.com/politics/2014/10/mass-shootings-rising-harvard.

[11] Louis Klarevas, "After the Santa Fe massacre, bury the 'good guy with a gun' myth: Armed staffers won't deter shooters or keep kids safe," *New York Daily News*, May 22, 2018, http://www.nydailynews.com/opinion/santa-fe-massacre-bury-good-guy-gun-myth-article-1.4003952.

[12] Blair, J. Pete, and Schweit, Katherine W. (2014). "A Study of Active Shooter Incidents, 2000 - 2013." Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington D.C. 2014, at 4.

39. To better understand the nature of these threats, the Federal Bureau of Investigation (FBI) in 2014 initiated a study of "active shooter" incidents designed to identify the prevalence of and trend in these events, how they unfolded, what brought them to an end, and other details that would be of assistance to law enforcement (Id.).[13]

40. In 2018, the FBI announced that the active shooter problem in the United States was growing ominously, as illustrated in Figure 1 below.[14] At that time, I stressed that this problem would only be getting worse if significant action was not taken to address it. Sadly, my predictions based on the growing lethality of weaponry in the United States have been fulfilled. As bad as the active shooter problem looked in 2018, it is considerably worse today, as seen in the same FBI active shooter data now extended through 2021 in Figure 2. In 2021, the 61 active shooter incidents were more than double the previous high of 30 in 2017!

[13] Note that if an active shooter bent on inflicting widespread casualties is stopped quickly enough, this incident would not appear in a count of "public mass shootings" that required, say, at least four individuals to be shot and killed, not counting the shooter (which is a standard, although not the only, definition of a mass shooting).
[14] https://www.usatoday.com/story/news/2018/06/20/fbi-most-active-shooters-dont-have-mental-illness-get-guns-legally/718283002/.

**Figure 1**




41. The ominous and steep upward trend in the FBI data charting the growth in active shooter incidents is unmistakable. Not surprisingly, the number of mass shootings clearly is higher following the termination of the federal assault weapons ban in 2004. In that year, the FBI counted 4 active shooter incidents in which 14 died. Since then, the mayhem has accelerated so much that in 2021 the FBI counted 61 active shooter incidents killing 103.[15]

[15] FBI, "Active Shooter Incidents in the United States in 2021," https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2021-052422.pdf/view.

**Figure 2**




42. Just in the last two years, the United States has experienced numerous, devastating mass shootings with firearms equipped with high-capacity magazines, including the March 16, 2021 Atlanta spa shootings (8 killed), the March 22, 2021 shooting at King Soopers supermarket in Boulder, Colorado (10 killed); the April 15, 2021 shooting at an Indianapolis FedEx warehouse (8 killed); the May 26, 2021 shooting at a transportation authority facility in San Jose, California (9 killed);[16] the May 14, 2022 supermarket shooting in Buffalo, New York (10 killed); the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas (19 children and 2 adults killed); the July 4, 2022 shooting at a Fourth of July parade in Highland Park, Illinois (7 killed), the November 20, 2022 shooting in a Colorado Springs nightclub in which five people were killed and 17 wounded, and the November 22, 2022 shooting at a Virginia Walmart that left 7 dead. These figures do not reflect the countless people injured, both physically and

[16] Woolfolk, John; Salonga, Robert; Savidge, Nico; Baron, Ethan (May 27, 2021). "San Jose shooting: VTA gunman was 'highly disgruntled,' had 32 illegal high-capacity magazines". *East Bay Times*. Walnut Creek, California.

emotionally, and the devastation inflicted on the communities in which they occurred. For example, during the July 4 mass shooting in Highland Park, Illinois, an 8-year-old boy was paralyzed and may never walk again after a bullet severed his spinal cord.[17]

43. The consequences for the shooter are also severe. Tellingly, the 18-year-old Buffalo shooter, who killed 10 using the same weapon as the Sandy Hook shooter— a Bushmaster XM-15 semiautomatic rifle—had written, "I am well aware that my actions will effectively ruin my life. If I'm not killed during the attack, I will go to prison for an inevitable life sentence." [18]

44. Assault weapons also pose particular dangers and problems to law enforcement. Because of the types of rounds typically fired by assault weapons as well as the muzzle velocities they tend to have, assault weapons are "capable of penetrating the soft body armor customarily worn by law enforcement."[19] The ability to fire rapidly also allows criminals to more effectively engage with responding police officers, even from a significant distance.[20] Empirical research by the Violence Policy Center shows that "one in five law enforcement officers slain in the line of duty was killed with an assault weapon," despite the relative rarity of assault weapon use in crime in general.[21] Christopher S. Koper et al. find that assault weapons, virtually all of which were assault rifles, "accounted for 13.2% of the firearms used in [police murders]" from 2009-2013 (note that this excludes cases involving the officer's own firearm).[22] Many law enforcement officers and agencies report that the possibility of encountering criminals with assault weapons necessitates that they spend a great deal of time and resources preparing for such encounters.[23] Both the February 2018 mass killing at Parkland High School and the May

---

[17] NBC Chicago, *Cooper Roberts, Boy, 8, Paralyzed in Highland Park Shooting, Continues to Push Forward, Mother Says*, Dec. 19, 2022, https://www.nbcchicago.com/news/local/cooper-roberts-8-year-old-paralyzed-in-highland-park-shooting-continues-to-push-forward-mother-says/3026490/.

[18] Ashley Parker, Tyler Pager, and Colby Itkowitz, "From Sandy Hook to Buffalo and Uvalde: Ten years of failure on gun control," *Washington Post*, May 22, 2022; Jesse McKinley, Jonah E. Bromwich, Andy Newman and Chelsia Rose Marcius, "Buffalo Suspect Planned Attack for Months, Online Posts Reveal," *The New York Times*, May 16, 2022; Craig Whitlock, David Willman, and Alex Horton, "Massacre Suspect Said He Modified Bushmaster Rifle to Hold More Ammunition," *Washington Post*, May 15, 2022.

[19] Brown Decl. ¶ 23, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).
[20] Kyes Decl. ¶ 15-17, *Worman v. Healy,* 293 F. Supp. 3d 251 (D. Mass. 2018).
[21] Violence Policy Center, *Officer Down: Assault Weapons and the War on Law Enforcement,* May 2003, *available at* http://www.vpc.org/studies/officer%20down.pdf (last visited Oct. 12, 2018) at 5.
[22] Christopher S. Koper et al. 2017, Finding at 317.
[23] Brady Center to Prevent Gun Violence 2008 at 4-6.

2022 mass killing in Uvalde, Texas – where police delayed entering the school during a shooting – vividly underscored how police responses to violence are impaired when the officers are confronted by a shooter armed with an assault rifle.

**The Importance of the Instrumentality Effect**

45. Decades of research has shown that there is a considerable variation in the survivability of a gun assault depending on the instrumentality employed. A seminal 1972 study by UC Berkeley Professor Frank Zimring found "that the outcome of gun assaults had a large random element, and that the power of the firearm was one systematic factor influencing the likelihood that an individual with a gunshot injury would survive."[24]

46. A meticulous study by Anthony Braga and Phil Cook in 2018 has powerfully confirmed this instrumentality effect. Braga and Cook examined the files of 511 gunshot victims kept by the Boston Police Department and found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound. Specifically, the death rate from handgun assault injuries increased substantially as the caliber of the firearm increased—even though the caliber was not correlated with observable indicators of the intent and determination to kill by the shooter. The shooter's use of a medium caliber handgun (.38, .380, and 9 mm) more than doubled the odds that the wounded victim would die compared to small caliber handguns (.22, .25, and .32). Large caliber handguns (.357 magnum, or greater) more than doubled the odds of death compared to medium caliber handguns.

47. The authors conclude that:

> The results here support the view that the intrinsic power and lethality of the weapon had a direct effect on the likelihood that a victim of a criminal shooting died. For Boston, in the period studied here, simply replacing larger-caliber guns with small-caliber guns with no change in location or number of wounds would have reduced the gun homicide rate by 39.5 percent. It is plausible that larger reductions would be associated with replacing all types of guns with knives or clubs (p.8, Braga and Cook 2018).[25]

---

[24] The description of the Zimring study comes from Braga and Cook (2018), infra, note 6.

[25] Anthony A. Braga and Philip J. Cook, "The Association of Firearm Caliber with Likelihood of Death from Gunshot Injury in Criminal Assaults," *JAMA Network Open*. 2018; 1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2688536.

48. Of course, the conclusion of the Braga and Cook study—that switching to less deadly firearm options could reduce firearm deaths—applies directly to bans on assault weapons and high-capacity magazines. The greater the lethality of the weapon, the more killed and injured in active shooter incidents. This was clearly illustrated in a study for the *Journal of the American Medical Association* that examined deaths and injuries documented in the FBI Active Shooter Database from 2000-2017.[26] The authors found that deaths and injuries were substantially higher for the 61 active shooter incidents using a semiautomatic rifle versus the 187 episodes using some other firearm. Specifically, in the incidents in which the shooter employed a semi-automatic rifle the average number killed or wounded was 9.72 versus only 5.47 killed or wounded when other firearms were used. (Note that the authors excluded the horrific Las Vegas shooting from the numbers above, since that case was so extreme, with 60 killed and almost 500 wounded—all with semi-automatic rifles.)

49. Indeed, if one looks at the deadliest acts of intentional mass violence in the United States since 9/11, they all share one feature. The killer in every case used an assault weapon and/or a firearm equipped with a high-capacity magazine. Table 1 provides a list of these most deadly mass violence incidents, with the numbers killed ranging from 13 – 60 in these mass shooting spasms of violence aided by the greater lethality afforded by these weapons and accessories formerly banned by the federal government and currently banned under Connecticut law. (Eleven incidents are listed because there were two killings tied for tenth with 13 killed.)

[26] Elzerie de Jager, et al., "Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States," *JAMA*. 2018;320(10):1034-1035. doi:10.1001/jama.2018.11009, https://jamanetwork.com/journals/jama/fullarticle/2702134.

**Table 1. The 11 Deadliest Acts of Intentional Violence in the U.S. since 9/11**

| Deaths | Date | Location | Used Assault Weapons and/or High-Capacity Magazines |
|---|---|---|---|
| 60 | October 1, 2017 | Las Vegas, NV | ✓ |
| 49 | June 12, 2016 | Orlando, FL | ✓ |
| 32 | April 16, 2007 | Blacksburg, VA | ✓ |
| 27 | December 14, 2012 | Newtown, CT | ✓ |
| 25 | November 5, 2017 | Sutherland Springs, TX | ✓ |
| 23 | August 3, 2019 | El Paso, TX | ✓ |
| 21 | May 24, 2022 | Uvalde, TX | ✓ |
| 17 | February 14, 2018 | Parkland, FL | ✓ |
| 14 | December 2, 2015 | San Bernardino, CA | ✓ |
| 13 | April 3, 2009 | Binghamton, NY | ✓ |
| 13 | November 5, 2009 | Fort Hood, TX | ✓ |

50. In addition to the well-documented increase in overall public mass shootings in the United States, there has been an equally dramatic rise of these events in school settings.[27] Indeed, the authors of a study on mass school shootings – written before the May 2022 shooting at Robb Elementary School in Uvalde, Texas left 21 dead – concluded in 2018 that "More people have died or been injured in mass school shootings in the US in the past 18 years than in the entire 20th century."[28] The impact of the elevated stress experienced by students and parents across the country as the reality of America's tragic mass shooting problem penetrates their consciousness is undeniable. While these horrendous gun massacres are relatively rare compared with the

[27] Antonis Katsiyannis, Denise K. Whitford, Robin Parks Ennis. Historical Examination of United States Intentional Mass School Shootings in the 20th and 21st Centuries: Implications for Students, Schools, and Society. *Journal of Child and Family Studies*, 2018; DOI: 10.1007/s10826-018-1096-2.

[28] Springer, "Rapid rise in mass school shootings in the United States, study shows: Researchers call for action to address worrying increase in the number of mass school shootings in past two decades." *ScienceDaily*, 19 April 2018. <www.sciencedaily.com/releases/2018/04/180419131025.htm>.

totality of gun homicides in the U.S, each one harms tens of millions, if not hundreds of millions, beyond those killed or wounded at the scene.

51. Indeed, consider the impact of the following student response to a recent mass shooting at a Texas high school:

> "It's been happening everywhere," student Paige Curry said after a gunman's attack at Santa Fe High School … killed [ten and wounded ten]. Asked if there was a moment where she felt as though the shooting could not be real, could not be actually happening at her school, Paige shook her head. "No, there wasn't," she said with a small hitch in her voice. "I've always kind of felt like eventually it was going to happen here, too," she said. "So, I don't know. I wasn't surprised, I was just scared."[29]

This is the reality of modern America: fear over the prospect of mass shootings for millions of students and their parents throughout the U.S. The harm of mass shooting in the United States is measured in the millions, far beyond the narrow death count the plaintiffs seek to minimize.

52. The FBI's analysis of active shooters over age 18 found that 65 percent had no adult convictions prior to the active shooting event.[30] Moreover, the FBI report found that only a tiny fraction would have qualified as "adjudicated mental defectives" that would have been barred from possessing weapons.[31] In other words, the lack of a basis for prohibiting gun ownership under current law for most active shooters means that tighter background checks would not have likely blocked their homicidal objectives.

53. The *Wall Street Journal* analyzed data from the 32 school shootings since 1990 with at least three victims dead or injured.[32] In 25 cases, the shooters were in their teens or younger. Of the 20 cases in which information was available, 17 of the shooters obtained their guns from their home or a relative. In other words, law-abiding citizens who possess weapons

---

[29] Adam Carlson, "'I've Always Felt Like Eventually It Was Going to Happen Here, Too,' Says Texas Shooting Survivor," People, May 18, 2018, https://www.yahoo.com/entertainment/apos-ve-always-felt-eventually-174424389.html.

[30] Silver, J., Simons, A., & Craun, S. (2018). A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 – 2013. Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 20535.

[31] The Gun Control Act of 1968 prohibits gun possession by felons and adjudicated "mental defectives" (18 U.S.C. §922 (d) (4) 2016).

[32] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come From Home," (April 5, 2018), https://www.wsj.com/articles/in-school-shootings-most-guns-come-from-home-1522920600.

equipped with high-capacity magazines can and do unwittingly assist their young children and relatives who take their lethal weaponry to commit mass shootings.

54. Nor can we hope to limit these horrific crimes by elevating the probability of apprehending mass shooters once their crime is completed since almost all mass killers are either captured, commit suicide, or are killed at the scene.[33] Tellingly, the recent 18-year-old Buffalo shooter, who killed 10 using the same weapon as the Sandy Hook shooter — a Bushmaster XM-15 semiautomatic rifle equipped with high-capacity magazines – had written, "I am well aware that my actions will effectively ruin my life. If I'm not killed during the attack I will go to prison for an inevitable life sentence."

55. Note the contrast of a school attack in China that occurred only hours before Adam Lanza used an assault weapon armed with 30-round magazines to kill 26: while 22 children and an adult were injured in the attack in China, no one died – a likely result, at least in part, of the attacker using a knife instead of an assault weapon.[34]

56. Consider the assassination attempt on the life of Ronald Reagan by John Hinckley on March 30, 1981. Hinckley fired six shots with a six-shot .22 caliber revolver – striking Reagan and three others (White House Press Secretary James Brady in the head, Metropolitan Police Officer Thomas Delahanty in the neck, and Special Agent Tim McCarthy in the abdomen as he turned to shield the president). Hinckley was tackled after he had emptied his gun, and all four of the wounded victims survived the attack.[35]

57. A similar attempt today would likely by far more devastating -- as a modern semi-automatic pistol with 15 or more bullets would have enabled the assassin to fire off many more rounds, hitting many more victims and delaying the opportunity to stop his attack. Moreover, as careful research has demonstrated, a typical 9 mm pistol round would have been far more lethal

---

[33] According to the FBI, in 156 of the 160 episodes, the mass shooter was either captured, committed suicide (64 cases), or was killed (30 cases). Blair, J. Pete, and Schweit, Katherine W. (2014). "A Study of Active Shooter Incidents, 2000 - 2013." Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington D.C. 2014. Of course, those who are captured alive are already punished as severely as the law allows, and the abundant number of mass shootings in Texas and Florida highlights the inefficacy of the death penalty in addressing this problem.

[34] Mallory Ortberg, "Man Arrested in China After Knife Attack on Students," http://gawker.com/5968740/man-arrested-in-china-after-knife-attack-on-students.

[35] U.S Secret Service, Forty Years Since the Assassination Attempt on President Reagan, https://www.secretservice.gov/reagan40thanniversary.

than a .22 caliber round[36] and the likelihood that individual victims would suffer more bullet wounds – which occurs with high-capacity magazines -- would also enhance the risk of death.

**The Far-Reaching Costs of Public Mass Shootings**

58. The large number of overall gun homicides compared with mass shootings should not obscure that major public mass shootings cause profound social damage. This harm of course includes the tragic deaths and extraordinarily devastating injuries, but extends far beyond these mere statistical counts of the fatal and non-fatal casualties. Public mass shootings are particularly high-visibility events that are quite shocking to the public and unsettling to the sense of public safety. Horrific mass shootings – such as those perpetrated by Adam Lanza at Sandy Hook School (killing 26), Stephen Paddock in Las Vegas (killing 59 and shooting 422 others), or by ISIS sympathizers at Inland Regional Center in San Bernardino (killing 14)[37] and at Pulse in Orlando (killing 49)[38] or at various houses of worship in Charleston, South Carolina (killing 9), Sutherland Springs, Texas (killing 26), and Pittsburgh, Pennsylvania (killing 11) – although small in number compared to the total number of homicides, have generated widespread apprehension and increased demand for effective responses from government. It is abundantly clear that the horrors of mass shootings -- such as the killing of 20 students and 6 teachers at Sandy Hook Elementary School in Newtown, Connecticut in December 2012; the killing of 19 elementary school students and two teachers in Uvalde, Texas; and 10 individuals who died in a

[36] An inspired study by Anthony Braga and Phil Cook in 2018 that examined the files of 511 gunshot victims kept by the Boston Police Department found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound. Specifically, the death rate from handgun assault injuries increased substantially as the caliber of the firearm increased – a victim was twice as likely to die from a wound from a 9 mm pistol than from a .22 caliber revolver.
Two studies have found that the fatality rates of those victims hit by more than 1 bullet were more than 60% higher than the fatality rates of gunshot wound victims who were hit by only a single bullet. Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990. Arch Surg. 1992;127(6): 694–698; Koper CS, Roth JA. A priori assertions versus empirical inquiry: a reply to Kleck. J Quant Criminology. 2001; 17(1):81–88.
Not surprisingly, analyses of gunshot wound victims at level I trauma centers suggest that high-capacity magazines are associated with higher rates of multiple bullet wounds per victim. Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. J Trauma Acute Care Surg. 2014;76(1):2–9; Manley NR, Fabian TC, Sharpe JP, Magnotti LJ, Croce MA. Good news, bad news: an analysis of 11,294 gunshot wounds (GSWs) over two decades in a single center. J Trauma Acute Care Surg. 2017;84(1):58–65.
[37] Christine Hauser, San Bernardino Shooting: The Investigation So Far, N.Y. Times (Dec. 4, 2015), http://www.nytimes.com/2015/12/05/us/san-bernardino-shooting-the-investigation-so-far.html (noting fourteen were killed in December 2015).
[38] Gregor Aisch et al., What Happened Inside the Orlando Nightclub, N.Y. Times (June 12, 2016), http://www.nytimes.com/interactive/2016/06/12/us/what-happened-at-the-orlando-nightclub-shooting.html (noting a gunman killed forty-nine in a June 2016 attack).

hate crime in Buffalo, New York, both in May 2022 -- have inflicted psychological distress far beyond the contours of those small communities and indeed caused suffering throughout the entire country (and the world).

59. A considerable scientific literature has documented the significant emotional and mental health harms that mass shootings inflict on survivors, community members, wounded victims, active responders, and children. The consistent finding of these studies is that mass shootings can lead to increased levels of post-traumatic stress disorder (PTSD), anxiety, and depression.[39] For example, on February 14, 2008, Steven Kazmierczak opened fire in a crowd of Northern Illinois University students, killing 5 people and wounding 17 more before killing himself. This shooting led to dramatic increases in the levels of post-traumatic stress (PTS) symptoms in a sample of Northern Illinois University students.[40]

60. Similar findings of the broad social damage from mass shootings were also documented in three studies of the broader harm from the 2011 Norway shooting, when Anders Breivik killed 68 people at a Youth Camp and wounded at least 32. Four to five months following the shooting, survivors were six times more likely to exhibit elevated PTS symptoms compared to an age- and gender-adjusted sample derived from the overall population.[41] But the psychic trauma was not limited to the victims and survivors of mass shootings. Two additional studies, which focused on the broader harm to the surrounding community following the Breivik shooting in Norway, found measurable increases in stress reactions in the general population, with the effects especially strong for young people with a prior history of trauma.[42] Sadly, we

---

[39] Shultz, James M., Siri Thoresen, Brian W. Flynn, et al. 2014. "Multiple Vantage Points on the Mental Health Effects of Mass Shootings." *Current Psychiatry Reports.* 16:469. To complete this meta-analysis of the scientific literature from 2010 to early 2014, the authors searched the PUBMED, SCOPUS, PILOTS, PSYCINFO, and CINAHL databases using combinations of terms for mass shooting incidents with MeSH (Medical Subject Heading) vocabulary on mental health.

