# 23-1344

## IN UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

EDDIE GRANT, JR.; JENNIFER HAMILTON; MICHAEL STIEFEL;
CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; SECOND AMENDMENT
FOUNDATION, INC.

*Plaintiffs-Appellants*,

v.

JAMES ROVELLA; JOHN P. DOYLE, JR.; SHARMESE L. WALCOTT; PAUL J.
NARDUCCI

*Defendants-Appellees*,

and

Edward Lamont, Jr.; Patrick Griffin; Margaret E. Kelly; David R. Applegate; Joseph T.
Corradino; David R. Shannon; Michael A. Gailor; Christian Watson; Paul J. Ferencek;
Matthew C. Gedansky; Maureen Platt; Anne F. Mahoney

*Defendants.*

———————

On Appeal from the United States District Court for the
Connecticut, No. 3:22-cv-01223-JAM

———————————

### BRIEF OF THE PLAINTIFFS-APPELLANTS

———————————

Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd.
P.O. Box 340
Harwinton, CT 06791
Tel: (203) 677-0782
catkinson@atkinsonlawfirm.com

Craig Fishbein, Esq.
FISHBEIN LAW FIRM, LLC
100 South Main St.
P.O. Box 363
Wallingford, CT 06492
Tel: (203) 265-2895
ccf@fishbeinlaw.com

Doug Dubitsky, Esq.
LAW OFFICES OF DOUG
DUBITSKY
P.O Box 70
North Windham, CT 06256
Tel: (860) 933-9495
doug@lawyer.com

*Attorneys for Plaintiffs-Appellants*

February 1, 2024

# FRAP 26.1 DISCLOSURE STATEMENT

Plaintiff-Appellant – Connecticut Citizens Defense League, Inc. ("CCDL") – is a non-governmental corporation incorporated under the laws of Connecticut, and it has no parent corporation. No publicly held corporation owns 10% or more of its stock.

Plaintiff -Appellant – Second Amendment Foundation, Inc. ("SAF") is a non-governmental corporation incorporated under the laws of the State of Washington and it has no parent corporation. No publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

FRAP 26.1 DISCLOSURE STATEMENT ............................................................. i

TABLE OF AUTHORITIES ............................................................... v

INTRODUCTION ................................................................. 1

JURISDICTION ................................................................... 3

STATEMENT OF THE ISSUES ................................................. 3

STATEMENT OF THE CASE ..................................................... 4

   I.    Background ................................................................... 5

   A.   Connecticut's Criminalization of "Assault Weapons" ................................ 5

       B.   Connecticut's "Others" .......................................................... 7

       C.   Connecticut Criminalizes "Others" ..................................... 8

       D.   Appellant Eddie Grant, Jr. ................................................. 9

       E.   Appellant Jennifer Hamilton ........................................... 11

       F.   Appellant Michael Stiefel ................................................ 13

   II.   Procedural History ...................................................... 15

SUMMARY OF THE ARGUMENT ................................................ 16

ARGUMENT ................................................................... 19

   I.    Standard of Review. ......................................................... 21

II. The District Court's Analytical Framework Improperly Converts The Supreme Court's "Dangerous And Unusual" Test Into An "Unusually Dangerous" Or "Dangerous Or Unusual" Test. ...................................................22

    A. The district court incorrectly required the Appellants to prove that the modern sporting arms they seek to possess are not "unusually dangerous" and are in common use for self-defense. ....................................................23

    B. The district court erred by confining "lawful purposes" solely to self-defense through reasoning every other federal circuit has rejected. .............28

    C. The district court disregarded Supreme Court and Second Circuit precedent in interpreting the "dangerous *and* unusual" exception to mean "unusually dangerous" or either "dangerous *or* "unusual."........................31

III. The Appellants Demonstrated That Modern Sporting Arms Are In Common Use For Lawful Purposes. ..................................................36

    A. Modern sporting arms are in common use.........................................36

    B. Modern sporting arms are typically possessed by law-abiding citizens for lawful purposes. ....................................................................39

IV. The Appellants Demonstrated That The Appellees Are Not Likely To Meet Their Historical Burden of Justifying Connecticut's "Assault Weapons" Ban. ..47

V. The Remaining Equitable Factors Favor The Appellants. .........................58

CONCLUSION ..................................................................61

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

.................................................................................63

CERTIFICATE OF SERVICE...........................................64

Special Appendix

**Cases**

*Am. Civil Liberties Union v. Clapper*, 804 F.3d 617 (2d Cir. 2015) ...............58, 59

*Andrews v. State*, 50 Tenn. 165 (1871)................................................................29

*Bliss v. Commonwealth*, 12 Ky. 90 (1822) ..........................................................55

*Briggs v. Bremby*, 792 F.3d 239 (2d Cir. 2015)...................................................21

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) .................... 19, 27, 31, 32, 33, 36

*Commonwealth v. Caetano*, 470 Mass. 774 (2015) ..............................................32

*District of Columbia v. Heller*, 554 U.S. 570 (2008)...19, 24, 27, 28, 29, 31, 32, 40, 45, 53, 59

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) ...............................................48

*Duncan v. Bonta*, 142 S.Ct. 2895(Mem) (2022)...................................................49

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021)...................................................48

*Duncan v. Bonta*, 49 F.4th 1228 (Mem) (2022)....................................................49

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)....................................30, 47

*Grant v. Lamont*, 2023 WL 5533522 (D.Conn. 2023)............................................ 4

*Heller v. District of Columbia (Heller II)*, 670 F.3d 1244 (D.C. Cir. 2011).....30, 35

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ......................................................35

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)........................................29, 60

*Miller v. Bonta*, 2023 WL 6929336 (S.D. Cal. 2023)......................................41, 46

*National Association for Gun Rights v. Lamont*, 2023 WL 4975979 (D. Conn. 2023) ...........................................16, 19, 24, 28, 32, 33, 34, 39, 45, 48, 53, 55, 56

*New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022) ....1, 23, 25, 27, 29, 34, 56, 57, 58, 59, 60

*New York State Rifle and Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ..2, 5, 33, 35, 36, 40, 46

*Nunn v. State*, 1 Ga. 243 (1846) ...........................................................55

*SAM Party of New York v. Kosinski*, 987 F.3d 267 (2d Cir. 2021) ......................61

*Shew v. Malloy*, 994 F.Supp.2d 234 (D.Conn. 2014)..............................................43

*Staples v. United States*, 511 U.S. 600 (1994) ......................................................41

*State v. Chandler*, 5 La. Ann. 489 (La. 1850).......................................................55

*State v. Huntly*, 25 N.C. 418 (1843) ....................................................................29

*State v. Mitchell*, 3 Blackf. 229 (Ind. 1833)..........................................................55

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023)...................................................26, 33

*United States v. Marzarella*, 614 F.3d 85 (3d Cir. 2010).......................................30

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)................................30

*We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021) .......................21

**Statutes**

18 U.S.C. § 922 ...............................................................................................7, 9

1993 Conn. Pub. Acts 93-306 ........................................................................... 5

2001 Conn. Pub. Acts 01–130 .............................................................. 6

28 U.S.C. § 1291 ............................................................................. 3

28 U.S.C. § 1331 ............................................................................. 3

42 U.S.C. § 1983 ............................................................................. 3

Cal. Penal Code § 16350 ..................................................................37

Cal. Penal Code § 16790 ..................................................................37

Cal. Penal Code § 16890 ..................................................................37

Cal. Penal Code § 30500 et. seq. ......................................................37

Conn Gen Stat. § 53a-3 ................................................................... 8

Conn. Gen. Stat. § 53-202a ................. 3, 6, 7, 10, 11, 12, 13, 47, 53, 55, 57, 58, 61

Conn. Gen. Stat. § 53-202b ..................... 3, 6, 10, 11, 12, 13, 47, 53, 55, 57, 58, 61

Conn. Gen. Stat. § 53-202c ..................... 3, 6, 10, 11, 12, 13, 47, 53, 55, 57, 58, 61

Conn. Gen. Stat. § 53-202d ................. 3, 6, 7, 10, 11, 12, 13, 47, 53, 55, 57, 58, 61

Conn. Gen. Stat. § 53-202e .........................................3, 6, 10, 47, 53, 55, 57, 58, 61

Conn. Gen. Stat. § 53-202f ..................... 3, 6, 10, 11, 12, 13, 47, 53, 55, 57, 58, 61

Conn. Gen. Stat. § 53-202h ..................... 3, 6, 10, 11, 12, 13, 47, 53, 55, 57, 58, 61

Conn. Gen. Stat. § 53-202i ..................... 3, 6, 10, 11, 12, 13, 47, 53, 55, 57, 58, 61

Conn. Gen. Stat. § 53-202j ..................... 3, 6, 10, 11, 12, 13, 47, 53, 55, 57, 58, 61

Conn. Public Act No. 23-53 .............................................................8, 9

DC Code Ann. §§ 7-2501.01, et. seq. ...............................................37

Del. Code tit. 11, § 1466(a) ..................................................37

Haw. Rev. Stat. Ann. §§ 134-1, et seq. ...............................37

IL HB 5471 ............................................................................37

Mass. Gen. Laws ch. 140, §§ 121 et seq. .............................37

Md. Code Ann., Crim. Law §§  4-301 et. seq. .....................37

Md. Code Ann., Pub. Safety § 5-101(r) ...............................37

N.J. Stat. Ann. §§ 2C:39-1w, et seq. ...................................37

N.Y. Penal Law §§ 265.00 et. seq. .......................................37

**Other Authorities**

Bruce N. Canfield, *Bruce Canfield's Complete Guide To The M1 Garand And The M1 Carbine* (1999) ...........................................51

David B. Kopel et. al., *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167 (2013) .......................................57

Dwight D. Demeritt, Jr., *Maine Made Guns & Their Makers* (rev. ed. 1997) ........51

Harold F. Williamson, *Winchester: The Gun That Won The West* (1952) .......50, 52

Jack Dunlap, *American British & Continental Pepperbox Firearms* (1964) ..........49

Jim Garry, *Weapons of the Lewis & Clark Expedition* (2012) ..............................49

Larry L. Ruth, *2 War Baby! Comes Home: The U.S. Caliber .30 Carbine* (R. Blake Stevens ed., 1993) .....................................51

Lewis Winant, *Pepperbox Firearms* (1952) ............................................49

Louis A. Garavaglia & Charles G. Worman, *Firearms of the American West 1866-1894* (1985) .......................................................................50

Nicholas J. Johnson, et al., *Firearms Law and The Second Amendment, Regulation, Rights, and Policy* 12 (2012)............................................................51

Norm Flayderman, *Flayderman's Guide To Antique American firearms And Their Values* (9th Ed. 2007) ...........................................................49, 50, 51

R.L. Wilson, *Winchester: An American Legend* (1991)........................................50

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007)........................................................................54

Robert Held, *The Belton Systems, 1758 & 1784-86: America's first Repeating Firearms* (1986)...............................................................................49

The Atlanta Journal-Constitution, *"He Had An AR-15, But So Did I." Sutherland Springs Hero Hailed By NRA* (May 6, 2018) ....................................................43

The Washington Post, *Why Do Americans Own AR-15s?* ....................................42

William English, 2021 National Firearms Survey: Updated Analysis Including Types Of Firearms Owned (May 13, 2022)........................................................42

# **INTRODUCTION**

AR-15-platform firearms are the most popular rifles in American history. They trace their natural lineage back to Founding Era designs of multi-shot repeating rifles that were presented to the Continental Congress and carried on the Lewis and Clark Expedition. Their 1830s to 1870s ancestors – the first breed of high-capacity rapid-shooting, repeating firearms – played an important part in settling the American West, enabling hunters, prospectors, settlers, and average citizens to hunt and defend themselves. Completely absent from this historical pedigree are any widespread categorical bans on any entire category of firearms.

Connecticut has enacted one of the strictest statutory regulations of firearms in the United States. It criminalizes the mere possession of AR-15-platform firearms and completely forecloses their lawful use by law-abiding Connecticut citizens. So strict is Connecticut's regulation of firearms that the multi-shot rifles presented to the Continental Congress and carried on the Lewis and Clark Expedition likely would not be legal to possess in Connecticut today. Nor would Connecticut law permit possession and use of the AR-15's other 19th Century ancestors.

*New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022)'s elimination of subjective means-end scrutiny renders the Appellees' enforcement of Connecticut's criminalization of America's most popular rifle untenable under

1

the Second Amendment. Instead, *Bruen* compels an objective statistical and historical analysis to determine if banned firearms are "dangerous *and* unusual" weapons.

This Court's decision in *New York State Rifle and Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) is dispositive of the statistical question. The Appellees' own data demonstrates that America's most popular firearms platform has only grown more popular since *Cuomo* found it was a "usual weapon," and that the number of so-called "assault weapons" owned by law-abiding Connecticut citizens is five times greater than what *Cuomo* held to constitute "common use."

The historical question also resolves straightforwardly under *Bruen*. The long historical pedigree of rapid-shooting repeating firearms behind the AR-15-platform, and the complete absence of any similar ban on their possession deprives Connecticut's ban of the historical analogues necessary to sustain its constitutionality.

The district court, however, accepted the Appellees' invitation to circumvent both *Bruen* and *Cuomo*. It incorrectly disregarded the required objective statistical and historical inquiries and conceived a "unique modern societal problem" to hold Connecticut's ban constitutional. In doing so, it cherry-picked history and focused on the precise subjective considerations that *Bruen* forbids courts to consider.

Thus, the district court upheld Connecticut's ban on much of the same reasoning that the Supreme Court prohibited in *Bruen*.

*Bruen* and *Cuomo*'s application to this case are clear and dispositive. The Second Amendment protects America's most popular firearm platform and others in its class, and the Appellees have not justified their ban on their possession under *Bruen's* objective analyses as they must. Thus, the Court should enjoin Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j.

