# 23-1344

## United States Court of Appeals
## for the Second Circuit

◆

EDDIE GRANT, JR.; JENNIFER HAMILTON; MICHAEL STIEFEL; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs-Appellants,*

v.

JAMES ROVELLA; JOHN P. DOYLE, JR.; SHARMESE L. WALCOTT; PAUL J. NARDUCCI,

*Defendants-Appellees,*

and

Edward Lamont, Jr.; Patrick Griffin; Margaret E. Kelly; David R. Applegate; Joseph T. Corradino; David R. Shannon; Michael A. Gailor; Christian Watson; Paul J. Ferencek; Matthew C. Gedansky; Maureen Platt; Anne F. Mahoney,

*Defendants.*

◆——————◆——————◆

Appeal from the United States District Court
for the District of Connecticut
Case No. 3:22-cv-01223-JAM

◆——————◆

**BRIEF OF *AMICI CURIAE* FIREARMS POLICY COALITION AND FPC ACTION FOUNDATION IN SUPPORT OF PLAINTIFFS-APPELLANTS**

◆——————◆

CODY J. WISNIEWSKI
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
cwi@fpchq.org

JOSEPH G.S. GREENLEE
GREENLEE LAW, PLLC
PO Box 4061
McCall, ID 83638
(208) 271-2494
joseph@greenlee.law
*Counsel of Record*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

Firearms Policy Coalition has no parent corporation, and as a nonstock nonprofit corporation, no publicly held corporation could own any share of its stock.

FPC Action Foundation has no parent corporation, and as a nonstock nonprofit corporation, no publicly held corporation could own any share of its stock.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ................................................................iv

STATEMENT OF *AMICI CURIAE* ..........................................................1

CONSENT TO FILE .............................................................................2

SUMMARY OF ARGUMENT .................................................................3

ARGUMENT ........................................................................................5

    I.   *Heller* held that common arms cannot be banned..........................5

    II.  The district court's "common use" analysis was badly flawed.......9

        A.  Plaintiffs do not have the burden of proving that arms are common; rather, the Second Amendment extends prima facie to all bearable arms. ..........................................................9

        B.  Arms can be banned only if they are *both* dangerous *and* unusual. ..............................................................................10

        C.  The "dangerous and unusual" consideration is part of the historical analysis—not the plain text analysis.........................12

        D.  "Common use" is not limited to self-defense, it includes all lawful purposes. ................................................................13

        E.  The commonality of arms for a lawful purpose, rather than their suitability for that purpose, is dispositive. ......................16

    III. Repeating arms predate the Second Amendment and were embraced by the Founders. .............................................................18

        A.  Repeating arms were invented around 1500. ...........................19

        B.  Repeating arms gained popularity in England during the 17th century, including some with 30-round magazines..........21

        C.  Repeaters were used in America by the mid-1600s and the Founders and Framers embraced them. ...................................25

        D.  Repeating arms became the most popular arms in the 19th century. ............................................................................30

    IV. There are no historical prohibitions on repeating arms. ............37

CONCLUSION ....................................................................................39

CERTIFICATE OF COMPLIANCE.......................................................40

CERTIFICATE OF SERVICE..................................................................41

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State*,
    50 Tenn. 165 (1871) ................................................................. 14

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) ............................................. 7, 8, 11, 17

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ....................................................... *passim*

*Drummond v. Robinson Twp.*,
    9 F.4th 217 (3d Cir. 2021) ..................................................... 15

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ................................................................. 17

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ("*Ezell I*") ............................... 15

*Ezell v. City of Chicago*,
    846 F.3d 888 (7th Cir. 2017) ("*Ezell II*") ............................. 15

*Friedman v. City of Highland Park, Ill.*,
    577 U.S. 447 (2015) ........................................................... 8, 15

*Friedman v. City of Highland Park, Ill.*,
    784 F.3d 406 (7th Cir. 2015) ......................................... 12, 17

*Grant v. Lamont*,
    No. 3:22-cv-01223 (JBA), 2023 WL 5533522
    (D. Conn. Aug. 28, 2023) .............................................. *passim*

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ................................................... 15, 16, 17

*Miller v. Bonta*,
    No. 19-cv-01537 (BEN), 2023 WL 6929336
    (S.D. Cal. Oct. 19, 2023) ........................................................ 11

*Nat'l Ass'n for Gun Rts. v. Lamont*,
No. 3:22-cv-1118 (JBA), 2023 WL 4975979
(D. Conn. Aug. 3, 2023) ............................................................ 9, 10, 16

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) ................................................................... *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ........................................................ 9, 10

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023) .............................................................. 13

*United States v. Miller*,
307 U.S. 174 (1939) ...................................................................... 6, 13

*Virginia v. Black*,
538 U.S. 343 (2003) .......................................................................... 10

*Watson v. Stone*,
148 Fla. 516 (1941) .......................................................................... 38

## Constitutional Provisions

U.S. CONST. amend. I ................................................................. 17, 18

U.S. CONST. amend. II ................................................................. *passim*

## Statutes and Regulations

1893 Fla. Laws 71 ............................................................................ 38

## Other Authorities

*16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM, May 10, 2014 ............... 20

*A New Gun Patent*, ATHENS (TENN.) POST, Feb. 25, 1853 ...................... 32

Antaris, Leonardo M., *In the Beginning: Semi-Automatic Pistols
of the 19th Century*, AMERICAN RIFLEMAN, Jan. 4, 2018 .............. 36, 37

BLACK'S LAW DICTIONARY (6th ed. 1990) ................................................. 10

Bresnan, Andrew L., *The Henry Repeating Rifle*, RAREWINCHESTERS.COM, Aug. 17, 2007 ................................................ 34

Brown, M.L., FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY, 1492–1792 (1980) ............................. 19, 25

Chapel, Charles Edward, GUNS OF THE OLD WEST (1961) ............... 25, 32

Cleveland, H.W.S., HINTS TO RIFLEMEN (1864) ..................................... 34

Demeritt, Dwight, MAINE MADE GUNS & THEIR MAKERS (rev. ed. 1997) ......................................................................................... 35

Dougherty, Martin, SMALL ARMS VISUAL ENCYCLOPEDIA (2011) ...... 22, 36

Dunlap, Jack, AMERICAN BRITISH & CONTINENTAL PEPPERBOX FIREARMS (1964) ...................................................................................... 31

Flayderman, Norm, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES (9th ed. 2007) .... 31, 32, 35, 36

