# 23-1344

------------------------------

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

------------------------------

Eddie Grant, Jr., Jennifer Hamilton, Michael Stiefel, Connecticut Citizens Defense League, Inc., Second Amendment Foundation, Inc.,
*Plaintiffs-Appellants*,

v.

James Rovella, Sharmese L. Walcott, John P. Doyle, Paul J. Narducci, in their official capacities,
*Defendants-Appellees*,

Edward Lamont, Jr., Patrick Griffin, Margaret E. Kelly, David R. Applegate, Joseph T. Corradino, David R. Shannon, Michael A. Gailor, Christian Watson, Paul J. Ferencek, Matthew C. Gedansky, Maureen Platt, Anne F. Mahoney, in their official capacities,
*Defendants*

------------------------------

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------

## BRIEF OF THE DEFENDANTS-APPELLEES

------------------------------

William Tong
Attorney General

Joshua Perry
Solicitor General

Janelle R. Medeiros
James M. Belforti
Assistant Attorneys General
165 Capitol Avenue
Hartford, CT 06105
860-808-5450
janelle.medeiros@ct.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF THE ISSUE .............................................................. 1

INTRODUCTION ........................................................................ 2

STATEMENT OF THE CASE ............................................................... 4

I.    Responding to an epidemic of mass shootings, Connecticut restricts assault weapons. ................................................................. 4

II.   The District Court refuses to enjoin Connecticut's gun safety laws pending trial. ...................................................................... 12

SUMMARY OF ARGUMENT ............................................................... 16

ARGUMENT ............................................................................ 20

I.    Plaintiffs did not carry their threshold burden of showing that Connecticut restricts any constitutional right. ..................................... 21

    A.    Plaintiffs had to show that the restricted weapons are used and useful for self-defense, not unusually dangerous weapons of war. ...................................................................... 22

    B.    Plaintiffs' numerosity arguments failed to satisfy the threshold test. .................................................................. 27

    C.    The restricted weapons are unusually dangerous weapons of war, neither used nor useful for self-defense. .................................... 33

    D.    Plaintiffs' facial challenge fails even if some of the restricted weapons are presumptively protected. ............................................. 47

II.   Connecticut's gun safety laws are consistent with our nation's history of regulating arms. ............................................................. 49

    A.    This Court's nuanced inquiry should look to authority from throughout U.S. history. .................................................... 50

i

B.      Compared with weapons regulations throughout our history, Connecticut's gun safety laws are similarly justified and impose a similarly insignificant burden on the right of armed self-defense...56

III. Plaintiffs failed to carry their burden on the other preliminary injunction factors.........................................................................66

CONCLUSION ...................................................................71

CERTIFICATION OF COMPLIANCE ...................................73

CERTIFICATION OF SERVICE ...........................................74

# TABLE OF AUTHORITIES

## Cases

*A.H. v. French*, 985 F.3d 165 (2d Cir. 2021) ..................................... 20, 67

*ACLU v. Clapper*, 804 F.3d 617 (2d Cir. 2015) ...................................... 67

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) .................... passim

*Benisek v. Lamone*, 138 S. Ct. 1942 (2018) ............................................. 67

*Bevis v. City of Naperville*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023) ... 57, 59

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ............. passim

*Brown v. Maryland*, 25 U.S. (12 Wheat) 419 (1827) .............................. 61

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ...................................... 29

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ............................................ 71

*Capen v. Campbell*, No. 22-11431, 2023 U.S. Dist. LEXIS 227385, (D. Mass. Dec. 21, 2023) ......................................................... 16, 35, 38, 41

*Del. State Sportsmen's Ass'n, Inc v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584 (D. Del. 2023) .................................... 16, 50, 64, 65

*Friedman v. City of Highland Park,* 784 F.3d 406 (7th Cir. 2015) ........ 30

*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ...................... 69

*Gallinger v. Becerra*, 898 F.3d 1012 (9th Cir. 2018) ............................... 40

*Hartford v. Ferguson*, 676 F. Supp. 3d 897 (W.D. Wash. 2023) ............. 16

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)..............34

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017)................................. passim

*Lincoln Prop. Co. v. Roche*, 546 U.S. 81 (2005) ......................................48

*Mastrovincenzo v. City of New York*, 435 F.3d. 78 (2d Cir. 2006) ..........21

*McCullen v. Coakley*, 573 U.S. 464 (2014) .............................................55

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)................................23

*Miller v. Bonta*, No. 19-1537, 2023 U.S. Dist. LEXIS 188421 (S.D. Cal. Oct. 19, 2023) ........................................................................................17

*Miller v. Bonta*, No. 23-2979 (9th Cir. Oct. 28, 2023)............................17

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32 (2d Cir. 2018) ..................................................................................21

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2012)...................................................................................................20

*Nat'l Ass'n for Gun Rts. V. Lamont,* No. 22-1118, 2023 U.S. Dist. LEXIS 134880 (D. Conn. Aug. 3, 2023) .................................................. 14, 54

*Nat'l Ass'n for Gun Rts. v. Lamont*, No. 23-1162 (2d Cir.) ......................2

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ...................................................................................................... passim

iv

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .......................................................................... passim

*Ocean State Tactical v. Rhode Island*, 95 F.4th 38, 2024 U.S. App. LEXIS 5723 (1st Cir. Mar. 7, 2024) ........................................................ passim

*Ocean State Tactical, LLC v. Rhode Island,* 646 F. Supp. 3d 368 (D.R.I. 2022) ................................................................................ 71

*Or. Firearms Fed'n, Inc. v. Kotek*, 2023 U.S. Dist. LEXIS 121299 (D. Or. 2023) ............................................................................ 16, 64

*Staples v. United States*, 511 U.S. 600 (1994) ....................................... 35

*Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004) ..... 71

*Teter v. Lopez*, 2024 U.S. App. LEXIS 4079 (9th Cir. Feb. 22, 2024) ..... 45

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) ........................................... 45

*United States v. Alaniz*, 69 F.4th 1192 (9th Cir. 2023) .......................... 25

*United States v. Miller*, 307 U.S. 174 (1939) .................................... 28, 65

*We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2021) ......... 20, 21, 70

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) .............................. 54

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................. 20, 67

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ..................................... 30

## Statutes, Regulations, and Rules

1706-7 Mass. Acts ch. 4 ........................................................... 61

1763-1775 N.J. Laws 346, ch. 539 (1771) ............................... 57

18 U.S.C. § 921 ...................................................................... 66

18 U.S.C. § 925 ...................................................................... 65

1821 Me. Laws 98, ch. 25 ....................................................... 61

1832 Conn. Acts 391, ch. 25 ................................................... 62

1837 Ala. Laws 7, No. 11 ........................................................ 58

1837 Ga. Laws 90, § 1 ............................................................ 58

1837-1838 Tenn. Pub. Acts 200-01 ......................................... 58

1838 Fla. Laws 36, No. 24 ....................................................... 58

1838 Va. Acts 76, ch. 101 ....................................................... 58

1839 Ala. Acts 67, ch. 77 ....................................................... 58

1868 Ala. Laws 11 .................................................................. 59

1871 Tenn. Pub. Acts 81, ch. 90 ............................................. 59

1881 Ark. Acts 191, ch. XCVI ................................................. 59

1993 Conn. Pub. Acts 93-306 ............................................. 5, 66

2023 Conn. Pub. Acts 23-53 .............................................. 10, 12

33 Hen. 8, ch. 6 §§ 1, 18 (1541) ............................................. 56

7 Rich. 2, ch. 13 (1383) ............................................................... 56

*A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District,* pp. 45-47, Image 48-50 (1832) ............................................................. 61

A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763) .......................................................... 61

*An Act Against Wearing Swords* (1686), reprinted in *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-290 (1881)........................................................................ 57

Conn. Gen. Stat. § 53-202a ...................................................... 5, 7, 9, 47

Conn. Gen. Stat. § 53-202b ....................................................... 6

Conn. Gen. Stat. § 53-202d ....................................................... 6

Conn. Gen. Stat. § 53a-3 .......................................................... 11

Fla. Laws 95, ch. 7.................................................................. 59

## Other Authorities

H.R. Rep. No. 103-489 (1994)..................................................... 18

Heather Sher, *What I Saw Treating the Victims From Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018) ................. 41

Matthew Green, *Gun Groups: More Than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED (Apr. 12, 2019) ........................................................... 70

Palmetto State Armory, *About Palmetto State Armory,* https://palmettostatearmory.com/about-psa.html .............................. 31

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016) ................ 46

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487 (2004) ... 60

U.S. Dep't of Justice, ATF, *Firearms Commerce in the United States: Annual Statistical Update* (2021) ......................................................... 30

*Use*, Black's Law Dictionary (11th ed. 2019) ........................................ 28

## STATEMENT OF THE ISSUE

Whether the District Court abused its discretion by declining to preliminarily enjoin Connecticut's gun safety laws restricting the sale and possession of assault weapons—including AR-15 rifles, grenade launchers, and Street Sweeper shotguns.

## INTRODUCTION

A mass murderer used an AR-15 rifle to kill 26 children and teachers at Connecticut's Sandy Hook Elementary School in 2012. The massacre exemplified a worsening national epidemic of mass murders perpetrated with assault weapons. Connecticut responded by bolstering its gun safety laws to restrict possession and sale of those military-style weapons, while protecting residents' right to armed self-defense with over a thousand kinds of guns and countless other arms.

Now Plaintiffs ask this Court to declare a new constitutional right to possess AR-15s and other assault weapons. Their facial challenge extends to grenade launchers and Street Sweeper shotguns. And they want to flood Connecticut with assault weapons without even a trial. Another group of plaintiffs is advancing these same radical arguments. *Nat'l Ass'n for Gun Rts. v. Lamont*, No. 23-1162, a challenge to Connecticut's assault weapons and large-capacity magazine (LCM) restrictions, is fully briefed before this Court. There, too, the District Court refused to preliminarily enjoin Connecticut's gun safety laws.

This Court should affirm in both cases. Nine years ago, this Court rejected a Second Amendment challenge against most of these same laws.

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) changed some of the analysis, but not the outcome. That is why the great majority of federal courts—and the only two Courts of Appeals—to consider the issue since *Bruen* have rightly refused to enjoin restrictions on assault weapons and other unusually dangerous weapons and accessories.

The Supreme Court has already said that states may ban M-16 machine guns "and the like," and the AR-15 and other restricted weapons are "like" their military siblings in every relevant way—muzzle velocity, maneuverability, ammunition, rapid fire rate, damage inflicted on the human body. Because they are unusually dangerous weapons of war, neither used nor useful for self-defense, the restricted assault weapons fall outside the Second Amendment's presumptive protections. And even if assault weapons were presumptively protected, states have always used their police powers to restrict newly proliferating technologies that pose extraordinary public safety risks–from black powder to percussion cap pistols to Bowie knives to submachine guns. Plaintiffs have shown no likelihood of success on the merits, and the other preliminary injunction factors tip sharply against them.

