# 23-1344

## IN UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————

EDDIE GRANT, JR.; JENNIFER HAMILTON; MICHAEL STIEFEL; CONNECTICUT CITIZENS DEFENSE LEAGUE, INC.; SECOND AMENDMENT FOUNDATION, INC.

*Plaintiffs-Appellants*,

v.

JAMES ROVELLA; JOHN P. DOYLE, JR.; SHARMESE L. WALCOTT; PAUL J. NARDUCCI

*Defendants-Appellees*,

and

Edward Lamont, Jr.; Patrick Griffin; Margaret E. Kelly; David R. Applegate; Joseph T. Corradino; David R. Shannon; Michael A. Gailor; Christian Watson; Paul J. Ferencek; Matthew C. Gedansky; Maureen Platt; Anne F. Mahoney

*Defendants.*

———————

On Appeal from the United States District Court for the Connecticut, No. 3:22-cv-01223-JAM

———————

### REPLY BRIEF OF THE PLAINTIFFS-APPELLANTS

———————

Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd.
P.O. Box 340
Harwinton, CT 06791
Tel: (203) 677-0782
catkinson@atkinsonlawfirm.com

Craig Fishbein, Esq.
FISHBEIN LAW FIRM, LLC
100 South Main St.
P.O. Box 363
Wallingford, CT 06492
Tel: (203) 265-2895
ccf@fishbeinlaw.com

Doug Dubitsky, Esq.
LAW OFFICES OF DOUG DUBITSKY
P.O Box 70
North Windham, CT 06256
Tel: (860) 933-9495
doug@lawyer.com

*Attorneys for Plaintiffs-Appellants*

May 23, 2024

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION ................................................................................1

ARGUMENT ....................................................................................4

I.    The District Court Applied The Correct Preliminary Injunction Standard Because The Appellants Seek A Prohibitory Injunction, Not A Mandatory One.... ................................................................................................4

II.    The Severability Doctrine Precludes Denial Of Appellants' Preliminary Injunction Motion On Grounds It Is A Facial Challenge. Alternatively, The Overbreadth Doctrine Applies. ................................................7

III.    The Second Amendment's Text Presumptively Protects All Bearable Arms, And The Appellants Have No Burden To Show That Modern Sporting Arms Are Not Dangerous And Unusual In A Textual Analysis. .........................................12

IV.    Supreme Court Precedents Establish That The Second Amendment Protects All Bearable Arms Commonly Possessed For All Lawful Purposes, Not Just Those Possessed For Self-Defense. ................................................18

V.    *Caetano v. Massachusetts* Confirms That The "Dangerous And Unusual" Test Is A Conjunctive Test, Not A "Dangerous Or Unusual" Or "Unusually Dangerous" Test.................................................................22

i

VI.   Assuming *arguendo* that the "dangerous and unusual" test is up for historical debate, the historical sources actually point to a narrower interpretation than the one that the Supreme Court currently recognizes.................................................24

CONCLUSION .......................................................................................................29

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

..............................................................................................................................31

CERTIFICATE OF SERVICE ..............................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023)................................. 14, 15, 16

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)............................................. 22, 23

*Carlin Communications, Inc. v. F.C.C.*, 837 F.2d 546 (2d Cir. 1988).....................8

*Commonwealth v. Caetano*, 470 Mass. 774 (2015).................................................23

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............... 14, 17, 19, 20, 26, 29

*English v. State*, 35 Tex. 473 (1871)........................................................27

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012).........................10

*Libertarian Party v. Lamont*, 977 F.3d 173 (2d Cir. 2020).......................................4

*Logan v. United States*, 144 U.S. 263 (1892) ...........................................................19

*Mastrovincenzo v. City of New York*, 435 F.3d. 78 (2d Cir. 2006) ......................4, 5

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010)................................. 20, 21

*New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022)...........

.............................................................. 1, 11, 12, 13, 14, 16, 17, 20, 25

*New York State Rifle and Pistol Association v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)

.............................................................................................. 2, 9, 20

*O'Neill v. State*, 16 Ala. 65 (1849) .........................................................27

*Regan v. Time, Inc.*, 468 U.S. 641 (1984)..................................................8

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ...........................................21

*Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947 (1984).....11

*State v. Langford*, 10 N.C. 381 (1824).......................................................................27

*State v. Lanier*, 71 N.C. 288 (1874)........................................................................27

*United States v. Cruikshank*, 92 U.S. 542 (1875).....................................................18

*United States v. Miller*, 307 U.S. 174 (1939) ...................................... 14, 19, 28, 29

*United States v. Salerno*, 481 U.S. 739 (1987)..........................................................8

*United States v. Stevens*, 559 U.S. 460 (2010) ................................................. 10, 11

*United States v. Williams*, 553 U.S. 285 (2008) .......................................................10

*Witherspoon v. Illinois*, 391 U.S. 510 (1968) ..........................................................19

*Wright v. Giuliani*, 230 F.3d 543 (2d Cir. 2000) ........................................................5

**Statutes**

Conn. Gen. Stat. § 29-28..............................................................................................6

Conn. Gen. Stat. § 29-33..............................................................................................6

Conn. Gen. Stat. § 29-36f.............................................................................................6

Conn. Gen. Stat. § 29-37a............................................................................................6

Conn. Gen. Stat. § 29-37p............................................................................................6

Conn. Gen. Stat. § 53-202a............................................... 7, 10, 11, 29, 30

Conn. Gen. Stat. § 53-202b............................................... 7, 10, 11, 29, 30

Conn. Gen. Stat. § 53-202c............................................... 7, 10, 11, 29, 30

