

OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

JOSHUA PERRY  860-808-5318
SOLICITOR GENERAL  Joshua.perry@ct.gov

August 23, 2024

Catherine O'Hagan Wolfe, Clerk of Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

>  Re: **Supplemental letter brief**
> **No. 23-1162,** *Nat'l Ass'n for Gun Rts., Toni Theresa Spera Flanigan v. Ned Lamont et al.*
> **No. 23-1344,** *Eddie Grant et al. v. Ned Lamont et al.*

Dear Ms. Wolfe,

This letter brief is Defendants-Appellees' response to the Court's orders directing the parties to discuss the effect of *United States v. Rahimi*, 144 S. Ct. 1889 (2024).

The District Court properly rejected Plaintiffs' bids to preliminarily enjoin Connecticut's gun safety laws, which restrict access to assault weapons and large-capacity magazines (LCMs).[1] Every federal appellate court to consider similar challenges has similarly denied that sweeping relief.[2] Now, *Rahimi* supports every relevant step of the District Court's analysis, pointing to affirmance.

For starters: *Rahimi* confirms that the District Court properly rejected Plaintiffs' facial challenges. Plaintiffs did not even try to show – as *Rahimi* says they must – that there is "no set of circumstances under which" the State's gun safety laws are valid. *Rahimi*, 144 S. Ct. at 1898. That failure alone mandates affirmance.

---

[1] The *NAGR* Plaintiffs challenge Connecticut's assault weapons restrictions as those laws were in force until 2023, plus the State's large-capacity magazine (LCM) restrictions. The *Grant* Plaintiffs challenge the assault weapons restrictions as amended through 2023, but not the LCM restrictions. In all relevant ways, *Rahimi* applies equally to both cases.

[2] *Bianchi v. Brown*, No. 21-1255, 2024 U.S. App. LEXIS 19624 (4th Cir. Aug. 6, 2024) (affirming denial of a preliminary injunction against Maryland's assault weapons restrictions); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194 (3d Cir. 2024) (same, for Delaware's assault weapons and LCM restrictions); *Ocean State Tactical v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024) (same, for Rhode Island's LCM restrictions); *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) (same, for Illinois' assault weapons and LCM restrictions), *pet. for cert. denied sub. nom. Harrel v. Raoul*, 144 S. Ct. 2491 (July 2, 2024).

165 Capitol Avenue
Hartford, Connecticut 06106

*An Affirmative Action/Equal Opportunity Employer*

Supplemental Letter Brief
August 23, 2024
Page 2

Next: *Rahimi* confirms that Plaintiffs cannot carry their threshold burden. As *Rahimi* explains, the "preexisting right" protected by the Second Amendment is the right to "a means of self-defense." *Id.* at 1897. So, at the threshold stage, it is not enough for Plaintiffs to contend – deploying debunked statistics – that assault weapons and LCMs are commonly made or owned. Instead, to win the Second Amendment's presumptive protection, Plaintiffs must show that these weapons of offensive warfare and mass murder serve the underlying right – that they are actually used, and useful, for self-defense. That showing requires an inquiry into design, suitability, and actual employment. Because Plaintiffs have not tried to carry that burden either, they cannot prevail.

Finally, if this Court looks past the threshold step: *Rahimi* confirms that Connecticut's restrictions fit comfortably into a longstanding tradition of arms regulation. *Rahimi* rejects Plaintiffs' cramped and inflexible historical analysis, emphasizing that our law is not "trapped in amber" and that challenged laws need only be "consistent with the principles that underpin our regulatory tradition." *Id.* at 1898. And Connecticut's laws are. Since before the Founding, our tradition has always allowed government to restrict "dangerous or unusual weapons," *id.* at 1901, that pose extraordinary threats to public safety in the hands of the civilian population. That is exactly what Connecticut's gun safety laws do, while leaving countless pathways for law-abiding residents to defend themselves.[3]

