| ATKINSON LAW, LLC | DOUG DUBITSKY, ESQ. | FISHBEIN LAW FIRM, LLC |
|---|---|---|
| 122 LITCHFIELD RD., STE. 2 | ATTORNEY AT LAW | 100 SOUTH MAIN STREET |
| P.O. BOX 340 | P.O. BOX 70 | P.O. BOX 363 |
| HARWINTON, CT 06791 | NORTH WINDHAM, CT 06256 | WALLINGFORD, CT 06492 |
| 203-677-0782 | 860-808-8601 | 203-265-2895 |

August 23, 2024

Catherine O'Hagan Wolfe
Clerk – U.S. Second Circuit Court of Appeals
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

**RE:** *Grant v. Lamont*, No. 23-1344 – Letter Brief Regarding *United States v. Rahimi*, 144 S.Ct. 1889 (2024).

Dear Ms. Wolfe,

Plaintiffs-Appellants respectfully submit this letter brief in response to the Court's July 22, 2024 order directing the parties to address the effect of *United States v. Rahimi*, 144 S.Ct. 1889 (Jun. 21, 2024) on this appeal.

*Rahimi* has little to no effect on this appeal for three main reasons. First, *Rahimi* did not alter the Supreme Court's repeated affirmation of a "dangerous *and* unusual weapons" exception to the Second Amendment's protections. Second, *Rahimi* applied *NYSRPA v. Bruen*, 142 S.Ct. 2111 (2022)'s text and history test without altering it. Third, to the extent that *Rahimi* requires a reliance on the principles underlying the Second Amendment, those principles must come from a well-established and representative historical analogue from the time the Second Amendment was adopted. *Rahimi*, 144 S.Ct. at 1899 (relying on a well-established historical common law tradition of restricting the firearm rights of those "who physically threatened others…" through judicial proceedings such as criminal prosecutions, imprisonment, and the surety systems). Put differently, *Rahimi* does not reestablish interest-balancing through a vague underlying principles analysis.

Contrary to the Defendants' July 16, 2024 FRAP 28(j) letter, *Rahimi* also does not impact this appeal procedurally. It did not change the well-established rules pertaining to facial challenges and the doctrine of severability. Nor does it limit the Second Amendment's protections to only arms "most suitable" or possessed for the purpose of self-defense.

For these reasons, the Court should adhere to Supreme Court precedent, and it should reverse the district court's denial of a preliminary injunction to the Plaintiffs.

**I. Overview of *Rahimi*:**

*Rahimi* considered a Second Amendment facial challenge to 18 U.S.C. § 922(g)(8), which prohibits "an individual subject to a domestic violence restraining order from possessing a firearm

1

if that order includes a finding that he represents a credible threat to the physical safety of [an] intimate partner" or their children. 144 S.Ct. at 1894 (cleaned up). It held that § 922(g)(8) survived the facial challenge.

In December 2019, the defendant, Zachary Rahimi, assaulted his girlfriend, C.M. and attempted to kidnap her, by forcibly shoving her into his car in Texas. *Id*. at 1894-95. During the assault, Rahimi realized a bystander was watching and retrieved a gun from under his passenger seat. C.M. fled, and Rahimi discharged his gun at her or the witness. *Id*. at 1895. He later called C.M. and threatened to shoot her if she reported the incident. *Id*. at 1895.

C.M. sought a restraining order through a sworn application. *Id*. at 1895. Her application detailed how Rahimi had endangered her and their child. *Id*. at 1895. Rahimi did not contest her testimony and, on February 5, 2020, consented to the entry of a restraining order against him. *Id*. at 1895. The order specifically found that Rahimi had committed family violence, that the violence was likely to occur again, and that Rahimi posed a credible threat to C.M. and her child's safety. *Id*. at 1895. The order also suspended Rahimi's firearms license for two years. *Id*. at 1895.

