ATKINSON LAW, LLC
122 LITCHFIELD RD., STE. 2
P.O. BOX 340
HARWINTON, CT 06791
203-677-0782

DOUG DUBITSKY, ESQ.
ATTORNEY AT LAW
P.O. BOX 70
NORTH WINDHAM, CT 06256
860-808-8601

FISHBEIN LAW FIRM, LLC
100 SOUTH MAIN STREET
P.O. BOX 363
WALLINGFORD, CT 06492
203-265-2895

November 22, 2024

Catherine O'Hagan Wolfe
Clerk – U.S. Second Circuit Court of Appeals
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

**RE:** *Grant v. Lamont*, No. 23-1344 – Letter Brief Regarding *Antonyuk v. James*, No. 22-2908, 2023 WL 11963034 (2d Cir. Oct. 24, 2024).

Dear Ms. Wolfe,

Plaintiffs-Appellants respectfully submit this letter brief in response to the Court's November 5, 2024 order directing the parties to address the effect *Antonyuk v. James*, No. 22-2908, 2023 WL 11963034 (2d Cir. Oct. 24, 2024) may have on this appeal.

*Antonyuk* should have no impact on this appeal for five specific reasons. First, *Antonyuk* caveated its entire opinion as a preliminary look at the merits and left its reasoning open for more thorough consideration. Second, in dicta, *Antonyuk* formulated a textual analysis for Second Amendment cases which misinterprets *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022) and completely ignores both *Caetano v. Massachusetts*, 577 U.S. 411 (2016) and *District of Columbia v. Heller*, 554 U.S. 570 (2008). Third, *Antonyuk* did not establish a rule that 1868 history is an independent sphere from which government may provide historical analogues. Fourth, *Antonyuk*'s comments on how to weigh historical evidence were directed solely to the historical record before it. Any broader interpretation would place this Court in open defiance of *Bruen*. Fifth, *Antonyuk* does not bar the Court's prior application of the doctrine of severability to Connecticut's modern sporting arms ban when considering a facial challenge.

**I.   *Antonyuk* Caveated Its Entire Opinion As A Preliminary Look At The Merits That Needs More Historical Analysis.**

*Antonyuk* recognized that the case came to the Court at "a very early stage of this litigation." *Antonyuk*, 2023 WL 11963034, at *79 n. 126. It emphasized that its decision did not determine the ultimate constitutionality of the law before it and that a full determination of the merits required "further briefing, discovery, and historical analysis, both in this case as it proceeds and perhaps in other cases." *Id*.

Thus, *Antonyuk* itself recognized that its conclusions are subject to being tested and weighed through a more thorough litigation process – both in *Antonyuk* itself and in other cases.

1

The Court should not place binding weight on *Antonyuk*'s pronouncements in light of this limiting caveat. Instead, the Court should adhere to Supreme Court precedent first and independently apply that precedent to this case.

## II. *Antonyuk*'s Independent Formulation of the Textual Inquiry is Dicta, Misinterprets *Bruen*, and Disregards Both *Heller* and *Caetano*.

*Antonyuk* offers two competing definitions of the textual inquiry required by *Bruen*. First, it stated that the textual inquiry "requires courts consider three issues: whether the conduct at issue is protected, whether the weapon concerned is 'in common use,' and whether the affected individuals are 'ordinary, law-abiding, adult citizens' and thus 'part of the people' whom the Second Amendment protects." *Antonyuk*, 2023 WL 11963034, at *24 (cleaned up). Second, *Antonyuk* accepted the Northern District of New York's formulation of the textual inquiry on three occasions. *Id*. at *46, 53, 62. That formulation was "(1) Plaintiff Sloane is part of 'the People' protected by the amendment, (2) the weapons in question are in fact 'arms' protected by the amendment, and (3) the regulated conduct (i.e., bearing a handgun in public for self-defense) falls under the phrase "keep and bear." *Antonyuk v. Hochul*, 638 F.Supp.3d 232, 297 (N.D.N.Y. Nov. 7, 2022). Additionally, *Antonyuk* limited its textual analysis in one other place to whether the Second Amendment guarantees a general right to public carry and found that it did. *Id*. at *76.

To the extent that *Antonyuk* accepted the Northern District of New York's formulation of the textual inquiry and merely quoted *Bruen*'s holding, its analysis was correct and consistent with Supreme Court precedent. Its own independent formulation of the textual inquiry, however, is nonbinding dicta that misinterprets *Bruen* and disregards *Heller* and *Caetano*.