[40] Bardeen, Joseph R., Mandy J. Jumpula, and Holly K. Orcutt. 2013. "Emotional regulation difficulties as a prospective predictors of posttraumatic stress symptoms following a mass shooting." *Journal of Anxiety Disorders* 27, no.2 (March): 188-196. This longitudinal study assessed the presence of PTS symptoms in a sample of female undergraduates at Northern Illinois University at three time points: T1, the starting period (pre-shooting) (n=1,045), T2, short term post-shooting (17-100 days post-shooting, n=691), and T3, roughly 7-8 months post-shooting (n=588). In the sample of 691 students that were assessed at T1 and T2, clinically significant levels of PTS rose from 20% pre-shooting to almost 50% post-shooting.

[41] Dyb, Grete, Tine K. Jensen, Egil Nygaard, et al. 2014. "Post-traumatic stress reactions in survivors of the 2011 massacre on Utoya Island, Norway." *The British Journal of Psychiatry* 204, no. 5 (May): 361-367. Of the 490 survivors from the Utoya shooting invited to participate in the study, 325 agreed. Semi-structured face-to-face interviews were conducted by health personnel approximately 4-5 months after the shooting.

[42] Thoresen, Siri, Helene Flood Aakvaag, Tore Wentzel-Larsen, et al. 2012. "The day Norway cried: Proximity and

must remember that Breivik wrote in his manifesto that he was grateful that he was able to purchase ten 30-round ammunition magazines from a U.S. supplier who mailed the devices to him since these were not available to him in Europe.

61. More generally, survivors of serious gunshot injuries and multiple victim incidents involving intentionally inflicted harm are at higher risk of experiencing PTS symptoms.[43]

62. Not surprisingly, those who have experienced previous trauma or psychological disorders are especially vulnerable to potential mental health problems after a mass shooting.[44] Moreover, children are more susceptible experiencing PTS symptoms following a mass shooting. For example, a study of 320 students who survived a mass public shooting at a Danish high school found that seven months later 35 percent of students reported PTS symptoms and 7 percent had PTSD.[45]

---

distress in Norwegian citizens following, 22nd July 2011 terrorist attacks in Oslo and on Utoya Island." *European Journal of Traumatology* 3, (Nov). The study drew a representative sample from the Norwegian Population Registry. A total of 465 individuals living in Oslo and 716 individuals living in other parts of Norway were interviewed over the phone 4-5 months after the Breivik attacks.
Nordanger, Dag, Kyrre Breivik, Bente Storm Haugland, et al. 2014. "Prior adversities predict posttraumatic stress reactions in adolescents following the Oslo terror events 2011." *European Journal of Traumatology* 5, (May). The study was based on a survey of 10,220 Norwegian high school students that was conducted 7 months after the Oslo and Utoya terrorist attacks. It collected information both on adverse life experiences (e.g. exposure to sexual trauma, violence, etc.) and the exposure and reactions to the Breivik attacks.

[43] Greenspan, Arlene I., and Arthur L. Kellerman. 2002. "Physical and Psychological Outcomes 8 Months After Serious Gunshot Injury." The Journal of Trauma: Injury, Infection and Critical Care 53, no.4 (Oct): 709-716. This study interviewed 60 patients who were admitted to a Level 1 trauma center for firearm-related injuries, first, at the time of their hospitalization, and second, 8 months after they were discharged. Most respondents indicated symptoms of PTS 8-months post-discharge, with 39% reporting severe symptoms of intrusion and 42% reporting severe avoidance behaviors.
Santiago, Patcho N., Robert J. Ursano, Christine L. Gray, et al. 2013. "A Systematic Review of PTSD Prevalence and Trajectories in DSM-5 Defined Trauma Exposed Populations: Intentional and Non-Intentional Traumatic Events." *PLoS One* 8, no. 4 (April). The authors identified 2,537 articles published from January 1, 1998 to December 31, 2010 and covering longitudinal studies of directly exposed trauma populations. Of these articles, they closely surveyed 58 articles that met the DSM-5 definition of having experienced a traumatic event and assessed PTSD symptoms at two or more time points within a 12-month window. The authors found that in the 5 studies with sufficient data, a median of 37.5% of individuals exposed to intentional traumatic events developed PTSD.

[44] See Shultz et al (2014), supra note 39, and Littleton, Heather, Amie E. Grills-Taquechel, Danny Axsom, et al. 2012. "Prior Sexual Trauma and Adjustment Following the Virginia Tech Campus Shooting: Examination of the Mediating Role of Schemas." *Journal of Psychological Trauma* 4, no.6 (Nov): 579-586. This study had interviewed 215 Virginia Tech college women prior to the school's mass shooting and then followed up with them two months and then one year after the shooting. The authors compared the post-shooting PTSD and depression symptoms of women with and without a history of sexual trauma. The authors found that women who had experienced sexual trauma reported significantly higher levels of depression ($p=0.006$) and shooting-related PTSD symptoms ($p=0.04$) in the post-shooting interview.

[45] Elklit, Ask, and Sessel Kurdahl. 2013. "The psychological reactions after witnessing a killing in public in a Danish high school." *European Journal of Traumatology* 4, (Jan). Seven months after the mass public shooting, researchers administered the Harvard Trauma Questionnaire to Danish students in the second and third grade of high school (this is roughly equivalent to the final two years of high school in the US system). The questionnaire was also

63. A recent study of broad scope by Maya Rossin-Slater et al (2019) tries to estimate the impact on mental health of the over 240,000 American students who experienced and survived a school shooting in the last two decades. Using large-scale prescription data from 2006 to 2015, the authors examined the effects of 44 school shootings on youth antidepressant use in a difference-in-difference framework. Their main finding was that local exposure to fatal school shootings increased youth antidepressant use by 21.4 percent in the following two years.[46] Given such evidence, any notion that the problem of public mass shootings in the U.S. is relatively minor is untenable. With only 5 percent of the world's population, the U.S. has roughly one-third of the public mass shootings across 171 countries since the late 1960s.[47]

**Banning Assault Weapons Saves Lives and Reduces Injuries**

64. The objective of Massachusett's assault weapons ban is to reduce the prevalence of weapons that will be most attractive to mass killers and most effective for committing mass murder or the type of rapid, sustained deadly fire that would be most advantageous for criminal purposes. In other words, there are two dimensions of assault weapons that are highly problematic in civilian hands: their dangerous symbolic and cosmetic features as well as their capacity to assist in mass killing. The zealous, pro-gun Texas politician Jerry Patterson – author of the 1995 Texas law that first allowed concealed carry of handguns – recognized the importance of the symbolic and cosmetic appeal of these weapons when he acknowledged that the primary value of an AR-15 in civilian life is to be "a look-at-me gun."[48] Unfortunately, no one desires this symbolic feature more than mass shooters, who frequently express the view that assault weapons will finally make others realize they are powerful. Moreover, as Senator Mark Warner noted in referring to a new proposed federal assault weapons ban, we must "recognize that the features and tactical accessories that define assault weapons under this legislation were designed for a specific purpose — to give soldiers an advantage over the enemy, not to mow

---

mailed to parents' addresses of students who had graduated in June. Of the 415 students enrolled at the time of the shooting, 320 students returned the questionnaire.

[46] Maya Rossin-Slater, Molly Schnell, Hannes Schwandt, Sam Trejo, Lindsey Uniat, Local Exposure to School Shootings and Youth Antidepressant Use, NBER Working Paper No. 26563 (December 2019), https://www.nber.org/papers/w26563. See also, "My son survived Sandy Hook. It's changed me as a parent," *The Washington Post,* December 13, 2019, https://www.washingtonpost.com/lifestyle/2019/12/13/i-cry-high-school-meets-how-sandy-hook-changed-me-parent/.

[47] Lankford, Adam, "Public Mass Shooters and Firearms: A Cross-National Study of 171 Countries," *Violence and Victims*, Vol 31, Issue 2, DOI: 10.1891/0886-6708.VV-D-15-00093, http://connect.springerpub.com/content/sgrvv/31/2/187.

[48] Rachel Monroe, "Are Texas Republicans Budging on Gun Control?" *The New Yorker* (June 16, 2022).

down students in school hallways."[49] The ominous and growing problem of mass public shootings since 2013 convinced the Virginia Senator to reverse his prior opposition to an assault weapons ban.

65. Rifles that incorporate military-style features add to their capacity to enhance the death toll in a public mass shooting event: pistol grips and thumbhole stocks enable easier spray-firing; a collapsible or folding stock allows the weapon to be shortened and more easily concealed;[50] and barrel shrouds are essential for mass shooters to continuously fire their weapons without suffering discomfort from an overheated barrel.[51] As a consequence, these attributes make these weapons particularly appealing to mass shooters, drug traffickers, and people who may want to exchange fire with law enforcement.[52]

66. Assault weapons, at least of the long gun variety, tend to have higher muzzle velocities than ordinary handguns.[53] They also tend to utilize .223 rounds designed to fragment and mushroom in a person's body, as illustrated in the 60 Minutes video referenced below at footnote 85.[54] These two factors in conjunction mean that injuries from being shot by assault weapons tend to cause more complex damage to the body in ways that make these wounds more dangerous and deadly in both the short and long term.[55]

---

[49] Mark Warner, "I voted against an assault weapons ban. Here's why I changed my mind," *The Washington Post*, October 1, 2018, https://www.washingtonpost.com/opinions/i-voted-against-an-assault-weapons-ban-heres-why-i-changed-my-mind/2018/10/01/3bfa76a0-c594-11e8-9b1c-a90f1daae309_story.html.

[50] Erica Goodejan, "Even Defining 'Assault Rifles' Is Complicated," *The New York Times* January 16, 2013, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html.

[51] *See* Rovella Aff. ¶¶ 34-38, *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014), *aff'd in part, rev'd in part sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); H.R. Rep. No. 103-489 (1994) at 18-19.

[52] *See* H.R. Rep. No. 103-489 (1994) at 14-16; Brady Center to Prevent Gun Violence, *Assault Weapons: Mass Produced Mayhem*, October 7, 2008, *available at* http://www.bradycampaign.org/resources/assault-weapons-mass-produced-mayhem (last visited Oct. 12, 2018) at 3; Batts Decl. ¶¶ 33, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), aff'd in part, vacated in part, remanded sub nom. Kolbe v. Hogan, 813 F.3d 160 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), and *aff'd sub nom. Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017).

[53] *See* Defts' Stmt. Docket Entry 63 ¶¶ 44–45, 58–59, 61, 64–65, *Worman v. Healey*,1-17-CV-10107, 293 F. Supp. 3d 251 (D. Mass. 2018).

[54] *See* Batts Decl. ¶¶ 44-45, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), aff'd in part, vacated in part, remanded sub nom. Kolbe v. Hogan, 813 F.3d 160 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017), and *aff'd sub nom. Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017); Rovella Aff. ¶¶ 39, *Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014), *aff'd in part, rev'd in part sub nom. New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); Duncan Long, *The Complete AR-15/M16 Sourcebook* (2d ed.), 2001 at 50; Colwell Decl. at 2-4, *Worman v. Healey*, 293 F. Supp. 3d 251 (D. Mass. 2018).

[55] *See* Colwell Decl. in Supp. of Defs.' Opp. to Mot. for Prelim. Inj. ¶ 8.

**Banning High-Capacity Magazines Saves Lives and Reduces Injuries**

67. Louis Klarevas, the author of Rampage Nation: Securing America from Mass Shootings (Amherst, NY: Prometheus 2016), has become the primary authority on research concerning mass shootings in the United States. Klarevas finds that the use of large-capacity magazines leads to more bullet wounds for victims (thereby substantially increasing the death toll of those who are shot), results in more shots fired (thus increasing the number of individuals who are shot) and reduces the capacity of potential victims to flee to safety or take effective defensive action.

68. Klarevas was the first to highlight that the ten-year federal ban on assault weapons and high-capacity magazines reduced the toll from mass shootings. Klarevas illustrated that the pattern of the deadliest mass shootings changed over the period from 1984-2014. Examining gun massacres in which at least six were killed, Klarevas found that these incidents and the number of resulting deaths fell during the decade in which the federal assault weapons ban was in place and then rebounded when the ban was lifted in 2004.

69. Specifically, Klarevas found that, from 1994-2004, there were only 12 incidents – slightly over one per year – due to assault weapons, resulting in 89 deaths. In the following decade, when the federal assault weapons ban was no longer in place, there was a dramatic surge in both the number of gun massacres and the total death toll: From 2004-2014, the number of gun massacres rose from 12 to 34 and the number of gun deaths jumped from 89 to 302. Moreover, since overall crime was trending down over this period, the link between the expansion of high-capacity magazines following the lapse in the federal assault weapon ban and the increased number of gun massacres is further buttressed.

**Figure 3**




70. Since the Klarevas data ended in 2014, I conducted my own study both to verify the accuracy of his findings and then to extend the analysis forward to the present. In implementing his definition of a gun massacre as a mass shooting incident in which 6 or more people died, Klarevas notes in his book that "It doesn't matter if there is one gunman or several gunmen. It doesn't need to occur in public. It can be for any reason whatsoever." In my study, I chose to use the *Mother Jones* database, which does limit the gun crimes to killings occurring in a public place and omits killings related to armed robbery, gang activity, or domestic violence in accord with recent FBI practice. I augmented the Mother Jones data whenever I found it had missed relevant mass shootings that appeared in other mass shooting databases.

71. Figure 4 below shows the number of incidents of such gun massacres and the deaths resulting therefrom based on these criteria.[56] The figure illustrates clearly that the number and deadliness of these mass shootings dropped during the ten years of the federal assault weapons ban from September 1994 through 2004 and rose sharply after the federal ban was lifted.[57] Although the number of incidents is too limited to highlight the 25 percent drop in gun massacres, the 40 percent drop in overall fatalities during the period of the federal ban is substantial and noteworthy.

72. After the federal ban lapsed in 2004, the gun market was flooded with increasingly more powerful weaponry that allowed mass killers to kill ever more quickly with predictable results. The decade after the ban elapsed saw a 266 percent increase in mass shooting incidents and a 347 percent increase in fatalities, even as overall violent crime continued downward (reflected in the dotted line in Figure 4). In other words, my independent assessment confirms the pattern first revealed by Louis Klarevas: gun massacres fell during the assault weapons ban and rose sharply when it was removed in 2004.

73. What has happened since 2014 is even more alarming. In five years, the number of fatalities in these gun massacres has already topped the previous high that occurred during the first decade after the federal assault weapon ban was removed. This murderous leap has occurred at the same time that overall violent crime persisted on a downward trend, as the dotted line in Figure 4 confirms.[58] If we continue at the post-2014 pace until 2024, the last column of Figure 4 shows that we will have an astonishing order of magnitude increase in gun massacre deaths over a 20-year period.[59]

---

[56] Figures 1 and 2 are replicated from John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV and discussed further in John Donohue, "The Swerve to 'Guns Everywhere:' A Legal and Empirical Analysis," *Law and Contemporary Problems*, (forthcoming, February 2020). See also the earlier piece: John Donohue and Theodora Boulouta, "That Assault Weapon Ban? It Really Did Work," *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html.

[57] The Federal Assault Weapons Ban took effect September 13, 1994, and expired on September 13, 2004, due to a sunset provision that enabled the law to lapse after President George W. Bush reneged on his campaign promise to support retention of the federal ban.

[58] This downward trend in violent crime even as mass shootings rise after 2004 is important evidence of the harmful impact of ending the federal assault weapons ban. Without that evidence one might mistakenly think that the overall violent crime drop of roughly 14 percent during the decade of the federal assault weapons ban was simply part of downward crime which itself explains the drop in mass shooting deaths. The experience after 2004 undermines that view.

[59] Note that the numbers of mass shootings would be substantially larger using alternative definitions, such as the Gun Violence Archive definition of *four individuals wounded by gunfire in a single incident*. Using that more

74. The evident effectiveness of the ten-year federal ban in reducing mass shooting deaths is exactly what we would expect, since during that decade mass killers could not simply enter a gun store and buy a weapon with a large capacity magazine, as they can do in most of the U.S. today.[60]

75. Figure 5 illustrates the average number of fatalities in each mass shooting for the same four periods shown in Figure 4. The pattern is the same: fatalities per incident fell during the federal assault weapon ban and have risen sharply thereafter. With the weaponry available to citizens getting increasingly more potent and plentiful, the average number of people who die in every incident has increased by 90 percent since the decade after elimination of the federal assault weapons ban.

76. Assault weapons and/or high-capacity magazines were used in all 15 gun massacres since 2014 in which at least six were killed (other than the shooter) shown in Figure 4; all 272 people who died in these 15 gun massacres were killed by weaponry prohibited under the federal assault weapons ban (as well as the comparable Connecticut ban).[61]

---

capacious definition, there have been 366 mass shootings in the first 318 days of 2019, killing 408 and injuring 1477. https://www.insider.com/number-of-mass-shootings-in-america-this-year-2019-8.

[60] With the adoption of a new law in Illinois this week, 9 states and the District of Columbia ban assault weapons and all of those states plus Colorado and Vermont restrict the permissible size of ammunition magazines.

[61] After Figure 4 was created another victim of the Las Vegas shooting died after two horrendous and agonizing years as a quadriplegic, which elevates to 272 the number of deaths form public gun massacres in the last five years. The following article highlights some of the devastating injuries that result from being shot by an assault rifle, such as that used by the Las Vegas shooter. https://www.kptv.com/news/vancouver-woman-says-sister-injured-in-las-vegas-shooting-has/article_af9198c6-099c-11ea-87c1-37de7096726f.html.

**Figure 4**




Mass shooting data from Mother Jones; dates begin and end in September to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place, except for the last column, which ends in 9/2/2019. Violent crime rate data from UCR; dots mark ten-year averages, except for the last dot, which ends in 6/2018.

**Figure 5**




77. This instrumentality effect was further demonstrated in an article I authored with Phil Cook since my 2019 Report, demonstrating that the federal assault weapons ban—which banned both new semi-automatic assault rifles with certain features that made them attractive to mass shooters *and* new ammunition magazines that could hold more than ten rounds—suppressed deaths in public mass shootings.[62] Figure 6 below shows that the deaths that occurred from these public mass shootings over the period from 1985-2019 in five year increments. The Figure highlights that by the second half of the ten-year existence of the federal assault weapons ban (1999-2004), fatalities from public mass shootings using banned weaponry had virtually been cut in half (falling from 30 down to 16). Conversely, there was no decline in public mass shooting deaths over this period with non-banned weaponry.

---

[62] Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," *JAMA*. 2022; 328(12):1191-1192, https://jamanetwork.com/journals/jama/fullarticle/2796675.

**Figure 6**




78. After the federal ban lapsed in 2004, the deaths from public mass shootings using the previously banned weaponry rose sharply: rising from 16 in the last five years of the federal ban to 271 in the five-year span from 2015-2019—with the latter figure 17 times as high as the former. Meanwhile, there was relatively little movement in public mass shooting deaths using the less-lethal weaponry (neither an assault weapon nor a high-capacity magazine). Indeed, as Figure 6 illustrates, there was roughly the same number of deaths from less lethal weaponry in the five-years prior to the federal assault weapons ban (1990-1994) as there was from 2015-2019—specifically 83 in the pre-ban period and 81 in the final period.

79. Figure 6 also highlights that while there was a roughly comparable *number of incidents* of public mass shootings that used either the most lethal (previously federally banned) weaponry or less lethal firearms not subject to the federal ban, the incidents involving assault weapons and/or high-capacity magazines were far more lethal. Specifically, the 18 public mass shootings conducted with the most lethal weapons killed 271 (roughly 15 deaths per episode),

while the 14 public mass shootings with the less lethal firearms killed 81 (about 5.8 deaths per episode).

**Restrictions on Assault Weapons Reduce Mass Shooting Deaths and Casualties**

80. Table 2 provides an original econometric analysis of Mother Jones mass shootings data from 1982-2019 to assess empirically whether assault weapons bans at the state and federal level have limited mass shootings deaths and overall casualties. This analysis reveals that such bans do generate statistically significant reductions in mass shooting deaths and casualties.

81. This panel data analysis simultaneously examines data from all 50 states and the District of Columbia from 1982-2019 to ascertain what happens when federal or state bans on assault weapons and/or high-capacity magazines go into effect or are eliminated. The statistical model specifically controls for national influences on mass shootings that occur each year ("year effects") as well as the stable differences in mass shooting rates across states ("state effects").[63] This panel data model also controls for a variety of criminal justice, socio-economic, and demographic factors that could also influence violent crime.[64]

82. Table 2 indicates that having an assault weapon ban (whether at the state or federal level) and/or high-capacity magazine ban in place in a given state is associated with a statistically significant decrease in per capita rates of deaths and casualties due to mass shootings.[65] Overall, this analysis serves to further reinforce and expand upon earlier findings that bans on assault weapons and high-capacity magazines save lives.

---

[63] This is a population-weighted, state-level two-way fixed effects regression.