## JURISDICTION

This is an appeal from a district court's denial of a preliminary injunction arising in the United States District Court for District of Connecticut on August 28, 2023. SPA-1.[1] This Court has appellate jurisdiction under 28 U.S.C. § 1292. The district court had federal question jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983. The Appellants timely filed their notice of appeal on September 27, 2023. JA-1348.

## STATEMENT OF THE ISSUES

I.  Whether The District Court Erred By Denying The Plaintiffs' Motion For A Preliminary Injunction.

---

[1] "SPA" cites to the special appendix. "JA" cites to the joint appendix.

## STATEMENT OF THE CASE

In this case, the Appellants – Eddie Grant, Jr., Jennifer Hamilton, Michael Stiefel, Connecticut Citizens Defense League, Inc. ("CCDL"), and Second Amendment Foundation, Inc. ("SAF") – sought declaratory and injunctive relief against various Connecticut officials enjoining them from enforcing Connecticut's "assault weapons" ban, which was ultimately expanded during the litigation to include an additional class of firearms. The Appellants filed the underlying action in the United States District Court for the District of Connecticut on September 29, 2022. On February 3, 2023, they filed a motion for a temporary restraining order and a preliminary injunction. The district court (Judge Janet Arterton) denied the motion for a temporary restraining order on June 1, 2023. After the Appellants filed an amended complaint on June 28, 2023 and an amended motion for preliminary injunction on July 5, 2023, the district court granted the Appellees' motion to dismiss the case against Appellees Lamont, Griffin, Kelley, Applegate, Corradino, Shannon, Gailor, Ferencek, Watson, Gedansky, Platt, and Mahoney. It denied the Appellants' motion for a preliminary injunction in a written decision on August 28, 2023. *Grant v. Lamont*, 2023 WL 5533522 (D.Conn. 2023). The Appellants appeal the denial of their motion for a preliminary injunction.

## I.      Background

### A. Connecticut's Criminalization of "Assault Weapons"

Prior to 1993, Connecticut did not prohibit the purchase, sale, or possession of certain modern sporting arms that it now classifies as "assault weapons." In 1993, it changed course, enacting legislation that banned "assault weapons" and criminalized their possession. 1993 Conn. Pub. Acts 93-306, § 1(a); *see also Cuomo*, 804 F.3d at 248 (discussing the history of Connecticut's assault weapons ban). The 1993 ban employed a two-track approach – banning 67 specifically named semiautomatic firearm models and firearms "capable of fully automatic, semiautomatic or burst fire at the option of the user." *Cuomo*, 804 F.3d at 248.

A year after Pub. Acts 93-306, the United States Congress enacted the Violent Crime Control and Law Enforcement Act of 1994, which purported to restrict the manufacture, transfer, and possession of certain "semiautomatic assault weapons." *Id*. The federal ban followed Connecticut's two-track approach to a limited extent, banning 18 specific firearms but introducing what became known as the "two-feature test." *Id*. The "two-feature test" banned "any semiautomatic firearm that contained at least two listed military-style features, including a telescoping stock, a conspicuously protruding pistol grip, a bayonet mount, a flash suppressor, and a grenade launcher." *Id*. The federal ban, however, contained a sunset clause that caused it to expire in 2004. *Id*.

The approaching expiration of the federal "assault weapons" ban inspired Connecticut to adopt its own equivalent of the federal ban in 2001, embracing the "two feature test" for the first time. 2001 Conn. Pub. Acts 01–130, § 1. In 2013, Connecticut expanded its criminalization of "assault weapons" broadly to create the statutory scheme the Plaintiffs now challenge - Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j.

The law makes the possession of an "assault weapon" a Class D felony punishable by a mandatory one-year sentence of incarceration and a maximum of five years' incarceration. *See* Conn. Gen. Stat. § 53-202c(a) *and* § 53a-35a(8). It also makes the distribution, transportation, importation, stocking for sale, advertisement for sale, sale, or gifting of an "assault weapon" a Class C felony, which carries a mandatory two-year sentence of incarceration and a maximum term of ten years' incarceration. *See* Conn. Gen. Stat. § 53-202b(a)(1) *and* § 53a-35a(7).

There is a limited "grandfathering" provision to the law, which allows individuals who lawfully possessed "assault weapons" on or prior to April 3, 2013 to continue to possess them if they proved previous lawful ownership to the Connecticut State Police, applied to the Connecticut State Police for a certificate of possession of the "assault weapons" by January 1, 2014, and have actually received the certificate. Conn. Gen. Stat. § 53-202d(a)(2). The "grandfathered" possession, however, is limited to narrowly defined places and for narrowly

defined purposes, which do not include self-defense outside of a home. Conn. Gen. Stat. § 53-202d(f).

Connecticut's two-track approach to defining "assault weapons" for purposes of criminalizing their possession, sale, and transfer first criminalizes the possession, sale, or transfer of approximately 160 specifically named firearm models in four statutory subsections. *See* Conn. Gen. Stat. § 53-202a. Second, it criminalizes the possession, sale, and transfer of all firearms that have certain features, which are classified in eleven categories. Conn. Gen. Stat. § 53-202a; *see* JA-36 – JA39.

Thus, the statutory scheme criminalizes countless ubiquitous semiautomatic firearms that are widely popular and commonly used for lawful purposes in Connecticut and throughout the United States. Additionally, a violation of the ban on "assault weapons" saddles the average citizen with a felony conviction, rendering him/her ineligible to ever lawfully possess a firearm again in his/her life. *See* 18 U.S.C. § 922(g)(1).

**B. Connecticut's "Others"**

Connecticut oversees the commercial sale of firearms through the State Police's Special Licensing and Firearms Unit ("SLFU"). Since 2013, the SLFU has routinely approved the commercial sale of "others." A firearm is considered an "other" because it does not meet the statutory definition of either "rifle,"

"shotgun," or "pistol" under Connecticut law. *See* Conn Gen Stat. § 53a-3(16)-(18).

Despite previously being legal in Connecticut, "others" have drawn political ire because of their visual similarities to "assault rifles." The key distinction, however, is that "others" often use "pistol braces" which gives them a similar visual appearance to "assault rifles" while not being designed to be fired from the shoulder. "Others," however, have not previously been categorized as "rifles" or "assault weapons" under Connecticut or federal law as shown by SLFU's systematic approval of the sale of tens of thousands of "others" in Connecticut over the past decade.

### C. Connecticut Criminalizes "Others"

On June 6, 2023, Connecticut included "others" in its definition of "assault weapons." *See* Conn. Public Act No. 23-53. The new definition classifies, as an assault weapon, "any semiautomatic firearm other than a pistol, revolver, rifle, or shotgun" having one of the following characteristics:

i. Any grip of the weapon including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;

ii. An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip;

iii. A fixed magazine with the ability to accept more than ten rounds;

iv.    A flash suppressor or silencer, or a threaded barrel capable of accepting a flash suppressor or silencer;

v.    A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel;

vi.    A second hand grip; or

vii.    An arm brace or other stabilizing brace that could allow such firearm to be fired from the shoulder, with or without a strap designed to attach to an individual's arm.

Conn. Public Act No. 23-53, § 23.

This new statutory scheme criminalizes countless ubiquitous semiautomatic firearms that are widely popular and commonly used for lawful purposes among Connecticut residents. As noted previously, a violation of the new ban on "others" saddles the average citizen with a felony conviction, rendering him/her ineligible to ever lawfully possess a firearm again in his/her life. *See* 18 U.S.C. § 922(g)(1).

### D. Appellant Eddie Grant, Jr.

Appellant Eddie Grant, Jr. is a retired Connecticut Department of Corrections Officer. JA-91, ¶ 3**.** He has held a Connecticut pistol permit for over 30 years, and he meets all of the federal and state legal qualifications to acquire and possess firearms, ammunition, and magazines. JA-91, ¶ 5. He is also a member and supporter of both the Connecticut Citizens Defense League, Inc. ("CCDL") and the Second Amendment Foundation, Inc. ("SAF"). JA-91, ¶ 6.

Grant served as a uniformed Corrections Officer for twenty-one years. JA-91, ¶ 7. Grant's responsibilities included conducting armed transports of high-risk

inmates and acting as an armed Perimeter Officer. JA-91, ¶ 8. These responsibilities required Connecticut to train Grant on the safe and effective use of AR-15-platform firearms. JA-91, ¶ 8. Connecticut also required him to qualify annually as a safe and effective user of AR-15-platform firearms. JA-91, ¶ 8. Grant repeatedly qualified as a safe and effective user during his service with the Department of Corrections, and he carried and used AR-15-platform firearms during his service as a Corrections Officer. JA-91, ¶ 8.

Grant seeks to lawfully purchase and possess an AR-15-platform firearm for defensive purposes. JA-92, ¶ 9. Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j, however, prohibit him from purchasing or possessing an AR-15-platform firearm.

Grant's interest in lawfully purchasing and possessing an AR-15-platform firearm is no armchair interest. As an African-American, Grant is acutely conscious of the struggle that his mother faced growing up in 1950s-60s. JA-92, ¶ 10. During the struggle for equality and civil rights in the Deep South, Grant's mother witnessed church burnings, and the racially motivated killings experienced by her family and friends were a concrete part of her life. JA-92, ¶ 10. Grant's understanding that these racially motivated attacks were repelled in large part by the private ownership of effective defensive firearms as African-Americans bravely defended their lives and their right to equal rights. JA-92, ¶ 10.

In Grant's view, Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j gives criminals and attackers a strong tactical advantage over him. JA-92, ¶ 10. Criminals do not follow gun restrictions, placing him at a disadvantage to someone who possesses and carries any type of so-called "assault weapon" for malevolent purposes. As a law-abiding citizen, Grant wants, and intends, to lawfully purchase, possess, and defensively carry one or more of the firearms banned by Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j. JA-92, ¶ 12.

Grant also owns firearms that are Connecticut "others." JA-92, ¶ 15. He intends to acquire more Connecticut "others." On June 30, 2023, Grant contacted Lock N' Load Firearms, LLC in Plantsville, Connecticut to inquire whether he could purchase either a .300 Blackout in a Connecticut "other" configuration – specifically with pistol and fore grips. JA-314, ¶¶ 5-6. Lock N' Load Firearms, LLC declined to sell him such a firearm because doing so would now be illegal under Connecticut law. JA-314, ¶ 7. Grant still intends to acquire a .300 Blackout in a Connecticut "other" configuration and would like to do so lawfully without fear of criminal prosecution. JA-314, ¶ 8.

### E. Appellant Jennifer Hamilton

Appellant Jennifer Hamilton is a licensed Nuisance Wildlife Control Operator and a firearms instructor who teaches initial pistol permit classes, personal defense classes, and tactical firearms use classes. JA-95, ¶ 8. She holds

pistol permits from Connecticut and Massachusetts. JA-95, ¶¶ 3, 5. She meets all federal and state requirements to lawfully acquire and possess firearms, ammunition, and magazines. JA-95, ¶ 5. She is also a member and supporter of CCDL and SAF. JA-95, ¶ 6.

Hamilton is a petite, 5'-2" tall woman who relies on defensive firearms instead of bodily strength to protect herself and her family from threats and attack. JA-95, ¶ 7. Because of her physical size, Hamilton prefers firearms that are smaller and more customizable to her physical build. JA-95 – JA-96, ¶¶ 9-10. Thus, she seeks, and intends, to lawfully purchase one or more firearms prohibited in Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j. – likely an AR-15-platform firearm – because of their adaptability and effectiveness for defensive purposes. JA-96, ¶ 12. Additionally, Hamilton seeks to purchase such a firearm with a telescopic stock to adjust the firearm's length of pull to fit her specific body type and size, which will, in turn, give her greater control over the firearm and improve her accuracy with it. JA-96, ¶ 10.

Hamilton's interest in purchasing, possessing, and carrying an AR-15-platform firearm is not abstract. She has been the victim of domestic violence, and she depends on effective defensive firearms to protect herself and her family from further attacks. JA-95, ¶ 7.

Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j prohibit her from purchasing an AR-15-platform firearm or a similar rifle with a telescopic stock because they classify both as being "assault weapons." In sum, Connecticut's "assault weapon" ban prohibits Hamilton from purchasing, possessing, or carrying a firearm that she can operate more safely, comfortably, and effectively.

Hamilton also owns firearms that are Connecticut "others." JA-96, ¶ 15. She intends to acquire more Connecticut "others." On July 5, 2023, she contacted Tobacco Valley Gun in East Windsor, Connecticut to inquire whether she could purchase a JP Firearm Corp. ".300 Blackout" with a 12.5-inch barrel, a pistol grip, and a fore grip in a Connecticut "other" configuration. JA-318, ¶¶ 5-6. Tobacco Valley Gun declined to sell her this "other" because doing so would now be illegal under Connecticut law. JA-318, ¶ 7. Hamilton still intends to acquire a JP Firearm Corp. .300 Blackout with a 12.5 inch barrel, a pistol grip, and a fore grip in a Connecticut "other" configuration, and she wants the ability to do so lawfully without fear of criminal prosecution. JA-318, ¶ 8.

**F. Appellant Michael Stiefel**

Appellant Michael Stiefel is a retired Connecticut Department of Corrections officer. JA-99, ¶ 10. He has held a Connecticut pistol permit for over thirty years. JA-99, ¶ 5. Stiefel is a member and supporter of CCDL and SAF.

Stiefel served as a uniformed Department of Corrections Officer for approximately 20 years. JA-99, ¶ 7. During his career with the Department of Corrections, he was responsible for conducting armed transports of high-risk inmates and served as an armed perimeter officer. JA-99, ¶ 7. These responsibilities required Connecticut to train and qualify Stiefel on the safe and effective use of AR-15-platform firearms. JA-99, ¶ 8.