Gallay, Alan, COLONIAL WARS OF NORTH AMERICA, 1512–1763 (2015) ........................................................................................................ 25

Garavaglia, Louis A. & Worman, Charles G., FIREARMS OF THE AMERICAN WEST 1866–1894 (1985) ....................................................... 34

Garry, James B., WEAPONS OF THE LEWIS AND CLARK EXPEDITION (2012) ................................................................................ 28, 29

Gilkerson, William, BOARDERS AWAY II (1993) ....................................... 30

Greener, W.W., THE GUN AND ITS DEVELOPMENT (9th ed. 1910) ........... 19

Kopel, David B. & Greenlee, Joseph G.S., *The Federal Circuits' Second Amendment Doctrines*, 61 ST. LOUIS U. L.J. 193 (2017) .......... 15

Kopel, David B. & Greenlee, Joseph G.S., *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. (forthcoming 2024) .............. 37

Letter from Joseph Belton to the Continental Congress
(Apr. 11, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS,
COMPILED 1774–1789 (1957) ............................................................. 27

Letter from Joseph Belton to the Continental Congress
(July 10, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS,
COMPILED 1774–1789 (1957) ............................................................. 27

Lewis, Meriwether & Clark, William, THE JOURNALS OF THE LEWIS
& CLARK EXPEDITION, vols. 2–8 (Gary Moulton ed., 1986–1993) ........ 29

McClure, Nancy, *Treasures from Our West: Lukens Air Rifle*,
BUFFALO BILL CENTER FOR THE AMERICAN WEST, Aug. 3, 2014 ........... 29

*Model 1892 Rifles and Carbines*, WINCHESTER REPEATING ARMS .......... 35

Mouret, Jean-Noel, PISTOLS AND REVOLVERS (1993) .............................. 37

*Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822 ................ 31

Niles, Samuel, *A Summary Historical Narrative of the Wars in
New England*, *in* MASSACHUSETTS HISTORICAL SOCIETY
COLLECTIONS, 4th ser., vol. 5 (1837) .................................................... 25

*NSSF Releases Most Recent Firearm Production Figures*, NSSF,
Jan. 11, 2024 ................................................................................. 8, 13

Peterson, Harold L., ARMS AND ARMOR IN COLONIAL
AMERICA (1956) ................................................................. 19, 24, 26, 27

Peterson, Harold L., THE TREASURY OF THE GUN (1962) ................. *passim*

Pirkle, Arthur, WINCHESTER LEVER ACTION REPEATING FIREARMS:
THE MODELS OF 1866, 1873 & 1876 (2010) ........................................... 35

Plaster, John, THE HISTORY OF SNIPING AND SHARPSHOOTING (2008) .... 28

Prenderghast, Gerald, REPEATING AND MULTI-FIRE WEAPONS (2018) .... 29

Report of the Continental Congress (May 3, 1777), *in* 7 JOURNALS
OF THE CONTINENTAL CONGRESS 1774–1789 (Worthington
Chauncey Ford ed., 1907) ................................................................... 27

Report of the Continental Congress (May 15, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789 (Worthington Chauncey Ford ed., 1907) ................................................................28

Sawyer, Charles Winthrop, FIREARMS IN AMERICAN HISTORY (1910).....25

*Springfield Armory Museum – Collection Record*, REDISCOV.COM .........36

Supica, Jim, et al., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM (2013).......................................................28, 32, 37

*The Cookson Gun and the Mortimer Pistols*, AMERICAN RIFLEMAN, vol. 63 (Sep. 29, 1917) ...........................................................26

THE DIARY OF SAMUEL PEPYS (Henry B. Wheatley ed., 1893) ...............23

Tilloch, Alexander, THE PHILOSOPHICAL MAGAZINE AND JOURNAL: COMPREHENDING THE VARIOUS BRANCHES OF SCIENCE, THE LIBERAL AND FINE ARTS, GEOLOGY, AGRICULTURE, MANUFACTURES, AND COMMERCE (Richard Taylor ed., 1822) ..................................................31

U.S. NAVY SEAL SNIPER TRAINING PROGRAM (2011).............................36

U.S. Patent No. 8,210................................................................32

Walter, John, RIFLES OF THE WORLD (3d ed. 2006) ................................36

Walton, Clifford, HISTORY OF THE BRITISH STANDING ARMY. A.D. 1660 TO 1700 (1894) ...........................................................23

Williamson, Harold F., WINCHESTER: THE GUN THAT WON THE WEST (1952)...................................................................33

Wilson, R.L., WINCHESTER: AN AMERICAN LEGEND (1991)...............33, 35

Winant, Lewis, FIREARMS CURIOSA (1955)..................................20, 31, 32

Winant, Lewis, PEPPERBOX FIREARMS (1952) ...................................31, 32

## STATEMENT OF *AMICI CURIAE*

**Firearms Policy Coalition (FPC)** is a nonprofit membership organization that works to create a world of maximal human liberty and freedom. It seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms. FPC accomplishes its mission through legislative and grassroots advocacy, legal and historical research, litigation, education, and outreach programs. Since its founding in 2014, FPC has emerged as a leading advocate for individual liberty in state and federal courts, regularly participating as a party or *amicus curiae*.

**FPC Action Foundation (FPCAF)** is a nonprofit organization dedicated to preserving the rights and liberties protected by the Constitution. FPCAF focuses on research, education, and legal efforts to inform the public about the importance of constitutional rights—why they were enshrined in the Constitution and their continuing significance. FPCAF is determined to ensure that the freedoms guaranteed by the Constitution are secured for future generations. FPCAF's research and *amicus curiae* briefs have been relied on by judges and advocates across the nation.

This case concerns *Amici* because it goes to the heart of the natural and fundamental right to armed self-defense.

## CONSENT TO FILE

All parties consented to the filing of this brief.[1]

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund the preparation or submission of this brief. No person other than *Amici* and their members contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The Supreme Court has already held that bans on common arms violate the Second Amendment. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court set forth and applied the test it later expounded in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). First, analyzing the Second Amendment's plain text, the *Heller* Court determined that the Second Amendment extends, prima facie, to all bearable arms. Next, analyzing our nation's historical tradition of firearm regulation, the Court determined that while dangerous and unusual arms may be banned, a ban on common arms violates the Second Amendment. Because handguns are common, the *Heller* Court held the District of Columbia's handgun ban unconstitutional.