## STATEMENT OF THE CASE

### I. Responding to an epidemic of mass shootings, Connecticut restricts assault weapons.

The mass murderer who broke into the Sandy Hook Elementary School in Newtown, Connecticut in 2012 used an AR-15 assault rifle and ten 30-round magazines, firing 154 rounds in less than five minutes, too quickly for law enforcement to intervene. *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 247 (2d Cir. 2015), *abrogated in part on other grounds by Bruen*, 597 U.S. 1; JA408, 404.

Sandy Hook was an outbreak in a national epidemic of mass shootings unknown at the Founding or Reconstruction. JA446 ("[T]here is no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948."). In the last three decades, the "rise in mass shooting violence"—here, shootings with more than six victims— "has far outpaced the rise in national population—by a factor of 13." JA436. All told, "in terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post 9/11 era, and the problem is growing nationwide." JA435.

Assault weapons drive the mass shooting trend.[1] Born from Cold War military technology, assault weapons first meaningfully penetrated civilian society after a gun industry marketing push in the 1980s, quickly becoming the weapons of choice for mass murderers. JA399-400. The killers in all U.S. shootings that took at least six lives since 2014, and in all eleven of the deadliest acts of mass violence in the country since 9/11, have used assault weapons, the large-capacity magazines that exacerbate assault weapons' lethality, or both. JA393, 382.

Four months after Sandy Hook, Connecticut's General Assembly responded with an "Act Concerning Gun Violence Prevention and Children's Safety," including General Statutes §§ 53-202a-c, the primary gun safety laws challenged here. JA458. Those laws, which updated regulations that have been in place for more than 30 years, *see* 1993 Conn. Pub. Acts 93-306, restrict possession and sale of unusually dangerous assault weapons while preserving residents' right to protect

---

[1] Gun industry marketers coined the term "assault weapon." For instance: the 1981 cover of Guns and Ammo magazine touted "the new breed of assault rifle." JA403. And a Heckler & Koch advertising pamphlet bills their HK 91 as a "Semi-Automatic Assault Rifle." JA498.

themselves with more than a thousand makes and models of legal firearms. JA365. And the restrictions carve out exceptions for classes of residents including law enforcement personnel and residents who owned the weapons and accessories before the laws' effective date. *See* Conn. Gen. Stat. §§ 53-202d(a), 53-202b(b)(1).

*Enumerated weapons.* The gun safety laws list and restrict 49 specific makes of assault rifles—almost all "centerfire" semiautomatic rifles, which fire larger, higher-velocity cartridges—by name or style. JA329.

These enumerated weapons are "essentially civilian versions of military weapons used by armed forces around the world." *Id.* Nineteen are variants on the AK-47—the Kalashnikov rifle developed for the Soviet army after World War II. *Id.* Thirteen are versions of the U.S. military's AR-15/M-16 platform. *Id.* Another three of the enumerated rifles are variants on the HK 91 or FN type military rifle. *Id.* Between them, AK-47s and AR-15/M-16s are "the most prolific military firearms in the world." *Id.*

The statutes also enumerate and restrict some semiautomatic assault pistols with especially deadly features. JA341. Of the 22 assault

pistols listed in the statutes, six are variants of the AK-47 and seven are variants of the M-16/AR-15. *Id.* And Connecticut restricts some types of shotguns, including the Street Sweeper and Striker 12 revolving cylinder shotguns and the Izhmash Saiga 12, a semi-automatic shotgun based on the AK design with modifications to accept shotgun shells. Conn. Gen. Stat. §§ 53-202a(1)(A)(i); 53-202a(1)(D); JA345.

*The AR-15 assault rifle.* Though Plaintiffs facially challenge the entire statutory scheme, their arguments focus on AR-15-type assault rifles, which all three individual Plaintiffs seek to keep and carry in Connecticut. Pl. Br. 10, 12, 14.

Designed in response to the U.S. military's request for an improved infantry weapon, the AR-15 aced its Vietnam field test: "[t]he lethality of the AR-15 and its reliability record were particularly impressive," crowed the testing report. JA406. Observers described an Army Ranger with an AR-15 killing a North Vietnamese soldier from about 50 feet away: "One round in the head—took it completely off. Another in the right arm, took it completely off, too. One round hit him in the right side, causing a hole about five inches in diameter." *Id.* Because of its "phenomenal lethality," the Army adopted the AR-15 as its standard-issue rifle, rebranding it as

7

the M-16. JA407. The M-16 is selective fire, allowing a soldier to choose between automatic and semi-automatic modes. The AR-15 marketed to civilians is semiautomatic, but that adaptation can be easily evaded: in 2017, a murderer killed 60 people in Las Vegas using an AR-15 modified for automatic-style fire. JA407; *and see* JA1175-76 (describing modifications, including using an elastic band, to increase the AR-15's fire rate); JA548 (giving examples of videos and books with simple instructions on converting rifles to automatic fire).

With a muzzle velocity of 3300 feet per second, just like the M-16, JA1174, the AR-15 can penetrate both police body armor and standard construction walls. JA379, 422. Also just like the M-16, the AR-15 chambers .223 caliber rounds "designed to mushroom and fragment" in a victim's body, JA389, boring a hole in human tissue that one trauma surgeon described as less like a nail puncture than like being shot by "a Coke can." JA407. And even without any adaptations to increase its fire rate, the AR-15—like the M-16—meets the military definition of "rapid fire." JA1173. It takes "as little as five seconds" for a semiautomatic rifle like the AR-15 to empty a thirty-round LCM. *Kolbe v. Hogan*, 849 F.3d

114, 125 (4th Cir. 2017) (en banc), *abrogated in part on other grounds by Bruen*, 597 U.S. 1.

Unsurprisingly, then, the Army Field Manual characterizes the AR-15 as no less dangerous than the M-16. To the contrary: according to the Manual, semiautomatic fire from an assault rifle like the AR-15 can be "superior to automatic fire in all measures: shots per target, trigger pulls per hit, and time to hit" in the circumstances of a typical mass shooting. JA427. Semiautomatic fire is "the most important firing technique during fast-moving, modern combat," and "the most accurate technique of placing a large volume of fire on poorly defined targets or target areas, such as short exposure, multiple, or moving targets." *Id.*

*Features.* Connecticut's gun safety laws also define assault weapons based on particularly lethal features, either built-in or added aftermarket, designed to "serve specific, combat-functional ends," *Kolbe*, 849 F.3d at 137, or to help criminals kill more people and evade detection. JA327. For instance, General Statutes § 53-202a(1)(E) prohibits semiautomatic, centerfire rifles with one or more of these features: telescoping stocks, which facilitate crime by making guns more concealable, JA327, 389; flash suppressors, which hide a shooter's

location by masking muzzle flash, JA327; grenade launchers, *id*; and pistol grips, thumbhole stocks, and forward grips. JA389. With these grips, and with assault weapons' minimal recoil, shooters can "shoot from the hip" at a crowd, JA548, killing "as many people as possible in as short a time as possible." JA550; JA541 ("[A]ssault weapons have incorporated into their design specific features that enable shooters to spray ('hose down') a large number of bullets over a broad killing zone, without having to aim at each individual target."). Finally, Connecticut restricts semiautomatic pistols or rifles with barrel shrouds—typically, ventilated covers that allow shooters to grip the weapon by the barrel, shooting many rounds rapidly without burning themselves on the hot metal. JA389, 541.

*Others*. On June 6, 2023, Governor Ned Lamont updated Connecticut's gun safety laws by signing Public Act 23-53 into law. JA210-311. The Act restricts "Connecticut Others"–firearms that kill and maim just like assault rifles, but that previously slipped through a regulatory loophole.

Before the Act, Connecticut only restricted non-enumerated firearms as "assault weapons" if they had at least one of the listed lethal

features and also fit the definition of a pistol, rifle, or shotgun. JA328.
Connecticut law defines a "rifle" or a "shotgun" as a firearm "intended to
be fired from the shoulder." Conn. Gen. Stat. § 53a-3. It defines a pistol
as a firearm with a barrel shorter than twelve inches. *Id*. Some firearms,
even though they function just like assault weapons, were specifically
manufactured to evade those categorical definitions. For example, the
New Frontier semi-automatic (below left) and the Aero Precision X15
(below right) have no shoulder stocks, so they are arguably not rifles
under Connecticut's pre-2023 statutory definition. But they have
features–forward grips, a stabilizer, and an arm brace–that allow them
to be fired just like assault rifles. JA358-63.



With these additional features, the "Others" don't just physically
resemble the assault rifles prohibited by the pre-2023 statutes, like the
Bushmaster XM-15 AR-15 style rifle used by the Sandy Hook shooter,

JA337, (below left), and the Keltec Sub-2000 (below right). JA339-40. They're also similarly dangerous.



Public Act 23-53 closed the loophole. The Act restricts "Other" firearms—even if they do not meet the statutory definition of pistols, rifles, or shotguns—if they have one or more of the features enumerated under the original features test or if they have an arm brace or stabilizing brace that allows them to be fired from the shoulder. *Id*. The Act allowed gun owners to retain their existing "Others" after May 1, 2024, by obtaining a certificate of possession. JA329.

## II.    The District Court refuses to enjoin Connecticut's gun safety laws pending trial.

*The Plaintiffs*. The Plaintiffs are three individual Connecticut residents and two membership organizations.

Each individual Plaintiff already owns many firearms. Mr. Grant owns about twenty, five of which are "Others." He has never used any of his firearms in self-defense. He has fired his AR-15 configured "Others"

at the firing range from the shoulder "like a long gun" by putting the pistol brace of the weapon up against his shoulder. SA60.

Mr. Stiefel owns about eighteen firearms, including four "Others." SA130-32. Like Mr. Grant, he has never "used any of [his] firearms in self-defense." SA186-87.

Ms. Hamilton owns "between 10 and 15" firearms, two of which are "Others" in an AR-15 configuration. SA232-41. She has discharged a firearm—a.22 caliber rifle, which the challenged gun safety laws do not restrict—twice in self-defense: once against a coyote, and once against a raccoon. SA263-65. She has never had to use, fire, or brandish any of her "others" in self-defense. SA262-63.

*The Lawsuit.* In the fall of 2022, Plaintiffs brought this facial challenge to Connecticut's gun safety laws and sought a preliminary injunction to bar enforcement of the gun safety laws entirely and for everyone. JA54-57.