Conn. Gen. Stat. § 53-202d............................................... 4, 10, 11, 29, 30

iv

Conn. Gen. Stat. § 53-202e ................................................................. 4, 10, 11, 29, 30

Conn. Gen. Stat. § 53-202f ................................................................. 4, 10, 11, 29, 30

Conn. Gen. Stat. § 53-202h................................................................. 4, 10, 11, 29, 30

Conn. Gen. Stat. § 53-202i.................................................................. 4, 10, 11, 29, 30

Conn. Gen. Stat. § 53-202j................................................................. 4, 10, 11, 29, 30

**Other Authorities**

1 W. Russell, *A Treatise on Crimes and Indictable Misdemeanors* (1831) ..... 26, 28

3 B. Wilson, *Works of the Honourable James Wilson* (1804).................................26

C. Humphreys, *A Compendium of the Common Law in Force in Kentucky* (1822)

........................................................................................................................26

E. Lewis, *An Abridgment of the Criminal Law of the United States* (1847) ...........27

F. Wharton, *A Treatise on the Criminal Law of the United States* (1852) ..............27

H. Stephen, *Summary of the Criminal Law* (1840) .................................................27

J. Dunlap, *The New–York Justice* 8 (1815)...........................................................26

Public Act No. 23-53 ....................................................................... 7, 10, 11, 29, 30

William Blackstone, *Commentaries on the Laws of England* (1765-1769)............25

## **INTRODUCTION**

The Appellees' heart-wrenching references to the Sandy Hook tragedy and other criminal misuses of firearms is a calculated appeal for the Court to abandon precedential legal principles and to decide this case on raw emotion. The Appellees urge the Court to resist creating "a new constitutional right to possess AR-15s and other assault weapons." Def. Br., p. 2. They further sound the alarm that the Appellants are asking the Court to find constitutional protection for weapons like "grenade launchers…." *Id*. The Appellees' brief mischaracterizes the nation's most popular civilian firearms as "weapons of war." *Id*. at 3. None of Appellees' theatrical contentions find support in Supreme Court precedent or this Court's precedents, but are instead an overt invitation for the Court to conduct the very interest-balancing the Supreme Court forbids. *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111, 2131, 2133 n.7 (2022).

*Bruen* expressly forbids courts from considering sensationalized and macabre portrayals of firearms when considering whether the Second Amendment protects their possession. Doing so would necessarily involve interest-balancing – an inquiry no longer permitted by *Bruen*. *Id*. The Appellants also do not ask the Court to recognize any new constitutional right. Rather, they ask the Court to faithfully apply existing precedent to find that the Second Amendment protects a right the Appellants have always possessed, and that the Supreme Court has recognized and affirmed.

1

Supreme Court precedent, and the parts of *New York State Rifle and Pistol Association v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) which remain binding law, compel an objective, dispassionate inquiry into whether specific banned firearms are commonly owned for lawful purposes. To evade this inquiry, the Appellees resort to a number of novel, and even frivolous, arguments. This brief addresses Appellees' primary arguments.

The Appellees' claims regarding initial procedural hurdles are unavailing. First, the Appellees seek to elevate the Appellants' burden by claiming Appellants sought a mandatory injunction. The district court, however, correctly found that the Appellants sought a prohibitory injunction because they asked the court simply to enjoin the Defendants' enforcement of the challenged law. Second, the Appellees argue that the Appellants raised a facial challenge to the relevant statutes and that some of the statutes' applications are constitutional, thus rendering a preliminary injunction unavailable. The Appellees' argument, however, ignores the severability doctrine, which the Court applied in *Cuomo* under nearly identical circumstances. Nothing here requires a different approach from *Cuomo*, and the Court should remain consistent in its application of the severability doctrine.

The Appellees then devote significant ink seeking a viable argument to shift the substantive burden to the Appellants to prove that the Second Amendment protects their conduct, but they fail to find one. First, the Appellees attempt to import

2

the Second Amendment's "dangerous and unusual" exception into the threshold textual analysis *Bruen* requires. *Bruen*, however, clearly establishes that the textual inquiry and the historical (i.e., "dangerous and unusual") exception inquiry are distinct and separate, and that it is the Appellees, not the Appellants, who bear the burden on the historical exception prong. Second, the Appellees ask the Court to limit the Second Amendment's protections exclusively to self-defense, but the Supreme Court has recognized that the Second Amendment protects all lawful purposes for owning firearms. Third, the Appellees invent – out of thin air – a novel interpretation of the historical "dangerous and unusual" exception that directly contradicts Supreme Court and this Court's precedents. Relying on linguistical gymnastics that ignore historical context, the Appellees ask the Court to adopt a new "unusually dangerous weapons" exception to the Second Amendment, which does not appear in any Supreme Court case. This Court, however, may not overrule the Supreme Court and fashion its own exception. Additionally, the Appellees' proposed new exception lacks any strong foundation in history, and it is directly contradicted by historical sources that recognized the objective "common use" inquiry contemplated by the "dangerous and unusual" exception.

Since the Appellees offer no viable arguments to justify the district court's complete abandonment of Supreme Court precedent and this Court's precedent, the

Court should reverse the district court's decision and remand this case with instructions to grant the Appellants' motion for a preliminary injunction.

## ARGUMENT

### I.   The District Court Applied The Correct Preliminary Injunction Standard Because The Appellants Seek A Prohibitory Injunction, Not A Mandatory One.

The Appellees take issue with the district court's application of the standard for prohibitory preliminary injunctions to this case. Def. Br., pp. 20-21. The Appellees maintain that the mandatory preliminary injunction standard should apply. *Id*. Their arguments lack merit, and the Court should affirm the district court's conclusion on this point.