## *Rahimi* Confirms that Plaintiffs Cannot Win Their Facial Challenge

Plaintiffs could have chosen an as-applied challenge, attacking only the provisions of Connecticut's gun safety laws that restrict owning and carrying the specific weapons they say they want. Instead, they tried to shoot the moon with a facial challenge – "the most difficult challenge to mount successfully" – to the entire statutory system. *Rahimi*, 144 S. Ct. at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). So, under *Rahimi*, Plaintiffs had to show that "no set of circumstances exists under which [Connecticut's laws] would be valid." *Id.* Or, inversely: Connecticut "need only demonstrate" that the challenged law "is constitutional in some of its applications." *Id.*; *and see id.* at 1910 (Justice Gorsuch's concurrence, explaining that a facial challenge fails if the challenged law "has *any* lawful scope.") (emphasis in original).[4]

---

[3] Citing Blackstone's invocation of the longstanding tradition of restricting "dangerous or unusual weapons," 144 S. Ct. at 1901, *Rahimi* also forecloses Plaintiffs' ahistorical argument that the dangerous/unusual formulation is necessarily conjunctive. *See Grant* Resp. Br., p. 55.

[4] *Rahimi*'s articulation of the heavy burden on a plaintiff who brings a facial challenge echoes and ratifies this Court's persuasive precedent from *Antonyuk v. Chiumento*, 89 F.4th 271, 316 (2d Cir. 2023), (*Bruen* did not "create an 'exception' to the normal rules about facial and as-applied challenges."), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024).

After handing down *Rahimi*, the Supreme Court vacated and remanded *Antonyuk*. But in fact *Rahimi* bolstered all *Antonyuk*'s relevant logic and conclusions, and nothing prevents this Court from reaching the same conclusions, and applying the same logic, on remand. *See Perlman v. U.S. Dep't of Just.*, 380 F.3d 110, 111-12 (2d Cir. 2004) (concluding, after GVR for

Supplemental Letter Brief
August 23, 2024
Page 3

Following *Rahimi,* this Court should look for circumstances where Connecticut's gun safety laws are mostly likely constitutional. *Id* at 1903. When it finds them, it should affirm. *Id.* at 1903, n. 2 ("[A] facial challenge fails if the law is constitutional in at least some of its applications"). And, as Defendants showed in their briefing, "some… applications" of Connecticut's laws – for instance, their applications to street sweeper shotguns and rocket launchers – are uncontestedly constitutional. *See Grant* Resp. Br., pp. 56-57.

Just weeks ago, a sister appellate court showed how *Rahimi*'s rule on facial challenges defeats a claim exactly like Plaintiffs'. In *Bianchi v. Brown*, No. 21-1255, 2024 U.S. App. LEXIS 19624 (4th Cir. Aug. 6, 2024), the en banc Fourth Circuit rejected a facial challenge to Maryland's assault weapons restrictions, which track Connecticut's. Citing *Rahimi* and *Salerno*, the Fourth Circuit explained that the plaintiffs there failed to carry their burden because they did not even try to "show that each firearm regulated by the Maryland statute is within the ambit of the Second Amendment." *Id.* at *34. For instance: the *Bianchi* plaintiffs never claimed that Barrett .50 caliber sniper rifles or street sweeper shotguns – weapons of war and crime, restricted by both Maryland and Connecticut – are somehow protected by the Second Amendment. *Id.*

The Fourth Circuit correctly applied *Rahimi* in the Second Amendment context, and this Court should follow suit. Plaintiffs would have this Court sift through the challenged statutes to sever the wheat from the chaff, doing the work that Plaintiffs themselves declined to do. *See, e.g.*, *Grant* Reply Br., pp. 13-18.[5] But that would relieve Plaintiffs of their *Salerno/Rahimi*

---

reconsideration in light of a new Supreme Court decision, that the new decision "does not affect the conclusion we previously reached in this case" and it "need not be disturbed"); *and see, e.g.*, *Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 164-65 (4th Cir. 2024) ("[T]he issuance of a GVR does not speak to the underlying merits of the case"); *Texas v. United States*, 798 F.3d 1108, 1116 (D.C. Cir. 2015) ("[I]t is well-settled that a GVR has no precedential weight and does not dictate how the lower court should rule on remand.").