Rahimi, however, continued to violate the law. First, he violated the order by approaching C.M's home at night and contacting her through social media. *Id*. at 1895. He then threatened a different woman with a gun and was charged with aggravated assault with a deadly weapon. *Id*. at 1895. This second incident led Texas police to identify him as a suspect in five more shootings. *Id*. at 1895.

These alleged shootings took place in close proximity to each other. After one of Rahimi's illicit drug customers "started talking trash" in December 2020, Rahimi drove to the customer's house and fired shots into it. *Id*. at 1895. The next day, Rahimi was involved in a car accident, and reacted by shooting at the other car. *Id*. at 1895. Three days later, he randomly fired his gun into the air while driving through a residential neighborhood. *Id*. at 1895. Several weeks later, a truck flashed its lights at Rahimi on the highway. Rahimi responded by chasing the truck and firing shots at it and a nearby car before fleeing. *Id*. at 1895. Finally, two weeks after the truck incident, Rahimi and a friend were eating at a roadside burger restaurant, and his friend's credit card was declined. *Id*. at 1895. Rahimi responded by shooting into the air. *Id*. at 1895.

A search of Rahimi's residence after his aggravated assault arrest yielded a pistol, a rifle, ammunition, and a copy of the restraining order. *Id*. at 1895. As a result, Rahimi pled guilty to violating 18 U.S.C. § 922(g)(8), but reserved his right to appeal the denial of the motion to dismiss he filed.

The Supreme Court reversed the Fifth Circuit and affirmed the denial of Rahimi's motion to dismiss. It rested its holding on the fact that 18 U.S.C. § 922(g)(8) was constitutional as applied to Rahimi himself. In particular, the Supreme Court noted Rahimi's extensive history of violent and dangerous behavior as described above. Because Rahimi's violent and dangerous behavior sufficiently resembled the type of behavior that well-established and representative historical disarmament laws targeted, the Supreme Court held that 18 U.S.C. § 922(g)(8) was constitutional as applied to Rahimi, thus requiring the denial of his facial challenge. *See generally Rahimi*, 144 S.Ct. 1889.

II. *Rahimi* **did not alter the Supreme Court's repeated affirmation of a "dangerous *and* unusual weapons" exception to the Second Amendment's protections.**

*District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (cleaned up) recognized a long-standing "historical tradition of prohibiting the carrying of dangerous and unusual weapons." Most of the Supreme Court's modern Second Amendment precedents have affirmed the "dangerous and unusual weapons" exception.[1] *See Caetano v. Massachusetts*, 577 U.S. 411 (2016); *Bruen*, 142 S.Ct. at 2128, 2143.

Of these decisions, *Heller* and *Caetano* provide the guiding framework. *Heller* establishes that the Second Amendment protects weapons that are "in common use at the time." 554 U.S. at 627 (cleaned up). *Caetano* applied the exception as recognized by *Heller* to reverse a criminal conviction because Massachusetts had not carried its burden on the "unusual" prong of the exception. *Bruen* merely recites *Heller*'s holdings. 142 S.Ct. at 2143.

*Rahimi* mentions the "dangerous and unusual" exception only once. In its recitation of the limitations on Second Amendment rights that the Supreme Court has recognized, *Rahimi* quotes *Heller*'s recognition of the prohibition on the carrying of "dangerous and unusual weapons." 144 S.Ct. at 1897 (cleaned up).

To the extent that *Rahimi* uses the language "dangerous or unusual weapons," it also only mentions it once in its discussion of "going armed" laws – "a particular subset of the ancient common-law prohibition on affrays." *Id*. at 1901. This mention quotes Blackstone's general description of the common law offense of affray: "the going armed laws prohibited riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land." *Id*. at 1901 (cleaned up).

*Rahimi*'s two quotations, thus, do not alter the "dangerous and unusual weapons" exception recognized in *Heller* and *Bruen* and applied in *Caetano*. Instead, *Rahimi*'s main quotation binds itself to the parameters of the exception recognized in *Heller*.