First, *Antonyuk*'s formulation of the textual inquiry is dicta because it was unnecessary to its textual holdings. *Antonyuk* considered a challenge to New York's licensing requirement that required applicants to demonstrate good moral character. *Antonyuk*, 2023 WL 11963034. The parties presented the Court with a dispute about whether this character requirement burdened the "rights of law-abiding, responsible citizens…." *Id*. at *24. *Antonyuk* analyzed the character requirement strictly within the context of whether the affected individuals are 'ordinary, law-abiding, adult citizens.'" *Id*. at *23-27. It never addressed what specific firearms the *Antonyuk* plaintiffs were seeking to carry. It never addressed whether those firearms were in common use. In other words, *Antonyuk*'s inclusion of "in common use" in its formulation of the textual inquiry was completely unnecessary to its holding or analysis, rendering it non-binding dicta.

Second, *Antonyuk*'s inclusion of "common use" in the textual inquiry misinterpreted *Bruen*. *Antonyuk* characterized "common use" as a threshold textual inquiry by relying on the language at the start of *Bruen's* textual analysis. *Id*. at *24 (citing *Bruen*, 142 S.Ct. at 2134). This portion of *Bruen*, however, merely took the same structural approach that courts commonly take in framing legal analyses: setting forth undisputed facts and legal principles up front to provide context for its subsequent analysis.[1]

---

[1] *Antonyuk* itself took a similar approach:

It is undisputed that the restricted-locations provision effectively prohibits entrance

> It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects. See *Heller*, 554 U.S. at 580, 128 S.Ct. 2783. Nor does any party dispute that handguns are weapons "in common use" today for self-defense. See *id.*, at 627, 128 S.Ct. 2783; *see also Caetano*, 577 U.S. at 411–412, 136 S.Ct. 1027. We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense.

*Bruen*, 142 S.Ct. at 2134.

This passage specifically distinguishes between the undisputed facts and the textual inquiry. It does not purport to combine them into a single analysis. *Antonyuk*'s conclusion that "common use" forms part of the textual inquiry ignores the critical language marking the distinction: "We therefore turn…." *Id*. at 2134. Thus, *Antonyuk* reads this portion of *Bruen* too broadly.

*Antonyuk*'s reading is also inconsistent with *Heller* and *Caetano*. *Heller* clearly established that the plain text of "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *see also Caetano v. Massachusetts*, 577 U.S. 411 (2016). *Heller* only addressed common use in two areas. First, *Heller* had to address Justice Stevens' contention that *United States v. Miller*, 307 U.S. 174 (1939) only protected a collective right to keep and bear arms pertaining to the militia instead of the individual right that the Court was recognizing. *Heller*, 554 U.S. at 621-25. *Heller* explained that *Miller* did not limit the Second Amendment's protections to arms most useful in militia service and that the Second Amendment expected citizens to bring to militia service those arms that were in common use at the time. *Id*. at 624. *Heller*, however, caveated its discussion of *Miller*, indicating that it would discuss *Miller* further in the following section. *Id*. at 625 ("That accords with the historical understanding of the scope of the right, see Part III., *infra*").

The following section of *Heller* then discussed limitations on the Second Amendment right. *Id*. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited"). *Heller* identified "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" as a limitation on the Second Amendment. *Id*. at 627. It cited *Miller*'s discussion of "common use" as being consistent with and supported by that historical tradition. *Id*. at 627. In sum, *Heller* explicitly recognized "common use" as being part of the "dangerous and unusual weapons" exception, not as a component of the textual analysis. *Id*. at 627. *Antonyuk* ignored *Heller*'s direction on this point though.

---

> with a firearm onto another person's private property – whether that property is generally open to the public, like a gas station or grocery store, or is generally closed to the public, like a personal residence – unless the owner or lessee of the property provides affirmative, express consent to armed entry.

*Antonyuk*, 2023 WL 11963034, at *5.

*Caetano* affirmed *Heller's* approach. It first quoted *Heller's* holding that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding…" as its textual analysis. *Caetano*, 577 U.S. at 411 (quoting *Heller*, 554 U.S. at 582). It then examined whether the Massachusetts Supreme Judicial Court had properly applied the historical exception – "dangerous and unusual weapons." *Id*. at 411-12. Thus, *Caetano* too recognized that "common use" is properly located within historical analysis and application of the "dangerous and unusual weapons" exception, not in the textual analysis. *Id*. at 411-12.