[64] The controls include the lagged incarceration rate in each state for each year, the lagged police employee rate, real per capita personal income, the unemployment rate, poverty rate, beer consumption, the percentage of the population living in MSAs, and six demographic variables (based on different age-sex-race categories). This statistical model is described in greater details in Donohue, John, Abhay Aneja, and Kyle Weber, "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019, https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

[65] The model also suggests that these gun safety restrictions suppress the rate of mass shooting incidents and injuries, although the evidence is statistically weaker for these dependent variables although the injury-alone effect is statistically significant at the .10 level.

**Table 2**

*The Effect of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings, 1982-2019*

| | Mass Shooting [a] *Incidents* per 10,000,000 Population | Mass Shooting *Deaths* per 1,000,000 Population | Mass Shooting *Injuries* per 1,000,000 Population | Mass Shooting *Casualties* [b] per 1,000,000 Population |
|---|---|---|---|---|
| Assault Weapon or High-Capacity Magazine Ban [c] | -.07<br>(0.05) | -.09**<br>(0.04) | -.22*<br>(0.12) | -.31**<br>(0.15) |

Notes: Outcome variables are based on *Mother Jones*' database of mass shootings in the 50 states plus Washington DC from 1982 to 2019. The OLS regressions also included the socioeconomic control variables used in DAW 2019 as well as state and year fixed effects. The coefficients on these variables were omitted from this table to conserve space. Regressions are weighted by each state's 1999 population, and standard errors are clustered at the state level.

[a] Mass shootings are defined as attacks in public places in which four or more victims were killed.

[b] Casualties are defined as people who were either injured or killed during a mass shooting.

[c] The variable "Assault Weapon or High-Capacity Magazine Ban" is assigned a value of 1 for each state-year for which either an assault weapon ban or high-capacity magazine ban was active, and 0 for all other state-years.

∗ p<0.1; ∗∗ p<0.05; ∗∗∗ p<0.01

83. One of the unfortunate consequences of the continuing advances in the lethality and power of modern firearms is that without appropriate government action the dangers posed by civilian weaponry will continue to outpace any legitimate crime-reducing benefit that firearms might provide. The lesson of the November 2017 massacre at the Sutherland Springs Baptist

Church in Texas highlights the growing dangers. The killer in that case used an AR-15 that was modified to include a laser scope and features that could allow large capacity magazines to be more quickly reloaded to maintain a relentless barrage. The killer stood outside the church and fired straight through the walls of the church as he strafed along at just above the top of the levels of the church pews, allowing him to shoot 254 shots from **outside** the church in a matter of minutes on his way to killing 26 men, women, and children. No portable weapon in civilian hands at the time of the adoption of the Second Amendment could possibly generate this degree of destruction so rapidly. The evident social harms will only grow as gun technology increases firearm lethality.

84. The tragedy that first brought mass shootings into the public consciousness is often thought to be the 1966 reign of death from the top of the University of Texas memorial tower when Charles Whitman used scoped hunting rifles to kill 14 and wound 32. Whitman was an expert Marine marksman, perched in a very protected space to continue his barrage, and it took him 90 minutes to produce this level of mayhem. Fast forward to November 5, 2009, and Nidal Hasan, an inexperienced shooter, was able to fire 214 times at Fort Hood in less than 10 minutes with a faster shooting handgun equipped with high-capacity magazines, killing 13 and also wounding 32.[66] The August 4, 2019 attack targeting a Dayton, Ohio bar district lasted only 32 seconds, yet armed with a 100 round drum magazine, the shooter was still able to kill nine and shoot 17 others.[67]

85. By 1981, as we saw with the Hinckley attempted assassination of Reagan, the US had not moved into the era of pervasive possession of modern weaponry, which was launched by both the increased advertising of assault rifles and the move towards modern pistols with high-capacity magazines that was catalyzed by the advent of the Glock 9 mm semiautomatic pistol, introduced into the U.S. market in 1986. These developments were accompanied by the U.S. gun market's fixation on ever bigger magazines and growing military-style appearance and enhanced lethality, turning mass shootings from once in a decade events in the 1960s and 1970s

---

[66] Lee Hancock, The gun Nidal Hasan used to kill at Fort Hood, Jun 17, 2011, https://www.dallasnews.com/opinion/commentary/2011/06/17/lee-hancock-the-gun-nidal-hasan-used-to-kill-at-fort-hood/.

[67] Although the shooter had previously been suspended from high school for making hit lists of students he wanted to rape and kill, he met the gun industry definition of a responsible, law-abiding citizen who should be able to purchase the weaponry he employed to commit mass murder. Biesecker, Michael; Carr Smyth, Julie (August 5, 2019). "Classmates: Ohio shooter kept a 'hit list' and a 'rape list'". Associated Press.

into the growing menace that they have become today. As the problem grew in the 1980s, government efforts at the state and federal level began, with the only serious national effort designed to address the problem coming in 1994 with the passage of the federal prohibition of new assault weapons and high-capacity magazines. While the ten years in which this federal ban was in place did restrict mass shootings, the lapsing of the federal ban and the continued expansion of these weapons has correlated tightly with the growing menace of mass shootings.

86. The dramatic increases in gun massacre incidents and fatalities closely tracks the growth in U.S. sales of previously federally banned weaponry that was ignited by the expiration of the federal assault-weapons ban in 2004, the removal of potential liability on the part of gun merchants, and intense advertising of the militarized upgrades, ranging from high-capacity magazines to flash suppressors, that stimulated the demand for this highly dangerous consumer product. Josh Sugarmann, executive director of the Violence Policy Center, notes that "The end of the assault-weapons ban allowed for the customization and modification of these weapons to make them look even more militaristic, even more grand in the eyes of their owners."[68]

87. Research published following the mass shootings in Buffalo, New York and Uvalde, Texas killing a total of 31 in May 2022 further confirms these findings.[69] Specifically, an analysis of mass shooting data by a group of injury epidemiologists and trauma surgeons reached the following conclusion:

> We calculated that the risk of a person in the U.S. dying in a mass shooting was 70% lower during the period in which the assault weapons ban was active. The proportion of overall gun homicides resulting from mass shootings was also down, with nine fewer mass-shooting-related fatalities per 10,000 shooting deaths.

88. Another empirical study that examined high-fatality mass shootings killing at least six victims between 1990 and 2017 similarly concluded that "LCM bans have been effective at saving lives" by reducing the incidence of and deaths in these mass shootings.[70] The authors found that:

---

[68] Quoted in Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/

[69] Klein, Michael, 2022. Did the assault weapons ban of 1994 bring down mass shootings? Here's what the data tells us, *The Conversation*, June 8, 2022, https://theconversation.com/did-the-assault-weapons-ban-of-1994-bring-down-mass-shootings-heres-what-the-data-tells-us-184430.

[70] Klarevas L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990-2017. *Am J Public Health*. 2019;109(12):1754-61. doi: 10.2105/ajph.2019.305311.

89. Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non–LCM ban states was more than double the rate in LCM ban states; the annual number of deaths was more than 3 times higher. In multivariate analyses, states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents.

**Industry Advertising Appeals to Potential Mass Shooters**

90. A year after the lapsing of the federal assault weapons ban, the Protection of Lawful Commerce in Arms Act (PLCAA) was passed, which provided gun manufacturers with near-blanket immunity from suits based on the criminal misuse of their products. This emboldened a torrent of consumer advertising designed to highlight the battlefield appeal of modern assault weapons, and sales soared in response. The dramatic rises in gun massacres followed.

91. These advertising campaigns reveal exactly how the gun industry sought to market assault weapons: they are hawked with explicit depictions of combat and phrases like "The closest you can get without having to enlist."[71]

92. Unsurprisingly, a growing number of mass killers turn to these assault rifles when they launch their deadly onslaughts. Moreover, an industry survey of civilian assault-rifle ownership "reveals that the average civilian assault-rifle owner keeps a small arsenal, owning three or more of the guns; 27 percent of owners have bought four or more. [Unfortunately,] many civilian assault-rifle owners fail to secure their arms; nearly one owner in five does not lock up his rifle, and more than 30 percent take no care to secure their ammunition."[72] In other words, a very substantial fraction of owners of assault rifles act irresponsibly, thereby exposing their weapons to loss or theft and resulting criminal misuse. For example, the weapons used by Adam Lanza to kill his mother, Nancy Lanza, and in the Newtown shooting were owned by his mother – a pattern that has repeated itself all too often as the *Wall Street Journal* noted (see footnote 32, above).

---

[71] *Id.*

[72] The NSSF periodically conducts research on civilian assault rifles intended for gun sellers, and these figures are from their latest survey. Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/

93. The makers of the Bushmaster assault rifle Nancy Lanza owned and that her son Adam Lanza used to gun down first-graders and teachers in Newtown was sold under the slogan "Forces of opposition, bow down." While such weapons are designed for and appropriately used by trained military personnel and law enforcement, they are exceedingly dangerous when wielded by mentally unstable civilians.

94. While the United States does not have a higher rate of mental illness than other advanced industrialized nations, it certainly has a higher rate of public mass shootings. This is in part because young men are saturated in a gun culture created by advertising designed to exploit their weaknesses.

95. In their Motion for Preliminary Injunction, the Plaintiffs quote the oft-repeated but clearly erroneous gun industry assertion that "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." Stenberg v. Carhart, 530 U.S. 914, 1001 (2000) at n. 16 (Thomas, J., dissenting). The truth is exactly the opposite.

96. Throughout the 1980s the gun industry marketed AR-type rifles as "assault" weapons because this marketing promoted sales. The image below of a Guns & Ammo magazine cover highlighting assault rifles in July 1981 is just one of the numerous such advertisements and gun industry publications concerning assault weapons that one can find on the web throughout the 1980s.[73] Only when the increase in civilian ownership of these weapons was followed by outrage over (and fears of potential tort liability for) prominent mass shootings did the industry shift away from that direct terminology in its advertisements (while continuing to market guns with appeals to their military character).

[73] See, https://www.democraticunderground.com/126210025.

**Figure 7**

Cover of the July 1981 Issue of Guns & Ammo[74]




97. Consider the following Bushmaster advertisement for the gun that Adam Lanza used, and imagine the impact it could have on someone struggling with substantial mental health problems:

[74] Reproduced from the *New York Times*, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html.

**Figure 8**




98. Notably, while Lanza used a Savage Mark II bolt-action .22-caliber rifle to kill his sleeping mother, he chose the much more dangerous Bushmaster assault weapon with 30-round magazines that enabled him to fire 154 bullets over the 264 seconds in his lethal rampage at Sandy Hook School.[75] We can surmise that if he had only a bolt action hunting rifle, he could not have fired as many bullets and many lives would have been spared.

99. The impact of the gun industry's efforts to exploit messages about assault weapons directed at those with deep insecurities and even mental health issues showed up in another recent mass shooting.

---

[75] Coalition to Stop Gun Violence, "What Adam Lanza Took, and Didn't Take, to Sandy Hook Elementary," https://www.csgv.org/adam-lanza-took-didnt-take-sandy-hook-elementary/ (last visited on October 22, 2018).

**Figure 9**




100. The nineteen-year old killer of 17 at Parkland High School (on February 14, 2018) was moved to post the above NRA image on his Instagram account. He stated in a recording that he had had enough of being told what to do and was tired of being called "an idiot." "I am nothing. I am no one, my life is nothing and meaningless. With the power of the A.R., you will know who I am."

101. Industry advertisements of guns "for the 'warrior' in you" undoubtedly enhance sales, but they convey an entirely inappropriate message to a civilian population.[76] The marketing strategy of gun sellers that exploits the fantasies of young men leads troubled individuals like the Sutherland Springs mass shooter to highlight their attachment to their weapons: he posted a picture of his AR-15 with the heading "She's a bad bitch" shortly before he killed 26 in Texas in 2017.[77]

[76] E-mail advertisement by the U.S. Concealed Carry Association, September 8, 2022.
[77] Seventeen-year-old Kyle Rittenhouse was drawn to the illegal purchase of the AR-15-style rifle he used to kill two and maim one because it "looked cool." Donohue, "An expert draws 7 lessons about US gun laws from the murder of Ahmaud Arbery and the Rittenhouse verdict," *The Conversation*, December 6, 2021, https://theconversation.com/an-expert-draws-7-lessons-about-us-gun-laws-from-the-murder-of-ahmaud-arbery-and-

102. Of course, banning assault weapons does not eliminate the threat from troubled individuals, but since these weapons are particularly attractive to troubled potential mass killers and specifically designed to facilitate the most rapid and effective annihilation of all intended targets, bans on assault weapons is not only prudent but indeed indispensable in any governmental effort designed to effectively address the mass shooting problem in America. A brief discussion of how and why the AR-15 came to be chosen as the primary military combat weapon used by the U.S. in Vietnam explains why.

**The Army Adopts the AR-15 for Battlefield Use**

103. In 1957, the Army invited Armalite's chief gun designer, Eugene Stoner, to produce a lightweight, high-velocity rifle, that could operate in both semi- and full-automatic modes with firepower capable "of penetrating a steel helmet or standard body armor at 500 yards." Stoner devised the AR-15 to meet these specifications. The Advanced Research Projects Agency (ARPA) –today known as DARPA – was so impressed with the AR-15's value as a combat weapon that it pushed to have 1,000 rifles shipped for use by South Vietnamese troops and their American special-forces trainers in 1961.

104. The performance of this new assault weapon was assessed in a confidential ARPA report in July 1962, stating "The AR-15 Armalite rifle has been subjected to a comprehensive field evaluation under combat conditions in Vietnam."[78] The report noted that "The lethality of the AR-15 and its reliability record were particularly impressive."[79] The wounds generated by this weapon were prodigious: "At a distance of approximately 15 meters, one Ranger fired an AR-15 full automatic hitting one VC [(Viet Cong)] with 3 rounds [of Caliber .223] with the first burst. One round in the head-took it completely off. Another in the right arm, took it completely off, too. One round hit him in the right side, causing a hole about five inches in diameter. It cannot be determined which round killed the VC but it can be assumed that *any one of the three would have caused death*."[80]

105. The report enumerated the wounds in a Ranger ambush of a Viet Cong position, including: a back wound that "caused the thoracic cavity to explode"; a buttock wound that

the-rittenhouse-verdict-172741.

[78] Advanced Research Projects Agency, Office of the Secretary of Defense, *Field Test Report, AR-15 Armalite Rifle*, at 4 (July 31,1962,). Retrieved October 12, 2018 from http://www.dtic.mil/dtic/tr/fulltext/u2/343778.pdf
[79] Id. at 15.
[80] Id. at 22 (emphasis added).

"destroyed all tissue of both buttocks"; and finally "a heel wound," where "the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip." All the deaths were "instantaneous," "except the buttock wound. He lived approximately five minutes."[81]

106. The "phenomenal lethality" of the AR-15 described by ARPA led the Army in December 1963 to adopt the AR-15 – rebranding it the M16.

107. Of course, the civilian AR-15 lacks the fully automatic (and burst) mode of the M16, but it still retains all the other aspects that made it such a valuable lethal weapon for deadly combat. In fact, the Army's own Field Manual states that semi-automatic fire is the "most important firing technique during fast-moving, modern combat," noting, "It is surprising how devastatingly accurate rapid semi-automatic fire can be."[82] In other words, saying that this semi-automatic assault weapon is not a weapon of war because it doesn't have fully automatic capacity is like saying that a conventional bomber is not a war plane because it isn't carrying a nuclear payload. Indeed, the ability to convert a civilian AR-15 into a fully automatic weapon – or the near fully-automatic capacity that Stephen Paddock used in the Las Vegas shooting of a year ago – is yet an additional factor that renders it unusually dangerous.

108. According to one of its designers, the AR-15 assault rifle was originally engineered to generate "maximum wound effect." "It's a perfect killing machine," says Dr. Peter Rhee, a trauma surgeon and retired Navy captain.[83]

109. Rhee was the doctor who saved the life of Arizona Rep. Gabby Giffords after she was shot in the head with a handgun fired during a mass shooting in 2011. According to Rhee: "A handgun [wound] is simply a stabbing with a bullet. It goes in like a nail. [But with the AR-15,] it's as if you shot somebody with a Coke can."

110. The identical message was conveyed by one of the emergency room doctors who treated some of the pulverized victims of AR-15 wounds inflicted during the catatostrophic Parkland shooting that killed 17 and wounded 17 others in a span of four minutes.[84] The CBS show 60 Minutes also provided a dramatic experiment to illustrate the far more destructive

---

[81] Tim Dickinson, "All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice," *Rolling Stone*, February 22, 2018, https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819/

[82] *Id.*

[83] *Id.*

[84] Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *The Atlantic*, February 2018, https://www.theatlantic.com/amp/article/553937/

impact on human tissue of being shot with an AR-15 than a handgun, as seen in the referenced video "What Makes the AR-15 so Deadly?"[85]

**The Allure of and Value to Mass Shooters of Assault Weapons**

111. It is not surprising that mass shooters employing these particularly lethal weapons are able to kill so many so quickly: Adam Lanza was able to slaughter 26 in less than five minutes with his Bushmaster AR-15. James Holmes used a Smith & Wesson "Military & Police" (M&P) AR-15 fitted with a 100-round magazine to kill 12 and wound 58 in a Colorado movie theater. The ISIS-inspired San Bernardino, California, shooters used a pair of AR-15s to kill 14. Orlando shooter Omar Mateen unleashed Sig Sauer's concealable "next-generation AR" to leave 49 dead and dozens more injured at the Pulse nightclub.

112. In July 2016, incensed by police shootings of unarmed black men, Gavin Long used a rifle with a 40-round magazine to shoot six police officers in Baton Rouge, Louisiana, killing three before he himself was killed by a police sniper. Long used a TAVOR assault rifle – which the manufacturer describes as "the ultimate weapon of the 21st century" employed by armed forces around the globe. Israel Weapon Industries notes on its webpage that this particular weapon, developed in co-operation with the Israeli Defense Forces, was "especially created" in response to "dynamic changes in the modern battlefield, the threats of global terrorism and the demands of ever-changing combat situations."[86]

113. Moreover, there is not the slightest evidence that the federal restrictions on assault weapons that was enacted in 1994 (and lapsed ten years later) compromised the safety of law-abiding citizens. Since these weapons are useful for those bent on mass killing, further limiting their availability should have a beneficial effect on the active shooter and mass shooting problems that are serious and worsening in the United States.

114. Hundreds of law-abiding citizens have been killed in mass shootings and the problem of mass shootings is getting worse. Since the value of assault weapons over non-assault weapons for legitimate self-defense is virtually non-existent, the primary impact of removing such weapons from circulation will be to decrease the prospect that a law-abiding citizen will be confronted by a criminal with such weaponry.

---

[85] https://www.cbsnews.com/news/ar-15-used-mass-shootings-weapon-of-choice-60-minutes-2019-06-23/.

[86] James Gill, "Civilians carrying 'ultimate weapon' Gavin Long used in Baton Rouge would be regarded worldwide as insane," The New Orleans Advocate, August 10, 2016.

115. "[L]aw-abiding citizens" whose guns are lost or stolen each year are one of the most important sources of weapons for criminals in the United States. The best current estimates are that roughly 400,000 guns move into the hands of criminals this way each year in the United States.[87] In other words, it is orders of magnitudes more likely that a criminal will steal a gun of a law-abiding citizen than a law-abiding citizen will fire an assault weapon in lawful self-defense. More assault weapons in the hands of law-abiding citizens like Nancy Lanza means more assault weapons in the hands of criminals such as Adam Lanza.

116. Further, many of the most horrific mass shootings in America were perpetrated by previously law-abiding citizens. The list, which is too long to recite, includes Stephen Paddock, who killed 59 in Las Vegas; Omar Mateen, who killed 49 in the Pulse nightclub in Orlando; Adam Lanza, who killed 26 in Newtown, Connecticut; and the Batman killer in Aurora, Colorado, who killed 12, as well as the Buffalo and Uvalde, Texas shootings in May 2022, where 10 and 21 died, respectively, after being shot with assault weapons equipped with high-capacity magazines.

117. The empirical evidence supports the conclusion that if, rather than allowing the federal assault weapons ban to lapse in 2004, the country had moved to a more complete ban, many of the gun tragedies of recent years would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States. It is also my opinion that Connecticut's ban on high-capacity magazines is one tool in the important governmental effort to reduce the likelihood that residents of the state will be killed in mass shootings by making it incrementally harder for prospective mass shooters to equip weapons with lethal accoutrements that are both uniquely appealing to their criminal aspirations as well as uniquely designed to aid in their homicidal rampages.

---

[87]According to Larry Keane, senior vice president of the National Shooting Sports Foundation (a trade group that represents firearms manufacturers), "There are more guns stolen every year than there are violent crimes committed with firearms." More than 237,000 guns were reported stolen in the United States in 2016, according to the FBI's National Crime Information Center. The actual number of thefts is obviously much higher since many gun thefts are never reported to police, and "many gun owners who report thefts do not know the serial numbers on their firearms, data required to input weapons into the NCIC." The best survey estimated 380,000 guns were stolen annually in recent years, but given the upward trend in reports to police, that figure likely understates the current level of gun thefts. See, Freskos, Brian. 2017c. "These Gun Owners Are at the Highest Risk of Having Their Firearms Stolen." *The Trace*. 4/11/2017. https://www.thetrace.org/2017/04/gun-owners-high-risk-firearm-theft/ and Freskos, Brian. 2017b. "Missing Pieces." *The Trace*. 11/20/2017. https://www.thetrace.org/features/stolen-guns-violent-crime-america/.