Stiefel seeks, and intends, to lawfully purchase and possess an AR-15-platform firearm for defensive purposes. JA-100, ¶ 12. Connecticut's "assault weapons" ban, however, prohibits him from purchasing or possessing an AR-15-platform firearm.

Stiefel also currently owns firearms that have been previously classified as "others" in Connecticut. JA-100, ¶ 15. He intends to acquire more Connecticut "others." On July 3, 2023, he contacted Swamp Yankee Arms, LLC to discuss whether they could build him a custom .300 Blackout in a Connecticut "other" configuration – specifically with a pistol grip and a fore grip. JA-322, ¶¶ 5-6. Swamp Yankee Arms, LLC, however, declined to build or sell him a .300 Blackout in a Connecticut "other" configuration because doing so would be illegal under Connecticut law. JA-322, ¶ 7. Stiefel still intends to acquire a custom .300 Blackout in a Connecticut "other" configuration and would like to do so lawfully without fear of criminal prosecution. JA-322, ¶ 8.

## II.    Procedural History

The Appellants filed this action on September 29, 2022. JA-8. They filed an amended complaint on October 24, 2022. JA-9. On February 3, 2023, they moved for a temporary restraining order and a preliminary injunction. JA-11. The Appellees moved to dismiss on February 8, 2023. JA-11. The district court (Arterton, J.) denied the Appellants' motion for a temporary restraining order on June 1, 2023. JA-12.

Changes in Connecticut and federal law required the Appellants to file a second amended complaint on June 28, 2023. JA-13. They then amended their motion for a preliminary injunction. JA-13. The parties assembled a substantial written record in support of their positions on the amended motion for a preliminary injunction.

The district court granted the Appellees' motion to dismiss on August 23, 2023. JA-15. It dismissed the Appellants' claims against Defendants Lamont, Griffin, Kelley, Applegate, Corradino, Shannon, Gailor, Ferencek, Watson, Gedansky, Platt, and Mahoney. JA-15. It permitted the Appellants to proceed against Appellees Rovella, Doyle, Jr., Walcott, and Narducci. JA-15. The Appellants do not appeal from this order.

On August 28, 2023, the district court (Arterton, J.) denied the Appellants' amended motion for a preliminary injunction, applying the conclusions of law that

it reached in *National Association for Gun Rights v. Lamont*, 2023 WL 4975979 (D. Conn. 2023). SPA-1. It found that the Appellants had failed to show that the modern sporting arms are commonly used for self-defense and that Connecticut's laws banning both were consistent with a national historical tradition of firearm regulation. SPA-9.

The Appellants timely filed their notice of appeal of Judge Arterton's denial of their amended motion for a preliminary injunction on September 27, 2023. JA-1348.

## SUMMARY OF THE ARGUMENT

The Second Amendment's plain text protects the right to possess and use AR-15-platform firearms. The Appellees therefore must justify Connecticut's criminalization of the mere possession and use of such firearms by demonstrating that they are consistent with the nation's early historical tradition of firearm regulation. To do so, the Appellees must demonstrate that the modern, semi-automatic firearms that they criminalize are both "dangerous *and* unusual." While the "unusual" element is an objective statistical inquiry, the "dangerous" element requires the Appellees to carry the heavy burden under *Bruen* of presenting *distinctly* similar historical laws categorically banning the possession and use of such firearms as "dangerous." The Appellees' failure to satisfy both elements renders Connecticut's "assault weapons" ban unconstitutional.

The district court, however, relieved the Appellees of their burden. It first shifted the entire burden of proof to the Appellants despite *Bruen*'s clear command that the Appellees bear it. It then required the Appellants to prove that the modern, semi-automatic firearms were known to the Founding Fathers and common at the time of the Founding. Unsatisfied with just shifting the burden, the district court then held that the Second Amendment only protects the ownership and use of firearms for self-defense, abrogating the Court's *Cuomo* decision and contradicting Supreme Court precedent as to what lawful purposes the Second Amendment protects. It then compounded these errors by minimizing and ignoring the Appellants' statistical evidence that demonstrates the popularity of AR-15 platform firearms in the United States. Finally, bereft of any suitable historical analogues to justify Connecticut's ban, the district court transformed the conjunctive "dangerous *and* unusual" test into an "unusually dangerous" or a disjunctive "dangerous *or* unusual" test. It relied an unrepresentative smattering of laws from scattered states that it made little attempt to connect to *Bruen*'s "how" and "why" metrics.

Each of the district court's errors contradict the Court's decision in *Cuomo* – the first step of which remains binding post-*Bruen*. A faithful application of *Cuomo* spells the end of Connecticut's categorical criminalization of the most popular semi-automatic rifle in American history. Connecticut's own statistics show that private citizens own up to 5 times the percentage of modern sporting

17

firearms that the Court found to constitute "common usage" in *Cuomo*. National statistics from the United States Department of Justice show that rifles are used in 0.0000014% of violent crimes nationwide. Thus, there is no question that AR-15 platform firearms are in common use for lawful purposes in the United States and enjoy Second Amendment protection.

History also does not support the district court's conclusion. The Founding Fathers themselves were aware of high-capacity, rapid-shooting rifles prior to the Second Amendment's adoption. One was demonstrated to the Continental Congress in 1777. The rapid development and proliferation of similar semi-automatic firearms prior to the Fourteenth Amendment's adoption and the lack of any widespread bans on such firearms in the United States completely undercut any conclusion that there are relevantly similar analogues to Connecticut's present ban.

This evidence and the lack of any distinctly similar historical tradition of regulating such firearms establishes that the Appellants are likely to succeed on the merits of their Second Amendment claims.

The remaining injunctive relief factors also favor the Appellants. The ongoing denial of a constitutional right is an irreparable injury, and the equities and the public interest – merged in a suit against government defendants – are not served by the Appellees continuing to enforce an unconstitutional restriction.

# **ARGUMENT**

The only issue in this appeal is whether the district court erred in denying the Appellants' motion for a preliminary injunction enjoining enforcement of Connecticut's newly expanded and original "assault weapons" ban. It did.

The district court's errors began not in the Appellants' case but rather in a related case – *National Association for Gun Rights v. Lamont*, 2023 WL 4975979 (D. Conn. 2023).[2] The district court's *NAGR* decision established the analytical framework for the Appellants' case, and the district court did not rule as to any of the Appellants' arguments regarding the analytical framework under *Bruen*. SPA-9. As recited by the district court, the legal test it applied in *NAGR* required the Appellees to demonstrate "either that the weapons are unusually dangerous, or that they are not commonly used or possessed for self-defense." SPA-9. This test abrogates this Court's decision in *Cuomo*, is inconsistent with *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *Bruen* because it improperly limits the Second Amendment's protections to only self-defense, and disregards the necessary conjunctive test – "dangerous *and* unusual" – established by *Heller*, *Caetano v. Massachusetts*, 577 U.S. 411 (2016), and *Bruen*.

Using the wrong test and improperly limiting the protected reasons a person may own a firearm led the district court to completely ignore the statistical

---

[2] *NAGR* is currently before this Court. *See NAGR v. Lamont*, No. 23-1162.

evidence that the Appellants presented regarding the common ownership of so-called "assault weapons" in Connecticut. The district court drew the erroneous inference that, if a certain firearm sounds impracticable for certain self-defense situations, the primary purpose for owning that firearm is presumptively unlawful and not protected by the Second Amendment. Such an approach guts the core holding in *Bruen*.

The district court's historical analysis also stretched *Bruen*'s command to examine relevant historical analogues well past its breaking point. Instead of comparing Connecticut's "assault weapons" ban to similar firearms regulations or the lack thereof in the Founding Era, the district court relied on implausible analogies to bans on Bowie knives, percussion cap pistols, and other similar weapons. SPA-13. These analogies, however, cherrypicked historical laws that were geographical outliers – some of which were found unconstitutional – and not representative of any national tradition of banning an entire class of commonly owned firearms.

Finally, while the district court did not discuss irreparable harm, the balance of the equities, and the public interest, these factors also favor the Appellants. The Court, therefore, should reverse the district court's denial of the Appellants' motion for a preliminary injunction.

# I.    **Standard of Review.**

A district court's grant or denial of a motion for a preliminary injunction is normally reviewed for abuse of discretion. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 280 (2d Cir. 2021). "A district court has exceeded the permissible bounds of its discretion when its decision rests on an error of law (such as the application of the wrong legal principle) or a clearly erroneously factual finding or cannot be located within the range of permissible decisions." *Id*. at 280 (cleaned up).

When a district court's error involves questions of law though, the Court reviews its denial of a preliminary injunction *de novo*. *Briggs v. Bremby*, 792 F.3d 239, 241 (2d Cir. 2015).

Parties seeking a preliminary injunction "that will affect government action taken in the public interest pursuant to a statute or regulatory scheme… must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *WTP*, 17 F.4th at 279 (cleaned up). They must also show that "the balance of equities supports the issuance of an injunction." *Id*. at 280.

## II. The District Court's Analytical Framework Improperly Converts The Supreme Court's "Dangerous And Unusual" Test Into An "Unusually Dangerous" Or "Dangerous Or Unusual" Test.

The district court described its analytical framework as follows:

> Under *Heller* and *Bruen*, Plaintiffs "bear the burden of producing evidence that the specific firearms they seek to use and possess are in common use for self-defense, that the people possessing them are typically law-abiding citizens, and that the purposes for which the firearms are typically possessed are lawful ones." *NAGR* PI Ruling at 33. "To the extent that Defendants seek to demonstrate that the regulated firearms are instead dangerous and unusual weapons that are not protected by the Second Amendment, Defendants must demonstrate either that the weapons are unusually dangerous, or that they are not commonly used or possessed for self-defense." *Id*. at 34. "If Plaintiffs establish each of those elements, the burden shifts to Defendants to justify their regulation based on *Bruen*'s requirements for establishing relevant similarity to history and tradition." *Id*. at 36.

SPA-9.

This framework is rife with errors and contradictions predicated on the district court's misinterpretation of *Bruen*. First, the district court improperly limits the lawful purposes for which firearms may be possessed under the Second Amendment self-defense – a limitation that Supreme Court precedents do not support. Second, the district court contorts the "dangerous and unusual" inquiry into an "either/or" "dangerous" or "unusual" inquiry despite the Supreme Court and this Court expressly using the conjunctive test, "dangerous and unusual." Underlying these two critical errors is the district court's confusion about who has the burden of proof under *Bruen*.

**A. The district court incorrectly required the Appellants to prove that the modern sporting arms they seek to possess are not "unusually dangerous" and are in common use for self-defense.**

This Court should begin its analysis by correctly establishing the various burdens of proof that the parties bear and the order in which such burdens must be satisfied. The Appellants acknowledge that they bear an overall burden of proof to show a likelihood of success on the merits at this stage only. How they demonstrate that likelihood of success on the merits depends in large measure on applying the correct burdens of proof to the correct parties in Second Amendment cases.

*Bruen* establishes a two-part test. First, the Appellants bear the initial burden of proof to show that "the Second Amendment's plain text covers [their] conduct." *Bruen*, 142 S.Ct. at 2129-30. When the plain text does cover their conduct, "the Constitution presumptively protects that conduct," and the burden then falls to the Appellees to "justify [their] regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. Only after the Appellees carry their burden "may a court conclude that the [Appellants'] conduct falls outside the Second Amendment's unqualified command." *Id*. at 2130 (cleaned up).

The district court strayed from *Bruen*'s test and held instead that the Appellants bear "the burden of producing evidence that the specific firearms they

seek to use and possess are in common use for self-defense, that the people possessing them are typically law-abiding citizens, and that the purposes for which the firearms are typically possessed are lawful ones." SPA-9 (cleaned up). Under *Bruen* though, the Appellants do not bear the burden to affirmatively establish that these propositions exist. The Appellees bear the burden to prove that they do not. The Appellants' only burden at this procedural stage is to show that the Appellees are not likely to carry their burden.

The district court's errors with respect to burdens of proof stem from its misplacing the "dangerous and unusual" test within the *Bruen* framework. In *NAGR*, the district court incorrectly posited that *Heller* had placed Second Amendment exceptions within the initial textual analysis by explaining that history and tradition are inextricably intertwined. 2023 WL 4975979 at *15. This misconstrues the Supreme Court's use of history in *Heller* and *Bruen*.

In determining that there is an individual right to keep and bear arms, *Heller* used history to interpret and confirm the plain text of the Second Amendment. At no point did *Heller* consider historical exceptions to this individual right apart from commenting on them in *dicta* to demarcate the line between permissible regulation and the Second Amendment right. *See, e.g.*, *Heller*, 554 U.S. at 626-628. Instead, *Heller*'s separate discussion of historically justified exceptions to the Second Amendment demonstrates that they are not part of the initial textual analysis. *Id*.

*Bruen* solidified this analytical framework. It first considered whether the petitioners demonstrated that the Second Amendment's plain text protected their "proposed course of conduct – carrying handguns publicly for self-defense." *Bruen*, 142 S.Ct. at 32. At no point during the initial textual analysis did *Bruen* require the petitioners to carry a burden of disproving New York's claimed historical exceptions. *Id*. at 31-33. Only after determining if the Second Amendment's plain text covered the petitioners' conduct did *Bruen* turn to the question of whether history and tradition justified New York's claimed exception, and the Court made it clear that New York must shoulder that burden of proof:

> Conceding that the Second Amendment guarantees a general right to public carry, contra, *Young*, 992 F.3d at 813, respondents instead claim that the Amendment "permits a State to condition handgun carrying in areas 'frequented by the general public' on a showing of a nonspeculative need for armed self-defense in those areas," Brief for Respondents 19 (citation omitted). To support that claim, the burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct.