Since the *Heller* Court already established and applied the test for arms prohibitions and held that common arms cannot be banned, *Heller*'s holding is binding and there is no need to conduct the analysis anew. Rather, this Court need only determine whether the arms at issue here are common. This Court previously concluded that they are. Indeed, nearly 30,000,000 of the banned arms are in circulation. Supreme Court

precedent therefore requires that Connecticut's ban be held unconstitutional.

The district court failed to follow *Heller*'s holding and committed several errors in its analysis. The court improperly placed the burden on Plaintiffs to prove that the banned arms are protected by the Second Amendment when *Heller* states that all bearable arms are presumptively protected. The court failed to recognize that *Heller* requires an arm to be both dangerous *and* unusual to fall outside the Amendment's protection. The court considered whether the arms are dangerous and unusual in its plain text analysis, while *Heller* made clear that such consideration must occur in the historical analysis. The court considered only whether the arms are used for self-defense without taking other lawful purposes into account. And the court assessed whether the arms are suitable for self-defense rather than whether they are commonly selected for that purpose.

The district court further erred by determining that Connecticut's ban is consistent with an alleged tradition of regulations restricting "new and dangerous characteristics" of "weapons technology." In fact, repeating arms predate the Second Amendment by about three centuries

and semiautomatic firearms existed in the 19th century. Despite continuous technological advancements over hundreds of years and widespread popularity once they became affordable in the 19th century, traditionally, repeating arms were never banned in America.

Because Connecticut bans arms that are common and have historically been protected, the ban violates the Second Amendment.

## ARGUMENT

### I.    *Heller* held that common arms cannot be banned.

The Supreme Court held that bans on common arms violate the Second Amendment in *District of Columbia v. Heller*, 554 U.S. 570 (2008). The *Heller* Court set forth and applied the test later expounded in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, which controls here:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation…. the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.

597 U.S. 1, 17 (2022).

Analyzing "Arms" in the Amendment's plain text, the *Heller* Court determined that "[t]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582.

5

Proceeding to the nation's tradition of firearm regulation, the Court held that common arms are protected and cannot be banned. Historically, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Therefore, "the sorts of weapons protected were those 'in common use at the time.'" *Id.* at 627 (quoting *Miller*, 307 U.S. at 179). As for regulations on particular arms, the Court's extensive historical analysis identified only "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* This traditional regulation "fairly supported" the Court's holding that the Second Amendment protects common arms because common arms are necessarily not dangerous *and unusual*. *Id.*; *see also Bruen*, 597 U.S. at 47 ("Drawing from this historical tradition [of restrictions on 'dangerous and unusual weapons'], we explained [in *Heller*] that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'") (quoting *Heller*, 554 U.S. at 627).

Concluding that the nation's tradition of firearm regulation allows only dangerous and unusual arms to be banned, and that handguns—as "the most popular weapon chosen by Americans," *Heller*, 554 U.S. at 629—are common, *Heller* held that "a complete prohibition of their use is invalid," *id.*

The concurrence in *Caetano v. Massachusetts* later confirmed this approach: "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." 577 U.S. 411, 420 (2016) (Alito, J., joined by Thomas, J., concurring).

Justice Thomas, who authored the *Bruen* opinion, joined by Justice Scalia, who authored the *Heller* opinion, provided additional confirmation of this application of the Court's test in a dissent from a denial of certiorari:

> *Heller* asks whether the law bans types of firearms commonly used for a lawful purpose…. Roughly five million Americans own AR-style semiautomatic rifles. The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons.

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 447, 136 S. Ct. 447, 449 (2015) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) (citations omitted) (emphasis added).

Thus, for arms prohibitions, "the pertinent Second Amendment inquiry is whether [the arms] are commonly possessed by law-abiding citizens for lawful purposes today."[2] *Caetano*, 577 U.S. at 420. (Alito, J., joined by Thomas, J., concurring) (emphasis omitted).

A recent report determined that there have been 28,144,000 "assault rifles," akin to those that Connecticut bans, "in circulation since 1990." *NSSF Releases Most Recent Firearm Production Figures*, NSSF, Jan. 11, 2024 (parenthetical omitted).[3] Thus, as this Court previously found, "assault weapons … are 'in common use' as that term was used in *Heller*." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242,

---

[2] Given that "dangerous and unusual" is a conjunctive test, commonality is enough to establish that a particular arms ban is unconstitutional. Only when an arm is uncommon does a court need to look to dangerousness—a need not present in this case.

[3] https://www.nssf.org/articles/nssf-releases-most-recent-firearm-production-figures-2024/ (last visited Feb. 7, 2024).

255 (2d Cir. 2015). Therefore, "a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629.

## II. The district court's "common use" analysis was badly flawed.

### A. Plaintiffs do not have the burden of proving that arms are common; rather, the Second Amendment extends prima facie to all bearable arms.

According to the district court, "Plaintiffs 'bear the burden of producing evidence that the specific firearms they seek to use and possess are in common use for self-defense, that the people possessing them are typically law-abiding citizens, and that the purposes for which the firearms are typically possessed are lawful ones.'" *Grant v. Lamont*, No. 3:22-cv-01223 (JBA), 2023 WL 5533522, at *4 (D. Conn. Aug. 28, 2023) (quoting *Nat'l Ass'n for Gun Rts. v. Lamont*, No. 3:22-cv-1118 (JBA), 2023 WL 4975979, at *15 (D. Conn. Aug. 3, 2023)). But that contradicts this Court's and the Supreme Court's precedents.

*Heller* expressly concluded in its plain text analysis that "[t]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. "In other words," this Court explained, "[*Heller*] identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of

9

rebutting." *Cuomo*, 804 F.3d at 257 n.73; *see also Virginia v. Black*, 538 U.S. 343, 369 (2003) (Scalia, J., concurring in part, concurring in the judgment in part, and dissenting in part) (defining "prima facie evidence" as "sufficient to establish a given fact" and "if unexplained or uncontradicted … sufficient to sustain a judgment in favor of the issue which it supports") (quoting BLACK'S LAW DICTIONARY 1190 (6th ed. 1990)). Thus, in *Cuomo*, this Court struck a ban on a pump-action rifle because the state focused exclusively on semiautomatic weapons and "the presumption that the Amendment applies remain[ed] unrebutted." 804 F.3d at 257.

## B. Arms can be banned only if they are *both* dangerous *and* unusual.

As noted above, *Heller*'s historical analysis identified only "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. According to the district court, this meant that the government "must demonstrate *either* that the weapons are unusually dangerous, *or* that they are not commonly used or possessed for self-defense." *Grant*, 2023 WL at *4 (quoting *Nat'l Ass'n for Gun Rts.*, 2023 WL at *16) (emphasis added). But the Supreme Court has made

10

clear that a weapon may be banned only if it is *both* dangerous *and* unusual.