In early August 2023, the District Court denied a preliminary injunction in a parallel case that sought to overturn Connecticut's pre-2023 restrictions on assault weapons and LCMs. *Nat'l Ass'n for Gun Rts. v. Lamont,* No. 22-1118, 2023 U.S. Dist. LEXIS 134880 (D. Conn. Aug. 3,

2023), *appeal pending*, No. 23-1162 (2d Cir.). After extensive analysis, the District Court held that the *NAGR* plaintiffs showed no likelihood of merits success because they failed to show that assault weapons are presumptively protected by the Second Amendment. *Id*. at \*5-6. Meanwhile, the defendants met their burden of showing that this nation has a "longstanding history and tradition" of relevantly similar arms regulations. *Id*.

On August 28, 2023, a few weeks after deciding *NAGR*, the District Court denied a preliminary injunction in our case. The District Court adopted *NAGR*'s holdings about the applicable analytical framework. Plaintiffs' Special Appendix (SPA) 9. Then it turned to the facts in our record.

At the threshold stage, the District Court concluded that Plaintiffs failed to show the restricted assault weapons are presumptively protected by the Second Amendment. *Id*. at 10-12. Only arms commonly used for self-defense—rather than unusually dangerous weapons of war—are presumptively protected. *Id*. at 12. But Plaintiffs produced no evidence that the assault weapons here fit the bill. *Id*. Instead, they tried

14

and failed to meet their threshold burden by asserting "mere statistical numerosity." *Id*. at 10.

Then, although Plaintiffs' threshold "failure to produce evidence sufficient to show common use for self-defense is fatal to their motion," the District Court moved on to *Bruen*'s second step, holding that, "as in *NAGR*, the Challenged Statutes are consistent with the nation's history of firearm regulation." *Id*. at 12. Referencing its own analysis in *NAGR* and other federal decisions, the District Court determined that Connecticut's restrictions track historical restrictions in both *how* and *why* they burden the right of armed self-defense. *Id*. at 12-13.

## SUMMARY OF ARGUMENT

No federal appellate court has ever enjoined a state from restricting assault weapons. The Seventh Circuit—the only Circuit to decide the issue since *Bruen*—has refused to preliminarily enjoin restrictions much like Connecticut's. *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), *petition for cert. filed sub. nom. Nat'l Ass'n for Gun Rts. v. City of Naperville*, No. 23-1353 (Feb. 12, 2024). Using similar reasoning as the Seventh Circuit, the First Circuit has affirmed the denial of a preliminary injunction against Rhode Island's restrictions on large-capacity magazines (LCMs)—magazines that hold more than 10 rounds of ammunition. *Ocean State Tactical v. Rhode Island*, 95 F.4th 38, 2024 U.S. App. LEXIS 5723 (1st Cir. Mar. 7, 2024) (*Ocean State II*). District courts across the country have also rejected challenges to assault weapon restrictions.[2]

---

[2] *See Capen v. Campbell*, No. 22-11431, 2023 U.S. Dist. LEXIS 227385 (D. Mass. Dec. 21, 2023) (denying preliminary injunction against Massachusetts' assault weapon and LCM restrictions), *appeal pending*, No. 24-1061 (1st Cir.); *Del. State Sportsmen's Ass'n, Inc v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584 (D. Del. 2023) (same in Delaware), *appeal pending*, No. 23-1633 (3rd Cir.); *Hartford v. Ferguson*, 676 F. Supp. 3d 897 (W.D. Wash. 2023) (denying preliminary injunction against Washington's assault weapons restrictions). *But see Miller v.*

The District Court here was well within its discretion in following suit, and this Court should affirm.

Plaintiffs are unlikely to succeed on the merits because they did not meet their threshold burden of showing that assault weapons are presumptively protected by the Second Amendment. That meant showing that the restricted weapons are "in common use today for self-defense," *Bruen*, 597 U.S. at 32, and not unusually dangerous weapons of war.

Plaintiffs did not even try to carry that burden. In an inquiry about the historical understanding of constitutional text, Plaintiffs put nothing in the record from either historians or experts in textual analysis. Instead, they adduced a handful of imprecise statistics aimed at tallying the number of assault rifles owned or in circulation. That ahistorical, extra-textual, and illogical approach is foreclosed by Supreme Court precedent, this Court's precedent, and persuasive precedent from other circuits.

---

*Bonta*, No. 19-1537, 2023 U.S. Dist. LEXIS 188421 (S.D. Cal. Oct. 19, 2023), *administratively stayed pending* appeal, No. 23-2979 (9th Cir. Oct. 28, 2023).

Defendants, meanwhile, built a rich evidentiary record showing that the restricted weapons get no Second Amendment protection because they are designed, used, and useful not for self-defense but for maximum lethality in offensive combat. Connecticut restricts only weapons with enhanced "capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns." H.R. Rep. No. 103-489, at 19-20 (1994). The AR-15, for instance, is "indistinguishable" from the M-16 machine gun that states unquestionably may ban. *Bevis,* 85 F.4th at 1197.

Because Plaintiffs bring a facial challenge, they have an even heavier threshold burden. They must show that Connecticut's gun safety laws are unconstitutional in all applications. But the laws restrict weapons, features, and accessories—like grenade launchers and Street Sweeper shotguns—that the Second Amendment plainly does not protect. So Plaintiffs fail even if some of the restricted weapons fall within the constitutional ambit.

And this Court should affirm even if all the restricted weapons were presumptively protected. Defendants showed a robust tradition of laws

18

restricting weapons technologies—especially newly-proliferating technologies—that present extraordinary public safety risks. Those historical analogues were motivated by the same concerns as Connecticut's gun laws and burdened the core Second Amendment right more significantly than Connecticut's laws, which do not impair armed self-defense.

Finally: Plaintiffs did not carry their burden on the other preliminary injunction factors. Connecticut, not Plaintiffs, faces an imminent risk of irreparable harm. Residents can buy and own more than a thousand makes and models of legal firearms for self-defense. Each Plaintiffs already owns at least a dozen firearms. But an injunction would irretrievably release assault weapons onto Connecticut's streets without even a trial.

# ARGUMENT

Plaintiffs seek "an extraordinary and drastic remedy that is never awarded as of right." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021) (internal quotation marks omitted). Since they would enjoin "government action taken in the public interest pursuant to a statute or regulatory scheme," Plaintiffs must at a minimum satisfy all four *Winter* factors, showing (1) "a likelihood of success on the merits"; (2) "irreparable harm"; (3) "public interest weighing in favor of granting the injunction"; and that (4) "the balance of equities supports the issuance of an injunction." *Id*. at 279-80 (adapting and applying *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

But Plaintiffs want a mandatory injunction, so "a heightened legal standard" applies. *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). They must "make a strong showing of irreparable harm and demonstrate a clear or substantial likelihood of success on the merits." *A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021).

The District Court mistakenly (but not dispositively) applied the lower "likelihood" standard. SPA8. But an injunction here would both alter a long-enduring status quo and force Defendants to take affirmative

steps in compliance. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36–37 (2d Cir. 2018) (injunctions are "mandatory, if they change the status quo"); *Mastrovincenzo v. City of New York*, 435 F.3d. 78, 90 (2d Cir. 2006) (injunctions are mandatory if they would command defendants "to perform any specific tasks"). Connecticut residents must obtain an eligibility certificate before buying a long gun, and a permit before buying or carrying a handgun. JA366. These requirements would endure even if the assault weapon restriction were enjoined. So an injunction would force state officials to perform "specific tasks" by processing applications—and where appropriate issuing permits or certificates—for Plaintiffs and perhaps others who want now-restricted weapons.

Even applying the lower standard, though, the District Court correctly denied Plaintiffs' preliminary injunction. This Court should affirm, reviewing for abuse of discretion. *We the Patriots*, 17 F.4th at 280.

## I. Plaintiffs did not carry their threshold burden of showing that Connecticut restricts any constitutional right.

In a Second Amendment challenge—as in many other kinds of constitutional challenges—plaintiffs must first show that the Constitution presumptively covers them and their proposed conduct.

This threshold step requires "interpreting the plain text" of the Second Amendment "as historically understood." *Antonyuk v. Chiumento*, 89 F.4th 271, 300 (2d Cir. 2023), *petition for cert. filed sub. nom. Antonyuk v. James*, No. 23-910 (Feb. 20, 2024). The District Court correctly found that Plaintiffs failed to clear the threshold.

### A. Plaintiffs had to show that the restricted weapons are used and useful for self-defense, not unusually dangerous weapons of war.

The Second Amendment does not allow just anyone "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Instead, it only guarantees the right of "the people" to keep and carry "certain types of weapons." *Id*. at 623.[3]

The plain text protects only keeping and carrying arms for self-defense. The Second Amendment, *Heller* taught, "codified a pre-existing right" of law-abiding residents "to possess and carry weapons in case of

---

[3] Defendants do not contest right now that these Plaintiffs are presumptively part of "the people." So this brief does not consider that component of the threshold inquiry, which may be relevant in other kinds of Second Amendment challenges or even, after further discovery, in this case.

confrontation." 554 U.S. at 570. Not "*any sort* of confrontation," though. *Id*. at 595 (emphasis in original). Instead, the 1689 English Bill of Rights "explicitly protected a right to keep arms for self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010). Blackstone characterized that traditional right as a "right of having and using arms for self-preservation and defence." *Heller*, 554 U.S. at 594. As Defendants' expert historian Saul Cornell summed up the history: the Second Amendment embodied the common law "right of self-defense." JA1220.

Embracing the preexisting definition of the right, *Heller* emphasized the constitutional significance of self-defense by repeating the phrase 37 times, explaining that self-defense is the "core" of the Second Amendment, its "*central component*," and the original motivation for codification. 554 U.S. at 599, 630 (emphasis in original). A few years later, *McDonald* underlined the centrality of self-defense to the Second Amendment inquiry. 561 U.S. at 787 ("self-defense was the *central component* of the right itself.") (emphasis in original, quotation omitted). *Bruen* sealed the deal. *Heller* and *McDonald*, *Bruen* explained, "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the

home for self-defense." 597 U.S. at 8-9. *Bruen*'s own holding is that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id*. at 10. Of course weapons can be put to "other lawful uses" beyond self-defense—"sporting uses, collection, and competitions come to mind as examples." *Bevis*, 85 F.4th at 1192. Not every lawful activity, though, is constitutionally protected. Instead, as the Seventh Circuit recently concluded, the constitutional protection only extends to "the individual right to self-defense." *Id*.[4]

Reconstruction lawmakers–the generation that incorporated the Second Amendment–embraced and encoded that original understanding of the right. *See Heller*, 554 U.S. at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."). Texas' 1868 Constitution, for instance, provided that

---

[4] Plaintiffs grapple with none of this history and never cite *Bevis*, the one post-*Bruen* appellate decision on point. They would lose, though, even if the Second Amendment protected lawful uses other than self-defense. They never showed that assault weapons are in fact used or useful for those purported other lawful purposes—or even, subjectively, that their individual Plaintiffs want them for lawful purposes other than self-defense. Pl. Br. 10, 12, 14.