The Court has drawn a clear distinction between prohibitory and mandatory injunctions:

> In distinguishing between prohibitory and mandatory injunctions, we have noted that "[t]he typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act ... [and] thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success."

*Mastrovincenzo v. City of New York*, 435 F.3d. 78, 89 (2d Cir. 2006) (cleaned up).

Its decisions regarding mandatory injunctions illustrate this distinction in practice. In *Libertarian Party v. Lamont*, 977 F.3d 173 (2d Cir. 2020), the court found that the Libertarian Party had applied for a mandatory injunction because it

sought an order directing Connecticut officials to place all nominated Libertarian Party candidates on the November 2020 ballot. Likewise, in *Wright v. Giuliani*, 230 F.3d 543 (2d Cir. 2000) the court found that five homeless individuals diagnosed with HIV or AIDs were seeking a mandatory injunction directing New York City officials to provide them with certain housing accommodations, maintain property security, and implement training for their personnel. In those cases, the Appellants sought to mandate the Appellees take some positive action they would not otherwise take.

Conversely, *Mastrovincenzo* held that a First Amendment challenge to a longstanding New York City law regarding the street vending of art sought a prohibitory injunction because it asked the district court to enjoin enforcement of the law – in other words, ordering the city officials not to do something they would otherwise do in the absence of an injunction. 435 F.3d at 89-90.

The Appellees do not contest this well-established distinction. Instead, they submit a cursory and tenuous argument that the injunction the Appellants seek would compel them to take certain actions such as issuing Connecticut pistol permits or long gun eligibility certificates, implying that they would need to issue a new permit or certificate each time a person sought to purchase the modern sporting arms the Appellants desire. Def. Br., p. 21. The Appellees' argument is patently frivolous because that is not how Connecticut's firearm purchasing system works.

5

Like some states, Connecticut regulates the carrying and purchase of firearms with background checks and a permitting system. A person seeking to carry or purchase a pistol or revolver must obtain a pistol permit under Conn. Gen. Stat. § 29-28 or a handgun eligibility certificate under Conn. Gen. Stat. § 29-36f. *See* Conn. Gen. Stat. § 29-33(b) (regulating the sale of pistols and revolvers). A person seeking to purchase a rifle or shotgun must obtain either a pistol permit under § 29-28 or a long gun eligibility certificate under Conn. Gen. Stat. § 29-37p. *See* Conn. Gen. Stat. § 29-37a(c) (regulating the sale of long guns). Regardless of what permit or certificate a person chooses, obtaining such a credential is a prerequisite to purchasing any firearm, and a single permit or certificate covers every firearm purchase the person may make – regardless of the make or model – for as long as the permit is valid. The credential is issued to the person, not for the firearm.

The only action the Appellees would have to perform at the time the Appellants were to purchase one of the currently-banned firearms is to check the Appellants' criminal history with a standard national instant criminal (NICS) background check – exactly as the Appellees currently do upon each purchase of any currently-legal firearm – be it a pistol, revolver, or long gun – by a person with such a permit or certificate. Conn. Gen. Stat. § 29-33(c) and Conn. Gen. Stat. § 29-37a(d). An injunction would not compel the Appellees to do anything they are not already doing. Nothing in Connecticut law requires the Appellees to issue any new pistol

6

permits, pistol certificates, or long gun eligibility certificates every time someone purchases a new firearm. Thus, nothing in Connecticut law supports the Appellees' frivolous contention that state officials would be mandated to process "applications" and issue "permits or certificates… for Appellants and perhaps others who want now-restricted weapons." Def. Br., p. 21.

The Appellants have clearly articulated the exact relief that they seek from day one of this case. They have consistently asked for an injunction that prohibits the Appellees from enforcing Conn. Gen. Stat. §§ 53-202a-f and 53-202h-j and how those statutes have been amended by Public Act No. 23-53. In other words, stop treating modern sporting arms differently from other firearms which are not banned. The Appellants' requests for relief have never demanded that any court order the Appellees to take some affirmative action.

The district court properly applied *Mastrovincenzo* and the Court's precedents to conclude that the Appellants only sought a typical prohibitory injunction. The Court should affirm that portion of its decision.

## II. The Severability Doctrine Precludes Denial Of Appellants' Preliminary Injunction Motion On Grounds It Is A Facial Challenge. Alternatively, The Overbreadth Doctrine Applies.

The Appellees ask the Court to affirm the denial of the Appellees' preliminary injunction motion on the grounds that it presents a facial challenge and certain aspects of the challenged statutes are constitutional. Def. Br., pp. 47-49. Under the

Appellees' "no set of circumstances" argument, Connecticut would be immune from a facial challenge to a law banning virtually any and all commonly owned firearms, so long as that law also bans at least one weapon – like a grenade launcher – that is not commonly owned for lawful purposes. While the Appellants do not dispute that *United States v. Salerno*, 481 U.S. 739, 745 (1987) requires them to show that "no set of circumstances exist under which" Connecticut's gun bans are constitutional, the Appellees carefully avoid the doctrine of severability, which this Court has applied previously in facial challenges to Connecticut's gun ban statutes. Thus, the Court should reject the Appellees' invitation to short-circuit this appeal.

It is well-established that, if a provision of a law is found to be unconstitutional, there is a presumption that the unconstitutional provision is severable from the rest of the law. *See Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984). Thus, "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Id*. at 653 (cleaned up). The Court has, in pre-enforcement cases, used severability to declare certain words in a statute unconstitutional based on their operative effect, while upholding the rest of the statute. *See Carlin Communications, Inc. v. F.C.C.*, 837 F.2d 546, 560-61 (2d Cir. 1988).