[5] The *Grant* Plaintiffs' reply brief invokes the inapposite "severability doctrine." Pp. 13-15. As support, strangely, the brief cites *New York State Rifle and Pistol Association v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), a case that never once mentions severability. But a court inquires into severability when a plaintiff only challenges some aspects of a statutory scheme, and the court must decide whether to throw out the baby with the bathwater. *See, e.g.*, *Murphy v. NCAA*, 584 U.S. 453 (2018) (discussing the severability doctrine in a context where it actually applies). That is the opposite of what both sets of Plaintiffs did here. Now they ask this Court to rescue them from their own strategic choice by taking a blue pencil to the statutory scheme.

Plaintiffs' reply brief also urges this Court – in a request absent from their opening brief, and never urged below – to invent a Second Amendment overbreadth doctrine. *Grant Reply Br.*, pp. 16-18. This Court should not create new doctrine based on an unpreserved and forfeited argument. *See, e.g.*, *Doherty v. Bice*, 101 F.4th 169, 175 (2d Cir. 2024) ("[I]ssues raised for the first time in a reply brief are generally deemed forfeited.") (cleaned up).

Supplemental Letter Brief
August 23, 2024
Page 4

burden, and searching through the statute to identify impermissible provisions is exactly what *Rahimi* disallowed. If it were this Court's job to save all or part of a doomed facial challenge, facial challenges would not be "disfavored" at all. They would be the mechanism of choice for all plaintiffs, because they would come with a built-in failsafe mechanism. In the end, Plaintiffs are the masters of their complaints, and they chose a facial challenge that they have not done nearly enough to win. This Court should follow *Rahimi* and affirm.

### *Rahimi* Confirms that Plaintiffs Cannot Carry Their Threshold Burden

*Rahimi* reiterates that the Second Amendment only applies "when the government regulates arms-bearing conduct." 144 S. Ct. at 1897. Defining that protected conduct, as this Court has recognized, requires "interpreting the plain text" of the Second Amendment "as historically understood." *Antonyuk v. Chiumento*, 89 F.4th 271, 300 (2d Cir. 2023), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024). The constitutional text and history cabin the right, which does not allow just anyone "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The Second Amendment "codified a pre-existing right" of law-abiding residents "to possess and carry weapons in case of confrontation." *Id.* at 592 (emphasis omitted). Not "*any sort* of confrontation," though. *Id.* at 595 (emphasis in original); *and see Rahimi*, 144 S. Ct. at 1924 (Justice Barrett's concurrence) ("Despite its unqualified text, the Second Amendment is not absolute. It codified a pre-existing right, and pre-existing limits on that right are part and parcel of it.").

As Defendants showed in their briefing, *see Grant* Resp. Br., pp. 31-36, the Second Amendment encoded only the common-law right that Blackstone characterized as the "right of having and using arms for self-preservation and defence." *Heller*, 554 U.S. at 594. Or, as the Fourth Circuit just put it: "[T]he right ultimately enshrined in our constitution" is the right "to keep and bear arms for the purpose of self-defense." *Bianchi*, 2024 U.S. App. LEXIS 19624, at *24; *and see Antonyuk*, 89 F.4th at 298 (*Bruen* addressed whether "handguns . . . were 'weapons in common use today for self-defense,' in the first step of the 'two-step framework'"); *Bevis v. City of Naperville*, 85 F.4th 1175, 1192 (7th Cir. 2023) ("Both Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense."), *pet. for cert. denied sub. nom. Harrel v. Raoul*, 144 S. Ct. 2491 (July 2, 2024); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (recognizing a plaintiff's obligation to show suitability for self-defense at *Bruen*'s threshold stage).

*Rahimi* shuts the door on Plaintiffs' unsupportable contention – already belied by *Heller* and rejected by this Court in *Antonyuk* and by three other circuit courts – that the Second Amendment's protection extends to all weapons that may be commonly owned for any lawful purpose whatsoever.[6] While there may be many lawful purposes for owning and carrying arms,

---

[6] *Rahimi* itself did not call for a threshold analysis, because the Government did not contest that Zackey Rahimi's conduct was presumptively protected by the Second Amendment. *See* 144 S. Ct.