As such, *Rahimi* does not control this appeal or affect it in any major way. *Heller* and *Caetano* do.

III. *Rahimi* **does not revise or reshape the *Bruen* framework.**

*Rahimi* did not alter *Bruen*'s framework for analyzing Second Amendment cases. Instead, *Rahimi* applies *Bruen* even if it made implicit assumptions about certain steps of the analysis.

*Rahimi* starts its analysis by setting forth the applicable test. It affirms that the inquiry must begin with "constitutional text and history." *Id.* at 1888 (quoting *Bruen*, 142 S.Ct. at 2128-29). It then affirms that courts must "examine our historical tradition of firearm regulation to help delineate the contours of the right." *Id*. at 1897 (quoting *Bruen,* 142 S.Ct. at 2126) (cleaned up). *Rahimi* draws the central inquiry right from *Bruen* – an examination of why and how a government

---

[1] *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) does not discuss it at all.

regulation burdens the Second Amendment right. *Id*. at 1898 (citing *Bruen*, 142 S.Ct. at 2133). *Rahimi* then proceeds to either cite or quote most of *Bruen*'s explanation for how this analysis works. *Id*. at 1898.

While *Rahimi* was widely debated over its statement that the limitations on the Second Amendment are not "trapped in amber," this single, much-cited phrase neither adds anything to, nor subtracts anything from, the *Bruen* framework as *Rahimi* itself recognizes. *Bruen* never required a "dead ringer" or a "historical twin" to justify the constitutionality of a law restricting Second Amendment rights. *Id*. at 1898 (quoting *Bruen*, 142 S.Ct. at 2133). *Bruen* simply requires a "well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S.Ct. at 2133.

*Rahimi* applies this framework despite skipping the textual analysis required by *Bruen*. It retraced the history it had reviewed in *Heller* and *Bruen*, to compare analogues to 18 U.S.C. § 922(g)(8). *Rahimi*, 144 S.Ct. at 1899-1901. As *Rahimi* traced that history, it focused on how and why historical laws restricted the right of violent and dangerous people to possess and carry arms. *Id*. Simply put, *Rahimi's* entire historical analysis faithfully applies the *Bruen* framework, exactly as *Bruen* contemplated that it should be applied.

Reasonable minds could perhaps disagree on just how close a resemblance that historical analogues must bear to justify a regulation like 18 U.S.C. § 922(g)(8). *Compare Rahimi*, 144 S.Ct. at 1909 (Gorsuch, J., concurring) ("I appreciate that one of our colleagues sees things differently…. But if reasonable minds can disagree whether § 922(g)(8) is analogous to past practices originally understood to fall outside the Second Amendment's scope, we at least agree that is the only proper question a court may ask") *with Rahimi*, 144 S.Ct. at 1933-44 (Thomas, J., dissenting) (assessing the historical evidence differently). Despite this difference of opinion between Justice Thomas and the *Rahimi* majority, neither employed a methodology different than that set forth in *Bruen*.

Finally, the *Rahimi* majority's omission of an initial textual analysis does not work a change in the *Bruen* framework. Courts routinely skip unnecessary parts of legal tests for the sake of efficiency. *Rahimi* did not require a textual analysis because the Court was able to conclusively resolve the pertinent issues without conducting one. *Rahimi* implicitly reinforced this conclusion by brushing aside the United States' apparent textual argument that it could disarm Rahimi because he is not a responsible firearms user. *Rahimi*, 144 S.Ct. at 1903.

**IV.** ***Rahimi* still requires well-established and representative historical analogues to justify limits on Second Amendment protections.**

*Rahimi* took great pains to identify the primary focus of *Bruen*'s historical analysis as being on "the principles that underpin our regulatory tradition." 144 S.Ct. at 1898. The Defendants suggested, in their July 16, 2024 FRAP 28(j) letter, that "contemporary gun safety laws need only be consistent" with these principles to be constitutional. *Rahimi*, however, is consistent with *Heller*, *McDonald*, and *Bruen* in requiring much more than what the Defendants suggest.