*Bruen* drove this point home. "After holding that the Second Amendment protected an individual right to armed self-defense, we also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right." *Bruen*, 142 S.Ct. at 21. It recognized that the "dangerous and unusual weapons" exception was a historically supported limitation on the Second Amendment. *Id*. at 21. Later, in its analysis of New York's historical analogues, *Bruen* explicitly treated the "dangerous and unusual weapons" exception as part of the historical analysis of the Second Amendment's limitations, and it recognized that "common use" is part of that inquiry:

> At most, respondents can show that colonial legislatures sometimes prohibited the carrying of "dangerous and unusual weapons"—a fact we already acknowledged in *Heller*. *See* 554 U.S. at 627, 128 S.Ct. 2783. Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large." *Ibid*. (internal quotation marks omitted). Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." *Id*. at 629, 128 S.Ct. 2783. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Id*. at 2143.

The Supreme Court has instructed lower courts not to overrule Supreme Court precedent that has direct application in a case: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (same). This Court has repeatedly adhered to that principle. *See, e.g., United States v. Donziger*, 38 F.4th 290, 38 F.4th 290, 303 (2d Cir. 2022); *United States v. Stevenson*, 834 F.3d 80, 85 (2d Cir. 2016).

This Court now has three Supreme Court cases – *Heller*, *Caetano*, and *Bruen* – which each treat "common use" as part of the "dangerous and unusual weapons" inquiry in the historical

portion of the *Bruen* analysis (where government bears the burden of proof). Those cases directly apply to the issues in this case. *Antonyuk*'s cursory dicta offers this Court no room to depart from its faithful adherence to the Supreme Court's binding precedent.

Furthermore, *Caetano v. Massachusetts,* 577 U.S. 411 (2016) directly applies to this case on the contours of the "dangerous and unusual weapons" exception. Its judgment applied the "dangerous and unusual weapons" exception as a conjunctive test in the historical exception analysis. *Caetano*, 577 U.S. 411. The Supreme Court has not overruled *Caetano*, nor did the Court revisit *Caetano* in either *Bruen* or *United States v. Rahimi*, 144 S.Ct. 1889 (Jun. 21, 2024). In fact, *Bruen* cited *Caetano* approvingly – along with *Heller* – for the rule that the Second Amendment's "dangerous and unusual weapons" exception does not cover weapons "in common use today for self-defense." *Bruen*, 142 S.Ct. at 2134 (citing *Caetano*, 136 S.Ct. at 1027-28) (cleaned up).

*Antonyuk* does not mention *Caetano* once. Nor was it required to. *Antonyuk* considered challenges to New York's Concealed Carry Improvement Act's licensing, sensitive-locations, and restricted locations provisions. *See Antonyuk*, 2023 WL 11963034 at *3-4. It never considered challenges to a prohibition on keeping and bearing any specific type of weapon. Thus, *Rodriguez de Quijas* and *Agostini* require the Court to apply *Heller*, *Caetano*, and *Bruen*, not *Antonyuk*, to resolve this case.

### III.   How *Antonyuk* Relied On 1868 History Is Too Vague To Bind The Court Here If Its Reliance Is Inconsistent With *Bruen*'s Instructions On Historical Analysis.

The Supreme Court granted certiorari in *Antonyuk* and summarily reversed its decision for reconsideration after *Rahimi*. The *Antonyuk* plaintiffs raised two issues: (1) "whether, when conducting Bruen's history and tradition analysis for Second Amendment challenges…, courts must rely exclusively on historical evidence from the Founding" and (2) "whether our vacatur of the injunction of the CCIA's 'good moral character' requirement contravened the *Bruen* framework." *Antonyuk*, 2023 WL 11963034, at *7. *Rahimi* did not opine on the first question. *Id*. at *7 (citing *Rahimi*, 144 S.Ct. at 1898 n.1).

*Antonyuk* reiterated its prior view that both "1791 and 1868" are "fertile ground, and the adjacent and intervening periods are likewise places in the historical record to seek evidence of our national tradition of firearms regulation." *Id*. at *19. It posited that "it is implausible that the public understanding of a fundamental liberty would arise at a historical moment, rather than over the preceding era." *Id*. at *17. *Antonyuk* also stated that "it is implausible that such public understanding would dissipate whenever that era gave way to another." *Id*. at *17.

On its face, *Antonyuk*'s statements might lead one to think that the government might carry its historical burden using historical analogues from either 1791 or 1868. *Antonyuk*'s analysis, however, appears to contradict that proposition because it looked for a "long, unbroken line… beginning from medieval England and extending beyond Reconstruction…" to hold, on the record before it, that there was a well-established historical tradition of regulating firearms in "often-crowded public areas." *Id*. at *56. Thus, *Antonyuk* is silent on how 1868 history should be used, except to say that it may be relevant.