**Gun Control Dramatically Reduced Mass Shootings in Australia**

118. In this regard, consider what happened in Australia after a gunman shot and killed 35 people in Port Arthur, Tasmania in 1996. The Australian federal government persuaded all states and territories to implement tough new gun control laws. Under the National Firearms Agreement (NFA), firearms legislation was tightened throughout the country, national registration of guns was imposed, and it became illegal to hold certain long guns that might be used in mass shootings. The effect was that both while there were 7 public mass shootings in Australia during the seventeen-year period 1979–96 (a per capita rate that was higher than in the U.S. at the time), there have been none in the 23 years since (in contrast to the bleak trend in public mass shootings in the United States[88]). Adjusting for the relative populations of the two countries, it would be as though there were 103 separate mass shooting events in the 18 years prior to the massive Australian gun buyback and none in the 23 years since.[89]

119. The important point of the Australian experience for present purposes is that by depriving disturbed individuals of the vehicle by which they imagined they would unleash their murderous impulses, Australia showed that strong gun control measures such as bans on semiautomatic rifles could dramatically reduce the number of mass shootings – even if guns are still widely available, as they remain in Australia.

120. Although the ban was highly controversial when enacted in 1996, the results have been so unambiguously positive for the country that there is now overwhelming support for it throughout Australia, as repeatedly shown in public opinion polls. For example, a survey by Essential Research in 2016 confirmed that 44 percent thought Australians gun restrictions were "about right" and 45 percent thought the laws were "not strong enough."[90] Against this 89 percent in support of gun restrictions, only 6 percent thought the laws were "too strong." Significantly, the poll specifically noted that these views were now consistent regardless of political party voting tendency for Labor, Coalition, or Greens voters.

[88] Dan Diamond, "**Mass Shootings Are Rising. Here's How To Stop Them,**" ***Forbes***, June 18, 2015 (depicting the accelerating trend in the U.S. versus the benign trend in Australia), https://www.forbes.com/sites/dandiamond/2015/06/18/charleston-deaths-are-an-american-tragedy-mass-shootings-are-rising/#12bd32ef787b.

[89] The population of Australia in 1996 was 18.3 million and the population of the US in the same year was 269.4 million, according to data from the World Bank.

[90] Essential Research, "Gun laws", 1 November 2016.

121. New Zealand followed the Australian lead after a horrific mass murder with an assault rifle,[91] and Canada announced in May 2022 its plans for a similar gun buyback for its current stock of assault weapons after its own horrendous mass shooting prompted the enactment of a ban on assault weapons in 2020.[92] Tellingly, in announcing an array of stringent gun safety measures, Canadian Prime Minister Justin Trudeau showed that he has learned from the lamentable experience of mass killings in the United States: "We need only look south of the border to know that if we do not take action, firmly and rapidly, it gets worse and worse and more difficult to counter."

**High-Capacity Magazines Enhance The Danger from Firearms, Which Can be Curtailed by Regulation**

122. While defensive gun ownership is designed to prevent violence, the intent of the public mass shooter is to kill as many people as possible. Accordingly, the lethal capacity of the weapon will influence that toll of these homicidal events (as opposed to the defensive setting when brandishing typically achieves its goal). As Klarevas, Koper, and courts have observed, assault weapons with large capacity magazines are disproportionately used in mass shootings.[93] When such weapons are deployed in mass shootings, they "result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks.'"[94] Among the mass shootings identified in a 2016 study by Everytown for Gun Safety, use of a large capacity magazine, or assault weapon that likely included a large capacity magazine, was associated with more than twice as many people being shot and nearly 50 percent more people being killed.[95]

[91] Associated Press, "New Zealanders hand in 50,000 guns after assault weapon ban," Dec. 21, 2019, https://www.nbcnews.com/news/world/new-zealanders-hand-50-000-guns-after-assault-weapon-ban-n1106081 ("The government banned the most lethal types of semi-automatic weapons less than a month after a lone gunman in March [2019] killed 51 worshippers at two Christchurch mosques. The police then launched a six-month program to buy the newly banned weapons from owners.")

[92] The Prime Minister also announced that magazine size would be restricted to five rounds in long guns. Justin Trudeau, "Further strengthening our gun control laws,' (May 30, 2022), https://pm.gc.ca/en/news/news-releases/2022/05/30/further-strengthening-our-gun-control-laws. Amanda Coletta, "Canada vows to 'freeze' handgun sales, buy back assault-style weapons," *The Washington Post* (May 30, 2022)("[T]he government banned 1,500 makes and models of "military-style assault weapons" in 2020, after a gunman posing as a police officer charged across rural Nova Scotia, killing 22 people, including a Royal Canadian Mounted Police officer, in the country's deadliest mass shooting.")

[93] Christopher Ingraham, *It's Time to Bring Back the Assault Weapons Ban, Gun Violence Experts Say*, Washington Post, February 15, 2018, https://www.washingtonpost.com/news/wonk/wp/2018/02/15/its-time-to-bring-back-the-assault-weapons-ban-gun-violence-experts-say/; Koper 2004 Assessment at 14, 18.

[94] *N.Y.S. Rifle*, 804 F.3d at 264 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011)).

[95] Mass Shootings in the United States: 2009 – 2016, Appendix of Shootings Profiled, https://everytownresearch.org/documents/2017/03/appendix-mass-shootings-united-states-2009-2016.pdf.

123. The argument that the federal assault weapons ban could not be effective since it only limited acquisitions of newly acquired weapons, but did not by itself reduce the stock of assault weapons or high-capacity magazines turned out to be incorrect. Figure 10 shows data from Chris Koper's investigation in six cities of the percent of guns recovered at crime scenes that were assault weapons, documenting how this percentage changed after the federal assault weapons ban went into effect. The figure clearly shows that the prevalence of assault weapons found at crime scenes fell in all six cities when the ban went into effect.

**Figure 10**




124. Subsequent research by Koper et al (2017: 319) further highlights both the increased danger from assault weapons (AWs) and firearms with large-capacity magazines (LCM firearms):

> LCM firearms, which include AWs as well as other high-capacity semiautomatics, appear to account for 22 to 36% of crime guns in most places, with some estimates

> upwards of 40% for cases involving serious violence. These estimates are comparable to or higher than earlier estimates of LCM use. …
>
> Consistent with prior research, this study also finds that AWs and LCM firearms are more heavily represented among guns used in murders of police and mass murders. AWs account for 13–16% of guns used in murders of police, while LCM weapons overall account for about 41% of these weapons. Estimates for firearm mass murders are very imprecise due to lack of data on the guns and magazines used in these cases, but available information suggests that AWs and other high-capacity semiautomatics are involved in as many as 57% of such incidents. Further, they are particularly prominent in public mass shootings and those resulting in the highest casualty counts.
>
> Importantly, trend analyses suggest that LCM firearms have grown substantially as a share of crime guns since the expiration of the federal ban on AWs and LCMs.[96]

125. In other words, the use of banned firearms and magazines by criminals fell during the federal AWB and rose when it lapsed. These weapons also account for a major share of murders of police and overall crime, as well as for firearm mass murder.

126. As the Fourth Circuit held in upholding Maryland's assault weapons ban in 2017: "the issue is whether the banned assault weapons and large-capacity magazines possess an amalgam of features that render those weapons and magazines like M16s and most useful in military service. The uncontroverted evidence … is that they do.[97] Indeed, the industry is constantly striving to find new ways to increase the lethality of their merchandise, so the notion that some threshold of "common use" erects a constitutional impediment that can obstruct governmental initiatives to promote citizen safety is wholly misguided. The ability and right of citizens to enact safety promoting measures designed to deal with the serious and growing problem of public mass shootings should not be affected by how quickly gun manufacturers can sell their products before regulations can be put into place.

---

[96] Koper, Christopher et al. (2017), Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources, J Urban Health (2018) 95:313–321, DOI 10.1007/s11524-017-0205-7. The authors summarized their findings based on crime data from Minneapolis from January - August 2014 as follows:This study has highlighted the potential value of LCM restrictions for reducing HVG cases, which pose clear public dangers (nearly all HVG cases in this study occurred in public or outdoor settings). The findings underscore the concern that criminal use of semiautomatic weapons with large ammunition magazines facilitates particularly dangerous and injurious HVG incidents that contribute to a notable share of gunshot victimisations. Koper, Christopher et al. (2018), "Gunshot victimisations resulting from high-volume gunfire incidents in Minneapolis: findings and policy implications,"

[97] *Kolbe v. Hogan*, (4th Circuit Court of Appeals, February 21, 2017), https://cases.justia.com/federal/appellate-courts/ca4/14-1945/14-1945-2017-02-21.pdf?ts=1487707284.

127. In 2016, fourteen-year old Jesse Osborne of South Carolina wanted to top the death toll of Adam Lanza, and he made numerous attempts to get his father's assault weapon from a gun safe as he planned a school shooting at a nearby elementary school. When that failed, he took his father's loaded handgun from his bed dresser and killed his father before heading to the school where he opened fire on the playground, killing a 6-year-old boy before his gun jammed. As the *Wall Street Journal* study referenced above found, a sizeable proportion of students aged 12-18 had access to firearms without adult permission. For students and others who harbor homicidal fantasies similar to Jesse Osborne, the most powerful and deadly weapons will be most helpful for their criminal designs.[98]

128. As stated above, an enormous source of guns used by teens in school shootings come from the home and the ability to kill is greatly enhanced if the gun at home is an assault weapon with a high-capacity magazine (see footnote 32, above). Adam Lanza could not have made this point any more powerfully when he used his mother's assault rifle to kill 26 (also killing himself as the police closed in). Of course, this is part of the larger problem of the enormous rates of gun thefts in the United States each year – in the neighborhood of 400,000 stolen. The more assault weapons lying around in the home of law-abiding citizens, the more will be made available to criminals via these enormous rates of theft.

129. My empirical evaluation of data through 2019 has emphasized that restrictions on high-capacity magazines are essential if one wants to reduce the risk of Las Vegas style killings that enable hundreds of individuals to be shot.[99] The evidence that the federal assault weapons bans reduced deaths from public mass shootings is powerful and unrefuted.

**Gun Ownership Is Becoming More Concentrated in a Declining Portion of the Population**

130. A discussion of the social science literature concerning gun ownership rates must begin with the General Social Science Survey (GSS), which is an annual survey conducted by the National Opinion Research Center, headquartered at the University of Chicago. The GSS is widely regarded by social science researchers as the most reliable indicator of national social trends, in part because of its professional implementation of face-to-face interviews using a very large sample size (the latest GSS data comes from 2,867 respondents versus roughly 1000 in a

[98] Tawnell D. Hobbs, "Most Guns Used in School Shootings Come From Home," *The Wall Street Journal*, https://www.wsj.com/articles/in-school-shootings-most-guns-come-from-home-1522920600, April 5, 2018.
[99] John Donohue and Theodora Boulouta, "The Assault Weapon Ban Saved Lives," *Stanford Law School Legal Aggregate*, October 15, 2019, https://stanford.io/2MWNsrV.

typical telephone survey) with a high response rate (always in excess of 70 percent versus telephone survey responses which have fallen below 10 percent in recent surveys). See Pew Research Center, "Assessing the Representativeness of Public Opinion Surveys," (May 15, 2012); http://www.people-press.org/2012/05/15/assessing-the-representativeness-of-public-opinion-surveys/.

131. GSS data from 2016, the most recent year that data is available, states that 30.8% of American households have at least one gun, and that 20.5% of adults personally own a gun. See Donohue & Rabbani, "Recent Trends in American Gun Prevalence," (attached as Exhibit B). A carefully executed 2015 national survey showed that 34% of households owned guns, and that ownership of private firearms is highly concentrated among a small percentage of gun owners.[100]

132. The evidence that gun ownership is concentrated is strong and uncontradicted. Researchers analyzing the results of a 2015 national survey found that 8% of individual gun owners reported owning ten or more firearms—collectively accounting for 39% of the American gun stock—and that 20% of gun owners, who owned the most guns collectively, possessed about 60% of the nation's guns.[101] A decade earlier, researchers found a similar pattern: a 2004 survey indicated that 48% of gun owners possessed four or more guns and that the top 20% of firearms owners possessed 65% of all firearms.[102]

133. While I am not aware of any current social science research providing an estimate for the number of American households that own large-capacity magazines or LCMs (defined as an ammunition feeding device with the capacity to hold more than 10 rounds of ammunition) or for the number of LCMs in private hands in America, many firearms owned by American households do not accommodate LCMs, including shotguns and many types of handguns and rifles.

134. Accordingly, the share of households containing a weapon with a large-capacity magazine will only be a subset of gun owners. This minority status of LCM ownership

[100] Azrael et al., "The Stock and Flow of US Firearms: Results from the 2015 National Firearms Survey," (Russell Sage Foundation J. Soc. Sci., forthcoming (2018) (attached as Exhibit C).
[101] See Azrael et al., supra.
[102] Hepburn et al., "The US Gun Stock: Results from the 2004 National Firearms Survey," Injury Prevention 2007;13:15–19.

by household both reflects the judgment of most Americans that LCMs are not important to their self-defense.

135. The minority status of LCM ownership is also consistent with numerous polls showing that two thirds or more of respondents favor limiting magazine size.[103] A January 2013 New York Times/CBS News poll of 1,110 adults nationwide found that nearly two-thirds of Americans overall favored a ban on large-capacity magazines.[104]

**Firing Capacity Restrictions Have Historically Corresponded with Increased Use and Criminal Abuse**

136. Restrictions on weaponry have historically followed growing criminal abuse and social harm, rather than at the time these weapons are first introduced. This makes sense because it is not always clear at the outset which inventions will lead to adverse impacts on public safety. Frequently, the dangers of products and practices fly below the radar until their proliferation generates sufficient social damage to enable the public and the scientific community to become aware of the full extent of their social harm.

137. The first group of state restrictions on the number of rounds that could be fired by a firearm without reloading were adopted in the 1920s and 1930s after weapons like the Tommy gun became a preferred weapon for gangsters.[105] More recently, after pistols replaced revolvers as the most commonly used handguns in the United States in the 1980s, a second round of restrictions addressing magazine capacity and assault weapons began to be adopted, including the now expired 10 year federal ban on large capacity magazines.[106] State restrictions continued to be adopted following the expiration of the federal ban, often in response to public mass shootings.

---

[103] VPR – Vermont PBS Poll (July 2018), http://projects.vpr.net/vpr-vermont-pbs-poll.; Castleton Poll Measures Vermonters' Support for Gun Control Measures, Complete Poll Results (Feb. 21, 2013), https://www.castleton.edu/academics/undergraduate-programs/political-science/poll-results/castleton-poll-measures-vermonters-support-for-gun-control-measures/complete-poll-results/

[104] Jennifer Steinhauer, "Pro–Gun Lawmakers Are Open to Limits on Size of Magazines," *N.Y. Times* (Feb. 18, 2013), http://www.nytimes.com/2013/02/19/us/politics/lawmakers-look-at-ban-on-high-capacity-gun-magazines.html?_r=1&.

[105] *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68 (2017).

[106] *See* 1990 N.J. Sess. Law Serv. 32 (West); Haw. Rev. Stat. Ann § 34–(8); Pub. L. 103–322, § 110103 (Sep. 13, 1994).

**Limiting the Size of Ammunition Magazines Should Save Lives and Reduce Injuries**

138. No single gun control measure is likely to be as effective in addressing the problem of public mass shootings as the limitation on the size of the ammunition magazine, and the evidence from the ten-year period when the federal assault weapons ban was in effect from 1994-2004 indicates that this federal law, which contained the limitation on the size of ammunition magazines to ten bullets saved lives and reduced the mayhem from mass shootings.

139. A review of the resolution of mass shootings and other public shootings unleashed with large-capacity magazines in the U.S. suggests that bans on large-capacity magazines can help save lives by forcing mass shooters to pause and reload ammunition. Citizens have frequently taken advantage of a perpetrator stopping to reload his weapon to tackle him or otherwise subdue him in at least 20 separate shootings in the United States since 1991, notably including the December 7th, 1993 shooting of passengers on a Long Island Railroad car,[107] the October 29th, 1994 shooting near the grounds of the White House,[108] the May 21, 1998 shooting at Thurston High School in Springfield, Oregon,[109] and the January 8th, 2011 shooting in Tucson, AZ that targeted U.S. Congresswoman Gabby Giffords.[110] In many other incidents, targeted victims were able to escape while a shooter reloaded. Perhaps the most vivid illustration of this benefit was seen when at least nine children at Sandy Hook Elementary School were able to escape while Adam Lanza reloaded his 30 round LCM.[111]

---

[107] "DEATH ON THE L.I.R.R.: The Rampage; Gunman in a Train Aisle Passes Out Death," *The New York Times*, December 9, 1993 - http://www.nytimes.com/1993/12/09/nyregion/death-on-the-lirr-the-rampage-gunman-in-a-train-aisle-passes-out-death.html (9-millimeter pistol, 15 round magazine).

[108] "Public Report of the White House Security Review," Department of the Treasury, 1995 - http://www.fas.org/irp/agency/ustreas/usss/t1pubrpt.html (Chinese-made SKS semiautomatic rifle, 30 round magazine).

[109] When an already wounded student realized the shooter's 50 round magazine was empty, the student ran 10 to 15 feet and tackled the shooter as he tried to reload his rifle. At that point, other boys helped subdue the gunman as he reached for a handgun in his belt. Jere Longman, "SHOOTINGS IN A SCHOOLHOUSE: THE HERO; Wounded Teen-Ager Is Called a Hero," *The New York Times*, May 23, 1998, https://www.nytimes.com/1998/05/23/us/shootings-in-a-schoolhouse-the-hero-wounded-teen-ager-is-called-a-hero.html.

[110] "Crowd members took gunman down," *Los Angeles Times*, January 9, 2011 - http://articles.latimes.com/2011/jan/09/nation/la-na-arizona-shooting-heroes-20110110 (9mm Glock handgun, 30-round extended magazine).

[111] "Legislative Leaders Say Bipartisan Agreement Could Yield Nation's Strongest Gun-Control Bill," *The Hartford Courant*, April 1, 2013. http://www.courant.com/news/politics/hc-gun-deal-newtown-0413-20130401,0,7341094.story (Bushmaster .223 caliber rifle, high-capacity 30 round magazine). While some contend that 11 children were saved in this fashion at Sandy Hook, Louis Klarevas puts the number at 9 in his book, Rampage Nation: Securing America from Mass Shootings (Amherst, NY: Prometheus 2016). p. 22.

140. On April 22, 2018, a man walked into a Nashville Waffle House and opened fire, killing four and wounding seven. The police credited a customer with ending the slaughter when he saw the shooter trying to reload his rifle. The 29-year-old customer "burst out from behind a swinging door where he had been hiding, wrested the weapon away and threw it over a countertop."[112] When shooters stop to reload, they are overtaken by citizens, shot by police, or provide opportunities for escape, all of which government policy should seek to facilitate. The lower the size of the magazine, the more reloading must take place in mass shooting situations.

141. Indeed, an effective ban on high-capacity magazines would likely have significantly reduced the number of deaths and non-fatal gun shot victims at the Las Vegas concert. The *New York Times* video of the 2017 Las Vegas shooting shows how the Las Vegas concert attendees would use the pauses in firing when the shooter's high-capacity magazines were spent to flee the deadly venue before more shots were fired.[113] If Stephen Paddock had been limited to using only 10-round magazines during his deadly rampage, potentially hundreds of victims at the concert could have been spared.

142. No one has a greater desire or use for a large-capacity magazine than a determined mass killer, and governments have a responsibility to thwart those desires and those uses. A ban on such magazines is an important tool in the effort to stop the most egregious homicidal rampages.

143. As noted above, Adam Lanza was able to kill more (a total of 20 children and six adults) because he was using lawfully purchased weapons equipped with a 30-round LCM. It may well be that Lanza would have criminally abused the guns that his mother had made available to him even if he had not had an LCM, but there is every reason to believe that he would have killed fewer individuals if he had to persistently reload during his murderous rampage. In other words, the LCM ban is designed precisely to save lives and by raising the costs for killers, the LCM ban would be expected to advance that goal.

144. Further, most mass killings by Americans involve the use of guns, and many of these killers – Adam Lanza (Newtown), James Holmes (the Batman movie killer in Aurora, Colorado

---

[112] Christopher Mele and Jacey Fortin, "Man Sought in Waffle House Shooting Had Been Arrested Near White House," *The New York Times*, April 22, 2018, https://www.nytimes.com/2018/04/22/us/waffle-house-shooting.html.