*Id*. at 2135 (footnote 8 omitted).

Thus, the Appellants bear the initial burden only to prove their conduct falls within Second Amendment's plain text. History and tradition play no part in that initial textual analysis, except to inform the text's meaning. If the Appellants meet that initial burden – which they did – the Appellees then bear the burden to prove

their restriction on the Appellants' conduct is consistent with this nation's historical tradition of firearm regulation. The district court conducted the inquiry of whether history and tradition justify Connecticut's regulations of modern sporting arms in the wrong step and incorrectly placed the burden of proof on the Appellants. The district court's critical misapplication of law in how it evaluated the Appellants' claims renders its entire analysis erroneous.

Notably, the Ninth Circuit recently found Hawaii bore the burden of proof under similar circumstances in *Teter v. Lopez*, 76 F.4th 938, 949-50 (9th Cir. 2023). It rejected Hawaii's argument that butterfly knives are not "arms" within the Second Amendment's meaning, reasoning:

> *Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 627, 128 S.Ct. 2783 (emphasis added) (cleaned up). It did not say that dangerous and unusual weapons are not arms. Thus, whether butterfly knives are "dangerous and unusual" is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis.

*Ibid*.

Nothing justifies a departure from the test established in *Heller* and *Bruen* as the Ninth Circuit held. The Appellants met their textual burden. Each of the individual Appellants is a law-abiding citizen legally qualified to possess firearms. JA-91; JA-92; JA-95; JA-99 – JA-100. They claimed a right to keep and bear modern sporting arms for lawful purposes, including self-defense. JA-91; JA-92;

JA-95; JA-99 – JA-100. Both *Heller* and *Bruen* establish that the Second Amendment's text protects the individual right to keep and bear arms in case of confrontation. *Bruen*, 142 S.Ct. at 2127; *Heller*, 554 U.S. at 592. *Bruen* solidifies *Heller*'s holding that the Second Amendment's protections do not apply "only to those arms in existence in the 18th century." *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation marks and alterations omitted). Instead, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation marks omitted); *see also Caetano v. Massachusetts*, 577 U.S. 411 (2016) (holding that the Second Amendment, *prima facie*, protects electronic stun guns). The modern sporting arms the Appellants seek to possess are bearable arms – a fact no party disputes. Thus, there was no question that the Second Amendment's plain text presumptively protected the Appellants' right to possess and bear modern sporting firearms.

At that juncture, the burden of proof shifts to the Appellees to "affirmatively prove that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127. For the purposes of their preliminary injunction motion, the Appellants only bear the burden of showing that the Appellees likely could not carry that burden. Contrary

to the district court's conclusion, the Appellants bear no other burden as to the merits.

**B.** **The district court erred by confining "lawful purposes" solely to self-defense through reasoning every other federal circuit has rejected.**

In *NAGR*, the district court erroneously concluded that the "lawful purposes" for which firearms may be possessed is confined solely to self-defense. 2023 WL 4975979 at *14. It relied on a single sentence from *Bruen* in which the Supreme Court stated there was no dispute among the parties "that handguns are weapons 'in common use' today for self-defense." *Id*. at *12 (cleaned up). The district court misconstrued that unremarkable statement into a full-blown binding holding of *Bruen* that should limit all Second Amendment inquiries to "whether the weapons are in common use today *for self-defense*." *Id*. at *13 (cleaned up).

Under the district court's overly-narrow interpretation, Americans would have no right to possess any firearm commonly used for hunting, competition, target practice, nuisance animal control, collecting, exhibition, or any other lawful purpose. The Second Amendment would only protect self-defense. *Heller*, *McDonald*, and *Bruen* squarely contradict the district court's interpretation.

In its comprehensive historical survey, *Heller* repeatedly described "lawful purposes" in the plural. *See Heller*, 554 U.S. at 625 (holding that the right does not apply to arms "not typically possessed by law-abiding citizens for lawful purposes"). *Heller* did not stop at the use of pluralities though and provided

examples of other lawful purposes from historical decisions. For example, "the prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id*. at 599. *Heller* also quoted approvingly the Tennessee Supreme Court's description of a general right protecting all lawful uses of firearms: "[T]he right to keep arms involves, necessarily, the right to use such arms *for all the ordinary purposes*, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen in times of peace." *Id*. at 614 (quoting *Andrews v. State*, 50 Tenn. 165, 178-79 (1871)) (emphasis added).

*McDonald* drives this point home with its description of *Heller*'s central holding: "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). In other words, the Supreme Court describes self-defense as the core of the Second Amendment right, not as the only lawful purpose it protects.

*Bruen* did not need to address this question in detail, but its majority responded to an argument from the dissent by referencing *State v. Huntly*, 25 N.C. 418, 422-23 (1843)'s broad discussion of a right to carry firearms for both business and amusement. *Bruen*, 142 S.Ct. at 2146. In sum, nothing in Supreme Court

precedent supports the district court's conclusion that the only lawful purpose of firearms ownership and use is self-defense. Instead, the Supreme Court's precedents squarely reject that notion. Thus, the district court's decision was premised on the wrong test.

The federal circuits have, without exception to the undersigned's knowledge, agreed with this view of Supreme Court precedent. *See, e.g.*, *United States v. Marzarella*, 614 F.3d 85, 92 (3d Cir. 2010) ("And certainly, to some degree, [the Second Amendment] must protect the right of law-abiding citizens to possess firearms for other, as-yet-undefined, lawful purposes"); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) ("Of course, the Court also said the Second Amendment protects the right to keep and bear arms for other lawful purposes, such as hunting, but self-defense is the core lawful purpose protected") (internal quotation marks and citations omitted); *United States v. Masciandaro*, 638 F.3d 458, 466 (4th Cir. 2011) ("It also observed that throughout the country's history, Americans have valued the right not only to be able to prevent the elimination of militia, but even more important[ly], for self-defense and hunting") (cleaned up); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective").

The district court's outlying decision is foreclosed by Supreme Court precedent, and no other federal circuit has adopted its reasoning. This Court should decline the invitation to be the first circuit to do so and should, instead, correct the district court's analytical error.

### C. <u>The district court disregarded Supreme Court and Second Circuit precedent in interpreting the "dangerous *and* unusual" exception to mean "unusually dangerous" or either "dangerous" *or* "unusual."</u>

*Heller* recognized that states could regulate "dangerous and unusual" weapons without violating the Second Amendment, establishing a conjunctive test. *Heller*, 554 U.S. at 627. The district court held that, under *Heller's* "dangerous and unusual" test, it could exclude modern sporting firearms from Second Amendment protection by finding that they "are unusually dangerous" or "that they are not commonly used or possessed for self-defense."[3] SPA-9 (cleaned up). The district court's reasoning errs by recrafting the "dangerous *and* unusual" standard into a "dangerous *or* unusual" or an "unusually dangerous" standard despite the Supreme Court and this Court's holdings to the contrary. *See Caetano*, 136 S.Ct. at 418 (Alito, J., concurring) (describing the *Heller* test as "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes").

---

[3] As already discussed, the district court limiting the Second Amendment's protections to only self-defense is erroneous.

*Heller* recognized that a limitation on the right to keep and bear arms was "the historical tradition of prohibiting the carrying 'dangerous *and* unusual weapons.'" 554 U.S. at 627 (emphasis added). It relied on numerous Founding era commentaries and Blackstone for the general proposition, but it did not elaborate further. *Id*. The district court, however, seized on lines in some of these early sources that characterized the limitation as "dangerous or unusual," and it held that the test was not conjunctive despite the Supreme Court's use of the word "and." *NAGR*, 2023 WL 4975979 at *16. That conclusion, however, simply evaporates under *Caetano*.

*Caetano* unanimously reversed the Massachusetts Supreme Judicial Court's holding that electronic stun guns are "dangerous and unusual." 136 S.Ct. at 411-412. *Caetano*'s context is critical. The Massachusetts Supreme Judicial Court analyzed both elements of the "dangerous and unusual" standard in its opinion. *Commonwealth v. Caetano*, 470 Mass. 774, 779-781 (2015). It first concluded that stun guns were "dangerous per se at common law." *Id*. at 779. It then concluded that they were unusual because they were not in common use at the time of the Second Amendment's enactment. *Id*. at 780-81. The Supreme Court did not disturb the lower court's conclusion electronic stun guns were "dangerous." Instead, it reversed only the state court's conclusion that they were "unusual." *Caetano*, 470 Mass. at 412. Thus, the Supreme Court vacated Jaime Caetano's conviction by

finding that electronic stun guns are not *both* dangerous *and* unusual as required by *Heller*.

Here, however, the district court ignored what the unanimous Supreme Court did in *Caetano* and viewed the Court's application of *Heller's* conjunctive "dangerous *and* unusual" test as the mere non-binding concurring opinion of Justice Alito. *NAGR*, 2023 WL 4975979 at *16; *see also Caetano*, 136 S.Ct. at 417 (Alito, J. concurring) ("As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual"). Despite the district court's stretch to conclude otherwise, *Caetano* – both in word and deed – binds this Court to a conjunctive "dangerous *and* unusual" test.

This Court's own precedent also established a conjunctive "dangerous and unusual" test.[4] *Cuomo*, 804 F.3d at 255 further established a two-part test for whether a weapon is "dangerous and unusual." It held that "[t]he Second Amendment protects only the sorts of weapons that (1) in common use and (2) typically possessed by law-abiding citizens for lawful purposes." *Cuomo*, 804 F.3d at 255 (cleaned up).

Unable to circumnavigate *Cuomo*, the district court found that *Bruen* had overruled *Cuomo* entirely because, in the district court's view, *Bruen* forbids treating "common use" as "a solely statistical question." *NAGR*, 2023 WL 4975979

---

[4] The Ninth Circuit has too. *See Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023) (striking down Hawaii's butterfly knife ban primarily on its "dangerous" analysis).

at *13. This reading of *Bruen* sweeps far too broadly. *Bruen* did not completely overrule *Cuomo*. It only overruled the means-end scrutiny step of the initial two-step test previously employed by this Court and other circuits.

First, *Bruen* expressly discussed the two-step test applied by various Courts of Appeals, including this Court, and held that the "first step" – a historical analysis about whether the Second Amendment protects the right at issue and the application of a historically supported exception – was "broadly consistent with *Heller*." *Bruen*, 142 S.Ct. at 2126-27. Second, *Bruen* clearly indicated that it was only overruling the "second step" – means-end scrutiny applied by the lower courts – in favor of a single step in which "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127.

To the extent that *Bruen* recalibrated *Cuomo*'s first step and introduced history to it, it did not abrogate *Cuomo*'s objective statistical inquiry. Instead, *Bruen*'s introduction and application of history in *Cuomo*'s first step occurs in two ways. First, history must justify the historical exception – "dangerous and unusual weapons" – that the Appellees rely on to justify their regulation of the conduct protected by the Second Amendment's text. *Id*. at 2128. Second, history provides the relevant analogues to determine whether an "arm" is dangerous as a matter of constitutional law. *Id*. at 2131-34.

In sum, the only exception that the Appellees have claimed is the "dangerous and unusual" weapons exception. Thus, *Cuomo* applies and mandates an objective statistical inquiry regarding common usage of modern sporting arms. If the Appellees demonstrate a lack of common usage of modern sporting arms for lawful purposes, then the inquiry shifts to whether historical analogues demonstrate that modern sporting arms are "dangerous."

Three circuits that have considered the "dangerous and unusual" exception post-*Heller* have relied "on statistical data of some form," holding that common use "is an objective and largely statistical inquiry." *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (quoting *Cuomo*, 804 F.3d at 256) (finding machineguns not to be in common use regardless of what statistical metric was used). This Court in *Cuomo* relied on the sheer number of "assault weapons" and "large-capacity magazines" in circulation in the United States. *Cuomo*, 804 F.3d 255. So did the D.C. Circuit in *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244 (D.C. Cir. 2011).

The objective statistical inquiry remains good law under the Supreme Court's precedents, and this Court should reverse the district court's decision to overrule the portion of *Cuomo* that neither the Supreme Court nor this Court, sitting *en banc*, has overruled.

**III.** **The Appellants Demonstrated That Modern Sporting Arms Are In Common Use For Lawful Purposes.**

**A. Modern sporting arms are in common use.**

In *Cuomo*, this Court established a clear metric the Appellants relied on before the district court. It considered estimates from both New York and the plaintiffs regarding the numbers of "assault weapons" owned nationwide. *Cuomo*, 804 F.3d at 255-56. Accepting the most conservative estimate offered by the parties and their amici – that "assault weapons" comprised 2% of the nation's firearms or approximately 7 million firearms – this Court held that "assault weapons" were "in common use as that term was used in *Heller*." *Id*. at 255.

Justice Alito also offered two metrics for "common use" in his *Caetano* concurrence. He cited the "[h]undreds of thousands of Tasers and stun guns [that] have been sold to private citizens, who it appears may lawfully possess them in 45 states." *Caetano*, 136 S.Ct. at 1032 (Alito, J., concurring) (cleaned up). Thus, the two metrics offered by Justice Alito are: 1) in how many states certain weapons are legal, and 2) how many are privately owned – the latter metric being consistent with *Cuomo*'s approach. Justice Alito found that "approximately 200,000 civilian owned stun guns as of 2009" were sufficient to demonstrate "common use." *Id*. at 1032-33 (Alito, J., concurring) (cleaned up).