In *Caetano*, the Supreme Court summarily reversed and remanded the Massachusetts Supreme Judicial Court's opinion upholding a ban on stun guns. After determining that the Massachusetts Supreme Judicial Court's analysis of whether stun guns were "unusual" was flawed, the Supreme Court declined to consider whether stun guns qualified as "dangerous." 577 U.S. at 412. Justice Alito, joined by Justice Thomas, elaborated in a concurring opinion that the Court ended its analysis because a banned weapon must be *both* dangerous *and* unusual:

> As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are "unusual," it does not need to consider the lower court's conclusion that they are also "dangerous."… If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous.

*Id.* at 417-18 (Alito, J., joined by Thomas, J., concurring) (citing *Heller*, 554 U.S. at 636); *see also Miller v. Bonta*, No. 19-cv-01537 (BEN), 2023 WL 6929336, at *4 (S.D. Cal. Oct. 19, 2023) ("The Supreme Court carefully uses the phrase 'dangerous and unusual arms,' while the State, throughout its briefing, refers to 'dangerous [or] unusual arms.' That the

State would advocate such a position is disheartening.").

If "the banned weapons are commonly owned … then they are not unusual." *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 409 (7th Cir. 2015). Therefore, because the weapons Connecticut bans are common, they are necessarily not "dangerous and unusual."

## C. The "dangerous and unusual" consideration is part of the historical analysis—not the plain text analysis.

The district court erred by considering whether the banned arms are "dangerous and unusual" in its analysis of the Second Amendment's plain text. *Heller* demonstrates that the "dangerous and unusual" consideration must occur in the historical analysis.

*Heller*'s plain text analysis simply determined how the word "Arms" was understood contemporaneous with the Amendment's drafting and ratification, which led the Court to the conclusion that "[t]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. Only when considering our nation's tradition of firearm regulation did the Court identify "the *historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (emphasis added). The Court further concluded in its historical analysis that "common" arms are protected because "[t]he

traditional militia" brought "arms 'in common use at the time[.]'" *Id.* at 624 (quoting *Miller*, 307 U.S. at 179). *Heller* "did not say that dangerous and unusual weapons are not arms," but rather, "that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition*[.]'" *Teter v. Lopez*, 76 F.4th 938, 949 (9th Cir. 2023); *see also id.* at 950 ("[W]hether butterfly knives are 'dangerous and unusual' is a contention as to which Hawaii bears the burden of proof in the second prong of the *Bruen* analysis.").

### D. "Common use" is not limited to self-defense, it includes all lawful purposes.

The district court further erred by considering only whether the banned arms are "normally used for self-defense." *Grant*, 2023 WL at *6. To be sure, the banned arms are normally used for self-defense. Plaintiffs provided several examples of the arms being used in self-defense, JA-44-45, along with evidence that "34% of buyers purchased an … 'assault rifle' for personal protection," JA-42—indicating that roughly 10,000,000 of the 28,144,000 "assault rifles" owned across the United States were purchased primarily for self-defense, *see NSSF Releases Most Recent Firearm Production Figures*. And, of course, the remaining "assault

13

rifles" purchased primarily for other lawful purposes—such as target practice or hunting—may well be kept for self-defense as well.

But self-defense is not the only purpose the Second Amendment protects. *Heller* explained that the right protects weapons "typically possessed by law-abiding citizens for *lawful purposes*," 554 U.S. at 625 (emphasis added), and that "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes *like* self-defense," *id.* at 624 (emphasis added).

*Heller* approvingly quoted the Supreme Court of Tennessee stating that "the right to keep arms involves, necessarily, the right to use such arms for *all the ordinary purposes*." *Id.* at 614 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)) (emphasis added). And it acknowledged that "most [Americans in the Founding Era] undoubtedly thought [the right] even more important for self-defense *and hunting*" than militia service. *Id.* at 599 (emphasis added). The *Heller* dissent thus recognized that "[w]hether [the Second Amendment] also protects the right to possess and use guns for nonmilitary purposes like hunting and personal self-defense is the question presented by this case." *Id.* at 636-37 (Stevens, J., dissenting).

14

The Supreme Court later summarized the "central holding in *Heller*: that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010); *see also Friedman*, 136 S. Ct. at 449 (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) ("The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, that is all that is needed[.]") (citation omitted).

Every federal circuit court to address the issue has found that the right protects other lawful purposes, *see, e.g.*, David Kopel & Joseph Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis U. L.J. 193, 204-07 (2017), including the Seventh Circuit, which twice struck restrictions on firing ranges for violating the Second Amendment, *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("*Ezell I*"); *Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017) ("*Ezell II*"); *see also Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021).

Aside from the fact that the banned arms are commonly kept for self-defense, that they are commonly kept for other lawful purposes such as hunting and training secures Second Amendment protection.

**E.    The commonality of arms for a lawful purpose, rather than their suitability for that purpose, is dispositive.**

In its common use analysis, the district court also considered whether the banned arms are commonly used in actual self-defense shootings or "are particularly suitable for self-defense." *Nat'l Ass'n for Gun Rts.*, 2023 WL at *22; *Grant*, 2023 WL at *4 (adopting the *Nat'l Ass'n for Gun Rts.* analytical framework). These considerations are irrelevant under *Heller*.

The relevant inquiry is whether the arms are commonly *selected* for a lawful purpose. As Justice Stevens explained, "[t]he [*Heller*] Court struck down the District of Columbia's handgun ban not because of the *utility* of handguns for lawful self-defense, but rather because of their *popularity* for that purpose." *McDonald*, 561 U.S. at 890 n.33 (Stevens J., dissenting).

In *McDonald*, the Supreme Court explained why it struck the handgun ban in *Heller*: "we found that this right applies to handguns because they are the most preferred firearm in the nation to 'keep' and

16

use for protection of one's home and family. Thus, we concluded, citizens must be permitted to use handguns for the core lawful purpose of self-defense." *McDonald*, 561 U.S. at 767-68 (cleaned up). Because handguns are "preferred," they "must be permitted."