24

"[e]very person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe." JA1228-29. Defense expert Cornell cited sixteen state constitutions adopted during the Reconstruction era that used similar language to condition the right conferred by their Second Amendment cognates. *Id.*

Reflecting the historical understanding, a Second Amendment plaintiff must first show that the restricted weapon is an arm "commonly used… for self-defense." *Bruen*, 597 U.S. at 38; *see also Antonyuk*, 89 F.4th at 298 (*Bruen* addressed whether "handguns . . . were 'weapons in common use today for self-defense,' in the first step of the 'two-step framework'"); *Bevis*, 85 F.4th at 1192 ("Both Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense."); *United States v. Alaniz*, 69 F.4th 1192 (9th Cir. 2023) (recognizing a plaintiff's obligation to show suitability for self-defense at *Bruen*'s threshold stage). The historical understanding demands a functional test. Plaintiffs must show what the restricted weapons are "useful" for, *Heller*, 554 U.S. at 627, and how they are "used." *Bruen*, 597 U.S. at 38. *Heller*, after all,

25

explored handguns' "type," "character," 554 U.S. at 622-23, and function-
—the "reasons that a citizen may prefer a handgun for home defense."
554 U.S. at 629 (discussing, among other things, the ready accessibility
and maneuverability that make handguns ideally suited to self-defense
in the home).

Plaintiffs must also show that a restricted weapon is not a
"dangerous and unusual" weapon falling outside the Second
Amendment's protection. *Heller*, 554 U.S. at 627. Historian Cornell
explained that the Founding generation would have understood
"dangerous and unusual" as a figure of speech meaning "unusually
dangerous." JA1220-21. Our historical tradition of banning unusually
dangerous weapons, *Heller* teaches, fixes the boundaries of the Second
Amendment right. 554 U.S. at 627. The category of unprotected weapons
includes some "weapons that are most useful in military service–M-16
rifles and the like." *Id*. And this part of the inquiry, too, is functional.
Showing that a restricted weapon is not "like" a bannable M-16 means
comparing the respective weapons' design, features, and real-world
usage. *Bevis*, 1175 F.4th at 1175-76 (comparing the kinetic energy

26

delivery, muzzle velocity, effective range, and fire rates of the M-16 and AR-15).

This Court has already embraced much of this test. In *Cuomo*, this Court explained that Second Amendment challengers must carry a threshold burden of showing that "the challenged legislation impinges upon conduct protected by the Second Amendment." 804 F.3d at 254. To *Cuomo*, the threshold inquiry considered statistics on weapon ownership but went much farther, examining "broad patterns of use and the subjective motives of gun owners." *Id*. at 255-56. *Cuomo* also understood that the threshold inquiry meant asking, among other things, whether restricted weapons are "dangerous and unusual" and "most useful in military service." *Id*.

## B. Plaintiffs' numerosity arguments failed to satisfy the threshold test.

Plaintiffs brush all this history, text, and precedent aside, trying to carry their burden with ownership statistics alone. Their numerosity argument failed below, and fails now, for four main reasons.

First: Plaintiffs purport to embrace *Cuomo*'s first step. But statistics are not enough under *Cuomo*. 804 F.3d at 255 (common ownership is relevant but not dispositive). That is especially true after

*Bruen*, which supplied the "clearer guidance" that *Cuomo* sought on the threshold inquiry. 804 F.3d at 257. Now we know that mere possession statistics have no constitutional significance. After all, *Bruen* specifically asks not just about "common use"—which *Cuomo* took to include considering ownership statistics—but specifically about "common use today *for self-defense*," 597 U.S. at 32 (emphasis added), a mandate to inquire into purpose and function.

Second: No constitutional right hinges on mass consumption or social popularity. Plaintiffs say they want to treat the Second Amendment like every other constitutional right, Pl. Br. at 60, but they ask this Court to put it on a pedestal. That is not what the Supreme Court commanded.

Nothing in *Heller, McDonald*, or *Bruen* suggests that possession statistics alone can carry the day. Those cases speak of "use," not "ownership." *See Use*, Black's Law Dictionary (11th ed. 2019) (An instrumentality is "used" when it is "employ[ed] . . . for the purpose for which it is adapted."). Like *United States v. Miller*, 307 U.S. 174 (1939) before it, *Heller* decreed that machine guns and short-barreled shotguns can be restricted without considering their prevalence. *See Kolbe*, 849

F.3d at 142 ("[T]he *Heller* majority said nothing to confirm that it was sponsoring [a] popularity test."); *Ocean State II*, 2024 U.S. App. LEXIS at *24 ("*Miller*'s determination that sawed-off shotguns fall outside the realm of Second Amendment protection… contains no hint that the court somehow assumed that few people owned such weapons before they were banned."). *Bruen* did not change that. As the First Circuit recently observed: *Bruen* never suggested that "states may permissibly regulate only unusual weapons… [n]or has it intimated that a weapon's prevalence in society (as opposed to, say, the degree of harm it causes) is the sole measure of whether it is 'unusual.'" *Ocean State II*, 2024 U.S. App. Lexis at *23-24.[5]

Plaintiffs' numerosity argument would implicitly overturn *Miller* and *Heller*, throwing the 1934 National Firearms Act's constitutionality into question. As of 2021, the last year for which data is publicly

---

[5] Plaintiffs would "treat[] the concurring opinion" in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), "as if it were binding authority." *Ocean State II*, 2024 U.S. App. LEXIS at *25. The *Caetano* per curiam itself never suggests that numerosity alone is enough to clear the threshold bar, or even that ownership statistics are relevant to the equation.

available, over 741,000 machine guns were registered in the United States—far more than Plaintiffs' proposed 200,000 benchmark for common possession.[6] Pl. Br. 36. When Congress passed the NFA, Thompson submachine guns or "Tommy Guns"—a major focus of the law—were "all too common." *Friedman v. City of Highland Park,* 784 F.3d 406, 408 (7th Cir. 2015), *abrogated in part on other grounds by Bruen,* 597 U.S. 1. But *Heller* reaffirmed the NFA's constitutionality, and no court has questioned it since. 554 U.S. at 624.

Third: Plaintiffs' reliance on ownership statistics misses the mark not just doctrinally but also logically. That, too, has been clarified since *Cuomo.* Plaintiffs' proposed circular inquiry would elevate a "law's existence" into "the source of its own constitutional validity." *Friedman,* 784 F.3d at 409; *and see Bevis,* 85 at 1190 (recapping *Friedman*'s reasoning); *Worman v. Healey,* 922 F.3d 26, 35 n.5 (1st Cir. 2019) (reducing the constitutional threshold test to a popularity contest is "somewhat illogical"), *abrogated in part on other grounds by Bruen,* 597

---

[6] U.S. Dep't of Justice, ATF, *Firearms Commerce in the United States: Annual Statistical Update* 16 (2021), https://www.atf.gov/resource-center/data-statistics.

U.S. 1. "It defies reason," the First Circuit explained, "to say that legislatures can only ban a weapon if they ban it at (or around) the time of its introduction, before its danger becomes manifest." *Ocean State II*, 2024 U.S. App. LEXIS at *23. A robust marketing campaign that drives a run on weapons of war or instruments of crime cannot set the Second Amendment's presumptive scope. Plaintiffs would make gun dealers into Second Amendment gatekeepers, allowing them to manipulate ownership statistics by flooding the market with assault weapons. As a gun dealer in South Carolina advertises: "We want to sell as many AR-15 and AK-47 rifles as we can and put them into common use in America today."[7]

Plaintiffs get the logic of enforcement backward. Government regulates when unusually lethal weapons penetrate society enough to present a serious social risk. Nobody ever needed to regulate for anomalous and unsuccessful technologies, like the 22-round rifle that Lewis and Clark purportedly carried or the other historical oddities that

---

[7] Palmetto State Armory, *About Palmetto State Armory,* https://palmettostatearmory.com/about-psa.html (last visited Feb. 12, 2024).

31

Plaintiffs cherry-pick from sources outside the record. Pl. Br. 47-48. As historian Saul Cornell explains: "Legislation was only necessary once new weapons became popular enough to cause a problem that required government action." JA1231.

Fourth: Plaintiffs are empirically off base, too. At most, their statistics speak to units owned. But the Constitution protects people, not weapons. The number of weapons in circulation–an "estimate," as Plaintiffs concede, JA104–and the number of permits issued says little about the number of owners, since the average assault weapons owner has "three or more of the guns." JA401. And none of Plaintiffs' limited data tells us anything about the constitutionally indispensable purpose, self-defense. We know for certain, though, that assault weapons are far less common than the handguns in *Heller* and *Bruen*. JA 105. We know that it is far more common not to own a gun than to own one. JA373 (nationwide, 70% of adults do not own any firearms, let alone assault weapons). And we know that it is far more common to want assault weapons banned than to want them on the street. JA374 (citing 2021 Pew survey showing that 63% of Americans support assault weapons ban).

**C.** **The restricted weapons are unusually dangerous weapons of war, neither used nor useful for self-defense.**

Plaintiffs cannot not carry their burden with ownership statistics alone. And even if ownership numbers were relevant, Defendants did more than enough to rebut Plaintiffs' minimal showing.

Unlike the laws at issue in *Heller*, *McDonald*, and *Bruen*, Connecticut's gun safety laws do not restrict an entire class of "quintessential self-defense weapon[s]" like conventional handguns. *Heller,* 554 U.S. at 629. Nor do they restrict all semiautomatic firearms, long guns, or rifles. Instead, Connecticut's laws are carefully calibrated to conform with the Constitution's contours. The restricted weapons are unusually dangerous, just like M-16 military rifles. They are used more often for mass shootings than for self-defense. And they are designed and marketed for offensive combat.

*The restricted assault weapons are indistinguishable from bannable military weapons.* Start with the place where the Seventh Circuit ended: assault weapons like the AR-15 are "indistinguishable" from military weapons like the M-16, and states can restrict both. *Bevis*, 85 F.4th at 1197.