The Court has applied this doctrine to Connecticut's gun ban statutes. *Cuomo* characterized challenges to sweeping New York and Connecticut gun control statutes as being pre-enforcement facial challenges: "Because plaintiffs pursue this pre-enforcement appeal before they have been charged with any violation of law, it constitutes a facial, rather than as-applied, challenge." 804 F.3d at 265 (cleaned up).[1] *Cuomo* found one provision in each of New York's and Connecticut's statutory schemes to be unconstitutional: New York's seven-round load limit and Connecticut's specific prohibition on the possession of Remington 7615 rifles. *Id.* at 269. Instead of denying the plaintiffs relief as to those unconstitutional provisions because they had brought pre-enforcement facial challenges, *Cuomo* implicitly adhered to the severability doctrine by striking down only those specific unconstitutional provisions while upholding the rest of the statutes.

Nothing compels a different approach here. Under *Cuomo*, the Court does not need to decide whether a grenade launcher, for example, is constitutionally protected as the Appellees suggest it must. Def. Br., pp. 47-49. Instead, the Court can focus on the challenge that the Appellants actually brought – the criminalization under Conn.

---

[1] While *Cuomo* did not discuss this characterization until it reached the plaintiffs' vagueness challenge at the end of its opinion, its characterization still applied with equal force to the analysis it conducted of the plaintiffs' Second Amendment claims. *Cuomo*'s analysis of the plaintiffs' Second Amendment claims indisputably adhered to severability even though it never discussed it or its relationship to facial challenges.

9

Gen. Stat. §§ 53-202a-f, 53-202h-j, and Conn. Public Act No. 23-53, § 23 of firearms commonly used for lawful purposes that the Appellees have labeled "assault weapons" and "weapons of war" to satiate political hysteria.

Alternatively, the Appellants ask the Court to apply the overbreadth doctrine to Conn. Gen. Stat. §§ 53-202a-f, 53-202h-j, and Conn. Public Act No. 23-53, § 23. In the First Amendment context, the Supreme Court has recognized a type of facial challenge "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (cleaned up). The Supreme Court has described this overbreadth doctrine as creating a sensible rule among many considerations:

> On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional—particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects.

*United States v. Williams*, 553 U.S. 285, 293 (2008).[2]

---

[2] While the Supreme Court has not applied the overbreadth doctrine outside the First Amendment context and the Court has avoided the question of whether it applies in Second Amendment cases – *see Kachalsky v. County of Westchester*, 701 F.3d 81, 101 (2d Cir. 2012) – its application is particularly appropriate in the Second Amendment context for the same reasons that it is a well-established First Amendment doctrine.

Strong similarities exist between the First and Second Amendments. The First Amendment guarantees a right to free speech. The state may only limit that right within narrow categories of First Amendment exceptions, and the Supreme Court has recognized that the right can only be enjoyed when it can be freely exercised without fear of punishment. *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984) (recognizing the chilling doctrine on the basis that people will refrain from engaging in protected speech if they might be punished for it). Likewise, the Supreme Court has recognized that the Second Amendment guarantees an individual right to keep and bear arms that is presumptively protected unless the state limits it within narrow categories of Second Amendment exceptions. *Bruen*, 142 S.Ct. at 2126. Just like the right to free speech, the right to keep and bear arms cannot be enjoyed when it cannot be freely exercised without fear of punishment. Thus, when a state regulation chills the exercise of the Second Amendment right to keep and bear arms, application of the overbreadth doctrine is appropriate.

The overbreadth analysis starts with defining the conduct that the law covers. *Stevens*, 559 U.S. at 474. Here, Conn. Gen. Stat. §§ 53-202a-f, 53-202h-j, and Conn. Public Act No. 23-53, § 23 criminalize the possession of countless firearms – both by name and by widely popular features -- that are commonly owned in the United States for lawful purposes. The overwhelming majority of the firearms criminalized

11

by these statutes are not dangerous and unusual, thus entitling them to Second Amendment protection. Thus, even if some of the banned firearms are not commonly used for lawful purposes, the challenged statutes' broad criminalization of countless constitutionally protected firearms far outnumbers any constitutionally-valid application the statutes may have. Thus, the Court should hold these provisions unconstitutional under the overbreadth doctrine.

**III.** **The Second Amendment's Text Presumptively Protects All Bearable Arms, And The Appellants Have No Burden To Show That Modern Sporting Arms Are Not Dangerous And Unusual In A Textual Analysis.**

The Appellees premise their argument for affirmance on the mistaken proposition that the Appellants have the burden to prove, under *Bruen*'s textual analysis, that the modern sporting arms they seek to acquire are not unusually dangerous. Def. Br., pp. 22-27, 44-45. *Bruen* directly contradicts the Appellees' arguments and the district court's decision on this point.

*Bruen* clearly established that the first inquiry is to determine "whether the plain text of the Second Amendment protects [the Appellants] proposed course of conduct…." *Bruen*, 142 S.Ct. at 2134. It then applied that analysis to the case before it, examining the question of whether the Second Amendment protected the right to carry "handguns publicly for self-defense." *Id*. at 2134-35. At no point in this first step did the Supreme Court import any historical limitations on the right to publicly carry handguns into its initial textual analysis. *Id*. Instead, the Supreme Court

12

focused on the Second Amendment's plain text: Does the plain text of the Second Amendment protect the Appellants proposed course of conduct? *Id*. at 2134.