Supplemental Letter Brief
August 23, 2024
Page 5

*Rahimi* reinscribed the conclusion that only one purpose is constitutionally relevant: the Second Amendment "secures for Americans a means of self-defense." *Rahimi*, 144 S. Ct. at 1897. And that historically contingent definition of the preexisting right also sets Plaintiffs' threshold burden. The burden, after all, is to show that Plaintiffs presumptively fall within the scope of the right. Not surprisingly, a Second Amendment right that protects carrying weapons for self-defense "is not concerned with ensuring citizens have access to military-grade or gangster-style weapons." *Bianchi*, 2024 U.S. App. LEXIS 19624, at *29-30.

Plaintiffs have to show, then, that the assault weapons and LCMs they want to own and carry in Connecticut are used and useful, designed and functional, for self-defense – not "excessively dangerous weapons ill-suited and disproportionate to such a purpose." *Id*. This is the test that the District Court correctly applied, *see Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 103 (D. Conn. 2023); that Defendants urge; and that Plaintiffs mistakenly reject. And it is a test that Plaintiffs cannot satisfy, because assault weapons and LCMs are dangerous and unusual weapons of war just like the bannable M16 infantry rifle, designed and deployed for offensive combat and mass-murder, and not used or useful for self-defense. *See, e.g.*, *Bianchi*, 2024 U.S. App. LEXIS 19624, at *54 (citing and endorsing the District Court's conclusion here) ("*Bruen*'s admonition that the right to keep and bear arms extends only to those weapons in common use today for self-defense reflects the fact that the Second Amendment protects only those weapons that are typically possessed by average Americans for the purpose of self-preservation and are not ill-suited and disproportionate to achieving that end. 597 U.S. at 32, 47; *see also Lamont*, 685 F. Supp. 3d at 71. . . [T]he AR-15 is a combat rifle that is both ill-suited and disproportionate to self-defense. It thereby lies outside the scope of the Second Amendment.").

These Plaintiffs do not even try to make the showing that precedent, now bolstered by *Rahimi*, requires. Instead, they want to carry their constitutional burden by showing that assault weapons and LCMs have been mass-manufactured. But this Court's sister circuits have rejected that ahistorical and illogical approach, and this Court should too. *See, e.g.*, *Ocean State Tactical v. Rhode Island*, 95 F.4th 38, 51 (1st Cir. 2024). Even if common ownership is a necessary threshold showing, it is hardly sufficient: the "proposed common use inquiry leads to absurd consequences because it totally detaches the Second Amendment's right to keep and bear arms from its purpose of individual self-defense." *Bianchi*, 2024 U.S. App. LEXIS 19624, at *52-53 ("[C]ertain bearable arms—such as the M16, the short-barreled shotgun, the ricin pellet-firing umbrella gun, and the W54 nuclear warhead—are not protected by the Second Amendment. But under appellants' common use inquiry, any one of these or similarly dangerous weapons could gain constitutional protection merely because it becomes popular before the government can sufficiently regulate it.").[7]

---

at 1907 (Justice Gorsuch's concurrence). But the opinion reinscribes the Court's earlier guidance, from *Bruen* and *Heller*, on the threshold step.

[7] Evidence emerging since Plaintiffs filed their reply briefs shows that they cannot carry their burden even on their own terms. Both sets of Plaintiffs would reduce their burden to mere numerosity. For that, they lean heavily on a National Shooting Foundation survey. *See Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 95 (D. Conn. 2023) (discussing the survey).