Immediately after its "principles" language, *Rahimi* returned to *Bruen*'s requirement of analogical reasoning. *Id*. at 1898. It emphasized the "why and how" portions of the *Bruen* historical

4

inquiry. *Ibid*. It reiterated *Bruen*'s command to engage in analogical reasoning using similar laws from the time of the Second Amendment's adoption. *Ibid*. *Rahimi* then applied these instructions by engaging in a study of historically analogous laws to test the constitutionality of 18 U.S.C. § 922(g)(8).

*Rahimi*'s explanation of how *Bruen*'s analogical inquiry is to be conducted also did not disturb *Bruen*'s instruction that, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S.Ct. at 2131.Nothing in *Rahimi* opens the door to the freewheeling formulation of broad, general principles the Defendants urge this Court to adopt. *Rahimi* and *Bruen*, read properly together, require any limiting principles or exceptions to flow from well-established and representative historical analogues. Simply being "consistent" with "underpinning principles" as the Defendants propose, falls far short of justifying an exception to Second Amendment protection.

Put differently, *Rahimi* does not reestablish, through a vague underlying principles analysis, the very interest-balancing specifically rejected in *District of Columbia v. Heller,* 554 U. S. 570, 634 (2008) and *McDonald v. Chicago*, 561 U. S. 742, 790-791 (2010). *Bruen*, 142 S.Ct. at 2129 ("*Heller* and *McDonald* expressly rejected the application of any judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests") (cleaned up).

In the case at bar, this Court does not write on a blank slate. The Supreme Court has long recognized a dual principle when it comes to the arms that the Second Amendment protects: arms that are in common use enjoy Second Amendment protection, while arms that are not in common use are subject to analysis under the "dangerous and unusual weapons" exception. *Heller*, 554 U.S. at 627.

The Supreme Court did not adopt this principle on a whim. It has steadfastly adhered to this rule since *United States v. Miller*, 307 U.S. 174, 179 (1939). *Miller* drew the rule directly from the constitutional convention debates, the history and legislation of the colonies and states, and the writings of Founding Era commentaries. *Miller*, 307 U.S. at 179. *Heller* further fleshed out the rule through an exhaustive historical analysis of the Second Amendment, and it arrived at the same rule as did *Miller*. *Heller*, 554 U.S. at 627.

Since the Supreme Court has already recognized the parameters of the "dangerous and unusual" exception, *see Caetano*, 577 U.S. 411, *Rahimi* and *Bruen* require a historical analysis that is more specific as to the arms at issue: modern semi-automatic firearms. As the Plaintiffs describe at pages 48-51 of their opening brief, high-capacity, rapid-firing, repeating firearms were introduced more than a decade before the Second Amendment's adoption, and proliferated between the mid-18th and early 19th centuries. The framers of both the Second and Fourteenth Amendments were well aware of them.

What is dispositive for purposes of *Rahimi* and *Bruen*'s historical analysis though is the

5

complete lack of any effort to categorically ban the use or possession of any entire category of commonly-owned firearms in the Founding Era or Reconstruction – not even then-modern high-capacity, rapid-firing, repeating firearms.

Thus, to the extent that *Rahimi* impacts this appeal, its reaffirmation of the *Bruen* methodology requires the reversal of the district court's denial of a preliminary injunction.

## V. *Rahimi* did not alter the law pertaining to facial challenges or the applicability of the doctrine of severability.

Defendants argue in their FRAP 28(j) letter that *Rahimi* dooms the Plaintiffs' facial challenges because, in addition to banning the most popular and commonly-owned firearms in the country, the Connecticut laws at issue ban grenade launchers and street sweeper shotguns. *Rahimi*, however, did not change the law pertaining to facial challenges or preclude application of the doctrine of severability in Second Amendment cases.