*Antonyuk* does not fully address *Bruen*'s instructions as to postenactment history though. *Bruen* affirmed *Heller*'s statement that "evidence of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represented a critical tool of constitutional interpretation." *Bruen*, 142 S.Ct. at 2136 (cleaned up). It elaborated that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Id*. at 2137 (cleaned up). *Bruen*, however, caveated this instruction: "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 2137 (cleaned up).

*Bruen* then addressed 1868 history: "As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Id*. at 2137 (cleaned up). *Bruen* described mid-to-late-19th century "commentary" and, by extension, other authorities as "secondary." *Id*. at 2137 (cleaned up). It instructed courts to treat "this 19th-century evidence" as "mere confirmation of what the Court thought had already been established." *Id*. at 2137 (cleaned up).

In other words, the Supreme Court has instructed lower courts to look to 1868 only to confirm the original 1791 understanding of the Second Amendment's limitations, not to find new limitations premised on later interpretations of the right.[2]

If *Antonyuk* is to be read consistent with *Bruen*, it requires courts to look for an historical tradition that endured from at least 1791 through 1868 in order for 1868 history to carry outcome-determinative force. The Court should reject reliance on 1868 historical analogies and any other reading of *Antonyuk* that renders it inconsistent with *Bruen*, particularly since *Antonyuk* did not clearly articulate that it was treating 1868 as an independent time period for determining limitations on the Second Amendment.

### IV. *Antonyuk*'s Instructions On How To Weigh The Absence Of Historical Analogues And The Non-Proliferation Of Historical Analogues Are Case-Dependent.

*Antonyuk* made two additional comments on the historical method with some relevance to this appeal. First, *Antonyuk* purports to limit the weight of "the absence of a distinctly similar historical regulation" on the determination of whether a particular modern regulation is constitutional. *Antonyuk*, 2023 WL 11963034, at *15. Second, it characterized *Bruen*'s "rejection of certain historical analogues due to the miniscule territorial populations who would have lived under them" as occurring in an "exceptional context." *Id*. at *16. If both comments are not case-dependent, *Antonyuk* openly defies *Bruen*'s clear commands in a way this Court may not follow.

Start with *Antonyuk*'s comments on "the absence of distinctly similar historical regulations…." *Antonyuk* renders its comments contingent on the state of the record before it: "the

---

[2] Despite acknowledging a scholarly debate over whether 1868 reshaped the Bill of Rights' meaning, *Bruen* listed cases involving other constitutional rights where it looked to the scope of the Bill of Rights in 1791, not 1868. 142 S.Ct. at 2137-38.

absence of a distinctly similar historical regulation in the presented record, though undoubtedly relevant, can only prove so much." *Id*. at *15. If its comments are limited to the case-specific limitations of the preliminary injunction record before it, *Antonyuk*'s discounting of reliance on historical silence as "risky" might be justifiable as a proper exercise of judicial caution in the appropriate case. *Id*. at *15.

If these comments purport to constitute a broader instruction on historical analysis, *Antonyuk*'s speculation that lawmakers did not need to regulate or that there were other reasons for non-regulation is just that: speculation. *Id*. at *15. Such speculation would run directly contrary to *Bruen*'s instructions and its application of those instructions: "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S.Ct. at 2131. *Bruen* described this historical inquiry as "straightforward," not a balancing test with speculation for a fulcrum. *Id*. at 2131. In other words, historical silence is dispositive, and *Bruen*'s findings of historical silence on prohibitions on the right to bear arms is illustrative.

Consider next *Antonyuk*'s comment that "it is likewise not dispositive whether *comparable* historical regulations exist in significant numbers." *Antonyuk*, 2023 WL 11963034 at *16. If *Antonyuk* was referring to the record before it (a plausible conclusion since it linked these comments to the point addressed above), its comment might be applicable in the procedural context of the preliminary injunction before it by appropriately balancing the government's substantive burden with the plaintiffs' procedural burden to show a likelihood of success on the merits.