[113] Malachy Browne, et al., *10 Minutes. 12 Gunfire Bursts. 30 Videos. Mapping the Las Vegas Massacre*, N.Y. TimesVideo, Oct. 21, 2017, *available at* https://www.nytimes.com/video/us/100000005473328/las-vegas-shooting-timeline-12-bursts.html (last visited Nov. 1, 2017).

killed 12 and injured 70), Jared Loughner (shooting Congresswoman Gabby Giffords), Stephen Paddock (who killed 58 and wounded roughly 500 in Las Vegas in October 2017) to name just a few – were drawn to a vision of killing large number of individuals in a certain way that included the use of LCM's. On November 5, 2009, Nidal Hasan killed 13 and injured more than 30 others at Fort Hood, near Killeen, Texas. When Hasan purchased his killing arsenal, he asked for "the most technologically advanced weapon on the market and the one with the highest standard magazine capacity."[114] This is exactly what one would do if one wanted to simply kill as many people as possible in the shortest amount of time. If one is serious about stopping mass killings, a good first step is to deprive such killers of their preferred killing approaches.[115]

**Assault Weapons Bans are Critical to Reducing the Cost of Mass Shootings**

145. The response that bans on assault weapons will have a limited effect on overall gun crime, which is most commonly committed with a handgun, is misplaced because Connecticut's' assault weapons ban was not primarily enacted to address gun crime generally, but rather was adopted in response to the growing mass shooting problem in the United States. Indeed, the first assault weapons ban was enacted in California in the immediate aftermath of the 1989 mass shooting in the schoolyard of Cleveland Elementary School in Stockton, California by an individual armed with an AK-47 semiautomatic rifle (killing 5 schoolchildren and wounding 32 others).

146. The Stockton massacre was a pivotal moment when the public first began to appreciate that the proliferation of increasingly lethal weaponry was causing a significant threat to public safety. For example, shortly after the massacre in March 1989, Republican Vermont Congressman Peter Smith announced that he was cosponsoring "a bill to stop the spread of semiautomatic assault weapons in this country. … I cannot — and will not — defend … the proliferation of paramilitary assault weapons that were designed solely for one purpose: killing human beings. These are not hunting rifles. These are killing machines." Realizing this threat to

---

[114] Scott Huddleston, "Hasan Sought Gun with 'High Magazine Capacity,'" MySanAntonio.com, October 21, 2010, http://blog.mysanantonio.com/military/2010/10/hasan-sought-gun-with-high-magazine-capacity/.

[115] Anders Breivik, who committed mass murder in Norway, was aided in his efforts because of lax rules concerning LCM's in the United States. Breivik was very unhappy that he could not get the large-capacity magazines that he wanted to use since they were banned in Europe. In his manifesto, he wrote about his attempts to legally buy weapons, stating, "I envy our European American brothers as the gun laws in Europe sucks ass in comparison." Under the section titled, "December and January - Rifle/gun accessories purchased," Breivik wrote that he purchased ten 30-round ammunition magazines from a U.S. supplier who mailed the devices to him. Stephanie Condon, "**Norway Massacre Spurs Calls For New U.S. Gun Laws,**" CBS News, July 28, 2011, http://www.cbsnews.com/news/norway-massacre-spurs-calls-for-new-us-gun-laws/.

the lucrative new market in AR-15-style weapons, the NRA immediately targeted Congressman Smith, who in 1990 became the first incumbent member of Congress from Vermont to lose re-election in 30 years.[116] Connecticut's assault weapons ban was implemented in the wake of the horrific Sandy Hook shooting in December 2012, again highlighting the importance of governmental responses to the heightened risk of mass shooting in order to promote public safety.

147. There is not the slightest evidence that the restrictions on assault weapons and large-capacity magazines exceeding 10 rounds compromised the safety of law-abiding citizens. Since assault weapons and large-capacity magazines are useful for those bent on mass killing, further limiting their availability will have a beneficial effect on a problem that is serious and growing in the United States.

148. The first line of defense to reducing mass shootings is clearly to try to keep guns out of the hands of those who may end up using them for criminal purposes, but this approach will never be fully effective since not all killers can be easily identified in advance. Therefore, a critical element in trying to stop the death and injury from the growing problem of mass shootings is to limit the killing power of the weaponry available to prospective mass shooters. The value of a ban on high-capacity magazines is that it is easily definable, hard to circumvent through cosmetic changes by gun merchants, and effective at reducing the lethality of mass shooters by limiting the number of bullets that can be fired without reloading.

149. It is my opinion that if, rather than allowing the federal assault weapons ban to lapse in 2004, the country had moved to a more complete ban, tragedies like the one in Las Vegas would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States and perhaps the world.[117] It is also my opinion that Connecticut's restrictions challenged in this litigation are effectively designed to reduce the likelihood that its citizens and visitors will be killed in mass shootings by making it incrementally harder for prospective mass shooters to equip themselves with weapons that are

---

[116] Paul Heintz, "Stickin' to His Guns? The NRA Helped Elect Bernie Sanders to Congress," Seven Days, June 26, 2019.

[117] The horrendous mass killing in Norway by Anders Breivik, endangered by the restrictive gun laws of Europe, was salvaged by his ability to procure ten 30-round, high-capacity magazines from the United States. Stephanie Condon, "Norway Massacre Spurs Call for New U.S. Gun Laws," CBS News, July 28, 2011, *available at* https://www.cbsnews.com/news/norway-massacre-spurs-calls-for-new-us-gun-laws/ (last visited Nov. 1, 2017).

both uniquely appealing to their criminal aspirations as well as uniquely designed to aid in their homicidal rampages.

**Uses of Assault Weapons and LCMs for Self-Defense are Extremely Rare**

150. In the face of the clear evidence from around the United States and the world, Plaintiffs' motion for preliminary injunction fails to acknowledge the threat posed by weapons accessories, and features that Connecticut restricts. First, it is worth noting that the vast majority of the time that an individual in the United States is confronted by violent crime, they do *not* use a gun for self-defense. Specifically, over the period from 2007-2011 when roughly 6 million violent crimes occurred each year, data from the National Crime Victimization Survey shows that the victim did not defend with a gun in 99.2 percent of these incidents – this in a country with 300 million or more guns in civilian hands.

151. Second, even if a gun were available for self-defense use, the need for an LCM is slight according to decades of statements by NRA-affiliated and pro-gun experts. For example, John Lott has repeatedly made the following claims:

- based on "about 15 national survey[s] … about 98 percent of [defensive gun uses] involve people brandishing a gun and not using them."[118]
- "When victims are attacked, 98 percent of the time merely brandishing a gun is enough to cause the criminal to stop his attack."[119]
- "Considerable evidence supports the notion that permitted handguns deter criminals. …. In 98% of the cases, people simply brandish weapons to stop attacks."[120]

152. Gary Kleck has similarly stated: "Of the … times citizens use their guns to defend themselves every year, the overwhelming majority merely brandish their gun or fire a warning shot to scare off their attackers."[121]

[118] Statements by John R. Lott, Jr. on Defensive Gun Brandishing Posted by Tim Lambert on October 17, 2002 http://scienceblogs.com/deltoid/2002/10/17/lottbrandish/. Page 41, State of Nebraska, Committee on Judiciary LB465, February 6, 1997, statement of John Lott, Transcript prepared by the Clerk of the Legislature, Transcriber's Office.

[119] John R. Lott, Jr., Packing Protection, Letters, *Chicago Sun-Times*, April 30, 1997, Pg. 52.

[120] John R. Lott Jr., "Unraveling Some Brady Law Falsehoods," *Los Angeles Times*, July 2, 1997.

[121] Gary Kleck and Marc Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun," 86(1) *Journal of Criminal Law and Criminology* 150-187 (Fall 1995). https://pdfs.semanticscholar.org/91da/afbf92d021f06426764e800a4e639a1c1116.pdf.

153. In other words, a gun is used in defense less than 1 percent of the time when someone is attacked in the United States. In the "overwhelming majority" of the less than 1% of cases in which a gun *is* used, brandishing is all that is needed for defense. One would imagine that the vast majority of the times that the gun is fired in this increasingly small subset, it will be fired no more than 10 times. All firearms that can accept high-capacity magazines can also accept magazines that hold fewer rounds. It cannot be seriously maintained that assault weapons and high-capacity magazines play any important role in furtherance of the Second Amendment goal of self-defense. Indeed, if they did, the industry would have marketed them as protection weapons instead of assault weapons – or in the more recent gun-marketing jargon "sporting" or "tactical" rifles.

154. Should there be a future case of a law-abiding citizen who 1) has a gun and 2) the need and opportunity to use it in self-defense, and 3) the desire to fire more than 10 rounds, the individual can either re-load the defensive weapon by inserting a new clip or by using a second weapon, which an increasingly large number of gun owners currently possess. This implies that the challenged Connecticut restrictions, which are designed to limit the mayhem caused by criminals engaging in the most dangerous forms of violent criminal behavior, are likely to have little or no impact on the defensive capabilities of law-abiding citizens.

155. Bullets fired by assault weapons or a modern weapon with an LCM will easily penetrate walls, threatening family members or occupants in attached dwellings. This point was dramatically underscored when a concealed carry permit holder attending a gun safety class inadvertently fired his weapon, which discharged a bullet that easily penetrated the classroom wall, striking and killing the owner of the gun store who was working in the next room.[122] Encouraging untrained, stressed individuals to spray bullets from a high-capacity magazine is a

[122] Peter Holley, *Ohio gun store owner accidentally killed by student during firearm-safety cl*ass, *Washington Post*, June 19, 2016, *available at* https://www.washingtonpost.com/news/morning-mix/wp/2016/06/19/ohio-gun-store-owner-accidentally-killed-by-student-during-firearm-safety-class/?utm_term=.ed4c232d20ad (last visited Nov. 1, 2017).

Another example of how doors and walls do not stop bullets from modern handguns occurred on September 13, 2015, when "39-year-old Mike Lee Dickey was babysitting an 8-year-old Casa Grande, Arizona boy. According to police, at about 2 a.m., Dickey was in the bathroom removing his .45-caliber handgun from the waistband of his pants when he unintentionally discharged the gun. The bullet passed through two doors and struck the 8-year-old in his arm while he lay sleeping in a nearby bedroom. The boy was flown to a hospital in Phoenix for treatment." *8-year-old boy unintentionally shot by babysitter*, Ohh Shoot, Sept. 13, 2016, *available at* http://ohhshoot.blogspot.com/2015/09/8-year-old-boy-unintentionally-shot-by.html (last visited Nov. 1, 2017).

recipe for generating similar unwelcome outcomes that will put family members and neighbors at considerable risk.

**Law Enforcement and Military Support for Assault Weapon and LCM Bans**

155. The testimony of United States Attorney (District of Colorado) John Walsh before the Senate Judiciary Committee on February 27, 2013,[123] is worth quoting:

> From the point of view of most law enforcement professionals, a perspective I share as a long-time federal prosecutor and sitting United States Attorney, shutting off the flow of military-style assault weapons and high-capacity magazines is a top public safety priority. […]

Like military-style assault weapons, high-capacity magazines should be reserved for war, and for law enforcement officers protecting the public.[124]

156. Dean L. Winslow, a retired Air Force colonel, flight surgeon, and professor of medicine at Stanford University has particularly valuable insight into the wisdom of having assault weapons in civilian hands.

157. Dr. Winslow noted that "as commander of an Air Force hospital in Baghdad during the surge, I have seen what these weapons do to human beings. The injuries are devastating."[125] Moreover, unlike a shotgun filled with birdshot, which is far more likely to hit a target and less likely to penetrate walls than a bullet from an assault weapon, assault weapons are simply not well suited for defensive use in the home. Based on his extensive military and medical experience, Dr. Winslow noted that it is "insane … that in the United States of America a civilian can go out and buy a semiautomatic weapon like an AR-15."

158. According to Maryland Police Superintendent Marcus Brown, "in many home defense situations assault weapons are likely to be less effective than handguns because they are less maneuverable in confined areas."[126] Experts consider handguns clearly more suitable than assault weapons for self-defense. Massachusetts Chief of Police Mark K. Leahy said that when

---

[123]Statement of John F. Walsh before the United States Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/2-27-13WalshTestimony.pdf (last visited Nov. 1, 2017).
[124]See, David S. Fallis and James V. Grimaldi, *In Virginia, high-yield clip seizures rise*, *Washington Post*, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html (last visited Nov. 1, 2017).
[125] Dean L. Winslow, "I spoke my mind on guns. Then my Senate confirmation was put on hold," *The Washington Post*, December 20, 2017. See also, Heather Sher, "What I Saw Treating the Victims from Parkland Should Change the Debate on Guns," *The Atlantic Monthly*, February 22, 2018, https://www.theatlantic.com/politics/archive/2018/02/what-i-saw-treating-the-victims-from-parkland-should-change-the-debate-on-guns/553937/.
[126]Brown Decl. ¶ 20, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).

"asked to recommend a weapon for home defense or concealed carry, I always recommend a handgun."[127]

159. Since AR-15's were selected by the Defense Department as a weapon of choice for the battlefield in Vietnam because the destructive force of the gun made it especially lethal to even outer extremity wounds, the point could not be clearer: keeping these weapons out of civilian hands will reduce the death toll and seriousness of injuries in cases of mass shootings or other criminal or accidental uses of these weapons.

160. A wise December 2016 editorial in the *Las Vegas Sun* noted the danger presented—and the lack of practical use for—LCMs:

> By overwhelmingly supporting universal background checks for firearms purchases, Clark County voters made it abundantly clear last month that they were concerned about gun violence.
>
> Now, it's time for Las Vegas-area lawmakers to go a step further to protect Nevadans and push to ban the sale of high-capacity magazines in the state. Eight states and the District of Columbia already have imposed such prohibitions, and with good reason. There's simply no legitimate civilian use for magazines that hold dozens upon dozens of rounds of ammunition.
>
> Don't believe us? Fine, then listen to Clark County Sheriff Joe Lombardo. "I'm a very avid hunter, I was in the military myself, and there's no need to have a high-capacity magazine for any practical reason," Lombardo said during a recent interview with the Sun.
>
> To the contrary, the dangers posed by such magazines are obvious. Lombardo says the time it takes for suspects to change magazines gives potential victims an opportunity to escape and law enforcement officials an opportunity to safely fire back. That being the case, the fewer times a shooter has to switch out magazines, the fewer the chances for people to get away and authorities to get a protected shot.[128]

The prescience of the editorial was powerfully underscored ten months later when On October 1, 2017, the deadliest mass shooting in U.S. history occurred in Las Vegas (60 killed and hundreds wounded) – only possible because of the use of high- capacity magazines.

---

[127] Leahy Decl. ¶ 22, *Worman v. Healy,* 293 F. Supp. 3d 251 (D. Mass. 2018).

[128] *High-capacity magazine ban a must for Nevadans' safety*, Las Vegas Sun, Dec. 11, 2016, *available at* https://lasvegassun.com/news/2016/dec/11/high-capacity-magazine-ban-a-must-for-nevadans-saf/(last visited Nov. 1, 2017).

161. One of the most disturbing aspects of the recent mass shootings our Nation has endured is the ability of a shooter to inflict massive numbers of fatalities in a matter of minutes due to the use of high-capacity magazines. High-capacity magazines were defined in the 1994 ban as magazines capable of holding more than 10 rounds, and this is a definition the Department endorses. The devastating impact of such magazines is not limited to their use in military-style assault rifles; they have also been used with horrific results in recent mass shootings involving handguns. The 2007 mass shooting at Virginia Tech involved a shooter using handguns with high-capacity magazines. Similarly, recent mass shootings in Tucson, Arizona; Oak Creek, Wisconsin; and Fort Hood, Texas all involved handguns with magazines holding more than 10 rounds. As evidenced by these events, a high-capacity magazine can turn any weapon into a tool of mass violence. Forcing an individual bent on inflicting large numbers of casualties to stop and reload creates the opportunity to reduce the possible death toll in two ways: first, by affording a chance for law enforcement or bystanders to intervene during a pause to reload; and second, by giving bystanders and potential victims an opportunity to seek cover or escape when there is an interruption in the firing. This is not just theoretical: In the mass shooting in Tucson, for example, 9-year old Christina-Taylor Green was killed by the 13th shot from a 30-round high-capacity magazine. The shooter was later subdued as he was trying to reload his handgun after those 30 shots. The outcome might have been different if the perpetrator had been forced to reload after firing only 10 times.

162. Furthermore, high-capacity magazines are not required for defending one's home or deterring further action by a criminal. The majority of shootings in self-defense occur at close range, within a distance of three yards. In such a scenario, and at such close ranges, a 10-round magazine is sufficient to subdue a criminal or potential assailant. Nor are high-capacity magazines required for hunting or sport shooting. Like military-style assault weapons, high-capacity magazines should be reserved for war, and for law enforcement officers protecting the public. The continued commercial sale of high-capacity magazines serves only to provide those determined to produce a high body count with the opportunity and the means to inflict maximum damage. Indeed, there is evidence suggesting that when the previous ban was in effect, it

reduced the number of high-capacity magazines seized by the police, as well as the lethality of incidents.[129][The citation is from Walsh's statement.][130]

**Threats to Civil Peace and to Democracy Itself**

163. There is also a larger issue at stake with the proliferation of assault weapons: their capacity to facilitate political violence and threaten American democracy. The concern is heightened by the sharp rise in the percentage of Americans who think that violence against the government could be appropriate, which doubled from 16 percent in 2010 to 34 percent in 2021 (over 40 percent of Republicans and independents and 23 percent of Democrats agreed).[131]

164. The extent and severity of these concerns have been clarified by the events of January 6, 2021, which I have written elsewhere has provided new insight into the dangers of such weaponry and the utter folly of many of the claims of the gun lobby:

> Consider the gun lobby protestation that "Gun control simply doesn't work." Imagine for a moment what that rally would have looked like in Houston, Texas, or some other "gun-friendly" jurisdiction. Without Washington, DC's profoundly wise firearm restrictions [including its assault weapons ban], a very large number of the rioters would have been marching on the U.S. Capitol armed with assault rifles equipped with high-capacity magazines and other highly lethal weapons. When the mob storming the Capitol spun out of control, guns would have been flashing everywhere, and it is not hard to imagine that bullets would have been cutting down scores or even hundreds of victims. Those who remember the 1970 Kent State massacre understand that once the bullets start flying in a riotous atmosphere, the consequences quickly turn lethal and dire….
>
> The pernicious Proud Boys leader Enrique Tarrio [currently being tried for seditious conspiracy],[132] who had planned to address the crowd before the U.S. Capitol riot, was thankfully taken off the streets two days earlier when he was arrested for tearing down a Black Lives Matter banner on a Washington, DC, church and lighting it on fire. At the time of his arrest, Tarrio was carrying two high-capacity magazines festooned with the Proud Boys logo. Washington, DC's wise prohibition on such unnecessary accoutrements to lethal weaponry managed to keep one conspiring criminal away from the U.S. Capitol on January 6, and

---

[129] See, David S. Fallis and James V. Grimaldi, *In Virginia, high-yield clip seizures rise*, Washington Post, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html (last visited Nov. 1, 2017).

[130] Statement of John F. Walsh before the United States Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/2-27-13WalshTestimony.pdf (last visited Nov. 1, 2017).

[131] Meryl Kornfield and Mariana Alfaro, "1 in 3 Americans say violence against government can be justified, citing fears of political schism, pandemic," *Washington Post*, January 1, 2022, https://www.washingtonpost.com/politics/2022/01/01/1-3-americans-say-violence-against-government-can-be-justified-citing-fears-political-schism-pandemic/.

[132] Alan Feuer and Zach Montague (Jan. 12, 2023). "Prosecutors Open Arguments Against Proud Boys in Sedition Trial," *The New York Times.*

> thousands of others, knowing of Washington, DC's strict gun laws, were dissuaded from carrying weapons because of these laws. [Moreover, the claim that weapons equipped with high-capacity magazines could protect American democracy is fanciful.] First, the thought that private gun owners could stand up to the modern U.S. military if it backed a tyrannical federal government is absurd. There is no circumstance in which private citizens in modern America could promote democracy by using assault weapons to kill government employees to show their disapproval of what they perceive to be a "tyrannical" government. Second, the idea that gun owners can be expected to *oppose* rather than support the tyrant was dealt a fatal blow by the violence at the U.S. Capitol.[133]

**Comments on Some of The Plaintiffs' Allegations**

165. Any discussion of assault weapons must address the tragic problem of public mass shootings. The Plaintiffs seem to believe that because automatic weapons are potentially more dangerous than semiautomatic assault weapons, this should disempower the ability of the state to address the worsening problem of mass shootings. Any such suggestion is misguided in two respects. First, the current and worsening problem of mass shootings is not a problem of automatic weapons, which have been effectively been addressed by government action. Since the evidence from the United States and the world indicates that restrictions on assault weapons and large-capacity magazines reduces the harm from mass shootings, this is the area where protective government action is needed.

168. The Plaintiffs fail to note that the Army Manual makes two points about the lethality of semiautomatic assault weapons.

> 7-12. The most important firing technique during fast-moving, modern combat is rapid semiautomatic fire. It is the most accurate technique of placing a large volume of fire on poorly defined targets or target areas, such as short exposure, multiple, or moving targets.
>
> 7-14. While Soldiers sacrifice some degree of accuracy to deliver a greater volume of fire, it is surprising how devastatingly accurate rapid semiautomatic fire can be. At ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and time to hit. Proper training and repeated practice increases the degree of accuracy.