Here, the Appellants demonstrated "common usage" before the district court under both *Cuomo* and Justice Alito's *Caetano* metrics. First, modern sporting

36

firearms of the AR-15 platform vintage are legal for private ownership in 41 states. Only 9 states and the District of Columbia prohibit their possession.[5] Thus, modern sporting firearms of the AR-15 platform vintage are widely accepted and legally owned across the United States.

Second, the Appellants' statistical evidence – supplied by Appellee Rovella's office – shows that the number of "assault weapons" lawfully owned in Connecticut greatly exceeds the numbers and percentages of "assault weapons" that this Court found to demonstrate "common use" in *Cuomo*. In response to a January 17, 2023 Freedom of Information Act (FOIA) request, Appellee Rovella's office declared that there are 1,306,867 firearms in the Connecticut weapons registry database. JA-62. In an earlier January 10, 2020 FOIA response, Appellee Rovella's office declared that there are 53,849 "assault weapons" registered in Connecticut. JA-62. In other words, lawfully owned "assault weapons" comprise approximately 4.1% of Connecticut's firearms – more than double the 2% metric that this Court found sufficient to demonstrate "common use" in *Cuomo.* JA-62.

---

[5] California – *see* Cal. Penal Code §§ 16350, 16790, 16890, 30500 et. seq.; Connecticut – laws already discussed; Delaware – *see* Del. Code tit. 11, § 1466(a); Hawaii – *see* Haw. Rev. Stat. Ann. §§ 134-1, et seq.; Illinois – *see* IL HB 5471, enacted January 10, 2023; Maryland – *see* Md. Code Ann., Crim. Law §§  4-301 et. seq., Md. Code Ann., Pub. Safety § 5-101(r); Massachusetts – *see* Mass. Gen. Laws ch. 140, §§ 121 et seq.; New Jersey – *see* N.J. Stat. Ann. §§ 2C:39-1w, et seq.; New York – *see* N.Y. Penal Law §§ 265.00 et. seq.; DC Code Ann. §§ 7-2501.01, et. seq.

The statistical evidence only grows stronger when "others" are added to the mix. In the January 17, 2023 FOIA response, Appellee Rovella's office declared that 88,766 of Connecticut's 1,306,867 firearms are "others." JA-63. In other words, approximately 6.8% of Connecticut's registered firearms are "others" – more than 3 times the percentage of firearms in private hands that this Court found to constitute "common use" in *Cuomo*. JA-63.

Since "others" are now "assault weapons" by virtue of Conn. Public Act No. 23-53, § 23, the statistical evidence of "common use" in Connecticut becomes overwhelming when "assault weapons" and "others" are combined. Together, "others" and "assault weapons" constitute 142,615 firearms of the 1,306,867 registered firearms in Connecticut as of 2023. In other words, approximately 10.9% of Connecticut firearms are now considered "assault weapons" – more than 5 times the percentage this Court found to constitute "common use" in *Cuomo*.

The national data Appellants presented shows a similar pattern of "common use." According to production and import/export data ranging from 1991-2018 compiled and estimated by the National Shooting Sports Foundation ("NSSF") based on the Annual Firearms Manufacturing and Export Report ("AFMER") issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), there are approximately 254,752,987 firearms in circulation in the United States. JA-105. Approximately 24,446,000 or 10% of those firearms are modern sporting

arms. JA-105. In other words, the national data shows that modern sporting arms are 5 times more popular across the country than the percentage this Court found to constitute "common use" in *Cuomo*.

Taken in their totality, these statistics leave no doubt that modern sporting arms – referred to in Connecticut as "assault weapons" – are in "common use" both in Connecticut and across the United States. The district court erred in rejecting *Cuomo* and denying the plaintiffs' motion. Thus, this Court should reverse.

### B. <u>Modern sporting arms are typically possessed by law-abiding citizens for lawful purposes.</u>

To the extent that the district court analyzed whether modern sporting firearms are typically possessed by law-abiding citizens for lawful purposes in *NAGR*, it fixated on four factors: (1) whether modern sporting firearms are suitable for self-defense; (2) whether they are possessed for use in non-mass shooting crimes; (3) whether modern sporting firearms are disproportionately used in mass shootings; and (4) whether modern sporting firearms contain military characteristics. *NAGR*, 2023 WL 4975979 at *19-26. These novel factors completely ignore the actual test that this Court articulated in *Cuomo*.

*Cuomo* simply does not permit most of the district court's test. Nor does *Heller*. Relying on *Heller*, *Cuomo* held that the inquiry into "typical possession" requires courts to "look into both patterns of use and the subjective motives of gun

owners." *Cuomo*, 804 F.3d at 256. It characterized "reliable empirical evidence of lawful possession for lawful purposes" to be "elusive, beyond ownership statistics." *Id*. at 257 (cleaned up).

The elusive nature of empirical evidence did not stop *Cuomo* from outlining what are impermissible considerations in this analysis under *Heller*. Because *Heller* held that the Second Amendment protects handgun ownership despite estimates that handguns "account for 71 percent to 83 percent of the firearms used in murders and 84 percent to 90 percent of the firearms used in other violent crimes," this Court held in *Cuomo* that "[l]ooking solely at a weapon's association with crime, then, is insufficient." *Id*. at 256. Instead, the pertinent inquiry is "whether the weapon is 'dangerous and unusual' in the hands of law-abiding citizens." *Id*.

*Cuomo* also grappled with the similarity between AR-15 platform firearms and military-style weapons like the M-16, which *Heller* suggested might be banned without offending the Second Amendment. *Id*. at 256 (citing *Heller*, 554 U.S. at 627). This struggle, however, is less difficult than it appeared to the Court in *Cuomo*. The Supreme Court has drawn a distinction between the critical feature of the M-16 on the one hand, and AR-15 platform rifles that constitute the majority of modern sporting arms, on the other hand. The M-16 is a selective-fire firearm capable of being converted into a fully automatic machine gun by a simple flip of a

selector switch. *Staples v. United States*, 511 U.S. 600, 603 (1994). Conversely, the "AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon." *Id*. *Staples* then drew a line between machineguns, sawed-off shotguns, and artillery pieces on one hand and semi-automatic firearms on the other hand – the latter of which it described as "traditionally hav[ing] been widely accepted as lawful possessions…." *Id*. at 611-12. Thus, the critical analogy between those categories of rifles that are permissible, and those that are not, is whether or not they are automatic – i.e., machine guns.

As *Cuomo* indicates, the proper starting point for a "typical use" analysis is firearm ownership statistics. The evidence in the record shows that Americans own approximately 24,446,000 modern sporting firearms. JA-105. Judge Roger Benitez of the Southern District of California perfectly describes the relevance of this ownership statistic:

> The United States Department of Justice reports that in the year 2021, in the entire country 447 people were killed with rifles (of all types). From this one can say that, based on a national population of 320 million people in the United States, rifles of any kind (including AR-15s) were used in homicides only 0.0000014% of the time. Put differently, if 447 rifles were used to commit 447 homicides and every rifle-related homicide involved an AR-15, it would mean that of the approximately 24,400,000 AR-15s in the national stock, less than .00001832% were used in homicides. It begs the question: what were the other AR-15 type rifles used for? The only logical answer is that 24,399,553 (or 99.999985%) of AR-15s were used for lawful purposes.

*Miller v. Bonta*, 2023 WL 6929336 at *3 (S.D. Cal. 2023).

In other words, rifles of any flavor are rarely ever used in violent crime. Thus, the statistics show the overwhelming majority of modern sporting rifle owners use them for lawful purposes.

National surveys further demonstrate the general lawful purposes for which law-abiding citizens own AR-15 platform rifles. A 2022 Washington Post survey revealed that law-abiding Americans own AR-15s for many lawful purposes such as self-defense (33% of survey respondents), target shooting (15%), recreation (15%), and hunting (12%). The Washington Post, *Why Do Americans Own AR-15s?*.[6] At least one other survey indicates that AR-15 platform firearm owners possess them for home defense (61.9%), hunting (50.5%), target shooting (66%), competitive shooting sports (32.1%), and self-defense outside of the home (34.6%). William English, 2021 National Firearms Survey: Updated Analysis Including Types Of Firearms Owned, at 33-34 (May 13, 2022).[7]

These surveys are not the only evidence of law-abiding citizens' typical use of AR-15 platform rifles. The federal government sponsors competitive shooting competitions through the Civilian Marksmanship Program, and a district court in this circuit has found the AR-15 platform to be the leading type of firearm used in

---

[6] Retrieved from https://www.washingtonpost.com/nation/interactive/2023/american-ar-15-gun-owners/ (last visited January 22, 2024).

[7] Retrieved from https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494 (last visited January 22, 2024).

those competitions. *Shew v. Malloy*, 994 F.Supp.2d 234, 245 n.40 (D.Conn. 2014). As the surveys indicate, target-shooting and competitive shooting sports are some of the main reasons why law-abiding citizens own AR-15 platform firearms.

Anecdotal evidence further supports the critical reasons why law-abiding citizens own AR-15 platform firearms. During the 2017 Sutherland Springs, Texas mass shooting, a former firearms instructor, Stephen Willeford, armed himself with an AR-15 and engaged in a gun battle with a criminal wearing body armor and wielding a rifle to massacre churchgoers. The Atlanta Journal-Constitution, *"He Had An AR-15, But So Did I." Sutherland Springs Hero Hailed By NRA* (May 6, 2018).[8] Not only did Willeford's actions save his own life, but also likely saved many more people's lives because he had equal firepower to confront an armed assailant with no respect for the law. *Id*. Sutherland Springs presents the perfect comparison between a law-abiding citizen using an AR-15 lawfully and a criminal using a similar firearm unlawfully in a mass shooting situation. The former was able to save lives because he owned an AR-15. The latter murdered – not because he owned an AR-15, but because he was intent on murder, and used a firearm in the commission of his crimes.

The Appellees chose not to address lawful uses of modern sporting firearms before the district court. Instead, they provided approximately a thousand pages of

---

[8] Retrieved from https://www.ajc.com/blog/buzz/had-but-did-sutherland-springs-hero-hailed-nra/QAO2FwB8GcBBNdrax24lGO/ (last visited January 22, 2024).

claims about mass shootings and the alleged effect of AR-15 rounds in gunshot wounds. Mass shooters, by definition, are not law-abiding citizens though. They are criminals, intent on committing crimes, and, as the evidence shows, criminal use of rifles broadly and modern sporting firearms in particular represents a tiny fraction of the uses to which they are put. Thus, the Appellees' heavy emphasis on mass shootings has no bearing on the actual "typical use" by law-abiding citizens.

The Appellants' own reasons for owning AR-15 platform rifles further support this conclusion. Each of them wishes to obtain an AR-15 platform firearm for self-defense. JA-91; JA-92; JA-95; JA-99 – JA-100. Each seeks to own an AR-15 platform firearm because of its customization-friendly features so they can effectively tailor it for their particular use for self-defense. JA-91; JA-92; JA-95; JA-99 – JA-100. None of the Appellants has expressed any intention, or even any hint of an intention, to use any such firearms for unlawful purposes.

The district court's fixations have no relevance in the *Heller/Cuomo* analysis. Nothing in Supreme Court precedent or in *Cuomo* permits the district court's musings on whether a modern sporting rifle is a weapon of war because such musings have no bearing on how such firearms are used every day by law-abiding citizens.

Nothing, however, demonstrates the district court's attempt to circumvent *Cuomo* and *Bruen* more than its musings on whether modern sporting firearms are

44

suitable for self-defense. On that point, the district court went astray in two respects. First, it reduced the actual use of modern sporting firearms to an inapplicable "shots-fired" approach. *NAGR*, 2023 WL 4975979 at *21. Second, it entertained speculation from the Appellees on just how well-suited for self-defense modern sporting arms were. *Id*. In other words, the district court adopted the "best weapon" approach rejected in *Heller*. 554 U.S. at 629. Neither path is permissible under *Cuomo, Heller*, and *Bruen*.

First, *Heller* dismissed any attempt to speculate about the suitability of a given class of firearms for self-defense:

> It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*Heller*, 554 U.S. at 629. In other words, the relevant metric under *Heller* is that the American people writ large have chosen a given class of firearms for a lawful purpose.

In *Cuomo*, this Court adhered to *Heller's* standard by instructing lower courts to "look into both broad patterns of use and the subjective motives of gun

owners." *Cuomo*, 804 F.3d at 256. Nowhere in *Cuomo* did this Court permit district courts to engage in their own subjective assessment of just how suitable a given firearm may be for self-defense or whether there could be "better" alternatives. The district court's choice to do so was erroneous.

Second, and building on the first point, "common use" cannot possibly equate to "shots fired." Most gun owners will live their entire lives without drawing their weapons or firing a shot in self-defense. In fact, it is the prayer of every law-abiding gun owner that God will keep them from ever having to use their firearms in self-defense. Judge Benitez aptly expressed this point in *Miller*:

> Probably the vast majority of Americans that own guns keep them and use them for self-defense the same way that a driver puts on a seat belt in the case of a collision. Though collisions rarely happen, the seat belt is used for protection and to be ready for the unexpected collision. A reserve canopy is being used on a parachute jump, although it is not deployed, in case the main parachute fails. A cell phone in one's pocket is being used when waiting for a telephone call or when one might need to make a call. An AR-15 under one's bed at night is being used for self-defense even when the night is quiet. A person may happily live a lifetime without having to fire their gun in self-defense. But that is not to say that such a person does not use their gun for self-defense when he or she keeps it under the bed with a hope and a prayer that it never has to be fired.

*Miller*, 2023 WL 6929336 at *36. In other words, "common use" includes "possession just in case."