It is for the People, not the state, to decide which arms are protected by the Second Amendment. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table," *Heller*, 554 U.S. at 636, including the choice to deprive Americans of their preferred arms. "To limit self-defense to only those methods acceptable to the government is to effect an enormous transfer of authority from the citizens of this country to the government—a result directly contrary to our constitution and to our political tradition." *Friedman*, 784 F.3d at 413 (Manion, J., dissenting); *see also Caetano*, 577 U.S. at 422 (Alito, J., joined by Thomas, J., concurring) (Expressing disapproval over "the safety of all Americans [being] left to the mercy of state authorities who may be more concerned about disarming the people than about keeping them safe.").

In the First Amendment context, "the general rule" is "that the speaker and the audience, not the government, assess the value of the information presented." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993). Just

17

as the People have the right to determine the value of the information they exchange, they have the right to determine the value—including the defensive value—of the arms they keep and bear.

Nor does it matter how often a firearm is actually fired in self-defense. A firearm that is kept for self-defense is *used* for self-defense, even when it is not being fired. *Heller* did not attempt to quantify defensive handgun incidents. It focused instead on how commonly handguns were kept for self-defense. Moreover, if Second Amendment protection depended on the number of actual defensive uses, low-crime communities would have a diminished ability to exercise their rights because their arms would be needed for self-defense less often. Rather, unfired firearms are protected by the Second Amendment just as unread books are protected by the First Amendment.

## III. Repeating arms predate the Second Amendment and were embraced by the Founders.

The district court incorrectly determined that Connecticut's "assault weapon" ban is consistent with an alleged tradition of regulations restricting "new and dangerous characteristics" of "weapons technology." *Grant*, 2023 WL at *6.

18

The technology is not new. Repeating arms predate the Second Amendment by about three centuries and semiautomatic firearms were introduced in the 19th century. Despite continuous technological advancements over hundreds of years and their widespread popularity in the 19th century, traditionally, repeating arms were never banned in America.

## A.     Repeating arms were invented around 1500.

"The desire for … repeating weapons is almost as old as the history of firearms, and there were numerous attempts to achieve this goal, beginning at least as early as the opening years of the 16th century."[4]

The first known repeaters were 10-shot matchlock arquebuses invented between 1490 and 1530. "The cylinder was manually rotated around a central axis pin[.]"[5] King Henry VIII (reigned 1509-1547) owned a similar firearm.[6]

---

[4] Harold Peterson, ARMS AND ARMOR IN COLONIAL AMERICA 215 (1956).

[5] M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY, 1492-1792, at 50 (1980).

[6] W.W. Greener, THE GUN AND ITS DEVELOPMENT 81-82 (9th ed. 1910).

19

Henry VIII also owned a multi-shot combination weapon called the Holy Water Sprinkler. "It is a mace with four separate steel barrels.… These barrels are formed into a wooden cylinder held with four iron bands, two of which have six spikes each."[7]

A repeater invented around 1580 could consecutively fire 16 superimposed rounds in Roman candle fashion[8]—meaning with each round stacked on top of another and that the user "could not stop the firing once he had started it."[9]

A similar firearm was patented in England in 1682. The patent protected "an Expedient with Security to make Musketts, Carbines, Pistolls, or any other small Fire Armes to Discharge twice, thrice, or more severall and distincte Shotts in a Singell Barrell and Locke with once Primeing."[10]

---

[7] Lewis Winant, FIREARMS CURIOSA 14 (1955).

[8] *16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM, May 10, 2014, http://bit.ly/2tngSDD (last visited Feb. 7, 2024); *see also* Winant, FIREARMS CURIOSA, at 168-70.

[9] *Id.* at 166.

[10] *Id.* at 167.

These Roman candle-style firearms were innovative, but the magazine-fed repeaters discussed next allowed the user to fire one round and then pause to decide whether and when to fire again.

### B. Repeating arms gained popularity in England during the 17th century, including some with 30-round magazines.

"Successful systems [of repeating arms] definitely had developed by 1640, and within the next twenty years they had spread throughout most of Western Europe and even to Moscow."[11] "[T]he two principal magazine repeaters of the era [were] the Kalthoff and the Lorenzoni. These were the first guns of their kind to achieve success."[12]

"The Kalthoff repeater was a true magazine gun. In fact, it had two magazines, one for powder and one for balls. The earliest datable specimens which survive are two wheel-lock rifles made by Peter Kalthoff in Denmark in 1645 and 1646."[13] "[T]he number of charges in the magazines ran all the way from six or seven to thirty."[14]

---

[11] Harold Peterson, THE TREASURY OF THE GUN 229 (1962).

[12] *Id.*

[13] *Id.*

[14] *Id.* at 230.

21

Kalthoff repeaters "were undoubtedly the first magazine repeaters ever to be adopted for military purposes. About a hundred flintlock rifles of their pattern were issued to picked marksmen of the Royal Foot Guards and are believed to have seen active service during the siege of Copenhagen in 1658, 1659, and again in the Scanian War of 1675-1679."[15]

"Examples [of Kalthoff-type repeaters] spread throughout Europe wherever there were gunsmiths with sufficient skill and knowledge to make them, and patrons wealthy enough to pay the cost…. [A]t least nineteen gunsmiths are known to have made such arms in an area stretching from London on the west to Moscow on the east, and from Copenhagen south to Salzburg. There may well have been even more."[16]

"The Lorenzoni also was developed during the first half of the Seventeenth Century."[17] A magazine-fed Italian repeating pistol that "used gravity to self-reload,"[18] it typically held around seven shots. Its

---

[15] *Id.*

[16] *Id.*

[17] *Id.* at 231.

[18] Martin Dougherty, SMALL ARMS VISUAL ENCYCLOPEDIA 34 (2011).

repeating mechanism spread throughout Europe and to the American colonies, and was applied to rifles as well.[19]

On July 3, 1662, famed London diarist Samuel Pepys wrote about experiencing "a gun to discharge seven times, the best of all devices that ever I saw, and very serviceable, and not a bawble; for it is much approved of, and many thereof made."[20] Abraham Hill patented the Lorenzoni repeating mechanism in London on March 3, 1664.[21] The following day, Pepys wrote about "several people ... trying a new-fashion gun" that could "shoot off often, one after another, without trouble or danger, very pretty."[22] It is believed that Pepys was referring to a Lorenzoni-style firearm in his March 4, 1664 entry,[23] and perhaps he also was in his 1662 entry.

---

[19] Peterson, THE TREASURY OF THE GUN, at 232.

[20] 4 THE DIARY OF SAMUEL PEPYS 258 (Henry B. Wheatley ed., 1893).