33

All the weapons that Connecticut restricts have unusually dangerous, "combat-functional" features, "designed to… shoot multiple human targets very rapidly." *Kolbe*, 849 F.3d at 137; *Heller v. District of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011); *and see supra* pp. 9-10 (explaining how the restricted features facilitate crime and mass murder). But the individual Plaintiffs here want AR-15-type assault rifles, whose lethal technology typifies the reasons why unusually dangerous, military-style weapons are beyond the Second Amendment's protections.

AR-15s were designed as battlefield weapons, capable "of placing a large volume of fire" on "multiple or moving targets." JA427. They do the job with "phenomenal lethality," JA407, and they are just as dangerous as their M-16 descendants. Compare the two on every relevant metric: "Both models… deliver the same kinetic energy (1220-1350 foot-pounds), the same muzzle velocity (2800-3100 feet per second), and the same effective range (602-875 yards)." *Bevis*, 85 F.4th at 1196. The AR-15 fires the same ammunition, at the same "rapid fire" rate, as its military twin. JA1173. It causes the same injuries as the weapons that American soldiers confront, and use, on the battlefield. JA1034. One retired Army

general summed it up: "For all intents and purposes, the AR-15 and rifles like it are weapons of war…. It is a very deadly weapon with the same basic functionality that our troops use to kill the enemy." JA428; *and see Capen v. Campbell*, No. 22-11431, 2023 U.S. Dist. LEXIS 227385, *37 (D. Mass. Dec. 21, 2023) ("[T]he AR-15 is a weapon with the same basic characteristics, functionality, capabilities, and potential for injury as the standard-issue rifle for infantry troops."); *Kolbe,* 849 F.3d at 136 ("Are the banned assault weapons and large-capacity magazines like M-16 rifles, i.e., weapons that are most useful in military service, and thus outside the ambit of the Second Amendment? The answer to that dispositive and relatively easy inquiry is plainly in the affirmative.") (cleaned up).[8]

Plaintiffs fall back on the AR-15's lack of an automatic fire mode, but that distinction comes with no relevant difference. An AR-15 can empty a 30-round magazine in five seconds—just three seconds more

---

[8] *See also Staples v. United States*, 511 U.S. 600, 603 (1994) (describing the AR-15 as "the civilian version of the military's M-16 rifle"). Plaintiffs mistakenly think that *Staples* cuts in their favor. Pl. Br. 57-58. But *Staples* was about *mens rea* for a federal firearms conviction, not about the Second Amendment.

than an M-16. *Kolbe*, 849 F.3d at 125. Even if automatic fire were the feature that makes M-16s such effective war machines, AR-15s can be rigged for automatic fire with simple aftermarket adaptations. JA1175-76. But the lack of automatic fire mode does not make AR-15s any less lethal. "It is surprising," the Army Field Manual drily notes, "how devastatingly accurate rapid semiautomatic fire can be." JA427. That is why the Fourth Circuit brushed off any minimal distinction as constitutionally meaningless. *Kolbe*, 849 F.3d at 125 ("[S]oldiers and police officers are often advised to choose and use semiautomatic fire, because it is more accurate and lethal than automatic fire in many combat and law enforcement situations."). It is also why the Seventh Circuit—the only post-*Bruen* federal circuit court to rule on this issue—held that Illinois could constitutionally restrict assault weapons. *Id.*[9]

---

[9] The AR-15's close kinship with the M-16 is hardly anomalous. For instance: in 2016, a Baton Rouge mass-murderer killed three police officers with a TAVOR assault rifle—a weapon created for the Israeli Defense Forces, whose manufacturers boast of empowering soldiers to navigate "dynamic changes in the modern battlefield, the threats of global terrorism, and the demands of ever-changing combat situations." JA408.

*Assault weapons are more often used in mass shootings than in self-defense.* Assault weapons are almost never used defensively. Of the 2,714 incidents in the Heritage Foundation's "Defensive Gun Uses" database as of October 2022, only 2% involved assault weapons, discharged or not. JA962-63. And of all 406 U.S. "active shooter" incidents between January 1, 2000, and December 21, 2021,[10] "only one . . . involved an armed civilian intervening with an assault weapon." JA451.[11]

But mass shooters disproportionately choose assault weapons. Defense expert Louis Klarevas, who studies U.S. gun massacres, showed that mass shooters use assault weapons ten times more often than the guns' prevalence would suggest. JA441-42. The perpetrators in six of the seven most deadly acts of intentional criminal violence in the country since 9/11—and in 75% of all shootings that took more than 20 lives—used assault weapons. *Id.* And mass shooters are choosing assault weapons more often. Over the past 32 years, assault weapons were used

---

[10] An "active shooter" incident is an attempted mass shooting: a "violent attack that involve[s] one or more individuals actively engaged in killing or attempting to kill people in a populated area." JA450.

[11] In response, Plaintiffs offer a couple of (extra-record) anecdotes. The rarity of those instances is really a confession.

in about a third of all mass shootings. In the past eight years, though, that share "has risen to approximately half." JA450. In sum, "assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings." JA451.[12]

*Assault weapons are unusually dangerous–designed and useful for mass shootings, not for self-defense.* One reason that assault weapons are not used in self-defense is that they are not useful in self-defense. AR-15s, for example, are not easily maneuverable one-handed in a confined space. JA423; *Capen*, 2023 U.S. Dist. LEXIS 227385 at *38 ("AR-15s are physically unsuited to typical self-defense scenarios. They are significantly heavier and longer than typical handguns, making them less concealable, more difficult to use, and less readily accessible, particularly for an inexperienced user."). They are remarkably lethal against large numbers at range, JA1031, but most self-defense occurs "within a distance of three yards." JA425. In the home, assault weapons

---

[12] This is why restrictions like Connecticut's save lives. Between September 1, 1990—when New Jersey passed the country's first broad restriction on assault weapons and LCMs—and December 31, 2022, states with restrictions benefited from a 66% decline in mass shooting fatality rates. JA460.

pose a terrifying risk to innocent bystanders, since "[r]ounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials." *Kolbe*, 849 F.3d at 127 (citation omitted); JA422-23.

The individual Plaintiffs themselves could not explain why an assault weapon is useful for self-defense. Mr. Stiefel acknowledged that a weapon that is "shorter" and therefore "easier to maneuver" is "better suited for self-defense," and admitted that all his pistols are shorter than his "others" and rifles. SA165-67; 172-73. Mr. Grant could not identify a reason to need assault weapons except that they were "like shoes" and he needed certain ones for certain seasons. SA24. Ms. Hamilton claimed that if "someone [was] standing over her bed" in the middle of the night, the only weapon with which she could defend herself would be an AR-15. SA289-295. When pressed about why she could not defend herself with any of her other firearms, Ms. Hamilton blamed "the recoil." SA292-95. Despite being a firearms instructor, she could not explain what that meant. *Id.*

Unlike their negligible utility in civilian self-defense scenarios, assault weapons are optimized for battlefield combat and mass shootings.

39

This Court has already found that "semiautomatic assault weapons have been understood to pose unusual risks" because they "tend to result in more numerous wounds, more serious wounds, and more victims." *Cuomo*, 804 F.3d at 262; *and see Gallinger v. Becerra*, 898 F.3d 1012, 1019 (9th Cir. 2018) (when assault weapons are paired with large-capacity magazines, "more shots are fired, and more fatalities and injuries result than when shooters use other firearms and magazines."). Assault weapons, along with the large-capacity magazines that they are often built to house, empower shooters to do more damage more quickly, before anyone can intervene. *See, e.g.*, JA384; *and see supra* pp. 7-9 (detailing characteristics of AR-15s and other assault weapons).

Uncontradicted defense experts quantified that difference in lethality. In mass shootings over the last 32 years, the use of assault weapons is linked to a 67% increase in average deaths per incident. JA444. Looking at all shootings nationally between 1982 and 2022 where four or more people were killed in a public place, econometrician Lucy Allen found an average of 36 fatalities or injuries when an assault weapon was used, versus ten otherwise. JA973.

Assault weapons are so unusually lethal in part because they inflict devastating damage on the human body. High-velocity rounds, leaving the barrel at 3300 feet per second—three times the speed of a typical .9mm round, JA1030—carry enormous kinetic energy and bore huge holes, leaving exit wounds "the size of an orange." Heather Sher, *What I Saw Treating the Victims From Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), http://tinyurl.com/56d9ejzn. The ripple effect of an AR-15's bullet, according to a radiologist who treated victims of 2018's Parkland, Florida massacre, is "like a cigarette boat traveling at maximum speed through a tiny canal," destroying tissue that it does not even touch. *Id*. Victims shot with handguns can usually be saved, she explained, but the Parkland victims mostly "died on the spot, with no fighting chance at life." *Id*. "A typical 9mm wound to the liver," according to another doctor, "will produce a pathway of tissue destruction in the order of [one inch] to [two inches]. In comparison, an AR 15 will literally pulverize the liver, perhaps best described as dropping a watermelon onto concrete." *Capen*, 2023 U.S. Dist. LEXIS at *40-41.

Defense expert Martin Schrieber, a decorated Army trauma surgeon with almost 40 years of service in both war zones and U.S.

hospitals, bore painful witness to assault weapons' unusual lethality. For him, assault weapons make American streets into battlegrounds. "The assault weapon wounds that I have seen in a civilian context," he laments, "are virtually identical in nature to the wounds that I saw in combat." JA1034. Wounds from handguns and other weapons, by contrast, "differ substantially… both in impact on the body and their relative fatality and complication rates." *Id*. Assault weapon blasts to the head, neck, and trunk are usually fatal; blasts to the abdomen "can destroy organs in a way that looks like an explosion has happened"; blasts to the extremities "frequently result in amputation." JA1034-35. Assault weapons, he concludes, "are designed for the purpose of maximum killing in wartime," and they do exactly what they're made to do. JA1035.

Assault weapons also pose an unusually high risk to law enforcement. *Cuomo*, 804 F.3d at 261 ("They are disproportionately used to kill law enforcement officers."). With their range and capacity for rapid fire, assault weapons enable criminals "to maintain parity with law enforcement in a standoff." JA1174-75. Their high muzzle velocities, and the type of rounds they can chamber, allow them to penetrate police body

armor. JA379. *Cuomo* quoted a study showing that, despite their relative rarity, "assault weapons were used to gun down at least twenty percent of officers killed in the line of duty." 804 F.3d at 262.