Only after it concluded that the "Second Amendment's plain text… presumptively guarantees… a right to 'bear' arms in public for self-defense," did the Supreme Court turn to a discussion of whether any historical limitations justified a departure from the Second Amendment's plain text. *Id*. at 2135. When it reached this discussion, the Supreme Court stated at the outset that "the burden falls on the respondents to show New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2135. The Appellees' proposed analytical framework, adopted by the district court, turns *Bruen's* mandate on its head.

The Appellees selectively present language from *Heller* and *Bruen* to argue that history "fixes the boundaries of the Second Amendment right." Def. Br., p. 26. The Appellants do not disagree that history has an important role to play in a Second Amendment analysis by identifying specific exceptions to the Second Amendment's protections, but the Supreme Court's precedents clearly establish that what light history sheds on permissible limitations does not apply in the initial textual analysis.

Start with *Bruen*'s discussion of *Heller*'s use of history in its textual analysis. *Bruen* confirms that *Heller* first focused on the Second Amendment's "normal and ordinary" meaning. *Bruen*, 142 S.Ct. at 2127. *Bruen* then affirmed *Heller*'s use of

13

history and tradition to confirm the Second Amendment's plain textual meaning. *Id*. *Bruen* finally recognizes *Heller*'s acknowledgment that the Second Amendment does not create an unlimited right, but one circumscribed by historical limitations such as prohibitions on the carrying of "dangerous and unusual weapons." *Id*.

Consider *Heller* next. After reviewing Founding Era dictionaries, *Heller* interpreted the term "arms" to mean all bearable arms and held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). Like *Bruen*, *Heller* treated the question of what limitations on the Second Amendment may be historically justified as a question separate and distinct from its initial textual analysis. *Id*. at 621-628 (distinguishing *United States v. Miller*, 307 U.S. 174 (1939)).

In other words, both *Heller* and *Bruen* drew a clear distinction between the Second Amendment's broad textual protections and its narrow historical limitations.

Later in their brief, the Appellees claim that the Court's recent decision in *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) supports the proposition that the threshold inquiry – the textual inquiry – must include a consideration of a particular weapon's dangerousness. Def. Br., p. 44 ("*Antonyuk* again situated the 'dangerous and unusual' inquiry at the threshold stage"). *Antonyuk*, however, did not conduct a thorough analysis on this question because the question simply did not control the

14

issues in front of the Court. *Antonyuk*, 89 F.4th at 312 (positing that there are three threshold issues under the textual analysis and identifying whether a weapon is in common use as one of those issues). Thus, its comments on this question are mere dicta and do not bind this Court, especially considering *Heller* and *Bruen*'s instruction directly to the contrary.

*Antonyuk* discussed "common use" in three places. First, it noted the portion of *Heller* where the Supreme Court held that the historical limitation of prohibiting the carrying of dangerous and unusual weapons was constitutionally permissible. *Id*. at 295. Second, it described the *Bruen* Appellants' argument that they wished to carry weapons in common use today. *Id.* at 298. Third, it dealt with a government argument that New York's character requirement went to the question of whether a person is an ordinary, law-abiding adult citizen whom the Second Amendment's text protects, thus eliminating the need for a historical analysis. *Id*. at 312. In its framing of New York's argument, *Antonyuk* posited that *Bruen* established three threshold inquiries, including "whether the weapon concerned is in common use." *Id*. at 312 (cleaned up). Without undertaking any analysis of New York's argument beyond noting that it implicated an incredibly complicated issue, *Antonyuk* upheld New York's character requirement against a facial challenge. *Id*. at 313.

The question's importance compels a deeper analysis than *Antonyuk* undertook. *Antonyuk* characterized "common use" as a threshold textual inquiry by

relying on the language at the start of *Bruen*'s textual analysis. *Id.* at 312 (citing *Bruen*, 142 S.Ct. at 2134). This portion of *Bruen*, however, merely took the same structural approach that courts commonly take in framing legal analyses: setting forth undisputed facts and legal principles up front to provide context for its subsequent analysis.[3]

> It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects.... Nor does any party dispute that handguns are weapons "in common use" today for self-defense.... We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense.

*Bruen*, 142 S.Ct. at 2134 (cleaned up).

*Bruen* did not clearly denote these undisputed facts as threshold inquiries. While *Heller* did include the "law-abiding" component as part of its textual analysis, it did not include "common use" as part of that inquiry as discussed previously, and

---

[3] *Antonyuk* itself took a similar approach:

> It is undisputed that the restricted-locations provision effectively prohibits entrance with a firearm onto another person's private property – whether that property is generally open to the public, like a gas station or grocery store, or is generally closed to the public, like a personal residence – unless the owner or lessee of the property provides affirmative, express consent to armed entry.

*Antonyuk*, 89 F.4th at 291.

*Bruen* specifically cites the portion of *Heller* that discusses "common use" as part of the "dangerous and unusual" exception. *Id*. at 2134 (citing *Heller*, 554 U.S. at 627).

What *Bruen* was absolutely clear about, however, was that "[t]he government must… justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. In its formulation of its own test, *Bruen* established the straightforward dual requirement that 1) limitations on the right to keep and bear arms must be justified under a historical analysis and that 2) the government bears the burden of proving that historical justification. *Id*. at 2130.

This analysis leaves a simple bottom line. There is no dispute that the modern sporting arms that the Appellants desire are "bearable arms" within the meaning of the Second Amendment's plain text. Because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *Heller*, 554 U.S. at 582, the Appellants' conduct – in owning "others" and prospective conduct in owning modern sporting arms – is presumptively protected by the Second Amendment. To the extent that the Appellees claim that their categorical prohibition on the keeping and bearing of those arms is historically justified, they must carry the burden of demonstrating that historical justification. *Bruen*, 142 S.Ct. at 2130. Nothing in *Antonyuk's* dicta changes this simple bottom line.