Supplemental Letter Brief
August 23, 2024
Page 6

### *Rahimi* Repudiates Plaintiffs' Cramped Historical Analysis

Because Plaintiffs did not carry their threshold burden, this Court need not reach *Bruen*'s historical inquiry. But if it does, *Rahimi* counsels affirmance. *Rahimi* confirmed the District Court's analytical approach and endorsed many of the same methodological principles that this Court articulated in *Antonyuk*. Whether *Rahimi* represents a substantive change of course, or merely corrects misapprehensions, it rejects Plaintiffs' cramped reading of *Bruen*'s historical analysis. *See United States v. Herriott*, No. 23-cr-37, 2024 WL 3103275, at *2 n.1 (N.D. Ind. June 24, 2024) ("If anything, *Rahimi* can be seen as a softening of the approach to the Second Amendment taken in *Bruen*.").

In *Rahimi*, eight justices reversed the Fifth Circuit's decision striking down the federal statutory provision prohibiting an individual subject to a domestic violence restraining order from possessing a firearm. To the Fifth Circuit, the provision violated the Second Amendment because it "does not fit within our tradition of firearm regulation." *See* 144 S. Ct. at 1896. But the Court rejected that reading, which trapped the Second Amendment "in amber." *Id.* at 1903. Instead, the Court held, "the appropriate analysis" is not to look for a "dead ringer" or "historical twin." *Id.* at 1898; *and see Antonyuk*, 89 F.4th at 302-303 (noting that a precursor need only be "analogous enough to pass constitutional muster," even if it is "not a dead ringer" for precedent). Rather than demanding a precise match between challenged laws and precedent, *Rahimi* taught, courts should "consider[] whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.*; *see also id.* at 1912 (Justice Kavanaugh's concurrence, explaining that courts' task is to identify "the principles embodied in [the Second Amendment's] text"); *id.* at 1925 (Justice Barrett's concurrence, explaining that "'[a]nalogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold.").

*Rahimi*, then, surveyed a broad span of our history to identify a relevant principle. It focused on two categories of analogues, instantiated by precedent from both the 18th and 19th centuries: surety laws (which required "individuals suspected of future misbehavior" to post a bond or else be incarcerated) and affray laws (which prohibited "going armed, with dangerous or unusual weapons" to terrify the public). *Id.* at 1899-1901. Neither analogue, the Court

---

But reporting and scholarship this summer shows that the deeply flawed survey, compiled by a hired gun who failed to disclose his industry funding, fails to satisfy basic requirements of academic rigor and integrity. *See* Mike McIntire & Jodi Kantor, *The Gun Lobby's Hidden Hand in the 2nd Amendment Battle*, N.Y. TIMES (June 18, 2024), https://www.nytimes.com/2024/06/18/us/gun-laws-georgetown-professor.html ("Case after case challenging gun restrictions cites the same Georgetown professor. His seemingly independent work has undisclosed ties to pro-gun interests."); Deborah Azrael et al., *A Critique of Findings on Gun Ownership, Use, and Imagined Use from the 2021 National Firearms Survey: Response to William English*, 78 SMU L. Rev. (forthcoming 2025), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4894282 (showing that the survey would not survive peer review).

Supplemental Letter Brief
August 23, 2024
Page 7

recognized, perfectly mirrored the modern prohibition on firearm possession by domestic abusers. *See id. at* 1904 (Justice Sotomayor's concurrence) ("[T]he Government has not identified a founding-era or Reconstruction-era law that specifically disarmed domestic abusers . . . but it did not need to do so."). But "[t]aken together," *id.* at 1901, the analogues reflected a longstanding principle: in our tradition, government can disarm an "individual [who] poses a clear threat of physical violence to another." *Id.* at 1901-02.

*Rahimi*'s approach and outcome suggest affirmance, supporting the District Court's methodology, Defendants' arguments, and the *Antonyuk* Court's logic in at least five ways:

- *Rahimi draws on multiple strands of analogues to identify a single throughline.* *Rahimi* abstracted its single principle from two separate regulatory traditions. In our cases, too, examination of multiple strands in our regulatory tradition, dating back to common law England and extending into the 20th century – with strong representation from both the Colonial/Founding and Reconstruction eras – reduces to a single, consistent principle: "[G]overnments in our constitutional tradition have always regulated newly proliferating technologies that pose special public safety dangers." *Grant* Resp. Br., p. 59; *and see Bianchi*, 2024 U.S. App. LEXIS 19624, at *61-66 (looking to regulations ranging from gunpowder restrictions to slungshot bans).