*Rahimi* only addresses the standard for facial challenges in passing. 144 S.Ct. at 1888. It simply quoted the well-established standard from *United States v. Salerno*, 481 U.S. 739, 745 (1987) that a litigant challenging a government statute facially must "establish that no set of circumstances exists under which the Act would be valid." *Id*. at 1888. *Rahimi* gives no comfort to Defendants' argument that no facial challenge may proceed against a statute if any fraction of the statute could theoretically survive. *Rahimi* did not instruct, as the Defendants appear to suggest, that simply including an unusual and arguably unprotected firearm to a list of protected commonly-owned firearms, immunizes the entire statute from facial challenge. Furthermore, *Rahimi* did not need to address whether any other legal doctrine would be applicable because it found that 18 U.S.C. § 922(g)(8) was constitutional as applied to the facts of *Rahimi*'s own case. *Id*. at 1888.

In this case, although some set of circumstances may exist under which a small fraction of the challenged statute might be found valid if standing on its own, there is no set of circumstances under which the statute as a whole could constitutionally survive. This Court should take the same approach that it did with this statute in *NYSRPA v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) and sever the small fraction of the statute that might be constitutional from the rest of the statute, which cannot pass constitutional muster under any set of circumstances.

Nothing in *Rahimi* prevents this Court from applying the doctrine of severability as the Plaintiffs have requested, and as the Court has done before in *Cuomo* to the very statute that the Plaintiffs challenge here.

## VI. *Rahimi* does not limit the Second Amendment's protections to only arms "most suitable" or possessed for the purpose of self-defense.

Defendants argued in their FRAP 28(j) letter that *Rahimi* emphasized that the Second Amendment only protects weapons that are used, or useful, for self-defense. They base their argument off a single broad sentence early in *Rahimi*'s statement of applicable legal principles: "Derived from English practice and codified in the Second Amendment, the right secures for Americans a means of self-defense." *Rahimi*, 144 S.Ct. at 1897.

6

However, *Rahimi* did not make such a major and sweeping pronouncement in a single summary sentence describing existing precedent. Issuing such a broad limiting pronouncement in such a cursory fashion, without any background or historical analysis, would run completely contrary to every principle of careful, reasoned, thoughtful judicial conduct – especially given the Supreme Court's systematic reliance on text, tradition, and historical analysis in *Heller*, *McDonald*, *Caetano*, *Bruen*, and *Rahimi*. Even assuming *arguendo* that this single sentence stands for what the Defendants claim it does, *Rahimi* then immediately contradicts itself by repeating *Bruen*'s textual promise that the Second Amendment protects, "prima facie…, all instruments constitute bearable arms…" without restricting that protection to only arms that are most suitable for self-defense. *Id*. at 1897 (cleaned up). The Court should not take such a leap either.

For the reasons set forth above, the Court should reverse the district court's denial of a preliminary injunction to the Plaintiffs.

Respectfully submitted,

   //s//   *Doug Dubitsky*
Doug Dubitsky, Esq.
(ct21558)
LAW OFFICES OF DOUG DUBITSKY
P.O. Box 70
North Windham, CT 06256
Telephone: 860.808.8601
Facsimile: 866.477.1120
Email: doug@lawyer.com

   //s//  *Craig C. Fishbein*
Craig C. Fishbein, Esq.
(ct25142)
FISHBEIN LAW FIRM, LLC
100 South Main Street
P.O. Box 363
Wallingford, Connecticut 06492
Telephone: 203.265.2895
Facsimile: 203.294.1396
E-mail: ccf@fishbeinlaw.com

                                                    *//s//  Cameron L. Atkinson*
                                               Cameron L. Atkinson, Esq. (ct31219)
                                               ATKINSON LAW, LLC
                                               122 Litchfield Rd., Ste. 2
                                               P.O. Box 340
                                               Harwinton, CT 06791
                                               Telephone: 203.677.0782
                                               Facsimile: 203.672.6551
                                               Email: catkinson@atkinsonlawfirm.com

                                               *Attorneys for the Plaintiffs*

CC via ECF:    All counsel of record.