If *Antonyuk*'s comment on this point purports to constitute a broader instruction on historical analysis, it openly defies *Bruen*'s command that "the government [must] identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S.Ct. at 2133. *Bruen* also required the proliferation of such analogues, not isolated local restrictions: "For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation." *Id*. at 2142; *see also id*. at 2145 ("Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate"); *Rahimi*, 144 S.Ct. at 1899-1901 (finding a historical tradition of disarming dangerous people based on the extensive review of "the history of American gun laws… in *Heller* and *Bruen*"). *Bruen* also required more than "a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense in public." *Id*. at 2153 (cleaned up). *Bruen* also rejected, as insufficient, "a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also contradict[ted] the overwhelming weight of other more contemporaneous historical evidence." *Id*. at 2155 (cleaned up). Finally, *Bruen* rejected localized restrictions on public carry in Kansas as being insufficient to "demonstrate a broad tradition of States doing so." *Id*. at 2156.

In other words, *Bruen* required proliferation to show a well-established and representative historical analogue, and it specifically held that "a few late-19th century outlier jurisdictions" were insufficient to establish the "well-established" and "representative" elements. This Court should not affirm an interpretation of *Antonyuk* that defies the Supreme Court's clear commands.

One final point bears emphasis. If *Antonyuk* correctly opens the door to speculation about why lawmakers did not adopt restrictions on the Second Amendment more universally, the Court also cannot place dispositive faith in a few historical regulations immune from constitutional challenges. *Barron v. City of Baltimore*, 32 U.S. 243 (1833) and *United States v. Cruikshank*, 92 U.S. 542 (1875) declined to incorporate the Second Amendment against the states for the entirety of the historical periods relevant to Second Amendment interpretation. *Bruen* deliberately required a "well-established and representative historical analogue" because anything less would invite judicial speculation as to why a tradition of limiting the Second Amendment did not gain widespread support among the states. Judicial speculation is nothing more than a cloak for the very means-end analysis – interest balancing – that *Bruen* specifically forbids. *Id*. at 2133 n.7 ("This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry"). The "well-established and representative historical analogue" standard that relies on proliferation ensures that courts "apply faithfully the balance struck by the founding generation to modern circumstances…." *Id*. at 2133 n.7.

Thus, interpreting *Antonyuk* to stand for anything more than observations on the record before it would place this Court in open defiance of *Bruen*.

## V. *Antonyuk* Does Not Alter The Longstanding Application Of The Severability Doctrine In Facial Challenges.

A point of contention in this case has been whether the doctrine of severability applies to Connecticut's ban on modern sporting arms. *Antonyuk* recited the general principles of facial challenges, which need no repeating here. *Antonyuk*, 2023 WL 11963034, at *25. It, however, had no occasion to address the doctrine of severability and its applicability to the case before it.

This Court has previously invoked the doctrine of severability to strike down a discrete portion of Connecticut's ban on modern sporting arms. *See New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 262 n.112 (2d Cir. 2015). There are no compelling reasons – from *Antonyuk* or otherwise – not to employ the same reasoning here.

## VI. Conclusion.

Nothing in *Antonyuk* compels the Court to interpret *Caetano v. Massachusetts* in a particular way. *Caetano* controls this case, and, contrary to the district court's conclusion, establishes that the Appellees must show that the modern sporting arms that the Appellants seek to possess are "dangerous and unusual weapons." The Court's prior decision in *Cuomo* settled that the modern sporting arms that the Plaintiffs-Appellants seek to possess are in "common use." The Plaintiffs-Appellants have demonstrated that they are law-abiding citizens who will use them for lawful purposes as millions of their fellow Americans do.

The inquiry ends there. The Second Amendment protects modern sporting arms, and a preliminary injunction permitting the Appellants to lawfully possess them should have issued.

For the reasons set forth above and in all the briefing submitted by the Appellants in this case, the Court should reverse the district court's denial of a preliminary injunction.

Respectfully submitted,

   *//s//  Doug Dubitsky*
Doug Dubitsky, Esq.
(ct21558)
LAW OFFICES OF DOUG DUBITSKY
P.O. Box 70
North Windham, CT 06256
Telephone: 860.808.8601
Facsimile: 866.477.1120
Email: doug@lawyer.com

   *//s//  Craig C. Fishbein*
Craig C. Fishbein, Esq.
(ct25142)
FISHBEIN LAW FIRM, LLC
100 South Main Street
P.O. Box 363
Wallingford, Connecticut 06492
Telephone: 203.265.2895
Facsimile: 203.294.1396
E-mail: ccf@fishbeinlaw.com

   *//s//  Cameron L. Atkinson*
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Facsimile: 203.672.6551
Email: catkinson@atkinsonlawfirm.com

*Attorneys for the Plaintiffs*

CC via ECF:   All counsel of record.