---

[133] John Donohue, "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf.

169. It is for this reason that all knowledgeable commentators on the lethality of the AR-15 understand that it fully enables – in the words of the Army Manual that the Plaintiff's cite --the "most important firing technique during fast-moving, modern combat" that in the typical circumstances of an attempted mass shooting "is superior to automatic fire in all measures."

170. Retired Army Maj. Gen. Paul D. Eaton endorses the same conclusion:

> "As the former Commanding General of the Infantry Center at Fort Benning and Chief of Infantry, I know a bit about weapons. **Let me state unequivocally — For all intents and purposes, the AR-15 and rifles like it are weapons of war….It is a very deadly weapon with the same basic functionality that our troops use to kill the enemy.** Don't take the bait when anti-gun-safety folks argue about it. They know it's true. Now you do too."[134]

172. It is widely recognized that "Early firearms were expensive. They were complicated. They required extensive training to use, and they were very slow to load."[135] Moreover, "The flintlock musket was the most important weapon of the Revolutionary War. It represented the most advanced technological weapon of the 18th century. Muskets were smooth-bored, single-shot, muzzle-loading weapons. The standard rate of fire for infantrymen was three shots per minute." With this type of weaponry, there would be absolutely no concern about a lone gunman blasting away at unsuspecting crowds with the lethal and tragic effect that even teenage mass shooters increasingly inflict in seconds or minutes in modern America. Any suggestion that 18th Century weaponry in civilian hands could impose anywhere near the risk to the public of the modern assault weapon is simply absurd on its face. Figure 11 highlights the gaping distance between an assault rifle and the weapons available to citizens at the time of the adoption of the Second Amendment.

[134] Paul Eaton, June 2, 2022 (emphasis supplied).
[135] "Learn about American Revolutionary War usage of muskets, bayonets, and gunpowder," Britannica https://www.britannica.com/video/195113/gunpowder-muskets-American-Revolution.

**Figure 11**



A musket from the 18th century, when the Second Amendment was written, and an assault rifle of today.
Top, MPI, via Getty Images, bottom, Joe Raedle/Getty Images .

## CONCLUSION

182. The problem of mass shootings in the United States is socially damaging, growing worse, and will be exacerbated if appropriate limitations on the lethality of weaponry, such as the restrictions on assault weapons and high-capacity magazines enacted first by the federal government and then by the state of Connecticut as this dire social harm first emerged, are not sustained as constitutionally permissible measures.

## DECLARATION UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1746

I declare that the foregoing is true and correct under penalty of perjury under the laws of the United States.

Executed on July 22, 2023

John J. Donohue

We only have electronic access to the book (click the link under the green available online box on the left) -- please let us know if that won't work for your purposes and we can look into obtaining a print copy.

Kevin M. Sweeney, "Firearms Ownership and Militias in Seventeenth- and Eighteenth-century England and America," which is Chapter 3 in the book A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment (Jennifer Tucker et al., eds 2019).

# EXHIBIT C

## Declaration of Professor Louis Klarevas

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EDDIE GRANT, ET AL.<br>*Plaintiff,* | : | CIVIL NO. 3:22-CV-01223(JBA) |
| v. | : | |
| LAMONT, ET AL.,<br>*Defendants.* | : | JULY 26, 2023 |

**DECLARATION OF LOUIS KLAREVAS**

I, Louis Klarevas, hereby depose and state:

1. I am over the age of 18 and am competent to testify to the matters stated below based on personal knowledge.

2. I have attached a copy of an expert report I have prepared, together with a copy of my curriculum vitae (attached as **Exhibit A** of my expert report). The opinions expressed in this report are based on my knowledge, skill, experience, training, and education, and I hold these opinions to a reasonable degree of professional certainty. I hereby adopt and incorporate my report in this declaration as if set forth in full.

I declare under penalty of perjury on this 25th day of July, 2023, that the foregoing is true and correct.

Louis Klarevas

# EXPERT REPORT OF LOUIS KLAREVAS

I, Louis Klarevas, declare:

1. I have been asked by the Defendants to prepare an expert report addressing the relationship between assault weapons, large-capacity magazines (LCMs), and mass shootings, including how restrictions on assault weapons and LCMs impact mass shooting violence. This expert report is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this expert report ("Report" hereinafter).

## PROFESSIONAL QUALIFICATIONS

2. I am a security policy analyst and, currently, Research Professor at Teachers College, Columbia University, in New York. I am also the author of the book *Rampage Nation*, one of the most comprehensive studies on gun massacres in the United States.[1]

3. I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University. My current research examines the nexus between American public safety and gun violence, including serving as an investigator in a study funded by the National Institutes of Health that is focused on reducing intentional shootings at elementary and secondary schools.

4. During the course of my 20-year career as an academic, I have served on the faculties of the George Washington University, the City University of New York, New York University, and the University of Massachusetts. I have also served as a Defense Analysis Research Fellow at the London School of Economics and Political Science and as United States Senior Fulbright Scholar in Security Studies at the University of Macedonia.

5. In addition to having made well over 100 media and public-speaking appearances, I am the author or co-author of more than 20 scholarly articles and over 70 commentary pieces. In 2019, my peer-reviewed article on the effectiveness of restrictions on LCMs in reducing high-

---

[1] Louis Klarevas, *Rampage Nation Securing America from Mass Shootings* (2016).

fatality mass shootings resulting in six or more victims killed was published in the *American Journal of Public Health*.[2] This study found that jurisdictions with LCM bans experienced substantially lower gun massacre incidence and fatality rates when compared to jurisdictions not subject to similar bans. Despite being over 3 years old now, this study continues to be one of the highest impact studies in all of academia. It was recently referred to as "the perfect gun policy study," in part due to the study's "robustness and quality."[3]

6. In the past four years (since January 1, 2019), I have been deposed or testified in the following cases: *Miller v. Bonta*, Case No. 3:19-cv-1537-BEN-JBS, Southern District of California, and *Nguyen v. Bonta*, Case No. 3:20-cv-02470-WQH-MDD, Southern District of California. *Miller* involves a challenge to California's restrictions on assault weapons and *Nguyen* involves a challenge to California's regulation limiting the sale of certain firearms to one purchase per month.

7. In 2021, I was retained by the Government of Canada in the following cases which involved challenges to Canada's regulation of certain categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.:

[2] Louis Klarevas, et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings," 109 *American Journal of Public Health* 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed December 27, 2022).

[3] Lori Ann Post and Maryann Mason, "The Perfect Gun Policy Study in a Not So Perfect Storm," 112 *American Journal of Public Health* 1707 (2022), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2022.307120 (last accessed December 27, 2022). According to Post and Mason, "Klarevas et al. employed a sophisticated modeling and research design that was more rigorous than designs used in observational studies. Also, they illustrated the analytic steps they took to rule out alternative interpretations and triangulate their findings, for example examining both state bans and federal bans. They helped build the foundation for future studies while overcoming the limitations of previous research." *Ibid.*

T-735-20; and *Eichenberg, et al v Attorney General of Canada*, Federal Court, Court File No.: T-905-20. I testified under oath in a consolidated court proceeding involving all six cases in the Federal Court of Canada.

8. A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this Report.

9. I have been retained by the Defendant to render expert opinions in this case. I will be compensated at a rate of $600 per hour for any testimony (in deposition and in court), and am being compensated at a rate of $480 per hour for all other services.

**OPINIONS**

10. It is my professional opinion, based upon my extensive review and analysis of the data, that (1) in terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post-9/11 era, and the problem is growing nationwide; (2) high-fatality mass shootings involving assault weapons and/or LCMs, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons and/or LCMs; (3) mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history, largely related to the use of assault weapons and LCMs; (4) assault weapons are used by private citizens with a far greater frequency to perpetrate mass shootings than to stop mass shootings; (5) handguns, as opposed to rifles (let alone rifles that qualify as assault weapons), are the most commonly owned firearms in the United States; and (6) states that restrict both assault weapons and LCMs experience fewer high-fatality mass shooting incidents and fatalities, per capita, than states that do not restrict assault weapons and LCMs. Based on these findings, it is my opinion that restrictions on assault weapons and LCMs have the potential to save lives by reducing the frequency and lethality of high-fatality mass shootings.[4]

---

[4] For purposes of this Report, "high-fatality mass shootings" (also referred to as "gun massacres") are defined as shootings resulting in 6 or more fatalities, not including the perpetrator(s), regardless of location or underlying motive. The data on high-fatality mass shootings is from a data set that I maintain and continuously update. This data set is reproduced

## I. Mass Shootings Are a Growing Threat to Public Safety

11. Examining mass-casualty acts of violence in the United States since 1991 points to two disturbing patterns.[5] First, as demonstrated in Table 1, the deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings. Second, as displayed in Figures 1-2, the problem of high-fatality mass shooting violence is on the rise. To put the increase over the last three decades into perspective, between the 1990s and the 2010s, the average population of the United States increased approximately 20%. However, when the number of people killed in high-fatality mass shootings in the 2010s is compared to the number killed in such incidents in the 1990s, it reflects an increase of 260%. In other words, the rise in mass shooting violence has far outpaced the rise in national population—by a factor of 13. The obvious takeaway from these patterns and trends is that mass shootings pose a significant—and growing—threat to American public safety.

**Table 1. The Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

| | Deaths | Date | Location | Type of Violence |
|---|---|---|---|---|
| 1 | 60 | October 1, 2017 | Las Vegas, NV | Mass Shooting |
| 2 | 49 | June 12, 2016 | Orlando, FL | Mass Shooting |
| 3 | 32 | April 16, 2007 | Blacksburg, VA | Mass Shooting |
| 4 | 27 | December 14, 2012 | Newtown, CT | Mass Shooting |
| 5 | 25 | November 5, 2017 | Sutherland Springs, TX | Mass Shooting |
| 6 | 23 | August 3, 2019 | El Paso, TX | Mass Shooting |
| 7 | 21 | May 24, 2022 | Uvalde, TX | Mass Shooting |

in **Exhibit B**. Unless stated otherwise, all of the data used to perform original analyses and to construct tables and figures in this Report are drawn from **Exhibit B**.

[5] Because the analysis in Section VI of this Report necessarily uses data from 1991 through 2022, for purposes of consistency (and to avoid any confusion), the analyses in Sections I and II also use data from 1991 through 2022.

**Figure 1. Annual Trends in High-Fatality Mass Shooting Incidents, 1991-2022**




Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

**Figure 2. Annual Trends in High-Fatality Mass Shooting Fatalities, 1991-2022**




Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

## II. THE USE OF ASSAULT WEAPONS AND LCMS ARE MAJOR FACTORS IN THE RISE OF MASS SHOOTING VIOLENCE

12. In addition to showing that the frequency and lethality of high-fatality mass shootings are on the rise nationally, the data point to another striking pattern: both assault weapons and LCMs are being used with increased frequency to perpetrate gun massacres.[6] As shown in Figures 3 and 4, based on incidents where the details on the use of assault weapons and LCMs are available, the pattern is particularly marked of late, with over half of all high-fatality mass shootings in the last four years involving assault weapons and all high-fatality mass shootings in the last four years involving LCMs. A similar pattern is found when examining fatalities in the last four years, with 62% of all high-fatality mass shooting deaths in the last four years involving assault weapons and 100% of all high-fatality mass shooting deaths in the last four years involving LCMs, as shown in Figures 5 and 6. These trends clearly demonstrate that, among mass shooters, there is a growing preference for using assault weapons and LCMs to perpetrate their attacks.[7]

---

[6] LCMs, also referred to as "high-capacity magazines," are generally ammunition-feeding devices that hold more than 10 bullets. As referenced in the present case, LCMs are defined by statute (CONN. GEN. Stat. § 53-202a). Assault weapons are generally semiautomatic firearms that fall into one of the following three categories: assault handguns, assault rifles, and assault shotguns. While the term "assault weapons" as referenced in the present case is defined by statute (CONN. GEN. Stat. § 53-202w), the modern-day roots of the term can be traced back to the 1980s, when gun manufacturers branded military-style firearms with the label in an effort to make them more marketable to civilians. *See*, Violence Policy Center, *Assault Weapons and Accessories in America* (1988) (Attached as **Exhibit C**); Violence Policy Center, *Bullet Hoses: Semiautomatic Assault Weapons—What Are They? What's So Bad about Them?* (2003), (Attached as **Exhibit D**); Phillip Peterson, *Gun Digest Buyer's Guide to Assault Weapons* (2008) (Relevant Excerpt Attached as **Exhibit E**); and Erica Goode, "Even Defining 'Assault Rifles' Is Complicated," *New York Times*, January 16, 2013, *available at* https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html (last accessed January 24, 2023).

[7] Out of all 93 high-fatality mass shootings in the United States between 1991 and 2022, it cannot be determined whether LCMs were used in 14 of those incidents. Furthermore, for 2 of these 14 incidents, it is also not possible to determine whether they involved assault weapons. Therefore, the graphical depictions in Figures 3-6 and the percentages discussed in Para. 12 of this Report are based on calculations that only use data points from the 79 incidents in which the involvement of assault weapons and LCMs could be determined.

**Figure 3. Share of High-Fatality Mass Shooting Incidents Involving Assault Weapons, 1991-2022**




Note: The calculations in Figure 3 exclude incidents in which the firearms used are unknown.

**Figure 4. Share of High-Fatality Mass Shooting Incidents Involving LCMs, 1991-2022**




Note: The calculations in Figure 4 exclude incidents in which it is unknown if LCMs were used.

**Figure 5. Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving Assault Weapons, 1991-2022**




Note: The calculations in Figure 5 exclude incidents in which the firearms used are unknown.

**Figure 6. Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving LCMs, 1991-2022**




Note: The calculations in Figure 6 exclude incidents in which it is unknown if LCMs were used.

13. The growing use of assault weapons to carry out high-fatality mass shootings is an obvious theme reflected in the data. The *disproportionate* resort to assault weapons by perpetrators of high-fatality mass shootings is another clear theme. Based on National Sport Shooting Foundation (NSSF) and federal government data, "modern sporting rifles"—which is a firearm industry term for AR-15-platform and AK-47-platform rifles—make up approximately 5.3% of all firearms in circulation in American society, according to the most recent publicly-available data (24.4 million out of an estimated 461.9 million firearms).[8] And, in all likelihood, this is an over-estimation because the figures appear to include firearms belonging to law enforcement agencies in the United States.[9] But even using this estimate (which is based in part on NSSF data), if assault weapons were used in proportion to the percentage of modern sporting rifles in circulation, approximately 5% of all high-fatality mass shootings would involve assault weapons. However, as seen in Figure 3 above, civilian ownership rates and mass-shooter use rates are not similar. Indeed, the current difference is approximately ten-fold, with the rate at

[8] The 5.3% ownership rate for modern sporting rifles was calculated using NSSF and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) data. The NSSF estimates that there are approximately 24.4 million modern sporting rifles in civilian hands in the United States as of the end of 2020 (when the most recent data are available). NSSF, "Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation," July 20, 2022, *available at* https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation (last accessed January 3, 2023). In a 2020 report that captured data through the end of 2018, the NSSF estimated that there were 433.9 million total firearms in civilian circulation in the United States. NSSF, *Firearm Production in the United States with Firearm Import and Export Data*, Industry Intelligence Report, 2020, at 18, *available at* https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (last accessed January 3, 2023). According to ATF data, in 2019 and 2020, an additional 28.0 million firearms entered the civilian stock nationwide. ATF, *National Firearms Commerce and Trafficking Assessment: Firearms in Commerce* (2022), at 181, 188, 193, *available at* https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume/download (last accessed January 3, 2023). Assuming these figures reported by the NSSF and ATF are accurate, this brings the estimated number of firearms in civilian circulation through the end of 2020 to approximately 461.9 million. The ownership rate is calculated as follows: 24.4 million modern sporting rifles divided by 461.9 million total firearms equals approximately 5.3%.

[9] ATF, 2022, *supra* note 5, at 12; NSSF, 2020, *supra* note 5, at 2-3.

which assault weapons are now used to commit gun massacres far outpacing the rate at which modern sporting rifles circulate amongst civilians in the United States.[10]

14. Another pattern that stands out when examining the relationship between assault weapons use and mass shooting violence reflects the disproportionately greater lethality associated with the use of assault weapons and LCMs. For instance, returning to the list of the 7 deadliest individual acts of intentional criminal violence in the United States since the coordinated terrorist attack of September 11, 2001, besides all seven of the incidents being mass shootings, two other prominent traits are that 6 of the 7 incidents (86%) involved assault weapons and all 7 incidents (100%) involved LCMs, as shown in Table 2. When examining all high-fatality mass shootings since 1991, the relationship between assault weapons use, LCM use, and higher death tolls is striking. In the past 32 years, assault weapons and LCMs have been used, respectively, in 34% and 77% of all high-fatality mass shootings. However, as the fatality thresholds of such incidents increase, so too do the shares of incidents involving assault weapons and LCMs. For instance, assault weapons and LCMs were used, respectively, in 75% and 100% of all mass shootings resulting in more than 20 deaths (Figures 7-8). As the data show, there is an association between mass shooting lethality and the use of assault weapons and LCMs.

**Table 2. The Use of Assault Weapons and LCMs in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

| Deaths | Date | Location | Involved Assault Weapon(s) | Involved LCM(s) |
|---|---|---|---|---|
| 60 | October 1, 2017 | Las Vegas, NV | ✓ (AR-15) | ✓ |
| 49 | June 12, 2016 | Orlando, FL | ✓ (AR-15) | ✓ |
| 32 | April 16, 2007 | Blacksburg, VA | | ✓ |
| 27 | December 14, 2012 | Newtown, CT | ✓ (AR-15) | ✓ |
| 25 | November 5, 2017 | Sutherland Springs, TX | ✓ (AR-15) | ✓ |
| 23 | August 3, 2019 | El Paso, TX | ✓ (AK-47) | ✓ |
| 21 | May 24, 2022 | Uvalde, TX | ✓ (AR-15) | ✓ |

[10] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar comparison using LCMs instead of modern sporting rifles.

**Figure 7. Percentage of High-Fatality Mass Shootings Involving Assault Weapons by Fatality Threshold, 1991-2022**




Note: The calculations in Figure 7 exclude incidents in which the firearms used are unknown.

**Figure 8. Percentage of High-Fatality Mass Shootings Involving LCMs by Fatality Threshold, 1991-2022**




Note: The calculations in Figure 8 exclude incidents in which it is unknown if LCMs were used.

15. Of the 91 high-fatality mass shootings since January 1, 1991, in which the type of firearm used is known, 31 involved assault weapons, resulting in 425 deaths. The average death toll for these 31 incidents is 13.7 fatalities per shooting. By contrast, the average death toll for the 60 incidents in which it is known assault weapons were not used (which resulted in 490 fatalities) is 8.2 fatalities per shooting (Table 3). Furthermore, of the 79 high-fatality mass shootings since January 1, 1991, in which LCM use is known, 61 involved LCMs, resulting in 704 deaths. The average death toll for these 61 incidents is 11.5 fatalities per shooting. By contrast, the average death toll for the 18 incidents in which it is known LCMs were not used (which resulted in 132 fatalities) is 7.3 fatalities per shooting (Table 4). In other words, in the last 32 years, the use of assault weapons and LCMs in high-fatality mass shootings has resulted, respectively, in 67% and 58% increases in average fatalities per incident (Tables 3 and 4).

16. Table 5 shows the average death tolls per high-fatality mass shooting incident that are attributable to assault weapons beyond deaths associated with the use of LCMs. When LCMs are not used, the average death toll is 7.3 fatalities. When LCMs are used, but not in conjunction with assault weapons, the average death toll is 9.2 fatalities. When LCMs are used with assault weapons, the average death toll is 14.0 fatalities. The data show that using LCMs without an assault weapon results in a 26% increase in the average death toll. However, using LCMs with an assault weapon results in a 52% increase in the average death toll associated with incidents that involved LCMs without assault weapons and a 92% increase in the average death toll associated with incidents that involve neither LCMs nor assault weapons. In other words, the increase in the death tolls for high-fatality mass shootings involving assault weapons appears to about one-third attributable to LCMs and about two-thirds attributable to assault weapons

17. This review of the data supports an obvious takeaway: assault weapons and LCMs are force multipliers when used to perpetrate mass shootings.

**Table 3. The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

| | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| Last 32 Years | 8.2 Deaths | 13.7 Deaths | 67% |

Note: The calculations in Table 3 exclude incidents in which the firearms used are unknown.

**Table 4. The Average Death Tolls Associated with the Use of LCMs in High-Fatality Mass Shootings in the U.S., 1991-2022**

| | Average Death Toll for Incidents That Did Not Involve the Use of LCMs | Average Death Toll for Incidents That Did Involve the Use of LCMs | Percent Increase in Average Death Toll Associated with the Use of LCMs |
|---|---|---|---|
| Last 32 Years | 7.3 Deaths | 11.5 Deaths | 58% |

Note: The calculations in Table 4 exclude incidents in which it is unknown if LCMs were used.