Nor is "common use" limited to whatever speculations the district court engaged in about "shots fired" in self-defense. As the Seventh Circuit recognized

in *Ezell v. City of Chicago*, 651 F.3d 684, 708-09 (7th Cir. 2011), the Second Amendment protects "the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." Thus, excluding the lawful purpose of training from an analysis of the lawful purposes for which law-abiding citizens use modern sporting firearms is impermissible under the Second Amendment. The Second Amendment does not require "shots fired" in self-defense to demonstrate "common use" for lawful purposes. Mere possession suffices.

For these reasons, the Court should reverse the district court's conclusions as to whether law-abiding citizens typically use modern sporting firearms for lawful purposes.

## IV. The Appellants Demonstrated That The Appellees Are Not Likely To Meet Their Historical Burden of Justifying Connecticut's "Assault Weapons" Ban.

The district court relied on its *NAGR* holding to conclude that the rationale underlying Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j are the same as historical firearms regulations:

> to respond to growing rates of violence and lethality caused by modern innovations in technology and changing patterns of human behavior by regulating the particular kinds of weapons or modes of carry that were being most often employed by those causing the violence, while leaving open alternative avenues for lawful possession of firearms for purposes of self-defense.

SPA-12 (cleaned up). For historical analogues, the district court used bans on Bowie knives, percussion cap pistols, and other weapons that it considered dangerous. SPA-13.

The district court's approach was erroneous from the start. In *NAGR*, the district court found that mass shootings pose a new modern societal problem. *NAGR*, 2023 WL 4975979 at *29. It reasoned that "the development of semiautomatic fire has led to a level of casualties and injuries from firearm violence previously unseen in American history and has been spurred by favors and advances in technology that would have been unimaginable to the Founding Fathers." *Id*. at *29. Thus, it held that the lack of historical bans on semiautomatic firearms was not dispositive. *Id*. at *29.

This reasoning ignores firearms history. While modern sporting arms like AR-15s represent a significant technological advancement compared to a traditional musket, multi-shot, semi-automatic firearms existed and were known by those drafting the Bill of Rights and the Fourteenth Amendment.

The Ninth Circuit described a 22-round semi-automatic rifle developed in 1779 – one of which was carried on the Lewis and Clark expedition. *Duncan v. Becerra*, 970 F.3d 1133, 1147-48 (9th Cir. 2020);[9] *see also* Jim Garry, *Weapons of*

---

[9] *Duncan v. Becerra* has a tortured procedural history. The Ninth Circuit first overruled it *en banc* without disturbing the historical portion on which the Appellants now rely. *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021). The Supreme

*the Lewis & Clark Expedition* 94 (2012). The Founding Fathers themselves became aware of semi-automatic, high-capacity repeating rifles when Joseph Belton demonstrated a 16-shot repeating rifle to the Continental Congress in 1777. *See* Robert Held, *The Belton Systems, 1758 & 1784-86: America's first Repeating Firearms* 37 (1986). Both 18th Century rifles would fall squarely within Connecticut's "assault weapon" ban if introduced today. Thus, history directly contradicts the district court's conclusion that modern semi-automatic firearm technology was unimaginable to the Founding Fathers.

Multi-shot, semi-automatic firearms proliferated at a great rate during the antebellum era. This proliferation took a major step forward with the 1821 introduction of the Jennings multi-shot flintlock rifle, which was capable of firing 12 shots before reloading. Norm Flayderman, *Flayderman's Guide To Antique American firearms And Their Values* 683 (9th Ed. 2007). Concurrently, "Pepperbox" pistols began to proliferate in the 1830s and were capable of firing between 6 to 24 shots without reloading. Jack Dunlap, *American British & Continental Pepperbox Firearms* 16 (1964); Lewis Winant, *Pepperbox Firearms* 7 (1952).

---

Court then summarily vacated the Ninth Circuit decision and remanded for reconsideration consistent with *Bruen*. *Duncan v. Bonta*, 142 S.Ct. 2895(Mem) (2022). The Ninth Circuit then remanded the case to the district court for reconsideration. *Duncan v. Bonta*, 49 F.4[th] 1228 (Mem) (2022).

The "Pepperbox" design influenced a new variation of rifle in the 1830s – the Bennett and Haviland Rifle – capable of firing 12 shots without reloading. Norm Flayderman, *Flayderman's Guide To Antique American firearms And Their Values* 711 (9th Ed. 2007). Competing semi-automatic rifle designs in the 1850s from Alexander Hall and Colonel Parry W. Porter also produced rifles capable of firing 15 shots and 38 shots respectively. *Id.* at 713, 716.

Repeating firearms technology advanced with the introduction of lever-action rifles in 1855 by the Volcanic Repeating Arms Company. *Id.* at 304. Early variations had 30-round tubular magazines, and advertisements of the era bragged that a user could fire 30 shots in under a minute. *Id.* at 303; Harold F. Williamson, *Winchester: The Gun That Won The West*, 25 (1952). The Volcanic repeating rifle then evolved into the Winchester Model 1866 (M1866) and was specifically advertised as perfect for defense against "sudden attack either from robbers or Indians." R.L. Wilson, *Winchester: An American Legend*, 32 (1991). The advertising of the era marketed its ability to fire eighteen shots in nine seconds, and it quickly became a very popular firearm in the American west. Louis A. Garavaglia & Charles G. Worman, *Firearms of the American West 1866-1894*, at 128 (1985); R.L. Wilson, *Winchester: An American Legend*, 34 (1991). Again, each of these 19th Century firearms would run afoul of Connecticut's "assault weapon" ban.

Other models followed with even greater capacity. For example, the 1873 Evans Repeating Rifle could fire 34 shots without reloading. Norm Flayderman, *Flayderman's Guide To Antique American firearms And Their Values* 694 (9th Ed. 2007); *see also* Dwight D. Demeritt, Jr., *Maine Made Guns & Their Makers* 293-95 (rev. ed. 1997).

Manufacturers improved and expanded these designs until the development of the M-1 carbine – a 15 or 30 shot carbine originally manufactured for World War II. Bruce N. Canfield, *Bruce Canfield's Complete Guide To The M1 Garand And The M1 Carbine* 163 (1999); *see also* Larry L. Ruth, *2 War Baby! Comes Home: The U.S. Caliber .30 Carbine* 575 (R. Blake Stevens ed., 1993). After World War II, Congress saw no problem distributing large numbers of surplus M-1 carbines to the general public through the Civilian Marksmanship Program, and they remain highly popular among civilian shooters today.

The natural successor to the M-1 carbine was the 1963 AR-15 platform, which has become the most popular rifle among civilians in American history. Nicholas J. Johnson, et al., *Firearms Law and The Second Amendment, Regulation, Rights, and Policy* 12, 809 (2012). This popular platform has dominated the American civilian firearms market since, and it forms the basis of the firearms that the Appellees categorically ban in Connecticut.

This long history of firearms development in the United States demonstrates two critical points. First, quick-firing, multi-shot, high-capacity firearms are not in any way unusual. Both the Founding Fathers and the framers of the Fourteenth Amendment were well aware of them, as were the state governments at the time of the Fourteenth Amendment's adoption. These firearms have proliferated throughout the United States in great numbers for centuries[10], and have been specifically advertised and used for self-defense and other lawful purposes.[11]

Second, absent from the history of firearms development in the United States is any effort to categorically ban the possession of multi-shot, semi-automatic firearms, or any entire class of commonly-owned firearms, because of their capacity to fire a certain number of shots quickly or without reloading. The Appellees – after undoubtedly engaging in much research and retaining two history experts[12] – failed to produce a single law until well into the 20th Century demonstrating any sort of ban on a semi-automatic firearm because of its capacity.

---

[10] The AR-15 itself was introduced to the civilian market over 60 years ago, and was legal in Connecticut for decades.

[11] Two historical examples suffice. In 1865, two Civil War veterans mining borax in the Rocky Mountains were attacked by 40 Indian warriors, but the veterans survived due to their ownership of Henry repeating rifles. Harold F. Williamson, *Winchester: The Gun That Won The West*, 459-60 (1952). In 1863, a certain James E. Wilson defended his family from seven armed attackers with a Henry repeating rifle, killing the seven men with eight shots. *Id*. at 456.

[12] The Appellees proffered Professors Randolph Roth and Saul Cornell as historical experts.

Thus, neither the Appellees nor their history experts could locate a single law that serves as a relevant analogue to Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j.

The Appellees and the district court answered this historical tradition with two gambits. First, they both turned a blind eye to both the history of firearms development and the lack of any statutory bans on semi-automatic firearms, which is dispositive of this case as discussed previously. Second, they argue that Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j attempts to address a distinctly "modern societal problem" – mass shootings carried out with "assault weapons." *NAGR*, 2023 WL 4975979 at *29. They then seek to justify Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j by comparing them to bans on "new and dangerous weapon technology" such as folding knives, dirk knives, and bowie knives. *NAGR*, 2023 WL 4975979 at *31.

Their gambit sorely misses the mark. First, Americans have been well aware of the potential for mass murder since prior to the Founding Era. It is not a unique modern problem. Every American school child learns the story of the Pilgrims going to church with their weapons to guard against Indian attacks. This threat endured beyond the Founding Era. JA-1165 – JA 1166.  The solution was never to disarm the populace. To the contrary, the historical solution required every man to bring his arms with him to public meetings, including church. *See Heller*, 554 U.S. at 601; Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to*

*Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 148 (2007) (collecting statutes). Thus, the district court's finding that mass shootings are a distinctly modern societal problem is erroneous.

Second, the Appellees' own expert – Professor Randolph Roth – provided an affidavit in which he described rising homicide rates in the late antebellum period and the Reconstruction era. JA-1152 – JA-1159. Professor Roth opined that "the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading… made the homicide problem worse." JA-1152 – JA-1153 .

Taken at its face value, the Appellees' own expert concedes that new advances in semi-automatic firearm technology caused an increase in homicides. Yet, the Appellees and the district court still could not locate any widespread legislative response to this crime problem that involved categorically banning the possession of an entire category of bearable arms. It is telling that the district court and the Appellees did not seek to use laws from Massachusetts banning stun guns or from New York City or Washington, DC effectively banning handguns as analogies to Connecticut's law banning "assault weapons." Clearly those laws are not chronologically analogous. But more importantly, those laws were found to be unconstitutional. At best, they could only muster laws banning the concealed

carrying of pistols. *NAGR*, 2023 WL 4975979 at *32-33. Those laws, however, suffered a limited and constitutionally-troubled tenure.

Kentucky passed the first concealed carry law in 1813, but the Kentucky Supreme Court invalidated it as unconstitutional in 1822. *Bliss v. Commonwealth*, 12 Ky. 90 (1822). There can be no apt analogy in the circular logic of citing an old unconstitutional law to try to support the argument that a new law is constitutional.

Similarly, Louisiana passed a similar law in 1813 that the Louisiana Supreme Court upheld because it did not ban the open carrying of firearms. *State v. Chandler*, 5 La. Ann. 489, 489–90 (La. 1850). Indiana's 1831 law prohibiting concealed carry escaped meaningful constitutional scrutiny and was upheld in a summary decision that recognized the right for travelers to carry guns. *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833). Georgia's 1837 prohibition on concealed carrying resulted in *Nunn v. State*, 1 Ga. 243 (1846) recognizing a right to open carry.

Each of these laws and other laws from the era did not prohibit possession or carrying of any class of firearms. including the multi-shot rifles and pistols that were proliferating in that era. They only regulated the method of carrying in public. Thus, such laws are inapt analogues for Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j.

Third, the district court and Appellees' comparison of a categorical prohibition on the possession of modern sporting firearms to folding knives, dirk knives, and bowie knives stretches *Bruen*'s "representative historical *analogue*" test well past its breaking point. Despite invitations to do so in both *McDonald* and *Bruen*, the Supreme Court has never looked to knife laws as a relevant analogue for a ban on firearms. Sound logic supports rejecting this analogy. Knives are distinctly different than firearms and appear to have been subject to their own historical tradition. Moreover, the number of states that banned the possession of certain knives were a distinct minority, falling fall short of creating "the well-established and representative historical *analogue*" necessary for the Appellees to prevail under *Bruen*. *NAGR*, 2023 WL 4975979 at *31 (citing six state knife bans between 1813 and 1838). In sum, knives were not a sufficient analogue for restricting handguns in New York and Chicago in both *McDonald* and *Heller*. They also are not a sufficient analogue to ban the mere possession of modern sporting firearms in Connecticut.

The analogy to knives encounters an additional methodological problem under *Bruen*. *Bruen* instructed courts to examine "how and why" regulations "burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2133. Central to this inquiry is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is

comparably justified." *Id.* Most knife bans in the antebellum era were far narrower in scope than Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j, primarily banning the carrying of certain knives while concealed, not outright prohibiting their possession. In that sense, these bans are more analogous to place and manner restrictions on carrying handguns in public, imposing a distinctly different burden on the right of armed self-defense than Connecticut's complete prohibition on the possession of the most popular rifle in American history.

Finally, if the knife bans from the antebellum era demonstrate one thing, it is that panic is a poor formula for interpreting the Second Amendment. When Colonel Jim Bowie popularized the use of the Bowie knife at the "Sandbar Fight," he set off a nationwide press campaign sensationalizing its use and generating breathless newspaper coverage over each tragedy associated with its use. *See* David B. Kopel et. al., *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 179-181 (2013). Not much has changed today with respect to modern sporting firearms. Every time someone who does not abide by the law uses one to commit a crime, it receives sensationalized national media coverage that takes no account of the millions of law-abiding Americans who own modern sporting firearms for self-defense and other lawful purposes. Like panicked bans on knife possession that swept up the carrying of pistols in the same swoop, outright prohibitions on the possession of modern sporting firearms are constitutionally

infirm and cannot withstand a faithful Second Amendment analysis that does not engage in stealth means-end scrutiny forbidden by *Bruen*.