[21] The patent was for a "gun or pistol for small shot carrying seven or eight charges of the same in the stock of the gun." Clifford Walton, HISTORY OF THE BRITISH STANDING ARMY. A.D. 1660 TO 1700, at 337 (1894).

[22] 7 THE DIARY OF SAMUEL PEPYS, at 61.

[23] Peterson, THE TREASURY OF THE GUN, at 232.

23

Despite Hill's patent, "[m]any other English gunsmiths also made guns with the Lorenzoni action during the next two or three decades."[24] Famous English gunsmiths John Cookson and John Shaw adopted the Lorenzoni action for their firearms. So did "a host of others throughout the 18th century."[25]

"The Kalthoff and Lorenzoni actions" were "the most popular of the early magazine repeaters," but "many others" were "made in several parts of Europe during the Eighteenth Century and apparently functioned well."[26]

"The Lorenzoni system even found its way to America where records indicate that at least two New England gunsmiths actually manufactured such guns."[27]

---

[24] *Id.*

[25] Peterson, ARMS AND ARMOR IN COLONIAL AMERICA, at 215.

[26] Peterson, THE TREASURY OF THE GUN, at 233.

[27] *Id.* at 232.

**C. Repeaters were used in America by the mid-1600s and the Founders and Framers embraced them.**

As of the mid-1600s, American repeaters sometimes employed a revolving cylinder that was rotated by hand.[28] "A few repeating arms were made use of in a military way in America."[29] For example, New France's governor, Louis de Buade de Frontenac, "astonished the Iroquois with his three and five shot repeaters" in 1690.[30]

In 1722, Boston gunsmith John Pim demonstrated a repeater he sold. "[L]oaded but once," it "was discharged eleven times following, with bullets, in the space of two minutes, each which went through a double door at fifty yards' distance." 5 Samuel Niles, *A Summary Historical Narrative of the Wars in New England*, *in* MASSACHUSETTS HISTORICAL SOCIETY COLLECTIONS, 4th ser., at 347 (1837). Pim also produced a "six-shot, .52 caliber snaphaunce revolver."[31]

---

[28] *See, e.g.,* 2 Charles Sawyer, FIREARMS IN AMERICAN HISTORY 5 (1939) (six-shot flintlock); Charles Chapel, GUNS OF THE OLD WEST 202-03 (1961) (revolving snaphance).

[29] 1 Sawyer, FIREARMS IN AMERICAN HISTORY, at 28-29.

[30] *Id.* at 29. That same year, Frontenac's army attacked English settlements in New York, Maine, and New Hampshire. *See* Alan Gallay, COLONIAL WARS OF NORTH AMERICA 240-42 (2015).

[31] Brown, FIREARMS IN COLONIAL AMERICA, at 257.

25

Perhaps the best-known repeaters in early 18th-century America were Lorenzoni variants known as Cooksons. "Many Americans call[ed] this [Lorenzoni] type of magazine repeater a Cookson because the first such gun to receive attention in this country bore the name of the English gunsmith John Cookson."[32] A Cookson repeater with a 10-round magazine, "believed to have found its way into Maryland with one of the early English colonists," "form[ed] perhaps the capstone of the collection of arms in the National Museum at Washington, D.C."[33]

A Bostonian also named John Cookson advertised a 9-shot repeater in the *Boston Gazette* on April 12 and April 26, 1756, explaining that the rifle was,

> made by John Cookson and to be sold at his house in Boston: a handy gun … having a Place convenient to hold 9 Bullets, and Powder for 9 Charges and 9 Primings; the said gun will fire 9 Times distinctly, as quick, or as slow as you please[.][34]

---

[32] Peterson, THE TREASURY OF THE GUN, at 230.

[33] *The Cookson Gun and the Mortimer Pistols*, AMERICAN RIFLEMAN, vol. 63, at 3, 4 (Sep. 29, 1917).

[34] Peterson, ARMS AND ARMOR IN COLONIAL AMERICA, at 215.

26

"Thus this type of repeating flintlock popular in England from the third quarter of the 17th century, was known and manufactured in Massachusetts early in the 18th century."[35]

In 1777, the Continental Congress ordered one hundred rifles from Joseph Belton,[36] who had informed the Congress that his rifles could "discharge sixteen, or twenty [rounds], in sixteen, ten, or five seconds."[37] Belton demonstrated one such rifle before leading military officers— including General Horatio Gates and Major General Benedict Arnold— and scientists—including David Rittenhouse—who verified that "[h]e discharged Sixteen Balls loaded at one time."[38]

---

[35] *Id.*

[36] Report of the Continental Congress (May 3, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789, at 324 (Worthington Chauncey Ford ed., 1907).

[37] Letter from Joseph Belton to the Continental Congress (Apr. 11, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774-1789, at 123 (1957).

[38] Letter from Joseph Belton to the Continental Congress (July 10, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774-1789, at 139.

Ultimately, the deal fell through when Belton demanded what the Congress deemed "an extraordinary allowance."[39] But the exchange proves that the Founders and Framers knew about and embraced repeating arms prior to the ratification of the Second Amendment. There is no question that when the Framers protected "arms," they knowingly protected the arms of the time, including repeating arms like Belton's.

When the Second Amendment was ratified, the state-of-the-art repeater was the Girardoni air rifle that could consecutively shoot 21 or 22 rounds in .46 or .49 caliber by utilizing a tubular spring-loaded magazine.[40] Although an air gun, the Girardoni was ballistically equal to a powder gun,[41] and powerful enough to take an elk with a single shot.[42] Indeed, at the time, "there were many gunsmiths in Europe producing compressed air weapons powerful enough to use for big game hunting or

---

[39] Report of the Continental Congress (May 15, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789, at 361.

[40] James Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100-01 (2012).

[41] John Plaster, THE HISTORY OF SNIPING AND SHARPSHOOTING 69-70 (2008).

[42] Jim Supica, et al., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

as military weapons."[43] The Girardoni was invented for the Austrian army—1,500 were issued to sharpshooters and remained in service for 25 years, including in the Napoleonic Wars between 1796 and 1815.[44] Isaiah Lukens of Pennsylvania manufactured such rifles,[45] along with "many makers in Austria, Russia, Switzerland, England, and various German principalities."[46] Meriwether Lewis famously carried a Girardoni on the Lewis and Clark Expedition.[47]

---

[43] Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION, at 91.