*Assault weapons are marketed for mass shootings, not for self-defense.* Even gun manufacturers do not tout assault weapons as useful in self-defense. Instead, they market assault weapons for war and aggression. *See* JA1234-35 ("Gun makers eventually developed a more effective set of marketing strategies that linked these products to their origins in the military…."). Assault weapons come "combat customized from the factory." JA1236. Owning an assault rifle will bring out the "warrior in you." JA405. Carrying one is the "closest you can get" to war "without having to enlist." JA401. Young men, like the Sandy Hook killer, are told that they can use assault weapons to regain their "man card" and make their opponents "bow down." JA404, 402, 1235. The assault weapons that Connecticut restricts, as one pro-assault-weapon-proliferation politician put it, are not tools of self-defense but "look-at-me guns." JA388. That appeals to shooters, who want to be seen. The killer who took seventeen lives at Parkland High School in 2018 wrote: "With the power of the A.R., you will know who I am." JA405.

*None of Plaintiffs' counterarguments helps them*. Plaintiffs respond with two unhelpful counterarguments, both aimed at shirking their threshold obligation to show that the restricted weapons are not unusually dangerous.

First: Plaintiffs contend that the District Court should not have considered dangerousness at the threshold step. But Plaintiffs embrace *Cuomo*'s Step 1, Pl. Br. at 33, and *Cuomo* taught that the threshold inquiry includes "whether restricted weapons are "dangerous and unusual" or "most useful in military service," and therefore "could be banned without implicating the Second Amendment." 804 F.3d at 256. *Antonyuk* again situated the "dangerous and unusual" inquiry at the threshold stage. For *Antonyuk*, whether a weapon is "dangerous and unusual" goes to whether it is in "common use"—and "common use" is a threshold question. 89 F.4th at 312 ("common use" is part of the threshold inquiry); *id*. at 295 (the Second Amendment only "protects the right to keep and bear the sorts of weapons that are in common use—a limitation [that] is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.").

44

Plaintiffs do not cite *Antonyuk*—controlling precedent from this Circuit, issued before they filed their brief. Instead, they mistakenly rely on *Teter v. Lopez*, 76 F.4th 938 (2023), where a Ninth Circuit panel held that the "dangerous and unusual" consideration is reserved for *Bruen*'s second step. Pl. Br. 26. But *Teter* was vacated pending en banc rehearing. *Teter v. Lopez*, 2024 U.S. App. LEXIS 4079 (Feb. 22, 2024) (en banc).

Second: Plaintiffs contend that "dangerous and unusual" does not mean "unusually dangerous." To them, a weapon must be both dangerous and unusual before it can be restricted. Pl. Br. 58-59. Since all guns are definitionally dangerous, though, Plaintiffs' mistaken insistence on a conjunctive test is just another way to insist that only common possession matters. We have already seen why that is wrong.

Plaintiffs' argument also assumes—directly contrary to the historical understanding of text valorized by *Heller* and *Bruen*—that "unusual" must mean statistically rare. *Bruen* does not say that, though. *Bruen* never "intimated that a weapon's prevalence in society (as opposed to, say, the degree of harm it causes) is the sole measure of whether it is 'unusual.'" *Ocean State II*, 2024 U.S. App. Lexis at *23-24.

45

"Dangerous and unusual" means what it meant historically. *Heller* cites Blackstone for the tradition of prohibiting "dangerous and unusual" weapons. 554 U.S. at 627. Professor Cornell, Defendants' expert, shows that Blackstone actually spoke of "dangerous *or* unusual weapons." JA1220 (emphasis added). *Heller* did not get the substance of the quote wrong, though. As Cornell explains, JA1220-21, the Founding generation would have understood both "dangerous and unusual" and "dangerous or unusual" as a figure of speech, like "cruel and unusual" and "necessary and proper," that involves "two terms, separated by a conjunction… melded together to form a single complex expression." *See* Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016). Whatever the conjunction: According to Cornell, dangerous and unusual, together, meant *unusually dangerous*. JA1221. Plaintiffs do nothing to rebut this historical evidence.

In the end: Plaintiffs declined to make a record on the threshold test, reducing the Constitution's reach to a counting game. But Defendants' record shows that the restricted assault weapons are

unusually dangerous; neither used nor useful for self-defense; and just like bannable military rifles.

### D. Plaintiffs' facial challenge fails even if some of the restricted weapons are presumptively protected.

Plaintiffs do not contest the District Court's conclusion that they facially challenge Connecticut's gun safety laws. SPA9-10. So, to win, Plaintiffs must show that "no set of circumstances exists under which" Connecticut's gun safety laws "would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). This Court reaffirmed that rule only months ago. *Antonyuk*, 89 F.4th at 316 (*Bruen* did not "create an 'exception' to the normal rules about facial and as-applied challenges."). Since some of the restricted weapons here are plainly beyond the Second Amendment's reach, the whole challenge fails.

The challenged laws restrict ownership and possession of a wide range of weapons–including grenade launchers, types of Uzis, and "Street Sweeper" shotguns. Conn. Gen. Stat §§ 53a-202a(1)(A)(i), 53a-202a(E)(i)(V). Plaintiffs have never claimed that those lethal, restricted weapons are protected by the Second Amendment. Nor could they. *See, e.g.*, *Heller*, 554 U.S. at 625-627 ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for

47

lawful purposes, such as short-barreled shotguns."); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 369-70 (W.D.N.Y. 2013), *affirmed in relevant part by Cuomo*, 804 F.3d at 247 (bans on "outlawed features" like "a grenade launcher, bayonet mount, or a silencer" are self-evidently constitutional and "require no explanation"); *United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008) (sawed-off shotgun is unprotected by the Second Amendment); *United States v. White*, 13-440, 2017 U.S. Dist. LEXIS 229493, at *8-9 (W.D. Mo. Oct. 13, 2017) ("[T]he Street Sweeper is both a 'dangerous and [un]usual weapon'" and properly banned) (quoting *Heller*, 554 U.S. at 627).

Plaintiffs are the "masters of their complaint." *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 94 (2005). They could have shaped it to challenge only some of the restricted weapons—the ones, for instance, that they say they want to keep and bear. They chose an unwinnable facial challenge instead. *See Antonyuk*, 89 F. 4th at 317 ("Facial challenges are disfavored because they often rest on speculation, raise the risk of premature interpretation of statutes on the basis of factually barebones records….") (internal quotation marks omitted). With at the very least a wide swathe

of the restricted weapons unprotected by the Second Amendment, this Court should affirm.

## II. Connecticut's gun safety laws are consistent with our nation's history of regulating arms.

The District Court correctly found that Plaintiffs would lose even if they survived the threshold inquiry, because Connecticut's restrictions are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The State's gun safety laws fit tightly with close analogues ranging from 17th century restrictions on pocket pistols, to 18th century restrictions on trap guns and black powder, to 19th century restrictions on Bowie knives and handguns, to 20th century restrictions on Tommy guns.

Connecticut's restrictions are relevantly similar to precedent in *how* and *why* they burden the core Second Amendment right to self-defense. *Id.* at 29. The *how*: Connecticut's gun safety laws restrict only unusually dangerous weapons that are not useful for self-defense while allowing residents to keep and carry more than 1,000 guns and countless other arms. *See Ocean State II*, 2024 U.S. App. LEXIS at *11 ("Given the lack of evidence that LCMs are used in self-defense, it reasonably follows that banning them imposes no meaningful burden on the ability of Rhode

Island's residents to defend themselves."); *Del. State Sportsmen's Ass'n, Inc v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 602 (D. Del. 2023) (*DSSA*) (assault weapon restrictions only impose a "slight" burden on self-defense). And the *why*: Going back to England, governments in our constitutional tradition have always regulated newly proliferating technologies that pose special public safety dangers. Connecticut's gun safety laws hew to that tradition while responding to a modern epidemic of mass shootings that would have been unimaginable at the Founding or during Reconstruction.

## A. This Court's nuanced inquiry should look to authority from throughout U.S. history.

At the start, *Antonyuk* resolves two important methodological points.

First: The historical analysis at *Bruen*'s second step looks to the full sweep of United States history–the Founding Era, Reconstruction, and beyond. "The prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis." *Antonyuk*, 89 F.4th at 304; *and see Bruen*, 597 U.S. at 39 (looking to both the Founding and Reconstruction). Laws from the 20th century are also relevant–at least so long as they are not contradicted by earlier evidence–since they may

show "a regular course of practice" that "liquidate[s] and settle[s]" the
Second Amendment's meaning. *Id*. at 35; *and see Antonyuk*, 89 F.4th at
319 n.32; *Ocean State II*, 2024 U.S. App. LEXIS at *26 ("We are therefore
unpersuaded by plaintiffs' assertion that the laws regulating sawed-off
shotguns, Bowie knives, and M-16s provide no insight into our 'Nation's
historical tradition of firearm regulation.'").

Second: Connecticut's gun safety laws respond to a worsening and
previously "unimaginable" epidemic of mass murder perpetrated with
technology that proliferated in the late twentieth century. *Bruen*, 597
U.S. at 28. These are the prototypical "unprecedented societal concerns"
and "dramatic technological changes." *Id*. As *Bruen* mandated, then, the
search for a "historical analogue, not a historical twin," is necessarily
more "nuanced" and flexible here. *Id*.

Plaintiffs' protestations against this nuanced approach are not only
baseless—offered without any supporting historical declaration in the
record—but also foreclosed, since this Court has already embraced
nuanced reasoning in a case like this one. "[T]he issues we face today,"
*Antonyuk* explained, "are different than those faced in medieval England,
the Founding Era, the Antebellum Era, and Reconstruction. To put it

51

plainly, our era does not resemble those." 89 F.4th at 302. So, this Court concluded, "a more nuanced approach is necessary in cases concerning new circumstances." *Id*.

The "new circumstances" here come from both new technological development and the (related) new social reality of mass shootings.

Gun violence at the Founding was very low. JA1140-41. "[T]here was no comparable societal ill to the modern gun violence problem," JA1216, in part because of the era's technological limitations. Most arms were flintlock muzzleloaders. JA1217, 428. Liable to misfire and inaccurate at distance, they could only shoot a single lead ball before being manually reloaded—a process that took at least half a minute even with skill and experience. JA1142; JA1216-17.

The violent destruction of a mass shooting would also have been unimaginable during Reconstruction. Civil War-era breach-loading rifles could, at their mostly deadly, kill about 153 people in an hour, while an assault weapon can kill thousands. JA1223; Miller & Tucker, *Common, Use, Lineage, and Lethality*, at 2508; *Kolbe*, 849 F.3d at 125. Revolvers developed in the Civil War era could fire repeatedly—but they too lacked the lethality of modern assault weapons. JA1156. Mass violence was a

"fact of life in the United States" by Reconstruction, but "it was a group activity… because of the limits of existing technology." JA1165.