17

The district court's conclusion and the Appellees' arguments to the contrary are sorely mistaken, and the Court should reject both.

## IV. Supreme Court Precedents Establish That The Second Amendment Protects All Bearable Arms Commonly Possessed For All Lawful Purposes, Not Just Those Possessed For Self-Defense.

The Appellees struggle to defend the district court's conclusion that the Second Amendment's plain text only protects a right to keep and bear arms for the purpose of self-defense. Def. Br., pp. 22-25. Their arguments, however, ignore more than 150 years of Supreme Court precedent on the Second Amendment, and they invite the Court to chart a unique "Second Amendment only" course that is inconsistent with how the Supreme Court has interpreted other constitutional rights.

First, Supreme Court precedent squarely forecloses the notion that the Second Amendment only protects conduct undertaken for self-defense. Instead, it supports a broad conclusion that the Second Amendment protects the right to keep and bear arms for all lawful purposes.

Start with *United States v. Cruikshank*, 92 U.S. 542 (1875). *Cruikshank* vacated the convictions of white mob members for depriving African-Americans of their right to keep and bear arms on the grounds that the Second Amendment only applies to the federal government. In discussing the right protected by the Second Amendment, *Cruikshank* specifically described the Second Amendment as protecting a right to bear arms for "a lawful purpose." *Cruikshank*, 92 U.S. at 553;

18

*see also Heller*, 554 U.S. at 620 & n.22 (holding that *Cruikshank*'s language on this point was the Supreme Court's description of the right protected by the Second Amendment).

*Logan v. United States*, 144 U.S. 263 (1892)[4] affirmed *Cruikshank*'s description of the right guaranteed by the Second Amendment. Like *Cruikshank*, *Logan* began with the First Amendment and characterized it as a right to "peaceably… assemble for lawful purposes." *Logan*, 144 U.S. at 286. It then reaffirmed *Cruikshank*'s holding that the Second Amendment only protected the right to bear arms for lawful purposes. *Id*. at 287.

Since the Supreme Court did not have occasion to address this aspect of the Second Amendment in any detail until *Heller*, *Cruikshank* and *Logan* remained the two controlling decisions as to the scope of the right it protects. *Heller* did not overrule *Cruikshank* and *Logan's* description of the Second Amendment's scope. Instead, *Heller* read the Supreme Court's precedents as being consistent with the broad scope of the Second Amendment articulated in *Cruikshank*. In particular, *Heller* construed the holding of *United States v. Miller*, 307 U.S. 174 (1939) "to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. To

---

[4] *Logan* was overruled on other grounds by the seminal case of *Witherspoon v. Illinois*, 391 U.S. 510 (1968).

the extent that *Heller* emphasized that self-defense was the central component of the Second Amendment's protection, it consistently described self-defense as "the core lawful purpose" protected by the Second Amendment, not the exclusive lawful purpose protected by the Second Amendment. *Id*. at 630.

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) terminated any residual doubt on this point. *McDonald* described *Heller*'s central holding as follows: "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780. Nothing in *McDonald* limited the Second Amendment's protections only to arms kept and borne for the purpose of self-defense.

Nothing in *Bruen* compels a different result. Like *Heller* and *McDonald*, *Bruen* emphasized that the right to armed self-defense is the central component of the Second Amendment right. *Bruen*, 142 S.Ct. at 2133. But *Bruen* did not use any language that limited the Second Amendment's protections solely to arms kept and borne for the purpose of self-defense.

This Court has explicitly recognized this view of Supreme Court precedent as being correct. In *Cuomo*, 804 F.3d at 253 (cleaned up), the Court cited *Heller* for the rule that "the Second Amendment protects only those weapons in common use by citizens for lawful purposes like self-defense." It also characterized hunting as a lawful purpose. *Id*. at 256.

20

Nothing has changed in the Supreme Court's precedents regarding what constitutes a "lawful purpose" under the Second Amendment. A "lawful purpose" under the Supreme Court's precedents is any lawful conduct or purpose. The Court should not disregard the Supreme Court's long line of precedents as the district court did. It should faithfully apply those precedents and find that the Second Amendment's plain text protects all lawful purposes for which individuals keep and bear arms, not just the purpose of self-defense.

This approach is consistent with how the Supreme Court has approached other constitutional rights. For instance, the Supreme Court has not read the freedom of assembly and freedom of speech rights guaranteed by the First Amendment to be limited to the purpose of engaging in political speech and associations. Instead, it has explicitly recognized that these First Amendment rights protect a myriad of purposes for which people associate and engage in speech, such as "social, economic, educational, religious, and cultural" purposes. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

Since the Supreme Court has made clear that the Second Amendment is not to be treated as a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S. at 780, this Court should reject the Appellees' invitation to construe the Second Amendment's protections narrowly and should overrule the district court's attempt to confine the

21

Second Amendment's protections to only conduct engaged in for the purpose of self-defense.

**V.** ***Caetano v. Massachusetts* Confirms That The "Dangerous And Unusual" Test Is A Conjunctive Test, Not A "Dangerous Or Unusual" Or "Unusually Dangerous" Test.**

The Appellees cannot explain away *Caetano v. Massachusetts*, 577 U.S. 411 (2016). Instead of grappling directly with it, they avoided it almost entirely, barely mentioning it in a single footnote. Def. Br., p. 29 n.5. *Caetano* directly contradicts the Appellees' position. It also directly contradicts the district court's decision that *Heller*, *McDonald*, and *Bruen* left wiggle room for this Court to conclude that "dangerous and unusual" actually means either "dangerous or unusual" or "unusually dangerous." *Caetano* binds this Court, and this Court must apply *Caetano* unless and until the Supreme Court overrules itself.