- *Rahimi underlines the flexibility of the "nuanced" inquiry appropriate here.* *Rahimi* mandates a search for a "principle," congruent but not identical to historical analogues, even before applying the more flexible "nuanced" inquiry that *Bruen* mandates in instances of "unprecedented societal concerns" and "dramatic technological changes." 597 U.S. at 28. As Defendants have shown, Connecticut's gun safety laws arise from precisely that kind of unprecedented concern and change: the penetration into civilian society of technologically advanced military weaponry leading to mass murder on a previously unimaginable scale. *Grant* Resp. Br., pp. 59-65. And *Rahimi* said nothing to reject this Court's persuasive analysis in *Antonyuk*, which concluded that "our era does not resemble" the Founding or Reconstruction eras. 89 F.4th at 302; *and see Bianchi*, 2024 U.S. App. LEXIS 19624, at *61 ("These are not our forebears' arms, and these are not our forebears' calamities."). *Rahimi*'s cautionary note against an overly rigid search for analogues applies with even more force to the "nuanced" inquiry here.

- *Rahimi shows that this Court should consider analogues from throughout U.S. history.* *Rahimi* declined to decide which era is most important in the search for analogues. But the majority's analysis considered 19th-century statutes. 144 S. Ct. at 1900-01. And at least five justices, in concurrence, would go further. *See id.* at 1917 (Justice Kavanaugh's explanation that "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool to help constitutional interpreters determine the meaning of vague constitutional text"); *id.* at 1924 (Justice Barrett's agreement that "postenactment history can be an important tool"). Again: that approach ratifies this Court's approach in *Antonyuk* and the District Court's approach here. *See* 89 F.4th at 305 (looking to both the Reconstruction and Founding eras).

Supplemental Letter Brief
August 23, 2024
Page 8

- <u>*Rahimi* warns against inferring disapproval from legislative silence</u>. In *Antonyuk*, this Court concluded that "the absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much. Legislatures past and present have not generally legislated to their constitutional limits." 89 F.4th 1t 302. Justice Barrett's *Rahimi* concurrence endorsed this conclusion, dismissing the "flawed" assumption that "founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." 144 S. Ct. at 1925. The record here is not silent: Defendants have adduced "close analogues ranging from 17th century restrictions on pocket pistols, to 18th century restrictions on trap guns and black powder, to 19th century restrictions on Bowie knives and handguns, to 20th century restrictions on Tommy guns." *Grant* Resp. Br., p. 58. But *Rahimi* teaches that even a sparser record would not warrant rejecting the District Court's conclusions.

- <u>*Rahimi* reaffirms that courts can rely on non-firearm analogues</u>. The District Court properly looked to historical restrictions on arms other than guns. *See, e.g.*, *Nat'l Ass'n for Gun Rights*, 685 F. Supp. 3d at 69. *Rahimi* endorsed that approach. *See* 144 S. Ct. 1899-1901 (relying on non-firearm laws as part of the "regulatory tradition" upholding the challenged federal gun law).

**<u>Conclusion</u>**

Plaintiffs want to overturn a detailed set of state statutory protections against wielding military-style weapons without full discovery or a trial. But they have not bothered to make indispensable showings. They have not tried to show that Connecticut's laws are unconstitutional in all applications. *Rahimi*, 144 S. Ct. at 1898. And at *Bruen*'s threshold stage, they have not tried to show that the restricted weapons are used and useful for self-defense, rather than dangerous or unusual weapons of war akin to M16s.[8] So this Court need not even conduct a historical analysis. But if it does: *Rahimi* endorses the District Court's methodology and conclusions, so this Court should affirm.

Very truly yours,

Joshua Perry
Counsel for Defendants-Appellees

CC: All counsel via ECF

---

[8] Plaintiffs have also declined to make any showing on any of the *Winter* factors beyond the merits – a failure that doomed an identical challenge in the Third Circuit. *Del. State Sportsmen's Ass'n,* 108 F.4th 194.