**Table 5. The Average Death Tolls Associated with the Use of LCMs and Assault Weapons in High-Fatality Mass Shootings in the U.S., 1991-2022**

| Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs but Not AWs | Percent Increase | Average Death Toll for Incidents Involving LCMs but Not AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase | Average Death Toll for Incidents Not Involving LCMs or AWs | Average Death Toll for Incidents Involving LCMs and AWs | Percent Increase |
|---|---|---|---|---|---|---|---|---|
| 7 3 | 9 2 | 26% | 9 2 | 14 0 | 52% | 7 3 | 14 0 | 92% |

Note: The calculations in Table 5 exclude incidents in which it is unknown if assault weapons or LCMs were used.

## III. Double-Digit-Fatality Mass Shootings Are a Post-World War II Phenomenon in American History and They Increasingly Involve Assault Weapons

18. I have also examined the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed since 1776 (Table 6 and Figure 9). A lengthy search uncovered several informative findings.[11] In terms of the origins of this form of extreme gun violence, there is no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948. The first known mass shooting resulting in 10 or more deaths occurred in 1949. In other words, for 70% of its 247-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities, making them a relatively modern phenomena in American history.[12]

19. After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966. The third such mass shooting then occurred 9 years later, in 1975. And the fourth such incident occurred 7 years after, in 1982. Basically, the first few mass shootings resulting in 10 or more deaths did not occur until the post-World War II era. Furthermore, these first few double-digit-fatality incidents occurred with relative infrequency, although the temporal gap between these first four incidents shrank with each event (Table 6 and Figure 10).[13]

---

[11] I searched for firearm-related "murders," using variations of the term, setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, *available at* www.newspaperarchive.com (last accessed October 2, 2022). The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607. Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

[12] Using the Constitution's effective date of 1789 as the starting point would lead to the conclusion that, for 68% of its 234-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.

[13] Figures 9-10 are reproduced in larger form as **Exhibit F** of this Report.

**Table 6. Mass Shootings Resulting in Double-Digit Fatalities in American History, 1776-2022**

| | Date | Location | Deaths | Involved Assault Weapon(s) | Involved LCM(s) |
|---|---|---|---|---|---|
| 1 | 9/6/1949 | Camden, NE | 13 | N | N |
| 2 | 8/1/1966 | Austin, TX | 14 | N | Y |
| 3 | 3/30/1975 | Hamilton, OH | 11 | N | N |
| 4 | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y |
| 5 | 2/18/1983 | Seattle, WA | 13 | N | N |
| 6 | 4/15/1984 | Brooklyn, NY | 10 | N | N |
| 7 | 7/18/1984 | San Ysidro, CA | 21 | Y | Y |
| 8 | 8/20/1986 | Edmond, OK | 14 | N | N |
| 9 | 10/16/1991 | Killeen, TX | 23 | N | Y |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | Y |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | Y |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | Y |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y |
| 23 | 5/18/2018 | Santa Fe | 10 | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | Y |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | Y |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y |

Note: Death tolls do not include perpetrators. An incident was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 Federal Assault Weapons Ban; (2) the statutes of the state where the gun massacre occurred; or (3) a legal or judicial declaration issued by a state official. An incident was coded as involving an LCM if at least one of the firearms discharged had an ammunition-feeding device holding more than 10 bullets.

**Figure 9. Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**




**Figure 10. Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1949-2022**



20. The distribution of double-digit-fatality mass shootings changes in the early 1980s, when five such events took place in a span of just five years. (Table 6 and Figure 10). This timeframe also reflects the first time that assault weapons were used to perpetrate mass shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the 1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths). But this cluster of incidents was followed by a 20-year period in which only 2 double-digit-fatality mass shootings occurred (Figure 10). This period of time from 1987-2007 correlates with three important federal firearms measures: the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994 Federal Assault Weapons Ban.

21. It is well-documented in the academic literature that, after the Federal Assault Weapons Ban expired in 2004, mass shooting violence increased substantially.[14] Mass shootings that resulted in 10 or more deaths were no exception, following the same pattern. In the 56 years from 1949 through 2004, there were a total of 10 mass shootings resulting in double-digit fatalities. In the 18 years since 2004, there have been 20 double-digit-fatality mass shootings. In other words, the average rate of occurrence has increased over six-fold since the Federal Assault Weapons Ban expired (Table 6 and Figure 10). (The 1994 Federal Assault Weapons Ban and its impact on mass shooting violence is discussed in further detail in Section VI of this Report.)

22. As with the analyses of mass shootings discussed above in Section II, death tolls in double-digit-fatality mass shootings are largely related to the use of assault weapons and LCMs—firearm technologies that, in terms of mass shootings, serve as force multipliers.

[14] *See*, for example, Louis Klarevas, *supra* note 1 (Relevant Excerpt Attached as **Exhibit G**); Louis Klarevas, et al., *supra* note 2 (Attached as **Exhibit H**); Charles DiMaggio, et al., "Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data," 86 *Journal of Trauma and Acute Care Surgery* 11 (2019) (Attached as **Exhibit I**); Lori Post, et al., "Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis," 7 *JMIR Public Health and Surveillance* (2021) (Attached as **Exhibit J**); and Philip J. Cook and John J. Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," 328 *JAMA*, September 27, 2022 (Attached as **Exhibit K**).

## IV. Assault Weapons Are Almost Never Used by Private Citizens in Self-Defense during Active Shootings

23. An important question that, until now, has gone unanswered is: Are assault weapons used as frequently to stop mass shootings as they are to perpetrate them? As shown above in Section II, assault weapons have been used to perpetrate approximately one-third of high-fatality mass shootings in the past 32 years (Figure 3). And in the past 8 years, the share of high-fatality mass shootings that has been perpetrated with assault weapons has risen to approximately half (Figure 3).

24. The Federal Bureau of Investigation (FBI) has been documenting active shooter incidents since 2000.[15] According to the FBI, active shootings are violent attacks that involve "one or more individuals actively engaged in killing or attempting to kill people in a populated area."[16] A simple way to conceptualize active shooter incidents is to think of them as attempted mass shootings. As part of its analysis of attempted mass shootings, the FBI identifies incidents that involved armed civilians using their personal firearms to intervene, regardless of whether the interventions were successful in stopping the attacks and/or neutralizing the perpetrator(s).

25. In the 22 years between January 1, 2000, and December 31, 2021, the FBI has identified 406 active shootings occurring in the United States. Out of these 406 active shooter incidents, 15 incidents (3.7%) involved defensive gun uses (DGUs) by civilians, excluding law enforcement or armed security.[17] Of these 15 DGUs that involved an armed private citizen

[15] All of the information in this section, including definitions and data, are publicly available from the FBI. *See* FBI, "Active Shooter Safety Resources," *available at* https://www.fbi.gov/how-we-can-help-you/safety-resources/active-shooter-safety-resources (last accessed January 2, 2023). At the time that this Report was being prepared, active shooter incident data was not yet available for the year 2022. This data will likely be released by the FBI at some point in 2023. As such, the time parameter for the analysis in this section is 2000-2021.

[16] The FBI adds, "Implicit in this definition is the shooter's use of one or more firearms. The 'active' aspect of the definition inherently implies the ongoing nature of the incidents, and thus the potential for the response to affect the outcome." *Ibid.*

[17] In 14 of these 15 DGU-involved active shooter incidents, there was an exchange of gunfire. For the one incident that did not involve an exchange of gunfire, the gun (a handgun) was used to detain the active shooter after the shooting had ceased. *Ibid.*

intervening, 12 incidents involved handguns. The remaining 3 incidents involved long guns: 1 shotgun, 1 bolt-action rifle, and 1 assault rifle. In other words, out of the 15 incidents where an armed civilian intervened, only 1 incident (6.7%) involved an assault weapon.[18] Within the broader context of all active shooter incidents, only 1 incident out of 406 in the past 22 years (0.2%) involved an armed civilian intervening with an assault weapon.[19]

26. The bottom line: assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings.[20]

[18] The FBI also identifies an incident in which an armed individual (a local firefighter) subdued and detained a school shooter, but there is no evidence that the armed firefighter drew his handgun during the incident. Moreover, local authorities have refused to comment on whether the firefighter ever drew his handgun. *See* Carla Field, "Firefighter Was Armed During Takedown of Shooting Suspect, Sheriff Says," WYFF, October 3, 2016, *available at* https://www.wyff4.com/article/firefighter-was-armed-during-takedown-of-shooting-suspect-sheriff-says/7147424 (last accessed January 3, 2023). Adding this incident to the 15 DGU-involved incidents would mean that 6.3% (as opposed to 6.7%) of the active shooter incidents, where an armed civilian intervened, involved an assault weapon.

[19] FBI, *supra* note 12. The one DGU that involved an assault weapon was the 2017 church massacre in Sutherland Springs, Texas. In that incident, an armed private citizen used an AR-15-style assault rifle to wound the perpetrator as he was attempting to flee the scene. While the perpetrator was still able to flee the scene despite being shot, minutes later, he crashed his vehicle trying to escape and then took his life with his own firearm before law enforcement could apprehend him. *See* Adam Roberts, "Man Who Shot Texas Gunman Shares His Story," KHBS/KHOG, November 7, 2017, *available at* https://www.4029tv.com/article/man-who-shot-texas-church-gunman-shares-his-story/13437943 (last accessed January 3, 2023).

[20] Given the limitations of the active shooter incident data reported by the FBI, it is not possible to discern whether any of the civilian DGUs involved an armed civilian using a firearm with an LCM at the time of the intervention. As such, it is not possible to perform a similar comparison between mass shootings perpetrated with LCM-equipped firearms and mass shootings thwarted with LCM-equipped firearms.

## V. Ownership Rates of "Modern Sporting Rifles" in the U.S.

27. As noted above in Para. 13, based on NSSF and federal government data, modern sporting rifles—such as AR- and AK-platform rifles—make up approximately 5.3% of all firearms in circulation in American society, according to the most recent publicly-available data (24.4 million out of an estimated 461.9 million firearms). Furthermore, in its most recent survey data (2022), the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle.[21] Based on this data, only 6.4 million gun owners—out of an estimated 81 million Americans who own at least one personal firearm—own modern sporting rifles.[22] In other words, less than 8% of all civilian gun owners in the United States own modern sporting rifles.[23] In terms of the total population of the United States, estimated by the Census Bureau to be approximately 333 million people in 2022, less than 2% of all Americans own a modern sporting rifle.[24]

---

[21] NSSF, *Modern Sporting Rifle: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles*, Comprehensive Consumer Report, 2022, at 12, *available at* https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf (last accessed January 16, 2023).

[22] The estimate that approximately 6.4 million gun owners possess what the NSSF considers to be modern sporting rifles is calculated by dividing the 3.8 average number of such rifles that each modern sporting rifle owner possesses into the 24.4 million such rifles estimated to be in civilian circulation. This calculation (24.4 million divided by 3.8) equals 6.4 million. Based on survey data, 81 million American adults are estimated to own guns. Andy Nguyen, "Proposed Assault Weapons Ban Won't Turn Gun Owners into Felons Overnight," PolitiFact, The Poynter Institute, August 3, 2022, *available at* https://www.politifact.com/factchecks/2022/aug/03/instagram-posts/proposed-assault-weapons-ban-wont-turn-gun-owners- (last accessed January 16, 2023).

[23] The finding that less than 8% of all gun owners possess modern sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 81 million American adults estimated to be gun owners. This calculation (6.4 million divided by 81 million) equals 7.9%.

[24] The Census Bureau's total population estimate for 2022 is 333,287,557 persons. U.S. Census Bureau, "Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic," December 22, 2022, *available at* https://www.census.gov/newsroom/press-releases/2022/2022-population-estimates.html#:~:text=DEC.,components%20of%20change%20released%20today (last accessed January 16, 2023). The finding that less than 2% of all Americans possess modern sporting rifles is calculated by dividing the 6.4 million modern sporting rifle owners by the 333

28. In deriving its estimates, the NSSF often relies on United States government data, particularly ATF data.[25] According to the ATF, from 1986 through 2020 (which reflects the most currently-available data), the civilian stock of firearms in the United States has been made up predominantly of handguns.[26] As Figure 11 shows, handguns account for 50% of the civilian stock of firearms, rifles account for 33%, and shotguns account for 17%.

29. According to ATF data, handguns are the most commonly owned firearms; not rifles, and most certainly not modern sporting rifles that qualify as assault weapons.[27]

**Figure 11. Share of Firearms in Civilian Circulation in the United States, 1986-2020**




million persons in United States. This calculation (6.4 million divided by 333 million) equals 1.9%.

[25] NSSF, 2020, *supra* note 6.

[26] For data on the number of firearms manufactured, imported, and exported, by category of firearm, from 2000-2020, *see* ATF, *supra* note 6. For similar data covering 1986-1999, *see* ATF, *Firearms Commerce in the United States: Annual Statistical Update, 2021, available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download (last accessed January 16, 2023).

[27] Due to the lack of accurate data on the number of LCMs in civilian circulation, there is no way to perform a similar analysis of ownership rates using LCMs instead of modern sporting rifles.

## VI. Restrictions on Assault Weapons and LCMs Reduce the Incidence of Gun Massacres, Resulting in Lives Saved

### VI. A. Bans in Theory

30. As conceptualized in the Trinity of Violence model that I developed in my book on mass shootings, every act of violence involves three elements: a perpetrator, a weapon, and a target (Figure 12).[28] The key to mitigating violence is to "break the trinity" by hindering at least one of the three elements. This is accomplished by dissuading the potential offender(s), denying the potential instrument(s) of violence, or defending the potential victim(s).[29]

**Figure 12. The Trinity of Violence**




31. Bans are law-based concepts that prohibit certain behaviors by criminalizing them.[30] Bans on assault weapons and LCMs generally make it illegal to manufacture, import, transfer, own, or possess assault weapons and/or LCMs. Bans work in relation to two of the three elements of the Trinity of Violence: dissuasion and denial. With regard to perpetrators,

---

[28] Klarevas, *supra* note 1.

[29] *Ibid.*

[30] Philip J. Cook, "Research in Criminal Deterrence Laying the Groundwork for the Second Decade," 2 *Crime and Justice* 211 (1980) (Attached as **Exhibit L**); and Daniel S. Nagin, "Deterrence in the Twenty-First Century," 42 *Crime and Justice* 199 (2013) (Attached as **Exhibit M**).

bans use the threat of criminal penalty to *deter potential offenders* from engaging in the prohibited behavior. In the case of bans on assault weapons and LCMs, they threaten conviction, imprisonment, and/or fines should an individual build or otherwise acquire a prohibited assault weapon or LCM. The primary mechanism at work here centers around dissuading potential shooters from trying to acquire banned firearm technologies. But there is also a secondary mechanism at work, focused on the assault weapon or LCM itself: *deprive potential instruments of violence*. Knowing that someone who is willing to commit murder might not be deterred from violating another criminal law, like possessing a prohibited item, bans on assault weapons and LCMs also threaten punishment against anyone who tries to transfer (through sale, gift, or loan) a restricted item to someone who is prohibited from acquiring it. This, in essence, reinforces the strategy of dissuading the offender with the strategy of denying the instruments of violence.[31]

32. Ideally, someone intent on committing a mass shooting with an assault weapon and/or LCM would be dissuaded from going on a rampage by the fact that their means of choice are not available. In such a scenario, the attack would be quashed. This *suppression effect* is akin to what economists and psychologists refer to as a positive spillover effect, where one desirable outcome produces a second, loosely-related desirable outcome.[32] A real-world example of this is the so-called "Matrix Killings," where a 19-year-old Virginia man blamed *The Matrix* film for driving him to murder his parents with a shotgun. At the time of the crime in 2003, the federal Assault Weapons Ban was in effect, preventing him from obtaining an assault rifle. In a 2013 jailhouse interview, he told CNN, "If I had an assault weapon, things would have been much worse." He added that had he had an AR-15 instead of a shotgun, he is positive that, after killing his parents, he would have gone on rampage and "killed as many people as I

---

[31] Klarevas, *supra* note 1.

[32] Paul Dolan and Mateo M Galizzi, "Like Ripples on a Pond. Behavioral Spillovers and Their Implications for Research and Policy," 47 *Journal of Economic Psychology* 1 (2015) (Attached as **Exhibit N**); K. Jane Muir and Jessica Keim-Malpass, "Analyzing the Concept of Spillover Effects for Expanded Inclusion in Health Economics Research," 9 *Journal of Comparative Effectiveness Research* 755 (2020) (Attached as **Exhibit O**).

possibly could." As he noted, "because I didn't have an assault weapon, that didn't happen."[33] In this case, the unavailability of an assault weapon due to the federal ban suppressed the perpetrator's impulse to commit a mass shooting.

33. Of course, many potential mass shooters will not be discouraged from going on a killing spree just because their means of choice are unavailable. They will instead replace their desired instruments of violence with available alternatives. This is commonly referred to as the *substitution effect*, wherein an act of violence is still perpetrated, but with a different, less lethal instrument of violence.[34] A real-world example of the substitution effect at work is the 2019 synagogue rampage in Poway, California. In that attack, the gunman appears to have been unable to acquire an assault rifle and large-capacity magazines due to California's ban on both. Instead, he acquired what is known as a California-compliant semiautomatic rifle (which lacked features such as a pistol grip and a forward hand grip) and 10-round magazines. As a result, the gunman quickly ran out of bullets, and while pausing to reload—which was extremely difficult given that he did not have assault weapon features on his rifle that facilitated fast reloading—a congregant chased him away, preventing him from continuing his attack.[35] In this incident, which resulted in only one death, California's ban on assault weapons and LCMs worked exactly as intended. It prevented the active shooter from being able to kill enough people to surpass the fatality threshold of a mass shooting. Stated differently, if you examine data sets that identify mass shootings, you will not find the Poway synagogue attack listed in them.

---

[33] "Inside the Mind of a Killer," CNN (Transcripts), August 23, 2013, *available at* https://transcripts.cnn.com/show/pmt/date/2013-08-23/segment/01 (last accessed January 24, 2023.

[34] Philip J. Cook, "The Effect of Gun Availability on Violent Crime Patterns," 455 *Annals of the American Academy of Political and Social Science* 63 (1981) (Attached as **Exhibit P**); Anthony A. Braga, et al. "Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?" 4 *Annual Review of Criminology* 147 (2021) (Attached as **Exhibit Q**).

[35] Elliot Spagat and Julie Watson, "Synagogue Shooter Struggled with Gun, Fled with 50 Bullets," Associated Press, April 30, 2019, *available at* https://apnews.com/article/shootings-north-america-us-news-ap-top-news-ca-state-wire-8417378d6b934a8f94e1ea63fd7c0aea (last accessed January 24, 2023).

34. It might seem perverse to think that restrictions on certain instruments of violence operate on the premise that, if an act of violence cannot be averted, then it will proceed with an alternative instrument. Nevertheless, this is exactly how bans on assault weapons and LCMs work in theory. They suppress the inclinations of potential mass shooters to go on killing rampages in the first place because their means of choice are unavailable. And, should deterrence fail, bans force perpetrators to substitute less lethal instruments for more dangerous, prohibited ones, reducing the casualty tolls of attacks when they do occur.

### VI. B. Bans in Practice

35. In light of the growing threat posed by mass shootings, legislatures have enacted restrictions on assault weapons and LCMs in an effort to reduce the occurrence and lethality of such deadly acts of firearm violence. Prominent among these measures was the 1994 Federal Assault Weapons Ban. In September 1994, moved to action by high-profile shooting rampages that occurred the previous year at a San Francisco law firm and on a Long Island Rail Road commuter train, the U.S. Congress enacted a ban on assault weapons and LCMs that applied to all 50 states plus the District of Columbia, bringing the entire country under the ban.[36]

36. Like the state bans on assault weapons and LCMs that were implemented before it, the federal ban was aimed primarily at reducing mass shooting violence—an objective the ban sought to achieve by prohibiting the manufacture, importation, possession, and transfer of assault weapons and LCMs not legally owned by civilians prior to the date of the law's effect (September 13, 1994).[37] Congress, however, inserted a sunset provision in the law which allowed the federal ban to expire in exactly 10 years, if it was not renewed beforehand. As

[36] Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).

[37] Christopher Ingraham, "The Real Reason Congress Banned Assault Weapons in 1994—and Why It Worked," *Washington Post*, February 22, 2018, *available at* https://www.washingtonpost.com/news/wonk/wp/2018/02/22/the-real-reason-congress-banned-assault-weapons-in-1994-and-why-it-worked (last accessed January 2, 2023).

Congress ultimately chose not to renew the law, the federal ban expired on September 13, 2004. In the aftermath of the federal ban's expiration, mass shooting violence in the United States increased substantially.[38]

37. In 2013, following the mass shooting that occurred at Sandy Hook Elementary School, in Newtown, Connecticut, that claimed the lives of 20 first-graders and 6 educators and that left another 2 educators injured, the Connecticut legislature passed S.B. 1160, which enacted new statewide restrictions on assault weapons and LCMs. In introducing S.B. 1160 on the Senate floor, the President Pro Tempore of the Senate, Senator Donald Williams, noted that the legislature felt compelled to take action in response to the tragedy in Newtown as well as a dozen other shooting rampages, including one at a Connecticut beer distribution center and another at the offices of the Connecticut state lottery.[39] Senator Williams characterized "the heart of our response … to the Newtown tragedy and all of the other mass shootings that I enumerated at the outset," as reflected in S.B. 1160, as com[ing] down to a stronger restriction on the assault weapons that have been used in these mass shootings and a limitation on the large-capacity magazines."[40]

38. The legislative intent of Connecticut is similar to that of other legislative bodies that have restricted assault weapons and LCMs. The primary objective of bans on assault weapons and LCMs is to reduce the frequency and lethality of mass shootings. Because, on average, the use of assault weapons and LCMs results in higher death tolls in mass shootings, the rationale for imposing restrictions on assault weapons and LCMs is to reduce the loss of life associated with the increased kill potential of such firearm technologies.