For these reasons, the Court should find that the district court erred in holding that the Appellants did not sufficiently show that the Appellees are not likely to carry their historical burden.

## V. The Remaining Equitable Factors Favor The Appellants.

### A. Irreparable harm

Courts presume that a movant has established irreparable harm when the movant's claim involves the alleged deprivation of a constitutional right. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). There is no question that the Appellants are entitled to this presumption.

They claim a constitutional right to keep and bear modern sporting arms for lawful purposes and allege that Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j deprives them of their Second Amendment right to obtain, keep, and bear arms in common use for lawful purposes, including self-defense. The Supreme Court has twice established that the Second Amendment's text protects individuals' right to keep and bear arms in case of confrontation. *Bruen*, 142 S.Ct. at 2127; *Heller*, 554 U.S. at 592. *Bruen* solidifies *Heller*'s holding that the Second Amendment's protections are not limited "only to those arms in existence in the 18th century." *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation

marks and alterations omitted). Instead, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 2132 (quoting *Heller*, 554 U.S. at 582) (internal quotation marks omitted). Thus, the Second Amendment presumptively protects the Appellants' right to possess and bear modern sporting arms – including AR-15 platform firearms – unless the Appellees "affirmatively prove that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

The Appellees have never carried their burden under *Bruen*'s historical analysis, and they fail now. Connecticut's criminalization of the possession, carrying, and sale of modern sporting firearms deprives the Appellants of their constitutional right to keep and bear "bearable arms." *Bruen* at 2132. Thus, the Appellants are entitled to a presumption of irreparable harm based on their alleged deprivation of their constitutional rights. *Clapper*, 804 F.3d at 622.

The Appellants clearly meet the standard for preliminary relief notwithstanding the presumption of irreparable harm. The Appellants seek to obtain, possess, and bear modern sporting firearms for lawful purposes, including self-defense. Every day that passes that they cannot do so without facing criminal consequences is an injury that money cannot remedy. In fact, the Appellants seek no monetary remedy, nor is such a remedy likely available to them. Declaratory

and injunctive relief is their only available remedy. They should not be required to wait for it, especially in a case where the Appellees bear the burden of proving the constitutionality of their conduct – a burden they have not met.

### B. Public interest and the balancing of the equities.

The Second Amendment is not a "second class right" and the Supreme Court has clearly established that lower courts shall no longer treat it as such. *McDonald,* 561 U.S. at 780. Courts can no longer interest-balance away Second Amendment rights. The Supreme Court stated in *Bruen* that "[t]he Second Amendment is the *very product* of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Bruen*, 142 S.Ct. at 2131 (cleaned up). Thus, it "demands" courts' "unqualified deference" to the Appellants' Second Amendment rights. *Id*. at 2131.

The Appellees cannot shoehorn the commonly used firearms at issue in this action into the "dangerous and unusual" exception. *Cuomo* has already definitively settled that question. All that remains is for the Court to apply the *Bruen* standard and protect the Plaintiffs from ongoing, and imminent irreparable harm by reversing the district court and granting a preliminary injunction.

Since the Appellants have shown that the Appellees are highly unlikely to carry their burden in the face of *Bruen* and *Cuomo*, preliminary injunctive relief would preserve the status quo and protect and uphold the public interest articulated

in the Second Amendment. At the same time, it would not disturb other Connecticut laws that, for example, screen who may purchase or possess a firearm. Thus, the public interest favors preliminary relief in this case.

For the same reasons, the balancing of the equities weigh in the Appellants' favor. *SAM Party of New York v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021) ("In a suit against the government, balancing of the equities merges into [a court's] consideration of the public interest").

## CONCLUSION

For the foregoing reasons, the Appellants respectfully request that the Court reverse the district court's denial of a preliminary injunction enjoining Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j and remand this case with instructions directing the district court to enter an injunction against the Appellees enjoining them from enforcing Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j.

Dated: February 1, 2024                    Respectfully Submitted,

    *//s//   Doug Dubitsky*
Doug Dubitsky, Esq.
LAW OFFICES OF DOUG DUBITSKY
P.O. Box 70
North Windham, CT 06256
Telephone: 860.933.9495
Email: doug@lawyer.com

    *//s//  Craig C. Fishbein*
Craig C. Fishbein, Esq.
FISHBEIN LAW FIRM, LLC
P.O. Box 363
Wallingford, Connecticut 06492
Telephone: 203.265.2895
E-mail: ccf@fishbeinlaw.com

    *//s//  Cameron L. Atkinson*
Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1 because it contains 13,989 words, excluding the parts of the brief exempted by Fed. R. App. P. 32, as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32 and the typestyle requirements of Fed. R. App. P. 32 because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.


Dated: February 1, 2024

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson

## CERTIFICATE OF SERVICE

I hereby certify that, on February 1, 2024, an electronic copy of the foregoing Brief Of The Plaintiffs-Appellants was filed with the Clerk of the Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson

**SPECIAL APPENDIX**

# CASE NO. 23-1344

# <u>SPECIAL APPENDIX TABLE OF CONTENTS</u>

Order Denying Amended Motion For Preliminary Injunction 8/28/2023 (Dkt. 65)……………………………………………………………………SPA-1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

EDDIE GRANT, JR., *et al.*

     *Plaintiffs*,

     *v.*

EDWARD M. LAMONT, JR., in his official capacity, *et al.*,

     *Defendants*.

Civil No. 3:22-cv-01223 (JBA)

August 28, 2023

---

**RULING ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs move for a preliminary injunction against Defendants in their official capacities that enjoins them from enforcing Conn. Gen. Stat. §§ 53-202a-f, 53-202h-j, and Conn. Public Act No. 23-53, § 23 (the "Challenged Statutes") (Pls.' Mem. for Prelim. Inj. [Doc. # 51]), arguing that the Challenged Statutes infringe on their Second Amendment right to keep and bear arms as articulated by *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (Jun. 23, 2022). Defendants argue *inter alia* that Plaintiffs cannot show a likelihood of success on the merits because the weapons Plaintiffs seek to possess are not protected by the Second Amendment and that the Challenged Statutes are consistent with this nation's tradition and history of firearm regulation. (Defs.' Opp'n to Mot. for Prelim. Inj. [Doc. # 59].) Based on this Court's prior ruling on the preliminary injunction motion in *National Ass'n for Gun Rights, et al, v. Lamont*, 3:22-1118(JBA), [Doc. # 85] (Aug. 3, 2023) ("*NAGR* PI Ruling") and for the reasons set forth below, the motion is denied.[1]

---

[1] Plaintiffs' motion to for leave to file excess pages [Doc. # 61] is granted *nunc pro tunc,* but Plaintiffs are reminded that any motion to depart from the page limit requirements is to be filed "at least seven (7) days before the deadline for the filing of the memorandum at issue," and a motion for permission not in compliance with the rule will "ordinarily be denied".

1

## I.   Background

### A.   Challenged Statutes

Conn. Gen. Stat. §§ 53-202a-f and Conn. Gen. Stat. §§ 53-202h-j restrict ownership of certain categories of firearms categorized as "assault weapons", which the statute defines both by naming specific firearms and by outlining categories of firearms with certain features that qualify. *Id.* The possession, sale, and transfer of those firearms is prohibited, and violation of the statute is a Class D felony punishable by a mandatory 1-year sentence, with a maximum of 5 years incarceration. Conn. Gen. Stat. § 53-202c(a); Conn. Gen. Stat. § 53a-35a(8). Distributing, transporting, importing, stocking for sale, advertising for sale, or gifting an assault weapon is a Class C felony, carrying a mandatory minimum of two years incarceration with a maximum of up to 10 years. Conn. Gen. Stat. § 53-202b(a)(1); Conn. Gen. Stat. § 53a-35a(7).

Previously, the statutes regulated only pistols, rifles, and shotguns; the term "other firearms" was commonly used to refer to weapons that did not meet the Connecticut statutory definition of either a pistol, a rifle, or a shotgun, and therefore did not qualify as an assault weapon. (Pls.' Mem. at 5.) "Others" often use "pistol braces", which attach to a person's forearm to provide stability and are visually similar to shoulder stocks but which manufacturers claim are not meant to allow for firing from the shoulder. (*Id.*) On January 31, 2023, the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) published a rule clarifying that firearms equipped with "stabilizing braces" (also referred to as "wrist braces" or "pistol braces") are now classified either as "rifles" or "short-barreled rifles" (depending on the length of the barrel) under federal law. (TRO Order at 2.) Individuals

---

D. Conn. Loc. R. 7. Further motions to depart from the page limits set in Rule 7 that are not filed in advance will not be considered absent extraordinary circumstances, and in the future, pages in excess of the page limit will not be considered by the Court.

owning these firearms may keep them under the ATF's new rule but must register them with the ATF; however, the Department of Justice announced in an online public information session held on January 31, 2023 that ATF would not accept registrations from Connecticut residents because it viewed the previously categorized "others" as now meeting the definition of "assault weapons" under Connecticut law because of the ATF reclassification of such "others" as being types of rifles. (Pl.'s Mot. at 7.) However, on February 8, 2023, the Connecticut Department of Emergency Services and Public Protection's Special Licensing and Firearms Unit released an official memorandum clarifying that despite the change in the ATF classification, it did not consider "others" to be assault weapons covered by the ban under Connecticut law. (Order Denying TRO [Doc. # 41] at 3-4.)

The classification of Connecticut "others" under Connecticut law changed on June 6, 2023, when Defendant Lamont signed into law Conn. Public Act No. 23-53, expanding the definition of "assault weapon" to include many of the weapons that were formerly defined as "others" if they meet the following criteria:

> (G) Any semiautomatic firearm other than a pistol, revolver, rifle or shotgun, regardless of whether such firearm is listed in subparagraphs (A) to (D), inclusive, of this subdivision, and regardless of the date such firearm was produced, that has at least one of the following:
>
> > (i) Any grip of the weapon, including a pistol grip, a thumbhole stock or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;
> >
> > (ii) An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip;
> >
> > (iii) A fixed magazine with the ability to accept more than ten rounds;
> >
> > (iv) A flash suppressor or silencer, or a threaded barrel capable of accepting a flash suppressor or silencer;
> >
> > (v) A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel;

(vi) A second hand grip; or

(vii) An arm brace or other stabilizing brace that could allow such firearm to be fired from the shoulder, with or without a strap designed to attach to an individual's arm;

(H) Any semiautomatic firearm that meets the criteria set forth in subdivision (3) or (4) of subsection (a) of section 53-202a of the general statutes, revision of 1958, revised to January 1, 2013, that was legally manufactured prior to September 13, 1994; or

(I) A combination of parts designed or intended to convert a firearm into an assault weapon, as defined in any provision of subparagraph (G) or (H) of this subdivision, or any combination of parts from which an assault weapon, as defined in any provision of subparagraph (G) or (H) of this subdivision, may be assembled if those parts are in the possession or under the control of the same person;

*See* Conn. Gen. Stat. §§ 53-202a. The newly added "other" firearms that now qualify as assault weapons are called "2023 assault weapon[s]" in the statute. *Id.* at Section 53-202a(10).

## B.   Plaintiffs

### 1.   Connecticut Citizens Defense League

Plaintiff Connecticut Citizens Defense League, Inc. ("CCDL") is a non-profit whose mission is to "preserve the effectiveness of the Second Amendment through legislative and grassroots advocacy, outreach, education, research, publication, legal action, and programs focused on the constitutional right to keep and bear arms." (Second Amend. Compl. ¶ 32) It alleges that it brings this action on behalf of its members, supporters, and similarly situated members of the public, and that it has "diverted, and continues to divert, significant time, money, effort, and resources" that were "otherwise reserved for different institutional functions and purposes" to address the Challenged Statutes. (*Id.* ¶¶ 32-34.)

### 2.   Second Amendment Foundation

Second Amendment Foundation ("SAF") is a nonprofit headquartered in Washington which maintains over 700,000 "members and supporters nationwide, including many members in Connecticut." (*Id.* ¶ 37.) SAF's purpose is "education, research, publishing, and

legal action focusing on the constitutional right to privately own and possess firearms under the Second Amendment, and the consequences of gun control." (Id. ¶ 38.) It alleges that the "Court's interpretation of the Second Amendment directly impacts SAF's organizational interests" and those of its members and supporters in Connecticut, on whose behalf it brings this suit. (Id.) According to SAF, "individual Connecticut members have been adversely and directly harmed and injured by Defendants' enforcement of the statutory prohibition on the sale, transfer, and ownership" of assault weapons. (Id.) SAF has dedicated "resources that would otherwise be available for other purposes" to engage in this lawsuit. (Id. ¶ 39.)

### 3.   Eddie Grant Jr.

Plaintiff Eddie Grant Jr. is a Meriden, Connecticut resident and retired Connecticut Department of Corrections officer. (Pls.' Mem. in Support of Prelim. Inj. [Doc. # 52-1] at 8.) He has a Connecticut pistol permit, which he has had for over 30 years. (Id.) He has also been trained on the safe and effective use of AR-15-platform firearms as part of his Corrections officer training and was "repeatedly qualified as a safe and effective user" while working there. (Id. at 9.) He "seeks to lawfully purchase and possess an AR-15-platform firearm for defensive purposes." (Id. at 9.) His desire stems in part from his background as an African American man whose parents witnessed the struggle for civil rights in the Deep South, and his understanding that "racially motivated attacks were repelled in large part by the private ownership of effective defensive firearms as African-Americans bravely defended their lives and their right to equality under the rights guaranteed by the Constitution." (Id. at 9-10.)