[44] Gerald Prenderghast, REPEATING AND MULTI-FIRE WEAPONS 100-01 (2018); Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION, at 91-94. As a testament to the rifle's effectiveness, "[t]here are stories that Napoleon had captured air riflemen shot as terrorists, making it hard to recruit men for the air rifle companies." *Id.* at 92.

[45] Nancy McClure, *Treasures from Our West: Lukens Air Rifle*, BUFFALO BILL CENTER FOR THE AMERICAN WEST, Aug. 3, 2014, https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/ (last visited Feb. 7, 2024).

[46] Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION, at 99.

[47] Meriwether Lewis & William Clark, THE JOURNALS OF THE LEWIS & CLARK EXPEDITION, vols. 2-8 (Gary Moulton ed., 1986-1993) (2002 printing).

### D. Repeating arms became the most popular arms in the 19th century.

The U.S. Navy started purchasing repeating arms from Joseph Chambers in 1813 and the Pennsylvania militia soon followed.[48] Chambers developed firearms employing "most of the systems of repeating gunnery known at that time: i.e., multiple barrels, multiple lock plates, and Roman Candle ignition."[49] Some of Chambers's muskets could "fire 12 [consecutive] shots." *Id.* at 149-50. Many of his swivel guns were "composed of seven musket barrels … containing twenty-five shot in each and discharging one hundred-seventy five bullets, by quick succession, in less than one minute."[50] The swivel guns Chambers produced for the Pennsylvania militia had capacities of "224 shots each."[51]

In 1821, the *New York Evening Post* lauded New Yorker Isaiah Jennings for inventing a repeater, "importan[t], both for public and private use," whose "number of charges may be extended to fifteen or

---

[48] William Gilkerson, BOARDERS AWAY II, at 124-25, 132, 139, 143, 147-48 (1993).

[49] *Id.* at 123-34.

[50] *Id.* at 129.

[51] *Id.* at 143.

even twenty … and may be fired in the space of two seconds to a charge."[52] "[T]he principle can be added to any musket, rifle, fowling piece, or pistol" to make it capable of firing "from two to twelve times."[53] "About 1828 a New York State maker, Reuben Ellis, made military rifles under contract on the Jennings principle."[54]

In the 1830s, the popular pepperbox handguns were introduced. They had multiple barrels—some as many as 24—that could fire sequentially.[55] That same decade, the Bennett and Haviland Rifle used a chain-drive system to fire 12-rounds consecutively.[56]

Samuel Colt also introduced revolvers in the 1830s. They fire repeating rounds like the pepperbox but use a rotating cylinder rather

---

[52] *Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822, *in* 59 Alexander Tilloch, THE PHILOSOPHICAL MAGAZINE AND JOURNAL: COMPREHENDING THE VARIOUS BRANCHES OF SCIENCE, THE LIBERAL AND FINE ARTS, GEOLOGY, AGRICULTURE, MANUFACTURES, AND COMMERCE 467-68 (Richard Taylor ed., 1822).

[53] *Id.*

[54] Winant, FIREARMS CURIOSA, at 174.

[55] Jack Dunlap, AMERICAN BRITISH & CONTINENTAL PEPPERBOX FIREARMS 148-49, 167 (1964); Lewis Winant, PEPPERBOX FIREARMS 7 (1952).

[56] Norm Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 711 (9th ed. 2007).

than rotating barrels.[57] Pin-fire revolvers with capacities of up to 21 rounds entered the market in the 1850s.[58] So did the Walch 12-Shot Navy Revolver, with each of its six chambers holding two rounds that fired separately.[59] In 1866, the 20-round Josselyn belt-fed chain pistol made its debut. Some later chain pistols had greater capacities.[60]

Alexander Hall's rifle with a 15-round rotating cylinder was introduced in the 1850s.[61] In 1851, Parry Porter patented "self-loading repeating-rifles" with magazines "constructed to contain thirty rounds."[62] The Porter Rifle could "make sixty discharges a minute."[63] In 1855, Joseph Enouy invented a 42-shot Ferris Wheel pistol.[64]

---

[57] *See* Winant, FIREARMS CURIOSA, at 25.

[58] Supica, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM, at 48-49; Winant, PEPPERBOX FIREARMS, at 67-70.

[59] Chapel, GUNS OF THE OLD WEST, at 188-89.

[60] Winant, FIREARMS CURIOSA, at 204, 206.

[61] Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 713, 716.

[62] U.S. Patent No. 8,210, available at https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/0008210 (last visited Feb. 7, 2024).

[63] *A New Gun Patent*, ATHENS (TENN.) POST, Feb. 25, 1853 (reprinted from N.Y. Post); 2 Sawyer, FIREARMS IN AMERICAN HISTORY, at 147.

[64] Winant, FIREARMS CURIOSA, at 208.

In 1855, an alliance between Daniel Wesson and Oliver Winchester led to a series of famous lever-action repeating rifles. First came the 30-shot Volcanic Rifle, which an 1859 advertisement boasted could be loaded then fired 30 times within a minute.[65]

Then came the 16-shot Henry Rifle in 1861. Tested at the Washington Navy Yard in 1862, "187 shots were fired in three minutes and thirty-six seconds (not counting reloading time), and one full fifteen-shot magazine was fired in only 10.8 seconds … hits were made from as far away as 348 feet, at an 18-inch-square target.… The report noted, 'It is manifest from the above experiment that this gun may be fired with great rapidity.'"[66] "Advertisements claimed a penetration of eight inches at one hundred yards, five inches at four hundred yards, and power to kill at a thousand yards."[67]

"[F]ueled by the Civil War market, the first Henrys were in the field by mid-1862."[68] Indeed, one of the most famous testimonials of the Henry

---

[65] Harold Williamson, WINCHESTER: THE GUN THAT WON THE WEST 26-27 (1952).

[66] R.L. Wilson, WINCHESTER: AN AMERICAN LEGEND 11-12 (1991).

[67] Peterson, THE TREASURY OF THE GUN, at 240.

[68] Wilson, WINCHESTER: AN AMERICAN LEGEND, at 11.

33

came from Captain James M. Wilson of the 12th Kentucky Cavalry, who used a Henry Rifle to kill seven of his Confederate neighbors who broke into his home and ambushed his family. Wilson praised the rifle's 16-round capacity: "When attacked alone by seven guerillas I found it (Henry Rifle) to be particularly useful not only in regard to its fatal precision, but also in the number of shots held in reserve for immediate action in case of an overwhelming force."[69] Soon after, Wilson's entire command was armed with Henry rifles.[70]

The Henry evolved into the 18-shot Winchester Model 1866, which was touted as having a capacity of "eighteen charges, which can be fired in nine seconds."[71] Another advertisement contained pictures of Model 1866 rifles underneath the heading, "Two shots a second."[72] "One of the most popular of all Winchester arms, the Model 1866 was widely used in opening the West and, in company with the Model 1873, is the most

---

[69] H.W.S. Cleveland, HINTS TO RIFLEMEN 181 (1864).