The mass shootings to which Connecticut's gun safety laws responded only became an epidemic when new technology, developed for military use, was mass-injected into civilian society: "Although breech loading rifles and repeating rifles emerged in the late nineteenth century, these weapons did not achieve sufficient market penetration to impact gun violence." JA1231. As assault weapons proliferated in the 20th century, they contributed to an epidemic of mass shootings unknown at the Founding and the Reconstruction. For 172 years, from 1776 to 1948, U.S. history records no mass shooting with double-digit fatalities. JA446. In the next 56 years, from 1949 through 2004, when the federal assault weapons ban expired, there were ten of those mass shootings. JA449. In the eighteen years since, there have been twenty mass shootings that each took at least ten lives—a six-fold increase in the average rate of occurrence. *Id*.

Mass shootings bring not just a new scale of death but a new type of widespread terror. Today's children grow up with the omnipresent fear of massacres, "each one harm[ing] tens of millions, if not hundreds of

53

millions, beyond those killed or wounded at the scene." JA383. Anxiety, depression, and other symptoms of trauma echo in communities afflicted by mass violence and spread nationwide. JA386. "The psychological impact of mass shootings on the psyche of law-abiding Americans," the District Court correctly concluded, "is also new and unique." *NAGR v. Lamont*, 2023 U.S. Dist. LEXIS 134880 at *91.

To all this—actual history, presented by actual historians, through actual declarations in the record—Plaintiffs respond with citations to extra-record literature mentioning scattered examples of early repeating weapons. Pl. Br. 48. But those weapons never meaningfully penetrated civilian society. JA1231. Even the Winchester repeating rifle fell far short of the destructive force represented by the AR-15 and its ilk. JA1223. And, again, neither the District Court nor Defendants rely on technological innovation alone. Unlike the AR-15, the Winchester rifle did not contribute to mass shootings. So a long-ago decision not to regulate the Winchester has no relevance here. *See Antonyuk*, 89 F.4th at 301 ("Legislatures past and present have not generally legislated to their constitutional limits. Reasoning from historical silence is thus risky."); *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) ("A State

54

need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns.").

A few months ago, the First Circuit rejected an argument against nuance, just like Plaintiffs'. *Ocean State II,* 2024 U.S. App. LEXIS at *8. The First Circuit concluded that assault weapons are indeed different technologies than their predecessors: "[T]oday's semiautomatic weapons fitted with LCMs are 'more accurate and capable of quickly firing more rounds' than their historical predecessors. And they are substantially more lethal." *Id.* "More importantly," though, the nuance inquiry doesn't end with technology: "[W]e find in the record no direct precedent for the contemporary and growing societal concern that such weapons have become the preferred tool for murderous individuals intent on killing as many people as possible, as quickly as possible." *Id.*

The Constitution "does not require States to regulate for problems that do not exist." *McCullen v. Coakley*, 573 U.S. 464, 481-82 (2014) (citation omitted). Because Connecticut's gun safety laws responded to new social and technological challenges, the District Court correctly rejected a "regulatory straightjacket" and embraced nuance and

flexibility. *Bruen*, 597 U.S. at 30. This Court did the same in *Antonyuk*, and it should stay the course.

**B. Compared with weapons regulations throughout our history, Connecticut's gun safety laws are similarly justified and impose a similarly insignificant burden on the right of armed self-defense.**

**1. From pre-colonial England through Reconstruction, government restricted newly proliferating weapons that posed unique public safety threats.**

The Second Amendment "codified a pre-existing right" to "public carry for self-defense"—a right that has always been qualified by restrictions on particularly dangerous weapons that threaten, rather than protect, the peace. Pre-colonial England, for instance, restricted launcegays (throwing spears), 7 Rich. 2, ch. 13 (1383), crossbows, handguns, hagbuts (archaic firearms), and demy hakes (same), 33 Hen. 8, ch. 6 §§ 1, 18 (1541).

The English colonies inherited and perpetuated the tradition of restricting weapons that uniquely threatened public safety. Colonial Era guns, as we have seen, were unreliable and not particularly useful for criminal violence. Criminals resorted to clubs and knives—and legislatures, both during the Colonial Era and during the Republic's early years, responded. For instance: concerned by the proliferation of the billy

56

club, a dangerous melee weapon, New York "enacted the first anti-club law in 1664, with sixteen states following suit." *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052, 1070 (N.D. Ill. 2023) (*Bevis I*). And, in 1686, a New Jersey law prohibited concealed carrying of "any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons." *An Act Against Wearing Swords* (1686), reprinted in *The Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-290 (1881).

The Colonial and Founding eras also saw restrictions on emerging and particularly dangerous firearms. During the late Colonial Era, when public safety was threatened by the advent of trap guns—firearms set to discharge automatically when a trap was sprung—legislatures responded by banning those new enhancements without barring all access to firearms for self-defense. 1763-1775 N.J. Laws 346, ch. 539, § 10 (1771). And the late 1700s saw the development of percussion cap pistols, which unlike their flintlock predecessors could be concealed and carried loaded without concern for corrosion. The prospect of perpetually loaded guns raised a new danger of impulsive gun violence, so some states responded by restricting carry of these concealable weapons.

57

JA1151 (six states promulgated restrictions against new, concealable weapons technologies "during the lifetimes of Jefferson, Adams, Marshall, and Madison.").

Between the Founding and the Civil War, states continued to deploy targeted restrictions to limit the risk posed by emerging technologies like folding knives, dirk knives, and Bowie knives–early 19th century enhancements on existing technologies, specifically designed for and primarily used in "an alarming proportion of the era's murders and serious assaults." JA1149.[13] "Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents." JA1150. All but one state responded by banning these "fighting knives," while leaving

---

[13] *See, e.g.*, 1837 Ala. Laws 7, No. 11, § 2 (prohibitive tax on Bowie knives); 1837 Ga. Laws 90, § 1 (prohibiting sale and possession of Bowie and other kinds of knives as well as "pistols, dirks, sword canes, [and] spears"); 1837-1838 Tenn. Pub. Acts 200-01, §§ 1–2 (prohibiting sale and carrying of Bowie knives, Arkansas toothpicks, and other fighting knives); 1838 Fla. Laws 36, No. 24, § 1 (prohibitive tax on sale and possession of pocket pistols, sword canes, and Bowie knives); 1838 Va. Acts 76, ch. 101, § 1 (banning "keep[ing] or carry[ing]" Bowie knives and other deadly weapons); 1839 Ala. Acts 67, ch. 77 (banning the concealed carry of Bowie knives and other deadly weapons).

58

avenues for law-abiding residents to defend themselves with many other weapons. *Bevis I*, 657 F. Supp. 3d at 1069.

When the Fourteenth Amendment was ratified, the historical tradition of restricting dangerous emerging technologies had become deeply entrenched. That same year, Alabama prohibited "rifle walking canes," which it called "hostile deadly weapons." 1868 Ala. Laws 11. In 1868, too, Florida prohibited the manufacture or sale of metallic knuckles. Fla. Laws 95, ch. 7, § 11. Forty-three states, meanwhile, limited or prohibited sale and possession of "slung shots"—weighted slings used in silent attacks against unsuspecting opponents. *Bevis I*, 657 F. Supp. 3d at 1070. As revolvers replaced their single-shot predecessors and violence surged, many states and territories restricted carrying some or all concealable weapons. JA1157-60. Tennessee and Arkansas went further. They entirely prohibited carrying and selling pocket pistols and revolvers. *See* 1871 Tenn. Pub. Acts 81, ch. 90 (carrying); An Act to Prevent the Sale of Pistols, 1879 Tenn. Acts 135-36, ch. 96, § 1 (selling); 1881 Ark. Acts 191, ch. XCVI.

Like Connecticut's, all these laws restricted–and many outright banned–carrying classes of weapons that posed unique threats to public

safety. Like Connecticut's, all these analogues left open other avenues to vindicate the right of armed self-defense. So, like Connecticut's, all were consistent with the Second Amendment.

### 2. A tradition dating back before the Founding protected against mass casualties by restricting access to gunpowder.

Connecticut's gun safety laws are also relevantly similar to Colonial and Founding Era restrictions on gunpowder.

Gunpowder explosions were the Founding Era's mass casualty events. Eighteenth century guns fired lead balls propelled by black powder, which was carried and stored in containers rather than encased in bullets. Keeping too much of that volatile, exposed gunpowder in private homes risked fires that could threaten entire communities. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487, 511-12 (2004).

Since mitigating the risk of mass casualties was an overridingly important interest, Founding Era policymakers and courts "recognized that state police power authority was at its pinnacle in matters relating to guns or gun powder." JA1225. Founding Era laws limited how much gunpowder any individual could keep in their home, requiring residents

to store excess gunpowder in the public "magazine." *See, e.g.*, 1706-7 Mass. Acts ch. 4, *available at* https://tinyurl.com/27ubvvvn (gunpowder must be stored in the "publick magazine" in the interest of "preventing the great loss and danger by casualties.").[14] Some states—like New York and Maine—allowed government to search private homes, on the lesser showing of reasonable cause, to find gun powder. JA1225; JA1227. The Supreme Court approved these gunpowder restrictions as constitutional exercises of states' police powers. *Brown v. Maryland*, 25 U.S. (12 Wheat) 419, 442-443 (1827) ("The power to direct the removal of gunpowder is a branch of the police power."); JA125-27. Private possession of excessive munitions posed a unique danger, so government could lawfully intervene. *See id.*

---

[14] *See also, e.g.*, *A Law for the Better Securing of the City of New York from the Danger of Gun Powder* (1763), https://tinyurl.com/5273xd57; Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627, 627; 1821 Me. Laws 98, ch. 25, § 5, https://tinyurl.com/up948844; *A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District,* Pg. 45-47, Image 48-50 (1832) *available at* The Making of Modern Law: Primary Sources; Portsmouth, New Hampshire 1786 *N.H. Laws* 383-84.

These historical gunpowder restrictions significantly burdened the right of armed self-defense. Connecticut, for instance, empowered local officials to determine, in their unqualified "opinion," whether a "quantity of gunpowder" in the possession of a private citizen "may endanger the persons or dwellings of any individuals whatsoever." 1832 Conn. Acts 391, ch. 25, § 1-2. If so, officials could order the owner to move the gunpowder to "some safe and convenient place within said town." *Id.* If the owner refused, officials could seize the gunpowder. *Id.* Since Founding Era guns needed gunpowder, restricting gunpowder–at a public official's unlimited discretion, no less–was like restricting possession or sale of bullets today. The challenge gun safety laws here do not go nearly that far.