*Caetano* is a *per curiam* decision reversing Jaime Caetano's conviction for possessing and using a stun gun to defend herself from her volatile ex-boyfriend. It contained three main holdings: (1) the Second Amendment protects modern arms, (2) arms are not unusual just because they are modern inventions, and (3) the Second Amendment's protections are not limited to only arms useful in war. *Caetano*, 577 U.S. at 412.

For this case's purposes, what the Supreme Court did is more important than what it said in *Caetano*. The Massachusetts Supreme Judicial Court applied the

"dangerous and unusual" test articulated in *Heller* as a conjunctive test and reached separate conclusions on each of the two elements. *Commonwealth v. Caetano*, 470 Mass. 774, 779-781 (2015). It had no difficulty reaching the conclusion that stun guns were "dangerous per se at common law." *Id*. at 780. It then concluded that stun guns are unusual weapons because they were not in common use at the time of the Founding, are a thoroughly modern invention, and are not readily adaptable for use in the military. *Id*. at 781. Because it separately found the existence of each element of the "dangerous and unusual" test, the Massachusetts Supreme Judicial Court upheld Caetano's conviction.

If the "dangerous and unusual" test was a "dangerous or unusual" or "unusually dangerous" test, the United States Supreme Court could not have reversed the Massachusetts Supreme Judicial Court's decision without reversing both of its conclusions: (1) that stun guns are "dangerous" and (2) that stun guns are "unusual." Instead, the United States Supreme Court focused entirely on the "unusual" element in its *per curiam* decision and said nothing about the lower court's "dangerous" conclusion. *Caetano*, 577 U.S. 411. It then vacated Caetano's conviction and remanded the case for further consideration. *Id*. at 412.

*Caetano*'s judgment clearly establishes that the "dangerous and unusual" test is a conjunctive test, not a disjunctive test or a "unusually dangerous" test. It shows that a given arm cannot be "dangerous and unusual" if it is not "unusual" (e.g., in

23

common use). The Appellees make no effort to contend with *Caetano* or distinguish it in any way. Instead, both the Appellees and the district court discount *Caetano* as shedding little light on this question, and both mischaracterize the Appellants' reliance on it as more of a reliance on Justice Alito's non-binding concurrence. While Justice Alito's concurrence is certainly instructive on the Supreme Court's *per curiam* decision, what the Supreme Court did controls. The Supreme Court's actions affirmed the rule that the "dangerous and unusual" test is a conjunctive one, under which the Appellees bear the burden of showing that any given arm meets both necessary elements.

Since the Appellees have not even tried to carry their burden, the Court should reverse the district court's decision.

**VI.** **Assuming *arguendo* that the "dangerous and unusual" test is up for historical debate, the historical sources actually point to a narrower interpretation than the one that the Supreme Court currently recognizes.**

The Appellees argue strenuously for the Court to recognize a tradition of banning "dangerous or unusual" weapons that they claim flows from the Statute of Northampton and William Blackstone's Commentaries. Def. Br., pp. 26, 46. To support this interpretation, the Appellees present a declaration from history professor Saul Cornell who argues that the Founding generation understood "dangerous and unusual" meant "dangerous or unusual" because it is a hendiadys. *Id*. at 46. While this argument defies existing Supreme Court and Second Circuit precedent, it also

24

presents an ill-conceived version of history that ignores the context of the historical sources on which it relies. The Court should reject it, and it should reverse the district court's reliance on it.

Start with the Appellees' reliance on Blackstone's Commentaries and the Statute of Northampton. Blackstone wrote as follows: "The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, and is particularly prohibited by the statute of Northampton… upon pain of forfeiture of the arms, and imprisonment during the king's pleasure…."[5] William Blackstone, *Commentaries on the Laws of England*, Vol. 4, Chapter 11, § 9 (1765-1769). Instead of establishing a broad tradition against the possession of "dangerous or unusual weapons," Blackstone set forth an understanding of the Statue of Northampton as only prohibiting the possession and bearing of "dangerous or unusual weapons" to terrify the people – an interpretation that the Supreme Court has endorsed. *Bruen*, 142 S.Ct. at 2141-42. *Bruen* also confirmed from Serjeant William Hawkins' influential treaty that the Statute of Northampton did not prohibit the mere "wearing of common weapons." *Id*. at 2142 (cleaned up). In other words, *Bruen* clearly established that the Statute of

---

[5] In the original version of Blackstone's commentaries, the letter "s" was commonly denoted as "f." The undersigned's version has modernized the text with "s" in place of "f" so, to the extent there is any variation, this portion does not alter the substance of this quotation.

Northampton did not establish any bar to the possession or bearing of "common weapons" unless the person bearing them bore them with the intention of terrifying the public.