---

[38] *See* sources cited *supra* note 11.

[39] *See*, Connecticut Senate, "P A. 13-3, S B. 1160," Senate Session Transcripts, April 3, 2013, at 2 (Attached as **Exhibit R**).

[40] *Ibid.*, at 65.

39. Currently, 30% of the U.S. population is subject to a ban on both assault weapons and LCMs. The following is a list of the ten state-level jurisdictions that presently ban both assault weapons and LCMs: New Jersey (September 1, 1990); Hawaii (July 1, 1992, assault pistols only); Maryland (June 1, 1994, initially assault pistols but expanded to long guns October 1, 2013); Massachusetts (July 23, 1998); California (January 1, 2000); New York (November 1, 2000); the District of Columbia (March 31, 2009); Connecticut (April 4, 2013); Delaware (August 29, 2022); and Illinois (January 10, 2023).[41] As a reminder, from September 13, 1994, through September 12, 2004, the entire country was also subject to federal ban on both assault weapons and LCMs.

40. In the field of epidemiology, a common method for assessing the impact of laws and policies is to measure the rate of onset of new cases of an event, comparing the rate when and where the laws and policies were in effect against the rate when and where the laws and policies were not in effect. This measure, known as the incidence rate, allows public health experts to identify discernable differences, while accounting for variations in the population, over a set period of time. Relevant to the present case, calculating incidence rates across states, in a manner that captures whether or not bans on both assault weapons and LCMs were in effect during the period of observation, allows for the assessment of the effectiveness of such bans. In addition, fatality rates—the number of deaths, per population, that result from particular events across different jurisdictions—also provide insights into the impact bans on assault weapons and LCMs have on mass shooting violence.[42]

---

[41] The dates in parentheses mark the effective dates on which the listed states became subject to bans on both assault weapons and LCMs.

[42] For purposes of this Report, incidence and fatality rates are calculated using methods and principles endorsed by the Centers for Disease Control. *See* Centers for Disease Control and Prevention, *Principles of Epidemiology in Public Health Practice: An Introduction to Applied Epidemiology and Biostatistics* (2012), *available at* https://stacks.cdc.gov/view/cdc/13178 (last accessed January 3, 2023).

41. Since September 1, 1990, when New Jersey became the first state to ban both assault weapons and LCMs, through December 31, 2022, there have been 93 high-fatality mass shootings in the United States (**Exhibit B**).[43] Calculating incidence and fatality rates for this time-period, across jurisdictions with and without bans on both assault weapons and LCMs, reveals that states subject to such bans experienced a 56% decrease in high-fatality mass shooting incidence rates. They also experienced a 66% decrease in high-fatality mass shooting fatality rates, regardless of the weaponry used by the mass murderers (Table 7).[44]

42. When calculations go a step further and are limited to mass shootings involving assault weapons or LCMs, the difference between the two jurisdictional categories is even more pronounced. In the time-period from January 1, 1991, through December 31, 2022, accounting for population, states with bans on both assault weapons and LCMs experienced a 62% decrease in the rate of high-fatality mass shootings involving the use of assault weapons or LCMs. Similarly, jurisdictions with such bans in effect experienced a 72% decrease in the rate of deaths resulting from high-fatality mass shootings perpetrated with assault weapons or LCMs (Table 7).

43. All of the above epidemiological calculations lead to the same conclusion: when bans on assault weapons and LCMs are in effect, per capita, fewer high-fatality mass shootings occur and fewer people die in such shootings—especially incidents involving assault weapons or LCMs, where the impact is most striking.

---

[43] There were no state bans on both assault weapons and LCMs in effect prior to September 1, 1990. Therefore, January 1, 1991, is a logical starting point for an analysis of the impact of bans on assault weapons and LCMs. As there were no high-fatality mass shootings in the last four months of 1990, extending the analysis back to September 1, 1990, would make no difference.

[44] Between September 13, 1994, and September 12, 2004, the Federal Assault Weapons Ban was in effect. During that 10-year period, all 50 states and the District of Columbia were under legal conditions that restricted assault weapons and LCMs. As such, the entire country is coded as being under a ban on both assault weapons and LCMs during the timeframe that the Federal Assault Weapons Ban was in effect.

44. The main purpose of bans on assault weapons and LCMs is to restrict the availability of assault weapons and LCMs. The rationale is that, if there are fewer assault weapons and LCMs in circulation, then potential mass shooters will either be dissuaded from attacking or they will be forced to use less-lethal firearm technologies, resulting in fewer lives lost. The epidemiological data lend support to the policy choices of Connecticut that seek to enhance public safety through restrictions on civilian access to assault weapons and LCMs.

45. While imposing constraints on assault weapons and LCMs will not prevent every mass shooting, the data suggest that legislative efforts to deny gunmen access to assault weapons and LCMs should result in lives being saved.

**Table 7. Incidence and Fatality Rates for High-Fatality Mass Shootings, by Whether or Not Bans on Assault Weapons and LCMs Were in Effect, 1991-2022**

| | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| All High-Fatality Mass Shootings | | | | | |
| Non-Ban States | 162.0 | 68 | 1.31 | 720 | 13.89 |
| Ban States | 135.8 | 25 | 0.58 | 208 | 4.79 |
| Percentage Decrease in Rate for Ban States | | | 56% | | 66% |
| High-Fatality Mass Shootings Involving Assault Weapons or LCMs | | | | | |
| Non-Ban States | 162.0 | 47 | 0.91 | 575 | 11.09 |
| Ban States | 135.8 | 15 | 0.35 | 135 | 3.11 |
| Percentage Decrease in Rate for Ban States | | | 62% | | 72% |

Note: Population data are from U.S. Census Bureau, "Population and Housing Unit Estimates Datasets," *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed January 3, 2023).

# EXHIBIT A

## to Expert Report of Professor Louis Klarevas

# Louis J. Klarevas

**Email: ljk2149@tc.columbia.edu**


## Education

Ph.D. International Relations, 1999
School of International Service
American University
Washington, DC

B.A. Political Science, *Cum Laude*, 1989
School of Arts and Sciences
University of Pennsylvania
Philadelphia, PA

## Author

*Rampage Nation. Securing America from Mass Shootings*

## Current Positions

Research Professor, Teachers College, Columbia University, New York, NY, 2018-Present

Faculty Affiliate, Media and Social Change Lab (MASCLab), Teachers College, Columbia University, New York, NY, 2019-Present

## Professional Experience

*Academic Experience (Presented in Academic Years)*

Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2011-2012

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York, NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

*Professional Experience (Presented in Calendar Years)*

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, United States Institute of Peace, Washington, DC, 2005, 2008-2009

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

**Courses Taught**

*Graduate*
Counter-Terrorism and Homeland Security
International Political Economy
International Politics in a Post-Cold War Era
International Security
Machinery and Politics of American Foreign Policy
Role of the United States in World Affairs
Security Policy
Theories of International Politics
Transnational Security
Transnational Terrorism
United States Foreign Policy

*Undergraduate*
American Government and Politics
European-Atlantic Relations
International Political Economy
International Relations
Transnational Terrorism
United States Foreign Policy

**Scholarship**

"State Firearm Laws, Gun Ownership, and K-12 School Shootings: Implications for School Safety," *Journal of School Violence*, 2022 (co-authored with Paul M. Reeping, Sonali Rajan, et al.)

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, May 2019 (correspondence)

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

*Rampage Nation: Securing America from Mass Shootings*, Prometheus Books, 2016

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974*, *Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy' Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus. An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti,* University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey*," *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis) [Reproduced as "Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)]

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

**Commentaries and Correspondence**

"Why Our Response to School Shootings Is All Wrong," *Los Angeles Times*, May 25, 2022 (co-authored with Sonali Rajan and Charles Branas)

"COVID-19 Is a Threat to National Security. Let's Start Treating It as Such," *Just Security*, August 6, 2020 (co-authored with Colin P. Clarke)

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015 [Reproduced as "Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015]

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998 [Reproduced as "Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998]

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993

**Commentaries Written for *New York Daily News* – https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Careful How You Talk about Suicide, Mr. President," March 25, 2020 (co-authored with Sonali Rajan, Charles Branas, and Katherine Keyes)

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007

**Commentaries Written for *The Huffington Post* – www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009

**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011

**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)

**Legal Analyses Written for *Writ* – writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)

**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Mass Shootings: What We Know, What We Don't Know, and Why It All Matters," keynote presentation to be delivered at the Columbia University Center for Injury Science and Prevention Annual Symposium, virtual meeting, May 2020

"K-12 School Environmental Responses to Gun Violence: Gaps in the Evidence," paper presented at Society for Advancement of Violence and Injury Research Annual Meeting, virtual meeting, April 2020 (co-authored with Sonali Rajan, Joseph Erardi, Justin Heinze, and Charles Branas)

"Active School Shootings," Post-Performance Talkback following Presentation of *17 Minutes*, Barrow Theater, New York, January 29, 2020 (co-delivered with Sonali Rajan)

"Addressing Mass Shootings in Public Health: Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

"Treating Mass Shootings for What They Really Are: Threats to American Security," Framingham State University, October 26, 2017

"Book Talk: Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

“The Current Political Situation in Cyprus,” address delivered at AMIDEAST, July 1997

“Making the Peace Happen in Cyprus,” presentation delivered at the U.S. Institute of Peace in July 1997

“The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies,” a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

“Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations,” paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

“The Political and Diplomatic Consequences of Greece’s Recent National Elections,” presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

“Prospects for Greek-Turkish Reconciliation,” presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

“Greek-Turkish Reconciliation,” paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

“The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era,” paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

“Peace Operations: The View from the Public,” paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

“Chaos and Complexity in International Politics: Epistemological Implications,” paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

“At What Cost? American Mass Public Opinion and the Use of Force Abroad,” paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

“American Mass Public Opinion and the Use of Force Abroad,” presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Preventive Medicine*

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Injury Epidemiology*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Victims & Offenders*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge

**Service to University, Profession, and Community**

Participant, Minnesota Chiefs of Police Association, Survey of Measures to Reduce Gun Violence, 2023

Member, Regional Gun Violence Research Consortium, Nelson A. Rockefeller Institute of Government, State University of New York, 2022-

Founding Member, Scientific Union for the Reduction of Gun Violence (SURGE), Columbia University, 2019-

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

**Expert Witness Service**

Town of Superior, Colorado, 2023-

City of Boulder, Colorado, 2023-

City of Louisville, Colorado, 2023-

County of Boulder, Colorado, 2023-

State of Connecticut, 2023-

State of Hawaii, 2023-

State of Illinois, 2023-

State of Massachusetts, 2023-

State of New Jersey, 2023-

State of Oregon, 2023-

City of Highland Park, Illinois, 2022-

County of Cook, Illinois, 2022-

State of Washington, 2022-

Government of Canada, 2021-2022

Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019

State of California, 2017-

State of Colorado, 2016-2017, 2022-

**Affiliations, Associations, and Organizations (Past and Present)**

Academy of Political Science (APS)

American Political Science Association (APSA)

Anderson Society of American University

Carnegie Council Global Ethics Network

Columbia University Scientific Union for the Reduction of Gun Violence (SURGE)

Firearm Safety among Children and Teens (FACTS)

International Political Science Association (IPSA)

International Studies Association (ISA)

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Regional Gun Violence Research Consortium

Society for Advancement of Violence and Injury Research (SAVIR)

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Grants, Honors, and Awards**

Co-Investigator, A Nationwide Case-Control Study of Firearm Violence Prevention Tactics and Policies in K-12 School, National Institutes of Health, 2021-2024 (Branas and Rajan MPIs)

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

# EXHIBIT B

## to Expert Report of Professor Louis Klarevas

**Exhibit B**
**High-Fatality Mass Shootings in the United States, 1991-2022**

| | Date | City | State | Deaths | Involved Assault Weapon(s) | Involved Large-Capacity Magazine(s) |
|---|---|---|---|---|---|---|
| 1 | 1/26/1991 | Chimayo | NM | 7 | N | N |
| 2 | 8/9/1991 | Waddell | AZ | 9 | N | N |
| 3 | 10/16/1991 | Killeen | TX | 23 | N | Y |
| 4 | 11/7/1992 | Morro Bay and Paso Robles | CA | 6 | N | N |
| 5 | 1/8/1993 | Palatine | IL | 7 | N | N |
| 6 | 5/16/1993 | Fresno | CA | 7 | Y | Y |
| 7 | 7/1/1993 | San Francisco | CA | 8 | Y | Y |
| 8 | 12/7/1993 | Garden City | NY | 6 | N | Y |
| 9 | 4/20/1999 | Littleton | CO | 13 | Y | Y |
| 10 | 7/12/1999 | Atlanta | GA | 6 | N | U |
| 11 | 7/29/1999 | Atlanta | GA | 9 | N | Y |
| 12 | 9/15/1999 | Fort Worth | TX | 7 | N | Y |
| 13 | 11/2/1999 | Honolulu | HI | 7 | N | Y |
| 14 | 12/26/2000 | Wakefield | MA | 7 | Y | Y |
| 15 | 12/28/2000 | Philadelphia | PA | 7 | N | Y |
| 16 | 8/26/2002 | Rutledge | AL | 6 | N | N |
| 17 | 1/15/2003 | Edinburg | TX | 6 | Y | U |
| 18 | 7/8/2003 | Meridian | MS | 6 | N | N |
| 19 | 8/27/2003 | Chicago | IL | 6 | N | N |
| 20 | 3/12/2004 | Fresno | CA | 9 | N | N |
| 21 | 11/21/2004 | Birchwood | WI | 6 | Y | Y |
| 22 | 3/12/2005 | Brookfield | WI | 7 | N | Y |
| 23 | 3/21/2005 | Red Lake | MN | 9 | N | Y |
| 24 | 1/30/2006 | Goleta | CA | 7 | N | Y |
| 25 | 3/25/2006 | Seattle | WA | 6 | N | N |
| 26 | 6/1/2006 | Indianapolis | IN | 7 | Y | Y |
| 27 | 12/16/2006 | Kansas City | KS | 6 | N | N |
| 28 | 4/16/2007 | Blacksburg | VA | 32 | N | Y |
| 29 | 10/7/2007 | Crandon | WI | 6 | Y | Y |
| 30 | 12/5/2007 | Omaha | NE | 8 | Y | Y |
| 31 | 12/24/2007 | Carnation | WA | 6 | N | U |
| 32 | 2/7/2008 | Kirkwood | MO | 6 | N | Y |
| 33 | 9/2/2008 | Alger | WA | 6 | N | U |
| 34 | 12/24/2008 | Covina | CA | 8 | N | Y |
| 35 | 1/27/2009 | Los Angeles | CA | 6 | N | N |
| 36 | 3/10/2009 | Kinston, Samson, and Geneva | AL | 10 | Y | Y |

| | Date | City | State | Deaths | Involved Assault Weapon(s) | Involved Large-Capacity Magazine(s) |
|---|---|---|---|---|---|---|
| 37 | 3/29/2009 | Carthage | NC | 8 | N | N |
| 38 | 4/3/2009 | Binghamton | NY | 13 | N | Y |
| 39 | 11/5/2009 | Fort Hood | TX | 13 | N | Y |
| 40 | 1/19/2010 | Appomattox | VA | 8 | Y | Y |
| 41 | 8/3/2010 | Manchester | CT | 8 | N | Y |
| 42 | 1/8/2011 | Tucson | AZ | 6 | N | Y |
| 43 | 7/7/2011 | Grand Rapids | MI | 7 | N | Y |
| 44 | 8/7/2011 | Copley Township | OH | 7 | N | N |
| 45 | 10/12/2011 | Seal Beach | CA | 8 | N | N |
| 46 | 12/25/2011 | Grapevine | TX | 6 | N | N |
| 47 | 4/2/2012 | Oakland | CA | 7 | N | N |
| 48 | 7/20/2012 | Aurora | CO | 12 | Y | Y |
| 49 | 8/5/2012 | Oak Creek | WI | 6 | N | Y |
| 50 | 9/27/2012 | Minneapolis | MN | 6 | N | Y |
| 51 | 12/14/2012 | Newtown | CT | 27 | Y | Y |
| 52 | 7/26//2013 | Hialeah | FL | 6 | N | Y |
| 53 | 9/16/2013 | Washington | DC | 12 | N | N |
| 54 | 7/9/2014 | Spring | TX | 6 | N | Y |
| 55 | 9/18/2014 | Bell | FL | 7 | N | U |
| 56 | 2/26/2015 | Tyrone | MO | 7 | N | U |
| 57 | 5/17/2015 | Waco | TX | 9 | N | Y |
| 58 | 6/17/2015 | Charleston | SC | 9 | N | Y |
| 59 | 8/8/2015 | Houston | TX | 8 | N | U |
| 60 | 10/1/2015 | Roseburg | OR | 9 | N | Y |
| 61 | 12/2/2015 | San Bernardino | CA | 14 | Y | Y |
| 62 | 2/21/2016 | Kalamazoo | MI | 6 | N | Y |
| 63 | 4/22/2016 | Piketon | OH | 8 | N | U |
| 64 | 6/12/2016 | Orlando | FL | 49 | Y | Y |
| 65 | 5/27/2017 | Brookhaven | MS | 8 | Y | Y |
| 66 | 9/10/2017 | Plano | TX | 8 | Y | Y |
| 67 | 10/1/2017 | Las Vegas | NV | 60 | Y | Y |
| 68 | 11/5/2017 | Sutherland Springs | TX | 25 | Y | Y |
| 69 | 2/14/2018 | Parkland | FL | 17 | Y | Y |
| 70 | 5/18/2018 | Santa Fe | TX | 10 | N | N |
| 71 | 10/27/2018 | Pittsburgh | PA | 11 | Y | Y |
| 72 | 11/7/2018 | Thousand Oaks | CA | 12 | N | Y |
| 73 | 5/31/2019 | Virginia Beach | VA | 12 | N | Y |
| 74 | 8/3/2019 | El Paso | TX | 23 | Y | Y |
| 75 | 8/4/2019 | Dayton | OH | 9 | Y | Y |

| | Date | City | State | Deaths | Involved Assault Weapon(s) | Involved Large-Capacity Magazine(s) |
|---|---|---|---|---|---|---|
| 76 | 8/31/2019 | Midland and Odessa | TX | 7 | Y | Y |
| 77 | 3/15/2020 | Moncure | NC | 6 | U | U |
| 78 | 6/4/2020 | Valhermoso Springs | AL | 7 | Y | Y |
| 79 | 9/7/2020 | Aguanga | CA | 7 | U | U |
| 80 | 2/2/2021 | Muskogee | OK | 6 | N | U |
| 81 | 3/16/2021 | Acworth and Atlanta | GA | 8 | N | Y |
| 82 | 3/22/2021 | Boulder | CO | 10 | Y | Y |
| 83 | 4/7/2021 | Rock Hill | SC | 6 | Y | Y |
| 84 | 4/15/2021 | Indianapolis | IN | 8 | Y | Y |
| 85 | 5/9/2021 | Colorado Springs | CO | 6 | N | Y |
| 86 | 5/26/2021 | San Jose | CA | 9 | N | Y |
| 87 | 1/23/2022 | Milwaukee | WI | 6 | N | U |
| 88 | 4/3/2022 | Sacramento | CA | 6 | N | Y |
| 89 | 5/14/2022 | Buffalo | NY | 10 | Y | Y |
| 90 | 5/24/2022 | Uvalde | TX | 21 | Y | Y |
| 91 | 7/4/2022 | Highland Park | IL | 7 | Y | Y |
| 92 | 10/27/2022 | Broken Arrow | OK | 7 | N | U |
| 93 | 11/22/2022 | Chesapeake | VA | 6 | N | U |

Note: High-fatality mass shootings are mass shootings resulting in 6 or more fatalities, not including the perpetrator(s), regardless of location or motive. For purposes of this Exhibit, a high-fatality mass shooting was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban; (2) the statutes of the state where the shooting occurred; or (3) a legal or judicial declaration issued by a state official. For purposes of this Exhibit, a high-fatality mass shooting was coded as involving a large-capacity magazine if at least one of the firearms discharged had an ammunition-feeding device holding more than 10 bullets. Incidents in gray shade are those incidents that occurred at a time when and in a state where legal prohibitions on both assault weapons and large-capacity magazines were in effect statewide or nationwide.

Sources: Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016); Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, 109 American Journal of Public Health 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed December 27, 2022); and "Gun Violence Archive," *available at* https://www.gunviolencearchive.org (last accessed January 3, 2023). The Gun Violence Archive was only consulted for identifying high-fatality mass shootings that occurred since January 1, 2018.