### 4.   Jennifer Hamilton

Plaintiff Jennifer Hamilton is a Nuisance Wildlife Control Operator working for the Connecticut Department of Energy and Environmental Protection; she is also a firearms instructor. (Id. at 10-11.) Hamilton lives in Enfield, Connecticut, and has pistol permits for both Connecticut and Massachusetts. (Id. at 11.) Hamilton "seeks, and intends, to lawfully

purchase one or more firearms prohibited in Conn. Gen. Stat. § 53-202a – likely an AR-15-platform firearm – because of their adaptability and effectiveness for defensive purposes," as well as a firearm "with a telescopic stock in order to adjust the firearm's length of pull to fit her specific body type and size, which will, in turn, give her greater control over the firearm and improve her accuracy with it." (*Id.* at 11.) Hamilton, who has been the victim of domestic violence, states in her affidavit that she relies on defensive firearms to protect herself and her family from threats and attacks. (*Id.*)

### 5.   Michael Stiefel

Plaintiff Michael Stiefel is a retired Connecticut Department of Corrections officer who has held a Connecticut pistol permit for over thirty years. (*Id.* at 12.) During his career, he was trained on the safe and effective use of AR-15 platform firearms and qualified annually as a safe and effective user of AR-15 platform firearms. (*Id.* at 12-13.) He "seeks, and intends, to lawfully purchase and possess an AR-15-platform firearm for defensive purposes." (*Id.* at 13.)

All three individual Plaintiffs submit in their affidavits that they are CCDL and SAF members, that they meet "all federal and state requirements to lawfully acquire and possess firearms, ammunition, and magazines," that they have Connecticut pistol permits, and that they own firearms categorized as 2023 assault weapons and have taken active steps to attempt to acquire additional 2023 assault weapons. (Pls.' Mem. at 8-12.)

### C.   Defendants

Defendants are Commissioner of Connecticut's Department of Emergency Services and Public Protection ("DESPP") James Rovella, and Connecticut's State's Attorneys Walcott,

Doyle, and Narducci.[2] (*See* Second Amend. Compl). All Defendants are sued in their official capacities.

### D. Procedural History

Plaintiffs filed their initial complaint on September 29, 2022, and filed their first amended complaint on October 24, 2022. On February 3, 2023, Plaintiffs filed an emergency motion for temporary restraining order and preliminary injunction ("TRO") barring enforcement of Conn. Gen. Stat. §§ 53-202a, 53-202b, and 53-202c ("the Assault Weapons Ban"), and, in the alternative, sought to enjoin Defendants from treating firearms "that have been considered legal 'others' under Connecticut law as 'assault weapons' until the Court can determine the merits of their application for a preliminary injunction." [Doc. # 28]. On February 8, 2023, Defendants filed a motion to dismiss based on 11th Amendment immunity, [Doc. # 29], which was granted. (*See* [Doc. # 63].) The TRO was dismissed for lack of standing on June 1, 2023, based on a lack of evidence that Plaintiffs were subject to a credible and imminent threat of enforcement of the ATF rule against them. [Doc. # 41]. After Governor Lamont signed Conn. Public Act No. 23-53 into law on June 6, 2023, the Court permitted Plaintiffs to file a Second Amended Complaint and an amended motion for preliminary injunction to add challenges to the newly defined categories of assault weapons.

## II. Legal Standard

To obtain a preliminary injunction, "the movant has to demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction. The movant also must show that the balance of equities tips in his or her favor." *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).[3] When

---

[2] Defendants Lamont, Griffin, Kelley, Applegate, Corradino, Shannon, Gailor, Ferencek, Watson, Gedansky, Platt, and Mahoney were dismissed from the suit. *See* [Doc. # 63].
[3] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

"the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction will only be granted if both irreparable harm and a likelihood of success on the merits are shown. *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir. 1989).

This Court held in *NAGR* that an injunction seeking to enjoin enforcement of Connecticut's assault weapon ban was a prohibitory one, rather than a mandatory one. *NAGR* PI Ruling at 13. Defendants urge the Court to find in this case that the injunction is a mandatory one because Plaintiffs "seek to enjoin enforcement of an in-force statute that has been upheld as constitutional" in *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) (Defs.' Opp'n at 7.) Defendants cite to *Consumer Directed Pers. Assistance Ass'n of New York State, Inc. v. Zucker*, No. 118CV746FJSCFH, 2018 WL 3579860, at *2 (N.D.N.Y. July 25, 2018), in which the district court interpreted the "status quo" as being the time that the statute plaintiffs sought to enjoin enforcement of came into effect; however, *Consumer Directed Pers. Assistance Ass'n* failed to address the Second Circuit's *Mastrovincenzo v. City of New York*, 435 F.3d. 78, 90 (2d Cir. 2006) finding that enjoining enforcement of a statute is prohibitory, rather than mandatory. *Pankos Diner Corp. v. Nassau Cnty. Legislature*, 321 F. Supp. 2d 520, 523 (E.D.N.Y. 2003), suffers from a similar flaw.[4] Thus, the Court finds that absent any demonstration that granting the injunction would grant Plaintiffs all the relief sought, it is of a prohibitory injunction rather than a mandatory one.

---

[4] Defendants' arguments might have more weight if they were distinguishing *Mastrovincenzo* on the basis that the statute they were defending had been found constitutional, thus establishing a status quo of enforcement, by a case whose holding was still binding; however, *Cuomo's* ultimate holding that the Challenged Statutes were constitutional was premised primarily on the means-end analysis rejected by *Bruen,* and further was decided before the Challenged Statutes were amended in June of 2023.

### III.     Discussion

In *NAGR,* the Court ruled on a motion for a preliminary injunction involving the same statute being challenged here, but which challenged only the firearms that were banned prior to the June 6, 2023 amendment. The Court adopts its prior holding in *NAGR* as to the analytical framework that now applies to Second Amendment challenges post-*Bruen* and the burdens borne by Plaintiffs and Defendants under that analytical framework. Thus, the only questions remaining to be decided on this motion are whether the Plaintiffs have (1) come forward with different or additional evidence that would warrant a different result in this case as to the pre-amendment categories of firearms, and (2) whether 2023 assault weapons may be constitutionally banned.

### A.     Standard for Evaluating Second Amendment Claims

Under *Heller* and *Bruen,* Plaintiffs "bear the burden of producing evidence that the specific firearms they seek to use and possess are in common use for self-defense, that the people possessing them are typically law-abiding citizens, and that the purposes for which the firearms are typically possessed are lawful ones." *NAGR* PI Ruling at 33. "To the extent that Defendants seek to demonstrate that the regulated firearms are instead dangerous and unusual weapons that are not protected by the Second Amendment, Defendants must demonstrate either that the weapons are unusually dangerous, or that they are not commonly used or possessed for self-defense." *Id.* at 34. "If Plaintiffs establish each of those elements, the burden shifts to Defendants to justify their regulation based on Bruen's requirements for establishing relevant similarity to history and tradition." *Id.* at 36.

### B.     Facial Challenges

This Court recently held that the standard for bringing facial challenges is that plaintiffs must show "that no set of circumstances exists" under which the Challenged Statutes would be constitutional based on the standard established in *United States v. Salerno*, 481 U.S. 739, 745 (1987) and reaffirmed as the governing standard in this Circuit by

*Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023). *See NAGR* PI Ruling at 13-16. However, the Supreme Court has also cautioned that "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid[,]" *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984), and the Second Circuit followed this principle in *New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265, 269 (2d Cir. 2015) by finding certain provisions of New York and Connecticut's statutory scheme regulating firearms to be unconstitutional (for example, Connecticut's ban on the Remington Tactical 7615 pump action rifle) and invalidating only those specific provisions while leaving the larger regulatory scheme intact. Thus, the Court will determine for each challenged portion of the statutes whether Plaintiffs have established that there is no set of circumstances under which the bans of the various types of firearms standing alone and in conjunction with their accessories, and of large capacity magazines, could be constitutional.

     **C.**     **Merits of Plaintiffs' Second Amendment Challenge**

          **1.**     **Whether Assault Weapons are Commonly Used for Self-Defense, and Typically Possessed by Law Abiding Citizens for Lawful Purposes, or are Dangerous and Unusual**

Plaintiffs argue that there is "absolutely no question that the Plaintiffs meet the first requirement" under *Bruen* that their proposed conduct of keeping and bearing assault weapons for the purpose of self-defense "falls within the protections of the Second Amendment's text." (Pls.' Mem. at 19.) However, in *NAGR,* this Court held that showing mere statistical numerosity is insufficient to show that a weapon is in "common use for self-defense," and that there is no evidence that assault weapons are commonly used for that

purpose; none of the evidence presented by Plaintiffs here gives the Court a basis for finding otherwise. *See NAGR* PI Ruling at 26-33.[5]

Although the classification of "others" as 2023 assault weapons was not challenged as part of the preliminary injunction motion brought in *NAGR*, neither side argues that there are any significant differences in the key functionality between the 2023 assault weapons and the more limited group of firearms classified as assault weapons prior to the June 6, 2023 amendment; Defendants take the position that 2023 assault weapons are "functionally similar to firearms captured under the original ban," (Defs.' Opp'n at 6), and Plaintiffs posit that the "key distinction" between 2023 assault weapons and pre-2023 assault weapons is that 2023 assault weapons often use "pistol braces" (Pls.' Mem. at 5). While Plaintiffs use the phrase "modern sporting rifles" and "others" separately on several occasions, they also acknowledge that the 2023 assault weapons being criminalized are all semiautomatic, and Plaintiff Grant described owning an "other" in an "AR15 configuration", from which the Court infers that there is significant overlap in the key features. (Defs.' Opp'n at 48) (quoting Plaintiff Grant's Deposition Tr., Defs.' Ex. I.). Detective Warenda also identifies several examples of "others" that are "AR-15 type", (Wardenda Aff. ¶¶ 67-69) and submits that assault weapons—without distinguishing between pre-2023 categories and the new 2023 assault weapons—are a subcategory of all semiautomatic weapons, the majority of which are essentially civilian versions of military weapons. (Warenda Aff. ¶¶ 27, 19.) Plaintiffs also provide no evidence specific to common use of the 2023 assault weapons category besides

---

[5] Defendants also note that Thompson submachine guns, or "Tommy Guns", were "all too common" before Congress passed the National Firearms Act of 1934, but that *Heller* nevertheless affirmed the holding of *United States v. Miller*, 307 U.S. 174, 179 (1939) that the National Firearms Act banning Tommy Guns was constitutional because certain weapons were "not eligible for Second Amendment protection." *Heller's* affirmation of *Miller* provides yet another reason to interpret "common use" as requiring more than a simple showing that many people own the firearm in question.

the statistics of how many Connecticut "others" are registered with the state and the individual testimony of each Plaintiff regarding how they use their 2023 assault weapon, neither of which shows whether the firearms are commonly used for self-defense.

Thus, absent any specific evidence that 2023 assault weapons are commonly used for self-defense where pre-June 2023 assault weapons were not, Plaintiffs have failed to meet their burden here as well. Plaintiffs are correct that the Second Amendment "provides them with the freedom to choose a firearm. . . that is not 'dangerous and unusual'" and that is normally used for self-defense (Pls.' Reply at 14); however, until they submit evidence that supports a finding that the assault weapons in the Challenged Statutes meet those requirements, they cannot show a likelihood of success on the merits of their Second Amendment claim.

<strong>2.      Whether the Firearm Regulations are Consistent with the Nation's Historical Tradition of Firearm Regulation</strong>

Plaintiffs' failure to produce evidence sufficient to show common use for self-defense of the assault weapons is fatal to their motion; however, the Court also finds that as in *NAGR,* the Challenged Statutes are consistent with the nation's history and tradition of firearm regulation. There, this Court concluded as a matter of law that the Challenged Statutes were enacted for the same reason as historical statutes regulating the method of carry and the types of weapons people could carry based on the new and dangerous characteristics of developing weapons technology: "to respond to growing rates of violence and lethality caused by modern innovations in technology and changing patterns of human behavior by regulating the particular kinds of weapons or modes of carry that were being most often employed by those causing the violence, while leaving open alternative avenues for lawful possession of firearms for purposes of self-defense." *NAGR* PI Ruling at 66. Because the Challenged Statutes ban "only a subset of each category of firearms that possess new and dangerous characteristics that make them susceptible to abuse by non-law abiding citizens

wielding them for unlawful purposes," the Court also found that the Challenged Statutes impose "a comparable burden to the regulations on Bowie knives, percussion cap pistols, and other dangerous or concealed weapons[.]" *Id.*

A number of other district courts have reached the same conclusion about the purpose for which early firearm and weapons regulations were enacted. *See, e.g., Oregon Firearms Fed'n v. Kotek Oregon All. for Gun Safety*, No. 2:22-CV-01815-IM, 2023 WL 4541027, at *46 (D. Or. July 14, 2023) (holding that "[t]hroughout this Nation's history, new technologies have led to the creation of particularly dangerous weapons," which "became tied with violence and criminality" as they became more common, and that the statutes being challenged shared the same driving motivation of "address[ing] the features of those weapons that made them particularly dangerous to public safety" as historical analogues); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, No. CV 22-951-RGA, 2023 WL 2655150, at *13 (D. Del. Mar. 27, 2023) (finding that the statutes being challenged were comparably justified to historical analogues that "were enacted in response to pressing public safety concerns regarding weapons determined to be dangerous.") Plaintiffs offer no new evidence that undermines or refutes the Court's prior analysis of this Nation's history, or its ultimate holding. Thus, the Court will not repeat the same historical analysis to hold that even if Plaintiffs had demonstrated that assault weapons in the Challenged Statutes were commonly used for self-defense, they cannot show a likelihood of success on the merits because bans on certain semiautomatic weapons are consistent with and justified by this nation's history and tradition of firearm regulation.

## IV.   Conclusion

Plaintiffs' Motion for a Preliminary Injunction is DENIED.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 28th day of August, 2023

14