[70] Andrew Bresnan, *The Henry Repeating Rifle*, RAREWINCHESTERS.COM, Aug. 17, 2007, https://www.rarewinchesters.com/articles/art_hen_00.shtml (last visited Feb. 7, 2024).

[71] Louis Garavaglia & Charles Worman, FIREARMS OF THE AMERICAN WEST 1866-1894, at 128 (1985).

[72] Peterson, THE TREASURY OF THE GUN, at 234-35.

deserving of Winchesters to claim the legend 'The Gun That Won the West.'"[73] Over 170,000 Model 1866s were produced, and over 720,000 Model 1873s were produced by 1919.[74] Magazine capacity for the Model 1873 ranged from 6 to 25.[75]

The Evans Repeating Rifle, manufactured in Maine, was also introduced in 1873. Its innovative rotary helical magazine held 34 rounds.[76]

Winchester's other iconic 19th-century rifles were the Model 1886, and then the Model 1892, made legendary by Annie Oakley, and later by John Wayne.[77] These arms had capacities of 15 rounds.[78] Over a million Model 1892 rifles were produced from 1892 to 1941.[79]

---

[73] Wilson, AN AMERICAN LEGEND, at 22.

[74] Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 306-07.

[75] Arthur Pirkle, WINCHESTER LEVER ACTION REPEATING FIREARMS: THE MODELS OF 1866, 1873 & 1876, at 107 (2010).

[76] Dwight Demeritt, MAINE MADE GUNS & THEIR MAKERS 293-95 (rev. ed. 1997); Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 694.

[77] *Model 1892 Rifles and Carbines*, WINCHESTER REPEATING ARMS, http://bit.ly/2tn03IN (last visited Feb. 7, 2024).

[78] *Id.*

[79] Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 311.

The most famous pump-action rifle of the 19th century was the Colt Lightning, introduced in 1884. It could fire 15 rounds.[80]

The first functional semiautomatic firearm was the Mannlicher Model 85 rifle, invented in 1885.[81] Mannlicher introduced new models in 1891, 1893, and 1895.[82] Additionally, numerous semiautomatic handguns utilizing detachable magazines were introduced before the turn of the century: including the Mauser C96,[83] Bergmann Simplex,[84] Borchardt M1894,[85] Borchardt C-93,[86] Fabrique Nationale M1899,[87] Mannlicher M1896 and M1897,[88] Luger M1898 and M1899,[89] Roth-

---

[80] *Id.* at 122.

[81] U.S. NAVY SEAL SNIPER TRAINING PROGRAM 87 (2011).

[82] John Walter, RIFLES OF THE WORLD 568-69 (3d ed. 2006).

[83] Dougherty, SMALL ARMS VISUAL ENCYCLOPEDIA, at 84.

[84] *Id.* at 85.

[85] *Springfield Armory Museum - Collection Record*, REDISCOV.COM, https://bit.ly/SPAR-1062 (last visited Feb. 7, 2024).

[86] Leonardo Antaris, *In the Beginning: Semi-Automatic Pistols of the 19th Century*, AMERICAN RIFLEMAN, Jan. 4, 2018, https://www.americanrifleman.org/content/in-the-beginning-semi-automatic-pistols-of-the-19th-century/ (last visited Feb. 7, 2024).

[87] *Id.*

[88] *Id.*

[89] *Id.*

Theodorovic M1895, M1897, and M1898,[90] and the Schwarzlose M1898.[91] Luger's M1899 could be purchased with 32-round magazines.[92]

Thus, by the late 19th century, semiautomatic firearms were in use, and repeating arms had been common for decades and known for centuries.[93]

## IV. There are no historical prohibitions on repeating arms.

Although repeating arms have existed since around the time that Columbus first landed in America, and despite the rapid technological advancements throughout the 19th century, there were no prohibitions on any repeating arm before 1900. Kopel & Greenlee, *The History of Bans on Types of Arms Before 1900*, at 196. The only law that specifically restricted repeating arms was an 1893 Florida law that required a license for repeating rifles. *Id.* That law made it "unlawful to carry or own a

---

[90] *Id.*

[91] *Id.*

[92] Jean-Noel Mouret, PISTOLS AND REVOLVERS 126-27 (1993); Supica, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM, at 86.

[93] This section identifies the most notable repeating arms produced before the year 1900. For a comprehensive historical analysis, *see* David Kopel & Joseph Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. at 10-15, 38-41, 55-74 (forthcoming 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197.

Winchester or other repeating rifle … without first taking out a license."
1893 Fla. Laws 71. This single law is insufficient justification for
Connecticut's prohibition. First, Florida's law was a licensing law while
Connecticut's is a prohibition. *Bruen* highlighted the difference by
seemingly approving of "'shall-issue' licensing regimes" for handgun
carry while invalidating New York's prohibition on carry. 597 U.S. at 39
n.9. Second, laws from "late-19th-century outlier jurisdictions" cannot
establish a tradition. *Id.* at 70. Third, the Florida law was racially
motivated and enforced. As Florida Supreme Court Justice Rivers H.
Buford later explained, the licensing law "was passed … for the purpose
of disarming the negro laborers" in the state and "was never intended to
be applied to the white population." *Watson v. Stone*, 148 Fla. 516, 524
(1941) (Buford, J., concurring). Finally, as Justice Buford further
explained, Florida's law was likely unconstitutional: "there had never
been any effort to enforce the provisions of this statute as to white people,
because it has been generally conceded to be in contravention of the
Constitution and non-enforceable if contested." *Id.* (Buford, J.,
concurring).

38

In sum, repeating arms predate the Second Amendment by hundreds of years, were embraced by the Founders and Framers, and were not traditionally restricted.

## CONCLUSION

Connecticut's ban on common and historically protected arms is unconstitutional. The decision below should be reversed.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
GREENLEE LAW, PLLC
PO Box 4061
McCall, ID 83638
(208) 271-2494
joseph@greenlee.law
*Counsel of Record*

CODY J. WISNIEWSKI
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
cwi@fpchq.org

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 6,999 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on February 8, 2024, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*