It is not hard to understand the "why" of Founding Era gunpowder regulations, which is relevantly similar to the "why" of Connecticut's gun safety laws: both aim to protect the public from the threat of mass casualties inflicted by aggregations of firepower far beyond any reasonable self-defense need. And the "how": like gunpowder regulations, Connecticut's gun safety laws protect the public without burdening the right to armed self-defense, limiting residents' offensive firepower while

62

leaving them plenty of leeway to defend themselves. *See Or. Firearms Fed'n, Inc. v. Kotek*, 2023 U.S. Dist. LEXIS 121299, *121 (D. Or. 2023) (concluding that colonial gunpowder restrictions were relevantly similar to Oregon's LCM restrictions).

### 3. American government imposed comparable restrictions on the progenitors of today's assault weapons from the time they first emerged.

Until the twentieth century, states did not regulate for a problem they did not have: the threat of mass death perpetrated by lone shooters with high-powered military-style weapons. But when modern machine gun and assault weapon technology emerged, states and the federal government quickly imposed targeted restrictions. That well-established pattern, consistent with Founding and Reconstruction tradition and consistently approved by the courts, has "liquidate[d] & settle[d]" the Second Amendment's meaning. *Bruen*, 597 U.S. at 35.

The turn of the twentieth century saw the development of previously unimagined new weapons technologies. Dynamite—an innovation for its power and stability—was invented in 1866. JA1169. The Thompson submachine gun was invented in 1918, importing into civilian life a weapons technology deployed on World War I battlefields.

*Id.* The submachine gun was a previously unknown force: portable, maneuverable, and capable of sustained bursts of spray fire from magazines of 20, 50, or 100 rounds. *Id.*

As those new technologies penetrated civilian society, criminals deployed them to horrific effect. A string of dynamite bombings in 1919-1920 included the murder of 38 people in a Wall Street attack. JA1170. And while "Tommy guns… were actually used relatively infrequently by criminals," they took a "devastating toll" in high-profile killings like 1929's infamous St. Valentine's Day massacre. *DSSA*, 664 F. Supp. 3d at 601; JA1170.

Proliferation, not the initial invention, drove regulation. *Kotek*, 2023 U.S. Dist. LEXIS at *71; JA1232 ("[F]ully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I. But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them."). "By the early 1930s," Saul Cornell shows, "more than half the states had passed some type of prohibition on fully automatic or semi-automatic weapons." JA1232. Around the same time, "thirteen states restricted the capacity of

ammunition magazines for semiautomatic and automatic firearms."
JA1171; *and see DSSA*, 664 F. Supp. 3d at 601 (describing restrictions on
magazines and "guns that could accommodate them, based on set limits
on the number of rounds."). Ultimately, Congress passed 1934's National
Firearms Act, whose restrictions on machine guns and short-barreled
shotguns were upheld in *Miller*, reaffirmed in *Heller*, and remain in effect
today. JA1171.

States and the federal government also moved to restrict
semiautomatic assault weapons when those proliferated. AR-15-type
weapons were developed during the Vietnam War, but didn't penetrate
civilian society until gun industry marketing linked them "to their
origins in the military… in a manner that made them avatars of
masculinity and libertarian ideology." JA1235. So in 1989, the federal
Bureau of Alcohol, Tobacco, and Firearms used its authority under the
Gun Control Act of 1968 to block the importation of foreign-made
semiautomatic rifles with military features, explaining that those
weapons are useful for military and not sporting purposes. *See* 18 U.S.C.
§ 925(d)(3) (generally barring the importation of firearms that are not
"particularly suitable for or readily adaptable to sporting purposes"). In

1993, Connecticut imposed its first restrictions on assault weapons. 1993 Conn. Pub. Acts 93-306. In 1994, Congress imposed a complete ban on assault weapons, which it defined by reference to features useful for the military and criminals but unnecessary for shooting sports or self-defense. 18 U.S.C. § 921(a)(30)(B)-(D) (expired). Gun massacres "fell substantially" when that federal ban was in place, and "rose sharply" when it expired ten years later. JA208.

Again: The *why* and *how* of these twentieth-century restrictions closely map onto Connecticut's existing gun safety laws. Like the NFA, Connecticut's laws regulated a newly proliferating technology, created for warfare and imported into civilian life from military service, that posed a novel and unique threat of mass murder. Like the NFA, Connecticut's laws restrict unusually dangerous weapons suited for military combat while leaving broad swathes of firearms available for armed self-defense. And like the NFA, Connecticut's laws survive any Second Amendment challenge.

## III. Plaintiffs failed to carry their burden on the other preliminary injunction factors.

This Court should affirm on the merits, but it can also affirm because Plaintiffs have not made "a strong showing" of irreparable harm,

66

*A.H. v. French*, 985 F.3d at 176, or proven that the equities and the public interest demand immediately enjoining Connecticut's gun safety laws.

Plaintiffs' only claimed irreparable harm is their asserted constitutional injury. They propose that a preliminary showing of likelihood of success in any type or scale of constitutional claim automatically gives rise to irreparable harm. Pl. Br. 58-60. But the one case they cite does not say that. Instead, *ACLU v. Clapper* quotes a party arguing for that proposition. 804 F.3d 617, 622 (2d Cir. 2015). In fact, neither this Court nor the Supreme Court has ever presumed harm from an alleged Second Amendment violation. *Cf. Antonyuk*, 89 F.4th at 351 (presuming harm from First Amendment violation.)

To the contrary: nobody, whatever their claimed harm, has a right to a preliminary injunction. *Winter*, 555 U.S. at 24 ("[A]preliminary injunction is an extraordinary remedy never awarded as of right."). Even when a plaintiff shows a likelihood of success on the merits of a constitutional claim, "a preliminary injunction does not follow as a matter of course." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943-1944 (2018) (per curiam). The plaintiffs in *Benisek*, for example, alleged an unconstitutional political gerrymander. *Id*. at 1943. But the Supreme

67

Court denied a preliminary injunction regardless of the plaintiffs' likelihood of merits success on a constitutional claim: "Even if we assume… that plaintiffs were likely to succeed on the merits of their claims, the balance of equities and the public interest tilted against their request for a preliminary injunction." *Id.* at 1944.

Plaintiffs have not even tried to make their requisite showing. Their only alleged hardship is a claim that they cannot keep themselves safe pending trial without wielding multiple redundant weapons of war. But each individual Plaintiff already owns well over a dozen firearms,[15] including rifles, pistols, revolvers, shotguns, and "others" that work just like otherwise banned assault weapons. *See supra pp.* 12-13. Mr. Grant, for instance, owns about five "others" in "AR15 configurations." SA056. No plaintiff has ever once used any of their firearms for self-defense whether by discharging the weapon or brandishing it. SA086; SA142; SA262-63. Ms. Hamilton shot a coyote once, in her role as an animal

---

[15] The precise number of the firearms the various Plaintiffs own is unclear as they all testified that they were not sure, could not remember, or did not "count" how many firearms they own.

control officer—with a .22 caliber rifle, an arm that she is already entitled to keep and bear. SA263-264.

Plaintiff's lack of urgency undercuts their claim of irreparable harm. They did not seek an injunction pending appeal, and they have not tried to move the litigation forward in any way since the District Court denied preliminary relief last summer. Similarly, each Plaintiff acknowledges that they were capable of legally purchasing "others" up until the new law was signed by the Governor and retaining those weapons afterward. SA81; 188-90; 297-98. But each Plaintiff waited until the law was signed before supposedly asking about buying a specific type of "other" from local gun dealers, with no credible explanation for the delay. SA81; 179-80; 297-99. If Plaintiffs believed they faced real harm, they would move quickly. *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 996 (9th Cir. 2015) (when Second Amendment plaintiffs fail to pursue the underlying merits action pending preliminary injunction appeal, "it seems unlikely [they] could make the requisite showing of irreparable harm to support the issuance of a preliminary injunction at this time.").

By contrast with Plaintiffs' lackluster showing: a mandatory injunction will work immediate and severe hardship on Defendants, the

State of Connecticut, and the public. *See We the Patriots*, 17 F.4th at 279 ("When deciding whether to issue a preliminary injunction, courts should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (internal citation omitted). Enjoining the statute effectively means ordering the State to deploy a costly, short-term scheme to license and track assault weapon purchases. *See* JA366 (describing Connecticut's purchase and carry requirements for long guns and handguns). The bell cannot be unrung. An injunction will unleash restricted assault weapons into Connecticut. *See* Matthew Green, *Gun Groups: More Than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED (Apr. 12, 2019), https://tinyurl.com/586mj8fa. If a trial shows that preliminary relief was unwarranted, it will be nearly impossible to retrieve them.

Gun safety laws work, and enjoining them without a full trial risks irreparable harm to public safety and wellbeing. JA397 ("[H]aving an assault weapon ban… and/or high-capacity magazine ban in place… is associated with a statistically significantly decrease in per capita rates of deaths and casualties due to mass shootings."). Mass shootings take a unique toll—measured in both lives and psychological distress inflicted

on entire communities. JA385-88 (discussing broad post-traumatic stress after mass shootings). So the public interest weighs heavily in favor of keeping Connecticut's restrictions in place pending a full trial. *Ocean State Tactical, LLC v. Rhode Island,* 646 F. Supp. 3d 368, 394 (D.R.I. 2022) ("The asserted government interest of public safety stemming from mass gun murders could not be more undeniably compelling.").[16]

## CONCLUSION

Defendants respectfully ask this Court to affirm the District Court's denial of preliminary injunctive relief.

Respectfully submitted,

WILLIAM TONG
ATTORNEY GENERAL

Joshua Perry
Solicitor General

By: Janelle R. Medeiros____
　James M. Belforti_____
　Assistant Attorneys General
　165 Capitol Avenue

---

[16] Any injunction that this Court does grant should be limited to these Plaintiffs and their specific claimed injuries. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (an injunction's scope is "dictated by the extent of the violation established"); *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 26 (2d Cir. 2004) ("By necessity, the scope of the injunction must be drawn by reference to the facts of the individual case.").

Hartford, CT 06105
Tel: (860) 808-5450
Fax: (860) 808-5591
janelle.medeiros@ct.gov
James.belforti@ct.gov

## CERTIFICATION OF COMPLIANCE

As required by Federal Rule of Appellate Procedure (FRAP) 32(g)(1), I hereby certify that this brief complies with the type-volume limitations of FRAP 32(a)(7)(B), as modified by Second Circuit Local Rule 32.1(a)(4), in that this brief contains 13,327 words, excluding the parts of the brief exempted by FRAP 32(f). I further certify that this brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32 (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

*AAG Janelle R. Medeiros*
Janelle R. Medeiros
Assistant Attorney General

Dated: April 30, 2024

## CERTIFICATION OF SERVICE

I hereby certify that on this 21st day of February 2024, I caused the foregoing brief to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*AAG Janelle R. Medeiros*

Janelle R. Medeiros
Assistant Attorney General