Professor Cornell and the Appellees' view also finds no support in the sources that *Heller* cited in recognizing the "dangerous and unusual" weapons exception. *Heller*, 554 U.S. at 627 (compiling sources). Instead, the commentators cited further confirm the principle that the "dangerous and unusual weapons" exception derived from the Statute of Northampton required an affray or an intent to terrorize people. 3 B. Wilson, *Works of the Honourable James Wilson* 79 (1804) ("In some cases, there may be an affray… where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people"); J. Dunlap, *The New–York Justice* 8 (1815) ("It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people"); C. Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822) ("Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land… But here it should be remembered, that… the constitution guar[]anties to all person the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily"); 1 W. Russell, *A Treatise on Crimes and Indictable Misdemeanors* 271–272 (1831)

(describing how the Statute of Northampton and its common law progeny did not prohibit the wearing of "common weapons" unless the bearer acted in such a way as to terrify the public).[6]

The cases that *Heller* relied on are in accord with the commentaries. *See State v. Langford*, 10 N.C. 381, 383 (1824) ("it seems certain there may be an affray when there is no actual violence: as when a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people"); *O'Neill v. State*, 16 Ala. 65, 67 (1849) ("It is probable, however, that if persons arm themselves with deadly or unusual weapons for the purpose of an affray, and in such manner as to strike terror to the people, they may be guilty of this offence, without coming to actual blows"); *English v. State*, 35 Tex. 473, 476 (1871) ("Blackstone says, the offense of riding or going around with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land"); *State v. Lanier*, 71 N.C. 288, 289 (1874) ("The elementary writers say that the offence of going armed with dangerous or unusual weapons is a crime against the public peace by terrifying the good people of the land, and this Court has declared the same to be the common law in *State v. Huntley*, 3 Ired. 418").

---

[6] The Supreme Court also cited the following commentaries, which the undersigned could not locate accessible copies in time to prepare this brief: H. Stephen, *Summary of the Criminal Law* 48 (1840); E. Lewis, *An Abridgment of the Criminal Law of the United States* 64 (1847); F. Wharton, *A Treatise on the Criminal Law of the United States* 726 (1852).

All of these sources demonstrate a historical understanding of the "dangerous and unusual weapons" exception as being tied to the common law offense of affray. In other words, the "dangerous and unusual weapons" exception required an illegal act or purpose to trigger its application. Nothing in these sources supports a conclusion that the "dangerous and unusual weapons" exception was a free-standing exception devoid of some nefarious conduct or intent, let alone an exception that contemplated the independent "unusually dangerous" standard the Appellees now propose.[7] More importantly, at least one of these sources explicitly adopts an objective "common use" standard. 1 W. Russell, *A Treatise on Crimes and Indictable Misdemeanors* 271–272 (1831) (describing how the Statute of Northampton and its common law progeny did not prohibit the wearing of "common weapons" unless the bearer acted in such a way as to terrify the public).

Importantly, *Heller* and its progeny did not adopt a strict historical interpretation of the "dangerous and unusual weapons" requirement because they properly accounted for historical context as first recognized in *United States v. Miller*, 307 U.S. 174 (1939). *Miller* and *Heller* both recognized a historical context where weapons useful for militia service and weapons useful for lawful purposes

---

[7] Appellees attempt to equate "dangerous and unusual" where "unusual" is a *quantitative adjective* referring to the measure of a given firearm's numerical commonality, to "unusually dangerous" where "unusually" is a *qualitative adverb* referring to the measure of a given firearm's perceived dangerousness. Nothing in Supreme Court precedence or historical analog supports such textual legerdemain.

like self-defense were the same. *Heller*, 554 U.S. at 624-25; *Miller*, 307 U.S. at 179. Recognizing that technological advancement could change that context, *Miller* and *Heller* adopted an objective "common use" standard that remains faithful to the spirit of the "affray" laws such as the Statute of Northampton while preserving to governments the ability to regulate weapons of which the mere possession is to terrify and menace one's neighbors – i.e., a small tactical nuclear missile.

Linguistical sleights of hand cannot explain away this well-reasoned and historically faithful approach from *Miller* and *Heller*. Nor can semantics. History supports a "common use" standard for the "dangerous and unusual" weapons standard, not a standard that invites the very interest-balancing that *Bruen* rejected.

Nothing that the Appellees offer the Court warrants a departure from the Supreme Court's reasonable and historically faithful interpretation of the "dangerous and unusual" exception. The district court erred greatly in departing from well-established, well-reasoned, and binding precedent, and the Court should reverse its decision.

## CONCLUSION

For the reasons stated herein and in their opening brief, the Court should reverse the district court's denial of a preliminary injunction enjoining Conn. Gen. Stat. §§ 53-202a-f, 53-202h-j, and Conn. Public Act No. 23-53, § 23, and remand this case with instructions directing the district court to enter an injunction against

the Appellees, enjoining them from enforcing Conn. Gen. Stat. §§ 53-202a-f, 53-202h-j, and Conn. Public Act No. 23-53, § 23.

Dated: May 23, 2024                    Respectfully Submitted,

_____//s//__ _Doug Dubitsky_____
Doug Dubitsky, Esq.
LAW OFFICES OF DOUG DUBITSKY
P.O. Box 70
North Windham, CT 06256
Telephone: 860.933.9495
Email: doug@lawyer.com

___//s//__ _Craig C. Fishbein_____
Craig C. Fishbein, Esq.
FISHBEIN LAW FIRM, LLC
P.O. Box 363
Wallingford, Connecticut 06492
Telephone: 203.265.2895
E-mail: ccf@fishbeinlaw.com

___//s//__ _Cameron L. Atkinson_____
Cameron L. Atkinson, Esq.
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

*Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION</u>

I hereby certify that:

1.  This brief complies with the type-volume limitation of Local R. 32.1 because it contains 6,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32, as determined by the word counting feature of Microsoft Word 2016.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32 and the typestyle requirements of Fed. R. App. P. 32 because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

Dated: May 23, 2024

/s/ Cameron L. Atkinson /s/
Cameron L. Atkinson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 23, 2024, an electronic copy of the foregoing Brief Of The Plaintiffs-Appellants was filed with the Clerk of the Court using the ECF system and thereby served upon all counsel appearing in this case.

<u>/s/ Cameron L. Atkinson /s/</u>
Cameron L. Atkinson
